## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GULF COAST HEALTH CARE, LLC, *et al.*,[1] | ) | Case No. 21-11336 (KBO) |
|  | ) | (Joint Administration Requested) |
| Debtors. | ) |  |
|  | ) |  |
|  | ) |  |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL,
(II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING
A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Gulf Coast Health Care, LLC ("**Gulf Coast**") and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby move (the "**Motion**") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "**Interim Order**" and the "**Final Order**," respectively), granting the relief described below.  In support thereof, the Debtors rely upon (a) the *Declaration of M. Benjamin Jones in Support of the Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**DIP Declaration**") and (b) the *Declaration of M. Benjamin Jones in Support of Chapter 11 Petitions*

---

[1]    The last four digits of Gulf Coast Health Care, LLC's federal tax identification number are 9281.  There are 62 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration.  A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GulfCoastHealthCare.  The location of Gulf Coast Health Care, LLC's corporate headquarters and the Debtors' service address is 40 South Palafox Place, Suite 400, Pensacola, FL 32502.

*and First Day Pleadings* (the "**First Day Declaration**"),[2] both filed concurrently herewith.  In further support of the Motion, the Debtors respectfully represent as follows:

## RELIEF REQUESTED

1.      By the Motion, the Debtors respectfully request entry of the Interim Order and the Final Order (collectively, the "**DIP Financing Orders**"):

- *DIP Facility*: authorizing Gulf Coast and certain of its subsidiaries (collectively, the "**DIP Borrowers**") to obtain postpetition financing on a secured basis, consisting of a new money term loan facility (the "**DIP Facility**," and the loans issued thereunder, the "**DIP Loans**") in an aggregate principal amount of up to $25,000,000 pursuant to the terms and conditions set forth in the Interim Order and that certain term sheet annexed to the Interim Order as Exhibit 1 (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "**DIP Term Sheet**"), executed by those certain Debtors identified as borrowers in the DIP Term Sheet the "**DIP Borrowers**") and those certain Debtors identified as guarantors in the DIP Term Sheet (the "**DIP Guarantors**" and, together with the DIP Borrowers, the "**DIP Loan Parties**"), OHI Asset Funding (DE), LLC, as the administrative agent and collateral agent for the DIP Facility (the "**DIP Agent**"), each of the DIP Lenders (the "**DIP Lenders**" and, together with the DIP Agent, the "**DIP Secured Parties**"), and certain of the Prepetition Secured Parties (as defined below).

- *DIP Loan Documents*: authorizing the Debtors to enter into the DIP Term Sheet and, subject to final order, the DIP Credit Agreement (as defined in the DIP Term Sheet) and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP Term Sheet and the DIP Credit Agreement, the "**DIP Loan Documents**");

- *DIP Obligations*: authorizing the DIP Borrowers to incur, and for the DIP Guarantors to guarantee on an unconditional joint and several basis, obligations for principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts, as and when due and payable under and in accordance with this Interim Order, the DIP Term Sheet, and the DIP Loan Documents (collectively, the "**DIP Facility Obligations**");

---

[2]      Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

- ***Authorization***: authorizing the DIP Loan Parties to perform such other and further acts as may be necessary or desirable in connection with the Interim Order, the DIP Term Sheet, the DIP Loan Documents, and the transactions contemplated thereby;

- ***DIP Liens***: granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the DIP Loan Parties to incur, the DIP Liens (as defined below), as applicable, in all DIP Collateral (as defined below) having the priority described in the Interim Order;

- ***DIP Superpriority Claims***: granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the DIP Loan Parties to incur, allowed superpriority administrative expense claims against each of the DIP Loan Parties, on a joint and several basis, in respect of all DIP Facility Obligations, in each case, in accordance with the terms of the Interim Order;

- ***Cash Collateral***: authorizing the DIP Loan Parties' use of Prepetition Collateral (as defined below), including Cash Collateral (as defined below), as well as the proceeds of the DIP Facility and New Ark Funding and the New Ark Operating Advance (each as defined in the DIP Term Sheet and, collectively, the "**New Ark Financing**"), subject to the terms and conditions set forth in the Interim Order and the DIP Loan Documents;

- ***Adequate Protection***: providing adequate protection to the Prepetition Secured Parties (as defined below) and the Prepetition HUD Lender (as defined below) on account of any Diminution in Value (as defined below) of the Prepetition Secured Parties' or Prepetition HUD Lender's interest in the Prepetition Collateral or Prepetition HUD Lender Collateral (as defined below), as applicable;

- ***Automatic Stay; Immediate Effectiveness***: modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate, including the right to exercise remedies following an Event of Default and expiration of any applicable notice period, the terms and provisions of this Interim Order and the DIP Loan Documents, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, and providing for the immediate effectiveness of the Interim Order;

- ***506(c) and Equities of the Case Waivers***: subject to and pending entry of the Final Order and as set forth in paragraphs 24 and 26 of the Interim Order, authorizing the Debtors to waive as to the DIP Lenders and Prepetition Secured Parties (a) certain of their rights to surcharge the DIP Collateral, Omega Landlord Collateral or any Prepetition Working Capital Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

- *Marshaling Waiver*: subject to and pending entry of the Final Order, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral, for the benefit of any party other than the DIP Secured Parties, and (b) the Prepetition Working Capital Collateral, for the benefit of any party other than the Prepetition Working Capital Secured Parties, subject to the Carve-Out (as defined below); and

- *Final Hearing*:  scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order, and approving the form of notice with respect to the Final Hearing.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 365, 503, 506, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-2, and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

4.      The Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.    The Chapter 11 Cases

5.      On the date hereof (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

6.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

7.      To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed an official committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed.

8.      Additional information regarding the Debtors and the Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of the Chapter 11 Cases, is set forth in the First Day Declaration.

## PROPOSED POSTPETITION FINANCING

### I.    Preliminary Statement

9.      The transactions contemplated by the RSA and Plan involves a series of interdependent agreements, each one critical to the other and to the Debtors' overall chapter 11 strategy.  One such critical agreement is the DIP Term Sheet, and subsequent DIP Credit Agreement, proposed to be entered into by the DIP Loan Parties and the DIP Secured Parties, which will supply the Debtors with critical and necessary postpetition debtor-in-possession financing.  The DIP Facility and the Debtors' ability to use Cash Collateral are essential to the Debtors' ability to maintain their business relationships with their employees, landlords, administrative personnel, vendors, and suppliers, and to meet their ongoing obligations to their

residents.  At bottom, access to the proceeds of the DIP Facility and the use of Cash Collateral is crucial to the Debtors' continued viability during the Chapter 11 Cases.  Any disruption in operations would likely have a grave and immediate impact on the Debtors' businesses and negatively impact their chapter 11 efforts.

### A.     The DIP Facility

10.     The DIP Facility consists of a postpetition secured superpriority debtor-in-possession credit facility in the form of a new money term loan facility in an aggregate principal amount of up to $25 million, with a maximum principal amount of $15.75 million available upon entry of the Interim Order, available upon satisfaction of certain conditions set forth in the DIP Term Sheet.  The DIP Facility will be secured by Priming DIP Liens (as defined in the Interim Order) upon (i) all of the DIP Loan Parties' right, title, and interest in, to, and under any tangible and intangible, real and personal prepetition and postpetition property of each DIP Loan Party, whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, to the extent such property is subject to the Prepetition Liens securing the Prepetition Secured Obligations (collectively, the "**DIP Priming Collateral**"); (ii) any valid, binding, enforceable, non-avoidable, and properly perfected liens and security interests (the "**Prepetition HUD Lender Liens**") in favor of Housing & Healthcare Finance, LLC (the "**Prepetition HUD Lender**") securing the obligations owed to the Prepetition HUD Lender solely with respect to property of Gulf Coast Master Tenant III, LLC, MS Singing, LLC, and MS Lakeside, LLC (collectively, the "**Prepetition HUD Obligors**") (collectively, the "**Prepetition HUD Lender Collateral**"); and (iii) Permitted Liens (as defined in the DIP Term Sheet); and Senior DIP Liens (as defined in the Interim Order) upon all of the DIP Loan Parties'

right, title, and interest in, to, and under (w) the DIP Proceeds Account and any account that only holds the proceeds of any DIP Loans, (x) subject to and upon entry of the Final Order, Avoidance Actions Proceeds (as defined below) and solely to the extent set forth below, (y) Stimulus Proceeds (as defined in the DIP Term Sheet), and (z) any other tangible and intangible, real (including leaseholds) and personal prepetition and postpetition property of each DIP Loan Party (excluding assets that qualify as Prepetition Working Capital Collateral or Prepetition HUD Lender Collateral) (collectively, the "**Unencumbered Property**"), whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (all of the foregoing, collectively, the "**DIP Priority Collateral**" and, together with the DIP Priming Collateral, the "**DIP Collateral**").[3]

11.     Obtaining access to the DIP Facility, including the use of Cash Collateral, on the first day of the Chapter 11 Cases is a prerequisite for the Debtors' major stakeholders to support the Debtors' chapter 11 efforts.  The DIP Facility, including the Debtors' use of Cash Collateral, is being consented to, or is deemed consented to, by the Debtors' pre-petition secured lenders, New Ark Capital, LLC as Prepetition Agent (as defined in the Interim Order) ("**New Ark**"), the Omega Landlords (as defined in the Interim Order), and the Prepetition HUD Lender (as defined below).

> **B.     The New Ark Financing**

12.     New Ark has consented to the use of Cash Collateral solely to the extent necessary to: (a) provide funding for those amounts and during applicable periods set forth in the New Ark Budget (as defined below), subject to permitted variances thereto, which amounts shall

---

[3]     For the avoidance of doubt, to the extent of any differences between terms defined in the Motion and their corresponding definition in the proposed Interim Order, the definition in the Interim Order shall control.

be withdrawn from the Prepetition Loan Account and deposited into a segregated escrow account maintained therefor (the "**New Ark Reserve Account**") on a weekly basis, to reserve for professional fees and other expenses set forth in the New Ark Budget pending approval of the Bankruptcy Court (if required) and disbursed by the Debtors to the respective beneficiaries thereof (not to exceed the amounts allocated for each such beneficiary under the New Ark Budget) (the "**New Ark Funding**"), all in accordance with and subject to the New Ark Funding Documentation; and (b) provide up to $7 million in funding from the Prepetition Loan Account for expenses set forth in the DIP Budget for the period of time prior to the Operations Transfer Date (the "**New Ark Operating Advance**" and together with the New Ark Funding, the "**New Ark Financing**"); *provided*, *however*, that the Debtors shall repay the New Ark Operating Advance in full and in cash to the Prepetition Loan Account as a condition precedent to the Operations Transfer Date (and the DIP Budget shall reflect and provide for such repayment). The New Ark Financing will be secured by liens on all DIP Collateral and shall receive superpriority claims, in all cases junior to the liens and claims under the DIP Facility.

13.     For the reasons set forth herein and in the DIP Declaration and the First Day Declaration, the Debtors believe that the authority to obtain the DIP Facility, including the use of Cash Collateral through the New Ark Financing, is in the best interests of the Debtors, their estates, and their creditors.  Accordingly, the Debtors respectfully request approval of the Motion and authority to enter into the DIP Facility and to use Cash Collateral as provided by the New Ark Financing, as more fully detailed herein and in the DIP Declaration, subject to the terms and conditions set forth in the Orders granting such relief.

## II.      Concise Statement Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2

14.      Pursuant to Bankruptcy Rules 4001(b), (c), and (d), and Local Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Loan Documents and DIP Financing Orders:[4]

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| **DIP Term Sheet Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **DIP Loan Parties**:<br><br>Borrower:      Those certain "Borrowers" under and as defined in the Prepetition Credit Agreement.<br><br>**(DIP Term Sheet, Borrowers)**<br><br>Guarantors:      All of the Debtors other than the Borrowers.<br><br>**(DIP Term Sheet, Guarantors)**<br><br>**DIP Secured Parties**:<br><br>DIP Agent:      OHI Asset Funding (DE), LLC, as administrative and collateral agent.<br><br>DIP Lenders:      One or more funds managed by, or other entities affiliated with, the DIP Agent.<br><br>Prepetition Agent: New Ark Capital, LLC<br><br>**(DIP Term Sheet, at 2)**<br><br>**Required Lenders**: The DIP Lenders holding more than 50% of the outstanding DIP Loans and unfunded DIP Commitments under the DIP Facility.<br><br>**(DIP Term Sheet, Required Lenders)** |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | **Interest Rate**. LIBOR plus 12% (subject to a 1.00% LIBOR floor).  Interest shall accrue monthly and is payable in arrears.<br><br>**(DIP Term Sheet, Interest Rate)**<br><br>**Default Rate**. 2.00% above the applicable interest rate, payable in cash on demand (but subject to the RSA) upon written notice from the Required Lenders while an Event of Default is continuing.<br><br>**(DIP Term Sheet, Default Rate)** |

---

[4]    Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Loan Documents or DIP Financing Orders, as applicable.  This statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents or the DIP Financing Orders. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Loan Documents or the DIP Financing Orders, the provisions of the DIP Loan Documents or the Orders, as applicable, shall control.

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| **DIP Commitments**<br><br>*Fed. R. Bankr. P.<br>4001(c)(1)(B);*<br><br>*Del. Bankr. L.R. 4001-<br>2(a)(ii)* | The DIP Facility will provide for new term loans in an aggregate principal amount not to exceed $25,000,000 to be funded as set forth below.<br><br>**(DIP Term Sheet, DIP Facility)**<br><br>The DIP Loans shall be made (1) in principal amounts in an aggregate amount of up to $15.75 million on or after the first business day following the entry of the Interim DIP Order and satisfaction of the conditions under the heading "Conditions to Effectiveness" (the "**Initial Draws**") and (2) in additional principal amounts in an aggregate amount of up to $25 million on or after the first business day following the entry of the Final DIP Order subject to, in each case of the foregoing clauses (1) and (2), (a) compliance with the terms and conditions set forth in the paragraphs below in this section with respect to the Pre-MOTA Funding Amount (as defined below), (b) no Default or Event of Default having occurred and be continuing as of the date of such draw, (c) accuracy of the Representations and Warranties (as defined below) in all material respects as of the date of such draw (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date or (ii) such representation and/or warranty is already qualified by materiality or material adverse effect or similar language, in which case such representation and warranty shall be true and correct in all respects as of such date), (d) compliance with the Milestones (as defined in the RSA) as of the date of such draw, and (e) the amount of such draw being limited to the amount required to comply with the DIP Budget (and any Permitted Variances or Permitted Carrybacks/Carryforwards with respect thereto) after giving effect to the minimum liquidity set forth therein, or except as otherwise determined by the Borrowers in consultation with the DIP Agent (each, a "**Delayed Draw**").<br><br>Subject to ongoing compliance with the DIP Budget (and any Permitted Variances or Permitted Carrybacks/Carryforwards with respect thereto) and the terms and conditions contained in the DIP Term Sheet and in the Documentation (including conditions to a Delayed Draw above), the DIP Lenders and New Ark shall, collectively, make available to the Borrowers up to $24.5 million (the "**Pre-MOTA Funding Amount**") consisting of (x) up to $17.5 million of DIP Loans to be provided by the DIP Lenders and (y) up to $7 million in funding from the Prepetition Loan Account (as defined below) to be provided by New Ark (this clause (y), "**New Ark Operating Advance**"), in each case of the foregoing clauses (x) and (y), for expenses set forth in the DIP Budget for the period of time prior to the Operations Transfer Date (the "**Pre-MOTA Funding**"). The Pre-MOTA Funding shall be funded by the DIP Lenders and New Ark as follows (the "**Pre-MOTA Funding Waterfall**"):<br><br>*First*, on or prior to the end of the first full week after the Petition Date, by the DIP Lenders in amounts consistent with the DIP Budget (subject to any Permitted Variances or Permitted Carrybacks/Carryforwards),<br><br>*Second*, beginning with the first day of the second full week after the Petition Date, by New Ark until such time as that the ratio of (a) the funds provided |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | by the DIP Lenders under the DIP Facility to (b) funds provided to the Debtors under the New Ark Operating Advance (such ratio, the "**Pre-MOTA Funding Ratio**"), is equal to 2.50:1.00,<br><br>*Third*, from and after the time on which the Pre-MOTA Funding Ratio is equal to 2.50:1.00, by the DIP Lenders and New Ark on a *pro rata* basis based on the remaining portion of their initial maximum funding amounts under this paragraph (*i.e.* New Ark shall concurrently fund $1.00 for each $2.50 funded by the DIP Lenders).<br><br>For the avoidance of doubt, and notwithstanding the foregoing, (i) the New Ark Operating Advance shall be funded solely through New Ark's consent to the Debtors' use of Cash Collateral of the Prepetition Lenders, (ii) to the extent that collections of prepetition receivables are insufficient for the New Ark Operating Advance to be utilized in accordance with the Pre-MOTA Funding Waterfall, the DIP Lenders may (but, for the avoidance of doubt, shall have no obligation to), in their sole discretion, advance additional funds such that the Pre-MOTA Funding Ratio is greater than 2.50:1.00 (and, if funded, such failure to adhere to the Pre-MOTA Funding Waterfall shall not constitute an Event of Default under this DIP Term Sheet), and (iii) if at any time after the second full week after the Petition Date (x) the Pre-MOTA Funding Ratio is greater than 2.50:1.00 and (y) there are sufficient funds in the Prepetition Loan Account to be utilized under the New Ark Operating Advance to cause the Pre-MOTA Funding Ratio to equal 2.50:1.00, then the Debtors shall solely utilize the New Ark Operating Advance until such time as the Pre-MOTA Funding Ratio is equal to 2.50:1.00 at which time any subsequent funding shall be made in accordance with the "*Third*" paragraph of the Pre-MOTA Funding Waterfall.<br><br>**(DIP Term Sheet, Availability)** |
| **New Ark Funding/Consent to Use of Cash Collateral and Intercreditor Provisions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);* | During the time period commencing on the Petition Date and continuing until the occurrence of the New Ark Funding Termination Date, the Prepetition Lenders shall consent to the use of Cash Collateral of the Prepetition Lenders solely to the extent necessary to:<br><br>i.    provide funding for those amounts and during applicable period set forth in the New Ark Budget, subject to permitted variances thereto, which amounts shall be withdrawn from the Prepetition Loan Account and deposited into a segregated escrow account maintained therefor (the "**New Ark Reserve Account**"), on a weekly basis, to reserve for professional fees and other expenses set forth in the New Ark Budget pending approval of the Bankruptcy Court (if required) and disbursed by the Debtors to the respective beneficiaries thereof (not to exceed the amounts allocated for each such beneficiary under the New Ark Budget) (the "**New Ark Funding**"), all in accordance with and subject to the New Ark Funding Documentation. To the extent that any funds remain in the New Ark Reserve Account following the payment of all allowed claims set forth in the New Ark Budget, including, without limitation, (a) the allowed amount of any claim set forth in the New Ark Budget is less than the budgeted amounts, (b) any funds in the New Ark Reserve Account are not |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | allowed by the Bankruptcy Court to be disbursed to a beneficiary of the New Ark Budget, or (c) such reserved funds relate to any period during which such beneficiary of the New Ark Budget is no longer employed by the Debtors, such excess funds shall revert to New Ark; and |
| | ii.    provide the New Ark Operating Advance; *provided, however* that the Debtors shall (1) repay the New Ark Operating Advance in full and in cash to the Prepetition Loan Account on the Operations Transfer Date (and the DIP Budget shall reflect and provide for such repayment) and (2) if at any time (x) the New Ark Operating Advance exceeds $6,000,000 and (y) there is Excess Cash as determined on the last business day of each week, the Debtors shall make a payment to the Prepetition Loan Account on the first business day of the immediately succeeding week in an amount equal to the lesser of (a) the amount of such Excess Cash and (b) the amount by which the New Ark Operating Advance exceeds $6,000,000 (each, an "**Excess Cash Payment**").  For purposes of this DIP Term Sheet, "**Excess Cash**" shall mean, as of any date of determination, the amount by which the projected unrestricted cash available to the Debtors for operations exceeds (i) projected cash disbursements to be made by the Debtors for the following week as reasonably determined by the Debtors' chief restructuring officer *plus* (ii) $2,500,000.  For the avoidance of doubt, and subject to the final paragraph of "Availability," any amounts repaid to the Prepetition Loan Account prior to the Operations Transfer Date under clause (2) above remain available to the Debtors to be utilized up to the full amount of the New Ark Operating Advance in accordance with this DIP Term Sheet. |
| | **(DIP Term Sheet, New Ark Funding/Consent to Use of Cash Collateral and Intercreditor Provisions)** |
| **Maturity and Termination Date**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(iii), 4001(c)(1)(B);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | All amounts outstanding under the DIP Facility shall be due and payable in full (subject to the RSA), and the DIP Commitments thereunder shall terminate, on the Maturity Date.  The "**Maturity Date**" shall be that date which is the earliest to occur of (a) the date that is 8 months after the Closing Date, (b) the date that is 35 days after the entry of the Interim DIP Order if the Final DIP Order has not been entered by the Bankruptcy Court prior to such date, (c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases, and (d) the date the DIP Agent, or the DIP Agent at the direction of the Required Lenders, provides written notice to the Borrowers of the existence of an Event of Default (subject to applicable notice and cure provisions, if any) by the Borrowers as specified in the Documentation.<br><br>**(DIP Term Sheet, Maturity Date)**<br><br>The Debtors' authorization to use Cash Collateral terminates upon the date which New Ark provides written notice in accordance with the DIP Orders of the occurrence of one or more events of default set forth on Annex G of the DIP Term Sheet. |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | **(DIP Term Sheet, New Ark Funding/Consent to Use of Cash Collateral and Intercreditor Provisions)** |
| **Lending Conditions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The availability of the DIP Facility on the Closing Date shall be conditioned upon satisfaction (or waiver) of solely the following:<br><br>• The Bankruptcy Court shall have entered an interim order in form and substance satisfactory to the DIP Agent and the Required Lenders in their sole discretion (the "**Interim DIP Order**"), which shall also be satisfactory to New Ark, authorizing the transactions contemplated by the DIP Facility and the New Ark Funding including, without limitation, authorizing the granting of superpriority claim status for the Superpriority Claims and granting of the liens and charges (which liens and charges shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected), authorizing the DIP Facility in a principal amount equal to $25 million (with $15.75 million available under the Interim DIP Order), granting the adequate protection liens and claims described above, approving the New Ark Funding and the establishment and use of the New Ark Reserve Account set forth herein, providing for the DIP Order Intercreditor Provisions, and subject to entry of the Final DIP Order, providing that the DIP Liens and the liens of the Prepetition Lenders shall not be subject to marshaling or sections 551 and 552(b) of the Bankruptcy Code and the DIP Collateral and the collateral of the Prepetition Lenders shall not be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise; *provided* that such Interim DIP Order shall not have been reversed, modified, amended, or stayed (other than with the prior written consent of New Ark, the DIP Agent, and the Required Lenders, which may be withheld in their sole discretion).<br><br>• Completion (after giving effect to the Interim DIP Order) of all filings and recordings necessary to provide the DIP Agent, for the benefit of the DIP Lenders and the DIP Agent, with perfected liens, charges, and security interests in the DIP Collateral and of the priority contemplated herein, *provided, however*, that, subject to the DIP Agent's satisfaction with the perfection provisions of the Interim DIP Order, no filings or recordings shall be required in connection with any owned or leased real property, any foreign assets, any intellectual property assets, and any certificates of title to any vehicles.<br><br>• Receipt by the DIP Agent of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations to the extent requested at least three business days prior to the Closing Date.<br><br>• Receipt by the DIP Agent of satisfactory Budgets (with the DIP Agent and DIP Lenders agreeing that the Initial Budgets are satisfactory).<br><br>• Accuracy of the Representations and Warranties in all material respects as of the Closing Date (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | material respects on and as of such earlier date or (ii) such representation and/or warranty is already qualified by materiality or material adverse effect or similar language, in which case such representation and warranty shall be true and correct in all respects, as of such date), as certified by the Borrowers.<br><br>**(DIP Term Sheet, Conditions to Effectiveness)** |
| **Fees & Expenses**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The Borrowers agree to pay to the DIP Agent:<br><br>• a 0.50% unused commitment fee, commencing upon entry of the Interim DIP Order and payable monthly in arrears based on the average daily balance of (a) prior to entry of the Final DIP Order, the undrawn DIP Commitments available to the Borrowers under the Interim DIP Order and (b) following entry of the Final DIP Order, the undrawn DIP Commitments; and<br><br>• a $250,000 upfront fee, earned, due, and payable upon entry of the Interim DIP Order.<br><br>**(DIP Term Sheet, Fees)**<br><br>All parties will be responsible for their own out-of-pocket expenses associated with due diligence, negotiation, and preparation of the DIP Financing and New Ark Financing.<br><br>**(DIP Term Sheet, Expenses)** |
| **Entities with an Interest in Cash Collateral**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(i)* | <u>As of the Petition Date, the following secured parties have an interest in Cash Collateral:</u><br>• **the Prepetition Working Capital Secured Parties;**<br>• **the Prepetition HUD Lender; and**<br>• **the Omega Landlords.**<br><br>**(Interim Order, ¶ E)** |
| **Use of Proceeds**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii), 4001(c)(1)(B);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The Debtors will be permitted to use the proceeds of the DIP Facility to fund the operational, employee, wind-down, and other costs of the Loan Parties, including, without limitation, payments authorized to be made under "first day" or "second day" orders, post-MOTA transition and employee costs, and costs associated with providing shared services to New Operator or plan administrator post-transition, and, in each case, consistent with, subject to, and within the limitations contained in, the DIP Budget depicting on a 13-week basis cash revenue, receipts, expenses, and disbursements, taking into account Permitted Variances (as defined in Annex F of the DIP Term Sheet) and Permitted Carrybacks/Carryforwards (as defined in Annex F of the DIP Term Sheet). Except as expressly set forth in the DIP Budget, proceeds of the DIP Facility shall not be used to pay the costs and expenses (including professional fees) of administering the Chapter 11 Cases.<br><br>Other costs and expenses (including professional fees) of administering the Chapter 11 Cases are scheduled to be funded from the Cash Collateral of the |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | Prepetition Lenders on the terms outlined herein, and as specifically identified in the New Ark Budget.  For the avoidance of doubt, (1) the fees, costs, and expenses detailed in the New Ark Budget shall not be revised in a manner that would shift the burden for such fees, costs, and expenses to the DIP Budget and/or the DIP Lenders and (2)(x) payments on account of claims under section 503(b)(9) of the Bankruptcy Code and (y) payments on account of critical vendor claims shall be included in the DIP Budget and not the New Ark Budget.  For the further avoidance of doubt, proceeds of the DIP Facility shall not be used to pay professionals, directors' fees, or U.S. Trustee fees.<br><br>**(Interim Order ¶ 7; DIP Term Sheet, Use of Proceeds)** |
| **Liens and Priorities**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i), (ii), and (xi);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | **DIP Liens and Priorities**.  The obligations of each Loan Party under the DIP Facility shall be secured by the following liens (the "**DIP Liens**"):<br><br>• **Priming DIP Liens**:  Pursuant to section 364(d) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected, senior priming security interest in and lien upon all DIP Priming Collateral, subject and subordinate only to (a) the Prepetition Working Capital Liens solely with respect to the Prepetition Working Capital Collateral, (b) the Prepetition HUD Lender Liens in favor of the Prepetition HUD Lender securing the obligations owed to the Prepetition HUD Lender solely with respect to the Prepetition HUD Collateral, and (c) (c) applicable Permitted Liens; and<br><br>• **Senior DIP Liens**:  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Priority Collateral; *provided,* that, subject to and upon entry of the Final Order, the DIP Priority Collateral shall include the proceeds of causes of action under sections 502(d), 544, 545, 547, 548, 550, 551, or 553 of the Bankruptcy Code, whether pursuant to federal law or applicable state law, of the DIP Loan Parties or their estates (such causes of action, collectively, the "**Avoidance Actions**" and the proceeds therefrom, the "**Avoidance Actions Proceeds**").<br><br>The DIP Liens shall be effective and perfected as of the entry of the Interim Order and without requiring the execution, filing, or recording of mortgages, security agreements, pledge agreements, control agreements, financing statements, or other agreements or instruments, or the taking of any action to obtain possession or control of any collateral.<br><br>**(Interim Order ¶¶ 5, 12; DIP Term Sheet, Security)**<br><br>**DIP Superpriority Claims and Priorities**.  Effective immediately upon entry of the Interim Order, the DIP Agent (on behalf of the DIP Secured Parties) is hereby granted, pursuant to sections 364(c)(1) and 503(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the DIP Loan Parties' Chapter 11 Cases and any Successor Cases |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

thereof on account of the DIP Facility Obligations, with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 328, 330, 331, 364(c)(1), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114, or any other provisions of the Bankruptcy Code and any other claims against the DIP Loan Parties (the "**DIP Superpriority Claims**"). The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code. The DIP Superpriority Claims shall have recourse against each of the DIP Loan Parties, on a joint and several basis. Notwithstanding anything contained herein or in any of the DIP Term Sheet to the contrary, the DIP Superpriority Claims shall, at all times be (x) in respect of any DIP Priming Collateral or proceeds or products thereof, (i) junior in right of payment to Prepetition Working Capital Liens and Prepetition HUD Lender Liens, as applicable, and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases and (y) in respect of any DIP Priority Collateral or proceeds or products thereof, senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases.

(**Interim Order ¶ 6**; **DIP Term Sheet, Security**)

**Adequate Protection**. The Prepetition Secured Parties and Prepetition HUD Lender are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral and Prepetition HUD Lender Collateral (in each case, including the Cash Collateral), as applicable, (x) with respect to the Prepetition Secured Parties, to the extent of any Diminution in Value of such Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, and (y) with respect to the Prepetition HUD Lender, to the extent of any Diminution in Value of the Prepetition HUD Lender's interests in the Prepetition HUD Lender Collateral (including Cash Collateral) from and after the Petition Date, if any (such claims set forth in clauses (x) and (y), the "**Adequate Protection Claims**"). In consideration of the foregoing, the Prepetition Secured Parties and Prepetition HUD Lender, as applicable, are hereby granted the following adequate protection (the "**Proposed Adequate Protection**"):

Adequate Protection Liens

- ***Prepetition HUD Lender's Adequate Protection Liens***: The Debtors will grant the Prepetition HUD Lender, in the aggregate amount of its Adequate Protection Claims (the "**HUD Lender Adequate Protection Claims**"), valid, perfected replacement security interests and liens upon all DIP Collateral of the Prepetition HUD Obligors (the "**HUD Lender Adequate Protection Liens**"), *provided* that the HUD Lender Adequate Protection Liens shall be junior to the Prepetition HUD Lender Liens.

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

|  | • **Prepetition Working Capital Secured Parties' Adequate Protection Liens**: The Debtors will grant the Prepetition Agent (for itself and for the benefit of the other Prepetition Lenders), in the aggregate amount of its Adequate Protection Claims (the "**Working Capital Adequate Protection Claims**"), valid, perfected replacement security interests in and liens upon all accounts receivable generated by the Debtors from the Petition Date onwards (the "**Postpetition Accounts Receivables**") and the proceeds thereof (the "**Working Capital Adequate Protection Liens**"), *provided* that the Working Capital Adequate Protection Liens shall be junior to the the Prepetition Working Capital Liens and the Carve-Out.

• **Omega Landlords' Adequate Protection Liens**: The Debtors will grant the Omega Landlords, in the aggregate amount of their respective Adequate Protection Claims (the "**Omega Landlord Adequate Protection Claims**"), valid, perfected replacement security interests in and liens upon all of the DIP Collateral (the "**Omega Landlord Adequate Protection Liens**" and together with the HUD Lender Adequate Protection Liens and the Working Capital Adequate Protection Liens, the "**Adequate Protection Liens**"), *provided* that the Omega Landlord Adequate Protection Liens shall be junior to the Prepetition HUD Lender Liens, the HUD Lender Adequate Protection Liens, the DIP Liens, Prepetition Working Capital Liens and the Working Capital Adequate Protection Liens.

507(b) Claims
• **Prepetition HUD Lender's 507(b) Claim**: The Prepetition HUD Lender is hereby granted allowed superpriority administrative expense claims against the Prepetition HUD Obligors as provided for in section 507(b) of the Bankruptcy Code in the aggregate amount of the applicable HUD Lender Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**HUD Lender 507(b) Claims**"). The HUD Lender 507(b) Claims shall be senior to any and all other administrative expense claims or other claims against the Prepetition HUD Obligors or their estates, in the Chapter 11 Cases and any Successor Cases.

• **Prepetition Working Capital Secured Parties' 507(b) Claim**: Pursuant to Bankruptcy Code section 507(b), the Debtors will grant the Prepetition Agent (for itself and for the benefit of the other Prepetition Lenders) allowed superiority administrative expense claims in the aggregate amount of the applicable Working Capital Adequate Protection Claims with, except as set forth in the |

17

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | DIP Financing Orders, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Working Capital 507(b) Claims**"). The Working Capital 507(b) Claims will be (i) in respect of any DIP Collateral of the Prepetition HUD Obligors (other than DIP Priority Collateral) or proceeds or products thereof, (a) junior in right of payment to claims secured by Liens on such DIP Collateral, the HUD Lender 507(b) Claims, the DIP Superpriority Claims, and the Carve-Out and (b) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, (ii) in respect of any DIP Collateral that is subject to first priority Prepetition Working Capital Liens or first priority Working Capital Adequate Protection Liens senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, and (iii) in respect of any other DIP Collateral, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, the DIP Superpriority Claims, the Omega Landlord 507(b) Claims, and the Carve-Out, and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases. |

• *Omega Landlord 507(b) Claim*: Pursuant to Bankruptcy Code section 507(b), the Debtors will grant the Omega Landlords allowed superiority administrative expense claims in the aggregate amount of the applicable Omega Landlord Adequate Protection Claims with, except as set forth in the DIP Financing Orders, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Omega Landlord 507(b) Claim**" and, together with the HUD Lender 507(b) Claims and the Working Capital 507(b) Claims, the "**507(b) Claims**"). The Omega Landlord 507(b) Claims shall be (i) in respect of any DIP Collateral of the Prepetition HUD Obligors (other than DIP Priority Collateral) or proceeds or products thereof, (a) junior in right of payment to claims secured by Liens on such DIP Collateral, the HUD Lender 507(b) Claims, and the DIP Superpriority Claims, and (b) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, (ii) in respect of any DIP Collateral that is subject to first priority Prepetition Working Capital Liens or first priority Working Capital Adequate Protection Liens, (a) junior in right of payment to claims secured by Liens on such DIP Collateral, the Prepetition Working Capital 507(b) Claims, the DIP Superpriority Claims and (b) senior to any and all other administrative expense claims or other claims against the DIP

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, and (iii) in respect of any other DIP Collateral, (a) junior in right of payment to claims secured by Liens on such DIP Collateral and the DIP Superpriority Claims, and (b) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases. <br><br> Postpetition Interest <br> • ***Postpetition Interest on the Prepetition Working Capital Debt***: The Prepetition Agent (for the benefit of the other Prepetition Lenders) shall receive cash payment of interest on the Prepetition Working Capital Debt at the non-default rate provided for under the Prepetition Credit Agreement (subject to recharacterization as repayments of principal to the extent the value of the Prepetition Working Capital Collateral does not exceed the Prepetition Working Capital Debt, and any amounts paid postpetition to the Prepetition Agent on account of the Prepetition Credit Agreement). <br><br> Postpetition Attorneys' Fees <br> • ***Postpetition Attorneys' Fees***: The Debtors shall not pay, as adequate protection or otherwise, any fees or expenses incurred postpetition by any of the Prepetition Agent, Prepetition Lenders, Omega Landlords, HUD Lender, the DIP Agent, or the DIP Lenders, each of which shall be responsible for paying its own fees and expenses. <br><br> **(Interim Order, ¶ 9; DIP Term Sheet, Prepetition Secured Claims/Adequate Protection)** |
| **Carve-Out** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B);* <br><br> *Del. Bankr. L.R. 4001-2(a)(ii)* | The New Ark Funding shall provide funding for a customary "Carve-Out" of certain statutory fees, allowed professional fees of the Debtors and any official committee of unsecured creditors appointed in the Chapter 11 Cases (an "**Official Committee**"), if appointed, including a Carve-Out Trigger Notice Cap, all as detailed in the Interim Order. <br><br> **(Interim Order, ¶ 21)** |
| **Covenants** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B);* <br><br> *Del. Bankr. L.R. 4001-2(a)(ii)* | The DIP Loan Parties shall comply with the covenants set forth in the DIP Loan Documents. <br><br> **(Interim Order, ¶ 14)** <br><br> **Affirmative Covenants**.  Usual and customary for financings of this type (subject to certain additional changes and modifications), including delivery of financial reporting, maintenance of existence, legal compliance, properties, insurance, and books and records, and inspection rights, as well as compliance with various milestones. <br><br> **(DIP Term Sheet, Affirmative Covenants and Annex E)** |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | **Negative Covenants**.  Usual and customary for financings of this type (subject to certain additional changes and modifications), including limitations on indebtedness, liens, asset sales, investments (except as provided in "first day" or other Court orders), and transactions with affiliates. |
| | **(DIP Term Sheet, Negative Covenants and Annex F)** |
| | **Financial Covenant.**  As of the last day of each Reporting Period commencing with the Budget Testing Start Date, permit the aggregate amount of operating cash disbursements payable to Persons other than the DIP Lenders made by the Debtors to exceed 110% of the aggregate amount of operating cash disbursements for such Reporting Period as set forth in the Approved DIP Budget (such variance that does not breach this covenant, a "**Permitted Variance**").  Notwithstanding the foregoing, the Borrower may (a) carry-forward any disbursement amounts that are available and unused during a prior Reporting Period to any of the following subsequent Reporting Periods (a "**Permitted Carryforward**") and (b) may carry-backwards up to 50% of any amounts available to be used in up to two subsequent Reporting Periods to be used in the Reporting Period then in effect (a "**Permitted Carryback**" and, together with Permitted Carryforwards, "**Permitted Carrybacks/Carryforwards**") (which Permitted Carrybacks will not be available in any subsequent Reporting Periods). |
| | **(DIP Term Sheet, Financial Covenant and Annex F)** |
| | **Budget Covenant**. The use of borrowings under the DIP Facility and the New Ark Funding shall be limited in accordance with each of the respective Budgets, subject to permitted variances (at a 10% level) determined on the basis of aggregate cash disbursements payable to Persons other than the DIP Lenders and tested every other week on a four-week rolling  basis (each a "**Reporting Period**"), beginning testing with the fourth full calendar week after the Closing Date ("**Budget Testing Start Date**"), with Permitted Carrybacks/Carryforwards.  In addition, prior to the Budget Testing Start Date, subject to "Use of Proceeds" above, any disbursements approved by the Bankruptcy Court and of the type reflected in the Initial Budgets may be financed with DIP Facility proceeds. |
| | **(DIP Term Sheet, Budgets)** |
| **Limitations on DIP Facility, DIP Collateral, Prepetition Collateral, Cash Collateral, the Carve-Out, and Other Funds.**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);* | Customary restrictions on the use of DIP Collateral, Prepetition Collateral, or Cash Collateral for the investigation of the DIP Secured Parties and Prepetition Secured Parties, subject to a $50,000 investigation carve-out in favor of an Official Committee, if appointed.<br><br>**(Interim Order ¶ 22)** |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| *Del. Bankr. L.R. 4001-2(a)(ii)* | |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The events of default under the DIP Facility (each, an "**Event of Default**," and collectively, the "**Events of Default**") shall be limited to those enumerated in the DIP Term Sheet, including, without limitation, the following:<br><br>• Failure to make any payment to the DIP Agent and DIP Lenders when due;<br><br>• failure of any Representation and Warranty of any Loan Party to be true and correct in all material respects when made;<br><br>• any breach or failure to comply with the Affirmative Covenants or Negative Covenants, subject to certain cure periods set forth in the DIP Term Sheet;<br><br>• any other breach or failure to comply with the terms of Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, as applicable, to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from the DIP Agent;<br><br>• failure to comply with the Milestones;<br><br>• (x) failure to timely perform Transfer Assistance Obligations as reasonably requested by Landlord or New Operator or (y) the occurrence of a default (or equivalent concept) under the MOTA that is not cured within three (3) business days of the occurrence of such default (or equivalent);<br><br>• prior to entry of the MOTA Order, the occurrence of a New Ark Event of Default that results in any limitation, suspension, or termination of funding under the New Ark Funding;<br><br>• the entry of the Final DIP Order shall not have occurred within thirty-five (35) days after entry of the Interim DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of any substantive modification or amendment, without the prior written consent of the DIP Agent and Required Lenders.<br><br>**(DIP Term Sheet, Events of Default)** |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi)* | The DIP Loan Parties shall achieve the following transaction milestones, each of which may be extended at any time with the written approval of the Initial DIP Lenders: |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

|  | <ul><li>no later than three (3) business days after the Petition Date, the Interim DIP Order approving the Term Sheet shall be entered by the Bankruptcy Court;</li><li>on or before the entry of the Final DIP Order by the Bankruptcy Court, the Loan Parties, the DIP Agent and the DIP Lenders shall have executed (i) the DIP Credit Agreement, consistent with the Documentation Principles, and (ii) any other Documentation reasonably requested by the DIP Agent at least two (2) business days prior to the Final Hearing;</li><li>no later than thirty-five (35) days after the Petition Date, the Final Order approving the DIP Facility shall be entered by the Bankruptcy Court;</li><li>no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered an order authorizing the Debtors' assumption of the RSA;</li><li>no later than 90 days after the Petition Date (*provided that* the deadline may be extended by the Loan Parties by up to an additional thirty (30) days solely to comply with licensing requirements), (i) the Bankruptcy Court shall have entered an order rejecting the BM Eagle Master Leases (as defined in the First Day Declaration), which rejection shall be effective *nunc pro tunc* to the Petition Date and (ii) the Loan Parties shall have transitioned the properties subject to the BM Eagle Master Leases;</li><li>the Bankruptcy Court shall have entered the MOTA Order within thirty-five (35) days after the Petition Date; *provided that* the deadline to obtain entry of the MOTA Order may be extended by the Borrowers until the earlier of (i) an additional fifteen (15) days  or (ii) December 1, 2021 if the Loan Parties are diligently pursuing the MOTA Order and the Loan Parties' failure to obtain the MOTA Order within the first thirty-five (35) Days after the Petition Date is primarily attributable to the Omega Entities (as defined in the RSA) or the New Operator(s); and</li><li>No later than the first day of the first month following entry of the MOTA Order, the MOTA(s) shall have been consummated and gone into effect;</li><li>No later than fifty (50) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement, solicitation procedures for the Plan (as defined in the RSA), and a deadline or bar date for filing of all prepetition claims;</li><li>No later than 100 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order (as defined in the RSA); and</li></ul> |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | • No later than 30 calendar days after the date that the Court entered the Confirmation Order, the Plan shall have been consummated.<br><br>The date of each milestone shall be calculated in accordance with Bankruptcy Rule 9006.<br><br>**(DIP Term Sheet, Annex E)** |
| **Repayment**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | **Voluntary Prepayment.**  The DIP Facility may be voluntarily prepaid by the Borrowers, in whole or in part, without premium or penalty, at any time upon two business days' notice to the DIP Agent (subject to actual breakage costs with respect to LIBOR Advances, if any).<br><br>**(DIP Term Sheet, Voluntary Prepayments)**<br><br>**Mandatory Repayment**.  Mandatory repayments shall be limited to the events listed below and applied to borrowings under DIP Facility until Paid in Full (subject to certain exceptions and basket amounts to be negotiated):<br><br>Asset Sales: Prepayments in an amount equal to 100% of the net cash proceeds of the disposition of any property or assets outside the ordinary course of business of the Borrowers and their subsidiaries.<br><br>Insurance Proceeds: Prepayments in an amount equal to 100% of the net cash proceeds of insurance (other than business interruption insurance) paid on account of any loss or damage of any property or assets of any Borrower, other than net cash proceeds that are promptly applied to restoration of the Leased Properties.<br><br>Incurrence of Not-Permitted Indebtedness: Prepayments in an amount equal to 100% of the cash proceeds of any Indebtedness incurred in violation of covenants under the DIP Facility.<br><br>**(DIP Term Sheet, Mandatory Prepayments)** |
| **Acknowledgements**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii);*<br><br>*Del. Bankr. L.R. 4001-2(a)(i)(B)* | The Debtors make certain customary admissions and stipulations with respect to the aggregate amount of prepetition indebtedness owing to the Prepetition Secured Parties and the validity, enforceability, and priority of the liens and security interests granted to the Prepetition Agents to secure such indebtedness.  The Debtors' stipulations are subject to customary challenge rights in favor of the Official Committee (if appointed) and other parties-in-interest.<br><br>**(Interim Order ¶¶ E)** |
| **Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iv);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | The Interim Order provides for lifting of the automatic stay to allow the DIP Secured Parties and Prepetition Secured Parties to exercise all rights and remedies provided for in the DIP Loan Documents and the Interim Order.<br><br>**(Interim Order ¶ 11)** |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |  |
|---|---|
| **Waivers and Consents**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x);*<br><br>*Del. Bankr. L.R. 4001-2(a)(i)(C), (H);*<br><br>*Del. Bankr. L.R. 4001-2(a)(ii)* | No obligation, payment, transfer, or grant of security under the DIP Term Sheet or the Interim Order to the DIP Secured Parties or New Ark shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 362, 502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, counterclaim, offset, or any other challenge under the Bankruptcy Code or any applicable law unless in accordance with paragraph 18 of the Interim Order.<br><br>**(Interim Order ¶ 3)**<br><br>**Indemnification of the DIP Secured Parties**.  The DIP Loan Parties shall jointly and severally indemnify and hold harmless the DIP Agent, each DIP Secured Party, and New Ark and each of their respective directors, officers, employees, agents, attorneys, accountants, advisors, controlling persons, equity holders, partners, members, and other representatives and each of their respective successors and permitted assigns (each, an "**Indemnified Party**") against, and to hold each Indemnified Party harmless from, any and all losses, claims, damages, liabilities, and reasonable, documented, and invoiced out-of- pocket fees and expenses (including, without limitation, fees and disbursements of counsel but limited, in the case of counsel, to the extent set forth in the DIP Term Sheet) that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of, or in any way in connection with, or as a result of: (i) the execution or delivery of the DIP Term Sheet or DIP Credit Agreement, any other DIP Loan Document, the performance by the parties thereto of their respective obligations thereunder and the other transactions contemplated thereby; (ii) the use of the proceeds of the DIP Loans or the New Ark Financing; (iii) the enforcement or protection of its rights in connection with the DIP Term Sheet, the DIP Credit Agreement, and any other DIP Loan Document; (iv) the negotiation of and consent to the Interim Order; or (v) any claim, litigation, investigation, or proceeding relating to any of the foregoing, whether or not any Indemnified Party is a party thereto and regardless of whether such matter is initiated by a third party or the Debtors or any of their subsidiaries or affiliates or creditors; *provided* that no Indemnitee will be indemnified for any loss, claim, damage, liability, cost, or other expense to the extent such loss, claim, damage, liability, cost, or expense that (i) is determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith, or willful misconduct of such Indemnitee or (B) a material breach of the obligations of such Indemnitee under the DIP Loan Documents or (ii) relates to any proceeding between or among Indemnitees other than claims arising out of any act or omission on the part of the DIP Loan Parties in accordance with paragraph 19 of the Interim Order.<br><br>**(Interim Order ¶ 19)** |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | **506(c) Waiver**.  Subject to and pending entry of the Final Order, and except as otherwise provided under an Approved DIP Budget or an Approved New Ark Budget, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured Parties (as the case may be) upon the DIP Collateral or Prepetition Collateral (as the case may be), shall be charged against or recovered from (a) the DIP Secured Parties or the DIP Collateral (including in respect of the Adequate Protection Liens), or any of the DIP Facility Obligations, or (b) the Prepetition Secured Parties or the Prepetition Collateral, in each case, pursuant to sections 105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust enrichment) or any similar principle of law, without the prior express written consent of the Required DIP Lenders or the Prepetition Agent, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

**(Interim Order ¶ 24)**

**No Marshaling**.  In no event shall the DIP Secured Parties or the Prepetition Secured Parties, subject to and effective only upon entry of the Final Order, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, the Prepetition Collateral, the Prepetition Working Capital Debt, or the Omega Master Lease Obligations, as applicable, and all proceeds shall be received and applied in accordance with the Interim Order, the DIP Term Sheet, the Prepetition Loan Documents, and the Omega Master Lease Documents, as applicable.

**(Interim Order ¶ 25)**

**552 Waiver**:  Subject to and effective only upon entry of the Final Order, the Prepetition Secured Parties are entitled to all the rights and benefits of Bankruptcy Code section 552(b), and the "equities of the case" exception will not apply.

**(Interim Order ¶ 26)** |

## III.    Key Provisions

15.      As a condition to obtaining the proposed financing, the DIP Lenders have required, and the Debtors have agreed to, certain provisions that may be considered key provisions to be highlighted to the Court.  These provisions include the following:

- <u>Liens on Avoidance Actions Proceeds</u>.  Subject to and upon entry of the Final Order, the DIP Liens shall include liens on proceeds of all claims and causes of action under sections 502(d), 544, 545, 547, 548, 550, 551, or 553 of the Bankruptcy Code, whether pursuant to federal law or applicable state law, of the DIP Loan Parties or their estates.  **(Interim Order ¶ 5)**.

- <u>Automatic Stay Relief</u>.  The Interim Order lifts the automatic stay to allow, during the continuation of a DIP Termination Event, the termination of the DIP Facility as to any future commitments, liabilities, or obligations, and the imposition of default rate interest, and, on five days' prior written notice to the Debtors, counsel to the Prepetition Agents, the U.S. Trustee, and counsel to any Official Committee, the exercise of rights and remedies against the DIP Collateral. **(Interim Order ¶ 18)**.

- <u>Carve Out</u>.  The DIP Facility provides for a Carve Out certain statutory fees, allowed professional fees of the Debtors and any official committee of unsecured creditors appointed in the chapter 11 cases, including a Post-Carve Out Trigger Notice Cap, all as detailed in the Interim Order.  **(Interim Order ¶ 21)**.  The Carve Out does not provide for disparate treatment of the Debtors' and the Committees' professionals and therefore is in compliance with Local Rule 4001-2(a)(i)(F).

- <u>506(c) and 552 Waiver</u>.  Subject to and effective only upon the entry of the Final Order, (i) the Debtors waive their rights to surcharge against the DIP Collateral and Prepetition Collateral pursuant to Bankruptcy Code section 506(c), and (ii) the Debtors waive their rights to assert an "equities of the case" claim against the Prepetition Agents or the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any Prepetition Collateral pursuant to Bankruptcy Code section 552. **(Interim Order ¶¶ 24, 26)**.

- <u>Committee Investigation</u>.  The Debtors have agreed that the limitations on use of Cash Collateral or proceeds of the DIP Facility or Carve Out to fund investigation of the DIP Liens, the Prepetition Liens, or claims against the DIP Lenders and/or Prepetition Secured Parties shall not apply to Committee investigations in an aggregate amount not to exceed $50,000.  The Interim Order also provides that the Debtors' stipulations as to the Prepetition Liens shall be binding upon all parties, including any Official Committee, unless a party in interest has filed an adversary proceeding or contested matter by the date that is (A) the later of (i) 75 calendar days after entry of the Interim Order, or (ii) 60 days after formation of an Official Committee (if appointed), in accordance with Local Rule 4001-2(a)(i)(B). **(Interim Order ¶¶ 22-23)**.

- <u>Adequacy of the Budget</u>.  The Debtors are required to deliver to the DIP Lenders the Initial DIP Budget for the 13 weeks beginning as of the week of the Closing Date.  The Initial DIP Budget will be updated on the first Thursday of each weekly period after the Budget Testing Start Date (as defined in the DIP Term Sheet). **(Interim Order ¶ 10(a)**; **DIP Term Sheet, Budgets)**.  The Debtors are

also required to deliver to the Prepetition Agent the New Ark Budget for the 13 weeks beginning as of the week of the Closing Date.  The New Ark Budget will be updated on the first Thursday of each weekly period after the Budget Testing Start Date (as defined in the DIP Term Sheet). (**Interim Order ¶ 10(b)**; **DIP Term Sheet, Budgets**).  The Debtors have reason to believe that the Initial DIP Budget, any Approved DIP Budget, the New Ark Budget, and any Approved New Ark Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing or the budget.

## IV.    Prepetition Capital Structure

### A.    Secured Debt Obligations

16.    Because the Debtors do not own the underlying real property and hold only leasehold interests in their Facilities, the primary collateralized assets owned by the Debtors are cash and accounts receivable.  As described more fully below, (i) New Ark holds a first priority security interest in the Debtors' cash and accounts receivable held by the Omega Facility Debtors (as defined below); (ii) affiliates of Omega hold a second priority security interest in the Debtors' cash and accounts receivable held by the Omega Facility Debtors; and (iii) the HUD Lender (as defined below) holds a first priority security interests in the Debtors' cash and accounts receivable held by the Debtors at the Blue Mountain HUD Facilities.

### i.    New Ark Obligations

17.    On July 6, 2018, Gulf Coast and certain other Debtors as borrowers, certain other parties designated as guarantors thereto, the lenders from time to time party thereto (the "**Prepetition Lenders**"), and Wells Fargo Bank, N.A. as administrative agent for the Prepetition Lenders ("**Wells Fargo**"), executed that certain Credit Agreement (as amended, modified, renewed, or restated from time to time, and all documents entered into in connection therewith, the "**Prepetition Working Capital Credit Agreement**"), which provided for a revolving credit facility in an amount up to $15 million.  On November 2, 2020, Wells Fargo and New Ark executed that certain Loan, Commitment and Agency Assignment Agreement (the "**Assignment**

**Agreement**"), through which Wells Fargo assigned its interests and obligations under the Prepetition Working Capital Credit Agreement to New Ark (as assigned, the "**New Ark Credit Agreement**"). As noted above, New Ark is an entity affiliated with the Debtors, as these entities share common indirect beneficial ownership.

18.    As of the Petition Date, the outstanding principal balance owed to New Ark under the New Ark Credit Agreement is approximately $14 million (such principal amount, together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the New Ark Credit Agreement, the "**New Ark Obligations**").

19.    The New Ark Obligations are secured by senior secured liens in favor of New Ark (the "**New Ark Liens**") encumbering the applicable Debtors' cash, accounts, and other assets (collectively, the "**New Ark Collateral**").

20.    On August 31, 2021, New Ark issued a notice of default to the Debtors, identifying certain events of default under the New Ark Credit Agreement, including failure to maintain the minimum Fixed Charge Coverage Ratio (as defined in the New Ark Credit Agreement) and the failure to make required payments under the Delta Seller Note (as defined below) and under the Omega Master Lease (as defined below). In connection with the notice, New Ark did not exercise any rights or remedies, but reserved all such rights and remedies it may have under the New Ark Credit Agreement.

**B.    Omega Master Lease Obligations**

21.    Twenty-four of the Debtors' Facilities are currently subject to (i) that certain Second Consolidated Amended and Restated Master Lease Agreement dated as of July 18, 2013 (as amended, modified, renewed, or restated from time to time, the "**Omega Master Lease**"), by and among Debtor Gulf Coast Master Tenant I ("**GC Master Tenant I**") and certain Omega

Landlords; and (ii) certain subleases between GC Master Tenant I and each Facility Debtor that operates an Omega Facility (collectively, the "**Omega Facility Debtors**").  Information regarding the Omega Facilities is summarized below:

| Omega Landlord | Facility Name | Facility Debtor | # of Licensed Beds |
|---|---|---|---|
| CSE Pine View LLC | Pine View Health and Rehabilitation Center | MS HUD Pine View, LLC | 90 |
| Dixie White Nursing Home, LLC | Pass Christian Health and Rehabilitation Center | MS HUD Dixie, LLC | 60 |
| Ocean Springs Nursing Home, LLC | Ocean Springs Health and Rehabilitation Center | MS HUD Ocean Springs, LLC | 115 |
| Pensacola Real-Estate Holdings I, LLC | Specialty Health and Rehabilitation Center | FL HUD Pensacola, LLC | 120 |
| Pensacola Real-Estate Holdings II, LLC | Bayside Health and Rehabilitation Center | FL HUD Bayside, LLC | 120 |
| Pensacola Holdings III, LLC | Bay Breeze Senior Living and Rehabilitation Center | FL HUD Baybreeze, LLC | 120 SNF / 60 ALF |
| Pensacola Holdings IV, LLC | Grand Boulevard Health and Rehab Center | FL HUD Destin, LLC | 97 SNF / 16 ALF |
| Pensacola Holdings V, LLC | Silvercrest Health and Rehabilitation Center | FL HUD Silvercrest, LLC | 60 |
| Skyler Boyington, LLC | Boyington Health and Rehabilitation Center | MS HUD Boyington, LLC | 180 |
| Skyler Florida, LLC | Rosewood Healthcare and Rehabilitation Center | FL HUD Rosewood, LLC | 155 |
| Skyler Pensacola, LLC | Margate Health and Rehabilitation Center | FL HUD Margate, LLC | 170 |
| Carnegie Gardens, LLC | Wave Crest Health and Rehabilitation Center | SF Carnegie, LLC | 138 |
| Greenbough, LLC | Greenbough Health and Rehabilitation Center | MS Greenbough, LLC | 66 |
| Marianna Holdings, LLC | Chipola Health and Rehabilitation Center | NF Chipola, LLC | 60 SNF / 76 ALF |
| Panama City Nursing Center, LLC | Panama City Health and Rehabilitation Center | NF Panama, LLC | 120 |
| Skyler Maitland, LLC | The Rehabilitation Center of Winter Park | MF Winter Park, LLC | 180 |
| Suwanee, LLC | Suwannee Health and Rehabilitation Center | NF Suwannee, LLC | 180 |
| OHI Asset (FL) Lake Placid, LLC | Southern Lifestyle Senior Living Center | SF Lake Placid ALF, LLC | 97 ALF |

| Omega Landlord | Facility Name | Facility Debtor | # of Licensed Beds |
|---|---|---|---|
| OHI Asset (FL) Pensacola – Hillview, LLC | Arcadia Health & Rehabilitation Center | NF Pensacola Manor, LLC | 150 |
| OHI Asset (FL) Eustis, LLC | Lake Eustis Health and Rehabilitation Center | MF Lake Eustis, LLC | 90 |
| OHI Asset (FL) Pensacola, LLC | Olive Branch Health and Rehabilitation Center | NF Escambia, LLC | 90 |
| OHI Asset (FL) Melbourne, LLC | Viera del Mar Health and Rehabilitation Center | Brevard Oaks Center, LLC | 131 |
| OHI Asset (FL) Pensacola – Nine Mile, LLC | De Luna Health and Rehabilitation Center | NF Nine Mile, LLC | 90 |
| OHI Asset (FL) Lake City, LLC | The Rehabilitation Center of Lake City | SF Brevard, LLC | 113 |

22.     The Omega Master Lease's initial term expires on June 30, 2028, with two ten-year renewal options.  Monthly rent under the Omega Master Lease is approximately $2.4 million.

23.     The Omega Master Lease Obligations are secured by second priority liens on property subject to the New Ark Liens and first priority on the other property set forth in the Omega Master Lease and related documents in favor of the Omega Landlords (the "**Prepetition Omega Liens**") encumbering the applicable Debtors' cash, accounts, and other assets (collectively, the "**Omega Master Lease Collateral**").

24.     On July 8, 2021, Omega issued a notice of default based upon a failure to timely pay rent and certain other charges.  The notice provided that Omega had applied a portion of its security deposit to the outstanding rent amounts, and demanded replenishment of the security deposit in the amount of $2,457,827.43 within ten days.  No other remedies were taken, and Omega reserved all other rights and remedies it may have under the Omega Master Lease.

25.     On August 10, 2021, Omega issued a second notice of default (the "**Rent Acceleration Letter**"), identifying certain events of default under the Omega Master Lease, including non-payment of rent and failure to replenish the security deposit as demanded in the July 8, 2021 letter.  Under the Rent Acceleration Letter, Omega accelerated all rent due and owing under the Omega Master Lease and demanded payment of $216,920,493.55, and reserved all other rights and remedies it may have under the Omega Master Lease.

### C.     Blue Mountain Master Lease Obligations

26.     Two of the Debtors' Facilities, Singing River Health and Rehabilitation Center and Lakeside Health and Rehabilitation Center (the "**Blue Mountain Non-HUD Facilities**"), are subject to that certain Master Lease dated as of November 2, 2020 (as amended, modified, renewed, or restated from time to time, the "**Blue Mountain Non-HUD Master Lease**") by and among Debtor Gulf Coast Master Tenant III, LLC and certain landlords (the "**Blue Mountain Non-HUD Landlords**").  Additionally, two of the Debtors' Facilities, Shelby Health and Rehabilitation Center, and Cobblestone Rehabilitation and Healthcare Center  (the "**Blue Mountain HUD Facilities**" and, together with the Blue Mountain Non-HUD Facilities, the "**Blue Mountain Facilities**"), are subject to that certain Master Lease dated as of April 6, 2021 (as amended, modified, renewed, or restated from time to time, the "**Blue Mountain HUD Master Lease**" and, together with the Blue Mountain Non-HUD Master Lease, the "**Blue Mountain Master Leases**"), by and among Debtor Gulf Coast Master Tenant II, LLC ("**GC Master Tenant II**") and certain landlords (the "**Blue Mountain HUD Landlords**" and, together with the Blue Mountain Non-HUD Landlords, the "**Blue Mountain Landlords**").

27.     In turn, Debtors GC Master Tenant II, LLC and Gulf Coast Master Tenant III, LLC, as applicable, are party to subleases with each Facility Debtor that operates a Blue

Mountain Facility (collectively, the "**Blue Mountain Facility Debtors**").[5]  Information

regarding the Blue Mountain Facilities is summarized below:

| Blue Mountain Landlord | Facility Name | Facility Debtor | # of Licensed Beds | HUD Facility |
|---|---|---|---|---|
| 1108 Church Street MS LLC | Shelby Health and Rehabilitation Center | MS Shelby, LLC | 60 | No |
| 101 Cobblestone Trace GA LLC | Cobblestone Rehabilitation and Healthcare Center | SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC | 59 | No |
| 3401 Main Street MS LLC | Singing River Health and Rehabilitation Center | MS Singing, LLC | 160 | Yes |
| 191 Highway 511 East MS LLC | Lakeside Health and Rehabilitation Center | MS Lakeside, LLC | 120 | Yes |

28.    The Blue Mountain Master Leases' initial terms expire on October 31, 2035, with

one ten-year renewal option.  In addition, the Blue Mountain Landlords have the option to

terminate the lease at any time after August 1, 2022, upon 90 days' written notice to the

applicable Debtors, upon which the Landlords owe the Debtors a termination fee as set forth in

the Blue Mountain Master Leases.  Monthly rent under the Blue Mountain Master Leases is

approximately $333,333 in the aggregate.[6]

---

[5]    The Blue Mountain Non-HUD Facilities also entered into subordination, non-disturbance, and attornment agreements dated November 22, 2020 (the "**SDNA Agreements**") with Capital Funding, LLC to secure the obligations of the Blue Mountain Non-HUD Landlords owed under certain loan agreements between the Blue Mountain Non-HUD Landlords and Capital Funding, LLC.

[6]    In contrast to the Blue Mountain Non-HUD Master Lease, the Blue Mountain HUD Master Lease is subject to a lease addendum (the "**HUD Addendum**") as long as the U.S. Department of Housing and Urban Development ("**HUD**") is the holder or insurer of any indebtedness secured by the Blue Mountain HUD Facilities.  Under the HUD Addendum, the Blue Mountain HUD Master Lease Documents are expressly made subject to the applicable statutes and regulations issued by HUD and all current requirements in HUD handbooks and guides, notices, and mortgagee letters (the "**HUD Program Obligations**").  The HUD Addendum also places certain restrictions on the transfer of the Blue Mountain HUD Facilities, including that prior written approval from HUD is required for (i) any assignment of the Blue Mountain HUD Master Lease and the related subleases, (ii) any change in or transfer of the management, operation, or control of the Blue Mountain HUD Facilities, or (iii) any changes in the ownership that requires HUD approval under any HUD Program Obligations.

29.     As of the Petition Date, the outstanding rent owed to the Blue Mountain Landlords under the Blue Mountain Master Leases is approximately $376,000 (such rent amount, together with all other amounts incurred or accrued but unpaid prior to the Petition Date, the "**Blue Mountain Master Lease Obligations**").

### D.     Prepetition HUD Obligations

30.     A portion of the Argent Transaction was structured as a sale and leaseback to allow certain of the Debtors to continue operating the Blue Mountain Facilities.  In connection with that transaction, GC Master Tenant II entered into those certain Master Tenant Security Agreements dated as of April 6, 2021 (the "**Prepetition HUD Security Agreements**") in favor of Housing & Healthcare Finance, LLC (the "**HUD Lender**") to secure, among others, (i) obligations of GC Master Tenant II and the Blue Mountain HUD Landlords owed to the HUD Lender under the Prepetition HUD Security Agreements (together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition HUD Loan Documents, the "**Prepetition HUD Obligations**") and (ii) obligations of GC Master Tenant II owed to the Blue Mountain HUD Landlords under the Blue Mountain HUD Security Agreements.  As of the Petition Date, the Debtors do not believe that any amounts are due and owing under the Prepetition HUD Obligations.

31.     The Prepetition HUD Obligations are secured by liens in favor of the HUD Lender (the "**HUD Liens**") encumbering substantially all of the assets of GC Master Tenant II and those assets located in or related to the Blue Mountain HUD Facilities, including first priority security interests in the applicable Debtors' cash, accounts receivable, and other assets, as described in greater detail in the Prepetition HUD Security Agreements.

### E.   Prepetition Seller Note Obligations

32.   In connection with the Debtors' acquisition of certain Facilities in 2008, certain Debtors (collectively, the "**Prepetition Seller Note Obligors**") entered into that certain Loan Agreement dated as of December 4, 2008 (as amended, modified, renewed, or restated from time to time, the "**Prepetition Seller Note Loan Agreement**"), by and among the Prepetition Seller Note Obligors, Delta Health Group, LLC ("**Delta**"), Cordova Rehab, LLC ("**Cordova**"), and Pensacola Health Trust, LLC (together with Delta and Cordova, the "**Prepetition Seller Note Holders**"), pursuant to which the Prepetition Seller Note Obligors obtained $62,800,000 to fund the acquisition and related legal and closing costs.

33.   On July 6, 2018, the Prepetition Seller Note Obligors executed an Amended and Consolidating Promissory Note, issued pursuant to the Prepetition Seller Note Loan Agreement, which amends, restates, consolidates, and supersedes in their entirety the amounts outstanding under the Prepetition Seller Note Loan Agreement, in the principal amount of $44,124,638.94.

34.   As of the Petition Date, the entire principal balance owed to the Prepetition Seller Note Holders under the Prepetition Seller Note Documents remains outstanding, plus additional interest, fees, and other charges due and owing under the Prepetition Seller Note, in the aggregate amount of approximately $49,402,516 (the "**Prepetition Seller Note Obligations**").

35.   The Prepetition Seller Note Obligations are secured by liens in favor of the Prepetition Seller Note Holders (the "**Prepetition Seller Note Liens**") encumbering 100% of the equity interests in the following Debtors:  (a) GC Master Tenant I; (b) GC Master Tenant II; (c) HUD Facilities, LLC; (d) Gulf Coast Facilities, LLC; and (e) Florida Facilities, LLC.

F.      **Subordination Agreements**

36.      The Debtors' secured lenders (other than those relating to the Blue Mountain Facilities) executed three separate Subordination and Intercreditor Agreements, dated as of July 6, 2018, which provide that, among other things: (i) the Prepetition Omega Liens are subordinated to the New Ark Liens; (ii) the Prepetition Seller Note Obligations are subordinated in right of payment to the New Ark Obligations; and (iii) the Prepetition Seller Note Obligations are subordinated in right of payment to the Omega Master Lease Obligations.

G.      **Unsecured Debt Obligations**

37.      In addition to the secured debt obligations described above, the Debtors are liable for other unsecured debt obligations, which include, among other things (i) general liability tort claims (including those subject to settlements, those currently in pending litigation, and other incurred but not yet reported claims); (ii) amounts owing to the affiliated service providers; and (iii) MAAP Payment amounts currently being recovered by CMS; and (iv) other trade and vendor claims.

V.      **Proposed Postpetition Financing**

A.      **The Debtors' Need for the DIP Facility and Development of the Budget.**

38.      As set forth in greater detail below and in the DIP Declaration, to continue operating in the ordinary course and to be able to effectuate the proposed liquidation, the Debtors need immediate access to new liquidity.  The Debtors, with the assistance of their advisors, analyzed their cash needs in order to determine the liquidity levels necessary to maintain the Debtors' operations during the pendency of the Chapter 11 Cases.  In undertaking this analysis, the Debtors and their advisors considered the Debtors' near-term projected financial

performance, including the amounts necessary to fund the transition of the operations under the MOTAs.

39.      As part of the Debtors' financial review and analysis, the Debtors developed a 13-week budget for the operational, employee, wind-down, and other costs to be funded by the DIP Financing (the "**Initial DIP Budget**"), attached as Exhibit 2 to the Interim DIP Order.  The DIP Budget incorporates a number of factors and reasonable assumptions, including the effect of the Chapter 11 Cases on the Debtors' operations, material cash disbursements, employee obligations, vendor/supplier payments, cash flows from the Debtors' ongoing operations, and the cost of necessary supplies and equipment.  Furthermore, the DIP Budget includes all of the expenditures for which the Debtors seek authority to pay pursuant to various "first day" pleadings, if approved by the Court.  The Debtors also developed a budget outlining the other costs and expenses of administering the Chapter 11 Cases, including professional fees, to be funded by the New Ark Financing (the "**New Ark Budget**" and together with the DIP Budget, the "**Initial Budgets**"), attached as Exhibit 3 to the Interim Order.

40.      With the consent, or deemed consent, of the Prepetition Secured Parties, the Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes.  Cash Collateral alone, however, will be insufficient to fund the costs associated with the Debtors' Chapter 11 Cases.  Therefore, the Debtors, with the assistance of their advisors, have determined that the DIP Facility is necessary to provide new money working capital for the Debtors' businesses, fund adequate protection payments, and satisfy the costs associated with consummating the proposed chapter 11 transactions.  As such, the DIP Facility is fundamental to the preservation and maintenance of the Debtors' going-concern value during the

Chapter 11 Cases and critical for the Debtors' successful operation of their facilities prior to their transition to new operators.

41.      Absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course and procure supplies and services that are vital to ongoing business operations, third-party payors may take actions to terminate their arrangements with the Debtors, vendors and suppliers may refuse to do business with the Debtors, and critical staff members may seek employment elsewhere, putting the residents' health and safety at risk. Moreover, absent access to capital under the DIP Facility and access to Cash Collateral under the New Ark Financing, the Debtors may not have sufficient liquidity to continue their business operations in the ordinary course, which would be materially detrimental to the Debtors' residents, creditors, employees, and other parties-in-interest.

42.      Therefore, the Debtors have an immediate need to access the DIP Facility and the New Ark Financing on an interim basis and throughout the pendency of the Chapter 11 Cases, and absent doing so would result in immediate and irreparable harm.

**B.      The Debtors' Efforts to Obtain Postpetition Financing**

43.      As described herein and in the First Day Declaration, the Company and its advisors have engaged in extensive discussions and diligence with New Ark and Omega to reach a framework for Chapter 11 Cases.  The current framework contemplates that postpetition financing will be necessary to transition the Debtors' facilities to new operators and subsequently liquidate the Debtors' remaining assets.

**i.      The DIP Facility**

44.      As described above and in the DIP Declaration, the Debtors and the DIP Lenders engaged in extensive, good faith, and arm's length negotiations with respect to the terms and

conditions of the proposed DIP Facility as memorialized in the DIP Term Sheet. Pursuant to the

DIP Term Sheet, a maximum aggregate principal amount of $25 million shall be available to the

DIP Borrower, of which $15.75 million shall be available upon entry of the Interim Order,

subject to the conditions set forth in the DIP Term Sheet.

45.     The Debtors' ability to maintain business relationships with their nursing staff,

supplemental employees, administrative personnel, vendors and suppliers, to meet their ongoing

obligations to the centers for Medicare and Medicaid services, and to make capital expenditures

and to satisfy other working capital and operational needs and otherwise finance their operations

is essential to the Debtors' continued viability. The proceeds of the DIP Facility provide much-

needed liquidity to fund their operations and meet their administrative obligations during the

Chapter 11 Cases and provide care for their residents up to and until the facilities are transferred

to new operators.

### ii.     Use of Cash Collateral

46.     The proposed DIP Facility is accompanied by the Debtors' request for immediate

access to and use of the Cash Collateral of the Prepetition Secured Parties on a consensual basis

to be provided through the New Ark Financing, subject to the terms and conditions of the DIP

Term Sheet and the DIP Financing Orders. Coupled with the liquidity provided under the DIP

Facility, immediate access to the Cash Collateral as provided by the New Ark Financing

will ensure that the Debtors have sufficient working capital to, among other things, satisfy the

administrative expenses of the Chapter 11 Cases, including payment of professional fees.

### iii.     Forms of Adequate Protection

47.     After extensive arm's length, and good faith negotiations, the DIP Lender has

agreed to provide the DIP Facility and the Prepetition Secured Parties have agreed, and the

Prepetition HUD Lender has been deemed to agree, to consent to the use of their Prepetition

Collateral and Prepetition HUD Lender Collateral, including Cash Collateral, subject to the

provision by the Debtors of the Proposed Adequate Protection.  Among other things, the

Proposed Adequate Protection contemplated by the DIP Facility is designed to protect (i) the

Prepetition Secured Parties from any Diminution in Value of such Prepetition Secured Parties'

interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date,

if any, and (ii) the Prepetition HUD Lender from any Diminution in Value of the Prepetition

HUD Lender's interests in the Prepetition HUD Lender Collateral (including Cash Collateral),

from and after the Petition Date, if any.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.**

48.      The Court should authorize the Debtors, as an exercise of their sound business

judgment, to enter into the DIP Term Sheet (and subsequent DIP Credit Agreement), obtain

access to the DIP Facility, and continue using the Cash Collateral provided by the New Ark

Financing.  Bankruptcy Code section 364 authorizes a debtor to obtain secured or superpriority

financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-

possession considerable deference in acting in accordance with its business judgment in

obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run

afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans*

*World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and

receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In*

*re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always

defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't*

*Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the

court's discretion under section 364 is to be utilized on grounds that permit reasonable business

judgment to be exercised so long as the financing agreement does not contain terms that leverage

the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to

benefit a party-in-interest.").

49.     Specifically, to determine whether the business judgment standard is met, a court

need only "examine whether a reasonable business person would make a similar decision under

similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In

re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should

not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority

under the [Bankruptcy] Code").

50.     Furthermore, in considering whether the terms of postpetition financing are fair

and reasonable, courts consider the terms in light of the relative circumstances of both the debtor

and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo.

2003) ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to

be extreme or even unreasonable. Certainly, many of them favor the DIP Lenders. But, taken in

context, and considering the relative circumstances of the parties, the Court does not believe that

the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First

Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich.

1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its

reorganization). Courts may also appropriately take into consideration non-economic benefits to

a debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

51.     The Debtors' determination to move forward with the DIP Facility and New Ark Financing is an exercise of their sound business judgment following an arm's length process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that postpetition financing and continued use of Cash Collateral will create certainty with respect to cash flows necessary for the administration of these cases through confirmation.  The Debtors negotiated the DIP Term Sheet with the DIP Lender and Prepetition Agent in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best and only financing available.  Importantly, the DIP Facility and New Ark Financing are essential components of a broader transaction contemplated by the RSA.  As noted in the DIP Declaration, the Debtors believe that the DIP Facility will provide comfort to their employees, residents, vendors, and suppliers that the Debtors will be able to continue to meet their commitments during the Chapter 11 Cases and will enable the Debtors to implement the proposed transition of their skilled nursing facilities to new operators and pursue their chapter 11 goals in a manner that maximizes the value of the Debtors' estates.  *See* DIP Decl. ¶ 14.

Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents, as it is a reasonable exercise of the Debtors' business judgment.

## II.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.

52.    The Debtors propose to obtain financing under the DIP Facility and access to Cash Collateral under the New Ark Financing by providing security interests and liens as set forth in the DIP Loan Documents pursuant to Bankruptcy Code section 364(c).  Specifically, the Debtors propose to provide to the DIP Lenders, the Prepetition Secured Parties, and the Prepetition HUD Lender continuing, valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens, and superpriority claims, including allowed superpriority administrative expense claims and liens on the DIP Collateral, Prepetition Collateral, and Prepetition HUD Lender Collateral, which include a substantial majority of the Debtors' assets.

53.    The statutory requirement for obtaining postpetition credit under Bankruptcy Code section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a)    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;

b)    the credit transaction is necessary to preserve the assets of the estate; and

c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also In re Los Angeles Dodgers LLC,* 457 B.R. 312–13 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37– 40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

54.     As described above and as set forth in the DIP Declaration, no party was willing to provide postpetition DIP financing on an unsecured or solely administrative priority basis. *See* DIP Decl. ¶¶ 10, 15.  Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided at least in part by, the Debtors' existing prepetition lenders.  As such, the Debtors, subject to Court approval, entered into the DIP Facility with the DIP Agent, who was granted superpriority administrative expense claims and liens on the DIP Collateral.

55.     Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer the Chapter 11 Cases and implement the Plan, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Term Sheet, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

56.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), Bankruptcy Code section 364(c) provides that a court

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit.

Therefore, approving superpriority administrative expense claims, liens on the Prepetition

Collateral, and junior liens on the DIP Collateral for the Prepetition Secured Parties is reasonable

and appropriate.

### III.      No Comparable Alternative to the DIP Facility is Reasonably Available.

57.      A debtor need only demonstrate "by a good faith effort that credit was not

available without" the protections afforded to potential lenders by Bankruptcy Code section

364(c).  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading

Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).  Moreover, in circumstances where only a

few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re

Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank

FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789

F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien

by establishment of unsuccessful contact with other financial institutions in the geographic area);

*In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's

finding that two national banks refused to grant unsecured loans was sufficient to support

conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39

(finding that the debtor must show that it made reasonable efforts to seek other sources of

financing under section 364(a) and (b)).

58.      The Debtors do not believe that alternative sources of financing are reasonably

available given the realities imposed by the Debtors' existing capital structure.  A substantial

majority of the Debtors' existing assets, including Cash Collateral, are encumbered under the

Prepetition Credit Agreement.  Moreover, the Debtors have searched for actionable alternative proposals—in short, there are no other better options.  *See* DIP Decl. ¶¶ 10, 15-16.  Thus, the Debtors have determined that the DIP Facility provides the most favorable terms and offers the most efficient transaction costs while reducing execution risks.  Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path for successful chapter 11 cases. Therefore, the Debtors submit that the requirement of Bankruptcy Code section 364 that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**IV.     The Debtors Should Be Authorized to Use the Cash Collateral.**

59.     Bankruptcy Code section 363 generally governs the use of estate property. Bankruptcy Code section 363(c)(2)(A) permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Secured Parties consent, or are deemed to consent, to the Debtors' use of the Cash Collateral (as well as the Prepetition Collateral) provided by the New Ark Financing, subject to the terms and limitations set forth in the Interim Order.

60.     Bankruptcy Code section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, Bankruptcy Code section 362(d)(1) provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996).  While Bankruptcy Code section 361 provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, Case No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7,

2012); *In re N.J. Affordable Homes Corp.*, Case No. 05-60442 (DHS), 2006 WL 2128624, at *14

(Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Case Nos. 91-803, 91-804, 1992

WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394

(Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (16th ed. 2021)

(explaining that adequate protection can take many forms and "must be determined based upon

equitable considerations arising from the particular facts of each proceeding")).

61.    As set forth in the Interim Order, the Debtors propose to provide the Prepetition

Secured Parties and the Prepetition HUD Lender with substantial adequate protection to protect

against the postpetition Diminution in Value of the Prepetition Collateral resulting from the use

of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the

"**Adequate Protection Obligations**"):

        a)      payment of interest at the default rate;

        b)      reasonable fees and expenses, including the fees and expenses of their counsel and financial advisors;

        c)      valid and automatically perfected replacement liens; and

        d)      allowed superpriority administrative expense claims.

The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect

the Prepetition Secured Parties and Prepetition HUD Lender from any Diminution in Value to

the Cash Collateral and Prepetition Collateral.

62.    In light of the foregoing, the Debtors further submit, and the Prepetition Secured

Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of

the Prepetition Secured Parties and Prepetition HUD Lender are appropriate.  Thus, the Debtors'

provision of the Adequate Protection Obligations is not only necessary to protect against any

Diminution in Value but is fair and appropriate under the circumstances of the Chapter 11 Cases

to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and

limitations set forth in the Interim Order, for the benefit of all parties-in-interest and their estates.

## V.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Loan Documents.

63.    The Debtors have agreed, subject to Court approval, to pay certain fees to each of

the DIP Agent.  In particular, as noted in the DIP Term Sheet, the Debtors have agreed to pay to

the DIP Agent for the account of each DIP Lender, an unused commitment fee in an amount

equal to 0.50%, commencing upon entry of the Interim Order and payable monthly in arrears

based on the average daily balance of (a) prior to entry of the Final DIP Order, the undrawn DIP

Commitments available to the Borrowers under the Interim DIP Order, and (b) following entry

of the Final DIP Order, the undrawn DIP Commitments.  The Debtors have also agreed to pay to

the DIP Agent a $250,000 upfront fee, earned, due, and payable upon entry of the Interim Order.

## VI.    The DIP Lenders Should Be Deemed Good Faith Lenders Under Bankruptcy Code Section 364(e).

64.    Bankruptcy Code section 364(e) protects a good faith lender's right to collect on

loans extended to a debtor, and its right in any lien securing those loans, even if the authority of

the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.

Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364
> of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this
> section of a priority or a lien, does not affect the validity of any debt so incurred,
> or any priority or lien so granted, to an entity that extended such credit in good
> faith, whether or not such entity knew of the pendency of the appeal, unless such
> authorization and the incurring of such debt, or the granting of such priority or
> lien, were stayed pending appeal.

11 U.S.C. § 364(e).

65.    As explained herein, in the First Day Declaration, and in the DIP Declaration, the

DIP Loan Documents are the result of: (a) the Debtors' reasonable and informed determination

that the DIP Lender offered the most favorable terms on which to obtain vital postpetition

financing, and (b) arm's length, good faith negotiations between the Debtors, the DIP Lenders,

and the Prepetition Secured Parties.  The Debtors submit that the terms and conditions of the DIP

Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of

the DIP Facility and New Ark Financing will be used only for purposes that are permissible

under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP

Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP

Lenders and Prepetition Secured Parties are "good faith" lenders within the meaning of

Bankruptcy Code section 364(e) and are entitled to all of the protections afforded by that section.

**VII.    The Automatic Stay Should Be Modified on a Limited Basis.**

66.    The proposed Interim Order provides that the automatic stay provisions of

Bankruptcy Code section 362 will be modified to permit: (a) the DIP Loan Parties to grant the

DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties

may reasonably request, to assure the perfection and priority of the DIP Liens and the DIP

Superpriority Claims; (b) the DIP Loan Parties to incur all liabilities and obligations, including

all the DIP Facility Obligations, to the DIP Secured Parties as contemplated under the

Interim Order and the DIP Loan Documents, and to perform under the DIP Loan Documents any

and all other instruments, certificates, agreements, and documents which may be required,

necessary, or prudent for the performance by the applicable DIP Loan Parties under the DIP

Loan Documents and any transactions contemplated therein or in the Interim Order; (c) the DIP

Loan Parties to take all appropriate action to grant the Adequate Protection Liens and the 507(b)

Claims set forth therein, and to take all appropriate action (including such action as the

Prepetition Agents may reasonably request) to ensure that the Adequate Protection Liens granted

thereunder are perfected and maintain the priority set forth herein; (d) the DIP Loan Parties to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and the Interim Order; (e) the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and the Interim Order; (f) subject to paragraph 18 of the Interim Order, the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any DIP Termination Event (as defined below), all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein; and (g) subject to paragraph 18 of the Interim Order, the implementation and exercise of all of the terms, rights, benefits, privileges, remedies, and provisions of the Interim Order and the DIP Loan Documents, in each case, without further notice, motion, or application to, or order of this Court.

## VIII.   Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

67.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code section 364 or to use cash collateral pursuant to Bankruptcy Code section 363 may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

68.      For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral, including advances under the New Ark Financing.  The Debtors cannot maintain the value of their estates during the pendency of the Chapter 11 Cases without access to this liquidity.  The Debtors will use cash to, among other things, fund the administration of these cases and the operation of their business.  The Debtors believe that substantially all of their

available cash constitutes the Prepetition Collateral.  The Debtors will therefore be unable to operate their business or otherwise fund these cases without access to the Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties-in-interest.  In short, the Debtors' ability to administer the Chapter 11 Cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

69.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties-in-interest, pending the Final Hearing.

## REQUEST FOR A FINAL HEARING

70.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing within approximately 30 days after the commencement of the Chapter 11 Cases, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

71.     The Court may grant the relief requested in the Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).  In the context of preliminary injunctions, the Third Circuit has interpreted the language "immediate and irreparable harm" to refer to a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages are inadequate.  *See, e.g*., *Norfolk S. Ry. Co. v.*

*City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).  The harm also must be actual and imminent, not speculative or unsubstantiated.  *See*, *e.g.*, *Acierno v. New Castle Cty.*, 40 F.3d 645, 653-55 (3d Cir. 1994).  The Debtors submit that, for the reasons already set forth herein, the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.

72.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in the Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.  Moreover, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a).

## **RESERVATION OF RIGHTS**

73.     Nothing in the Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise or requirement to pay any claim or other obligation; (d) granting third-party-beneficiary status, bestowing any additional rights on any third party, or being otherwise enforceable by any third party.

## NOTICE

74.     The Debtors will provide notice of the Motion to: (a) the U.S. Trustee; (b) the

Internal Revenue Service; (c) the Securities and Exchange Commission; (d) the United States

Attorney for the District of Delaware; (e) the Centers for Medicare & Medicaid Services; (f) the

parties included on the Debtors' consolidated list of their 40 largest unsecured creditors;

(g) counsel for Omega Healthcare Investors, Inc.; (h) counsel for New Ark Capital, LLC;

(i) counsel for Barrow Street Capital LLC and its affiliates; (j) counsel for Eagle Arc Partners

LLC (f/k/a BM Eagle Holdings); and (k) all parties entitled to notice pursuant to Local Rules

2002-1(b) and 9013-1(m).  The Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

75.     No previous request for the relief sought herein has been made to this or any other

court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim and Final Orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
October 14, 2021

**MCDERMOTT WILL & EMERY LLP**

*/s/ David R. Hurst*
David R. Hurst (I.D. No. 3743)
1007 North Orange Street, 10th Floor
Wilmington, Delaware 19801
Telephone:     (302) 485-3900
Facsimile:     (302) 351-8711
Email:         dhurst@mwe.com

- and -

Daniel M. Simon (*pro hac vice* pending)
Emily C. Keil (*pro hac vice* pending)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:     (312) 372-2000
Facsimile:     (312) 984-7700
Email:         dmsimon@mwe.com
               ekeil@mwe.com

*Proposed Counsel for Debtors and Debtors-in-Possession*