**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>GULF COAST HEALTH CARE, LLC, *et al.*,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 21-11336 (KBO)<br>)<br>) (Joint Administration Requested)<br>) |

**DECLARATION OF M. BENJAMIN JONES IN SUPPORT OF MOTION OF DEBTORS
FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

I, M. Benjamin Jones, hereby declare under penalty of perjury as follows:

1. I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Motion**"),[2] which seeks approval of the Debtors' $25,000,000 proposed postpetition DIP Facility and the postpetition use of Cash Collateral.[3]

---

[1] The last four digits of Gulf Coast Health Care, LLC's federal tax identification number are 9281. There are 62 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GulfCoastHealthCare. The location of Gulf Coast Health Care, LLC's corporate headquarters and the Debtors' service address is 40 South Palafox Place, Suite 400, Pensacola, FL 32502.

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Motion.

[3] The material terms of the proposed DIP Facility are set forth in detail in the Motion. For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Term Sheet.

2.      The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have obtained from the above-captioned debtors and debtors-in-possession's (collectively, the "**Debtors**") management, personnel of Health Care Navigator LLC ("**HCN**"), which provides essential business and administrative consulting services to the Debtors, and advisors, the Debtors' books and records, and employees of Ankura Consulting Group, LLC ("**Ankura**") working directly with me and under my supervision, direction, or control.  Specifically, I have overseen an Ankura team which, since June 2021, has been one of the principal advisors for the Debtors, and, in that capacity, I have been directly involved in the matters leading up to the Debtors' chapter 11 filings.  I am over 18 years of age and authorized to submit this Declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## BACKGROUND AND QUALIFICATIONS

3.      I am a Senior Managing Director with Ankura, and, in that role, provide broad restructuring, crisis management, financial advisory, and expert witness services to parties in a broad variety of distressed corporate settings, with a significant emphasis on the U.S. healthcare industry.  I have more than 20 years of financial restructuring, interim management, turnaround, and management consulting experience, and have served as president, chief restructuring officer, and chief financial officer for both private and public companies, including Balducci's New York LLC and High Ridge Brands Co.  I have also played key roles in dozens of other high-profile restructurings, mergers, and acquisitions including Trident Holdings, Mariner Post-Acute Networks, Centennial Healthcare, World Health Alternatives, The Penn Traffic Company, Milacron, Lionel, Caraustar Industries, Golden Books Family Entertainment, and Signature

Healthcare. Prior to joining Ankura, I began my career at Ernst & Young, focusing on valuations and middle-market corporate finance transactions. In 1998, I joined CDG Group to focus on restructurings and reorganizations, rising to the level of senior managing director. I hold a Bachelor of Science in Accounting, with distinction, from Wake Forest University.

## ANKURA RETENTION

4. Ankura was initially retained to provide the Company with certain limited financial advisory services under a prior engagement letter dated as of November 24, 2020, which contemplated the creation and review of various financial analyses and corresponding presentations. Under an engagement letter dated as of June 1, 2021, Ankura was retained to provide the Company with certain financial and restructuring advisory services in connection with the Company's ongoing evaluation and development of strategic alternatives to address its operational and liquidity challenges. On October 13, 2021, I was appointed as the Debtors' CRO. As CRO, I report to Mr. Scott Vogel, in his capacity as independent manager of Gulf Coast Health Care, LLC, Pensacola Administrative Holdings, LLC, and Gulf Coast Master Tenant Holdings, LLC.

5. Pursuant to the Motion, the Debtors seek entry of the Interim Order and the Final Order approving the Debtors' entry into the DIP Facility and consensual use of Cash Collateral. As explained below, the Debtors have an immediate need to access liquidity. The *Declaration of M. Benjamin Jones In Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), filed contemporaneously herewith, provides an overview of the Debtors' businesses, pre-petition capital structure, and the developments leading up to these chapter 11 cases.

**DEBTORS' NEED FOR DIP FINANCING AND ACCESS TO CASH COLLATERAL**

6. Prior to the commencement of the Chapter 11 Cases, the Debtors, advised by Ankura and their other advisors, carefully considered a number of potential alternatives to address the Debtors' capital structure and liquidity challenges, as detailed in the First Day Declaration.

7. I have worked closely with the Debtors' management, personnel at HCN, and the Debtors' advisors to evaluate the Debtors' cash requirements for their business. As part of Ankura's evaluation of the Debtors' liquidity position, Ankura assisted in the development of the Debtors' 13-week and long-term cash flow forecasts. These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including the effect of the chapter 11 filings on the operations of the business, fees and interest expenses associated with potential DIP financing, professional fees, the anticipated impact of COVID-19, the ongoing recovery by CMS of MAAP Payments (as further discussed in the First Day Declaration) and required operational payments. These forecasts indicated that the Debtors face significant shortfalls, and the capital necessary to transition the Debtors' facilities would be substantial.

8. Based on these forecasts and discussions with the Debtors' management, personnel at HCN, and the Debtors' advisors—and despite the Debtors' efforts—the Debtors' determined that they would require access to both Cash Collateral and postpetition funding to provide sufficient liquidity to effectuate a transition of the Debtors' facilities and otherwise administer the Debtors' estates during the Chapter 11 Cases. Among other things, the Debtors need such liquidity to satisfy payroll for the Debtors' employees, provide payments to staffing agencies to ensure that the facilities can meet requisite staffing ratios under Medicare and

Medicaid programs, pay suppliers, vendors, and utility providers, and make any other payments that are essential or appropriate for the continued management, operation, and preservation of the Debtors' businesses and assets. In addition, the Debtors require access to Cash Collateral and postpetition financing to fund their ordinary course working capital needs, necessary repairs, and capital expenditures. I believe that the Debtors' ability to continue making such payments during the Chapter 11 Cases is essential to the Debtors' continued operation and the preservation of their assets during the pendency of the Chapter 11 Cases.

## THE DEBTORS' SELECTION OF THE PROPOSED DIP FACILITY

9. Beginning in September 2021, the Debtors and their advisors engaged in efforts to negotiate and obtain postpetition financing led by Ankura. In this case, obtaining access to postpetition financing from third-parties that were not already part of the Debtors' capital structure was difficult because all or substantially all of the Debtors' assets are encumbered by valid and perfected prepetition liens. Therefore, Ankura's strategy to obtain the best source of financing was reflective of the practical realities of the Debtors' existing capital structure. Notwithstanding these hurdles, the Debtors evaluated the possibility of (a) extending or expanding the Debtors' Prepetition Credit Facility; (b) obtaining the consent of the Prepetition Lenders to the priming of their liens; or (c) locating a third-party lender willing to provide post-petition financing on a junior or unsecured basis. As a result, my team and I embarked on a process to raise liquidity on an exigent basis, approaching several parties that Ankura believed, in our experience and judgment, were most likely to fund a postpetition debtor-in-possession financing facility. Given the short time frame, along with the complexities of the Debtors' businesses and ongoing operating losses, it was impractical to approach a broad range of traditional financing sources. I, and others on my team under my supervision, solicited interest

from parties that we identified based on the type of financing required and the known healthcare lenders for this sector. In its solicitation, Ankura provided potential lenders an overview of the situation and described the financing opportunity.

10. In total, Ankura contacted five potential financing sources, in addition to the Debtors' existing lenders, one of which executed an NDA with the Debtors. Notwithstanding execution of the NDA, each of the five parties Ankura contacted declined to propose a DIP facility under the facts and circumstances facing the Debtors. The feedback from these parties was conclusive: no party was willing to provide postpetition DIP financing based upon the lack of collateral and likelihood of repayment. Therefore, the Debtors, in consultation with their advisors and in their exercise of sound business judgment, concluded that any workable financing likely would require the support of, and be provided by, the Debtors' existing secured parties, including New Ark and the Omega Landlords.

11. On September 18, 2021, the Omega Landlords delivered to the Debtors a DIP term sheet which contemplated a senior secured DIP facility in an amount of up to $12 million, which would prime New Ark as senior secured lender. Because such a facility would require the consent of New Ark,[4] and New Ark would not consent to be primed, the Omega Landlords' initial funding proposal was not viable. On September 23, 2021, New Ark submitted a DIP term sheet to the Debtors which provided sufficient funding for the Debtors to transition their Facilities to new operators, followed by the wind-down of the Debtors through a chapter 11 plan. New Ark's proposal required the Omega Landlords to contribute a negotiated amount of funding to offset the operating costs associated with the Omega Facilities through the transition of those

---

[4] Because the Omega Landlords and New Ark are parties to an intercreditor and subordination agreement under which any DIP financing proposal by either the Omega Landlords or New Ark likely would require the consent of the other party.

facilities to new operators pursuant to a MOTA. This proposal was rejected by the Omega Landlords.

12. However, on September 24, 2021, the Omega Landlords provided another DIP funding proposal, this time on a junior basis to the prepetition liens of New Ark, in a maximum amount of $25 million. Under this proposal, which in concept was acceptable to New Ark and ultimately became the basis of the DIP financing for which the Debtors seek Court approval, (i) an indirect affiliate of Omega (the "**Omega DIP Lender**") would provide up to $25 million to fund the operations of the Debtors relating to both the Omega Facilities and the Blue Mountain Facilities during transition, and fund other costs as further outlined under a DIP budget determined by the Omega DIP Lender (the "**Omega DIP Facility**"), and (ii) New Ark would provide (a) availability to the Debtors to use up to $7 million of its cash collateral to fund operations prior to the implementation of MOTAs related to the Omega Facilities to reduce the Omega DIP Lender's initial DIP funding requirement (subject to reimbursement by the Omega DIP Lender following implementation of the MOTAs); and (b) funding of the professional fees and other process costs incurred during the Chapter 11 Cases as further outlined in a budget determined by New Ark (the "**New Ark Financing**"). Taken together, the DIP Facility and the New Ark Financing provide sufficient funding for the Debtors to operate and administer the Chapter 11 Cases through a confirmed chapter 11 plan. Unfortunately, given the substantial operating losses generated by the Facilities, and the lack of any additional collateral to support the DIP financing obligations, the projected recovery of the funding to be provided by the Omega DIP Lender and New Ark under the proposed DIP Facility and New Ark Financing remains uncertain.

13.     In the exercise of their sound business judgment, the Debtors negotiated extensively with the DIP Lenders and the Prepetition Lenders for access to critical and necessary postpetition financing, including the use of Cash Collateral, in the form of the DIP Facility.  In connection with this restructuring framework, it is my understanding that the Prepetition Lenders have consented to the Debtors' use of their Cash Collateral.  Additionally, I understand that the proposed DIP Facility allows the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of the Chapter 11 Cases.  I also understand that the DIP Facility serves an important component of the Debtors' overall restructuring efforts because it provides the Debtors with a clear source of financing to transition the facilities under the MOTAs and wind down their estates in the Chapter 11 Cases.

14.     Thus, the DIP Facility is the product of extensive negotiations at arm's length and in good faith among the Debtors, the DIP Lenders and the Prepetition Lenders, and is an essential component of a broader restructuring transaction contemplated by the RSA.  As noted in detail above, I believe that the DIP Facility will provide comfort to the Debtors' employees, residents, vendors, and suppliers that the Debtors will be able to continue to meet their commitments during the Chapter 11 Cases and will enable the Debtors to implement the proposed transition of their skilled nursing facilities to new operators, pursue their restructuring goals in a manner that maximizes the value of the Debtors' estates, and prioritize the health and safety of their residents.

15.     I believe that there are no alternative sources of financing reasonably available on both better and executable terms than those being provided by the DIP Facility.  No party that Ankura communicated with as part of the marketing process, and no other party that Ankura is aware of, was interested in providing, or willing to provide postpetition financing (recognizing

that any such financing would either require the consent of both the Omega DIP Lender and New Ark, or would have subjected the Debtors to a protracted and expensive priming dispute) because the extent of repayment of any such obligations remains uncertain.

16. In sum, the DIP Facility, including use of Cash Collateral, is not only the best financing available, but also the only financing that was available as of the Petition Date. The Debtors' best path forward in order to effectuate the broader restructuring transactions contemplated by the RSA is to seek the Court's approval of the DIP Facility and use of Cash Collateral. It is my belief, based on my experience, the Debtors' circumstances, and after participating in the negotiations around the DIP Facility and the broader restructuring transaction, that the economic terms of the proposed DIP Facility are reasonable and appropriate. I also believe that the DIP Facility represents the best option available to address the Debtors' liquidity needs during the Chapter 11 Cases and is in the best interests of the Debtors' estates, employees, residents, vendors, and suppliers. Accordingly, I believe that the DIP Facility pending approval before the Court is reasonable, appropriate, and is the Debtors' best—and only—available option and should be approved on the terms and conditions described in the Motion.

## THE DIP BUDGETS

17. The Debtors, with the assistance of their advisors, and in close consultation with both the Omega Landlords and New Ark, developed the DIP Budgets. The DIP Budgets contain line items for each category of cash flows anticipated to be received or disbursed during the time period for which the DIP Budgets is prepared. I believe that the DIP Budgets include all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtors' businesses for the period set forth in the DIP Budgets.

18.     As explained above, failure to obtain access to the DIP Facility and Cash Collateral will result in immediate and irreparable harm to the Debtors, their residents, and their stakeholders and will diminish the value of the Debtors' estates.  Without the approval of the DIP Facility and use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course and preserve and maximize the value of their assets for the benefit of all parties-in-interest.

19.     Accordingly, based on the foregoing, I respectfully submit that the Court should approve immediate access to the DIP Facility and Cash Collateral.

### **THE FEES IN CONNECTION WITH THE DIP FACILITY ARE REASONABLE**

20.     The Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent pursuant to the DIP Term Sheet.  Specifically, the Debtors have agreed to pay:

> a)   to the DIP Agent, a 0.50% unused commitment fee, commencing upon entry of the Interim Order and payable monthly in arrears based on the average daily balance of (a) prior to entry of the Final DIP Order, the undrawn DIP Commitments available to the Borrowers under the Interim Order and (b) following entry of the Final DIP Order, the undrawn DIP Commitments; and
>
> b)   to the DIP Agent, a $250,000 upfront fee, earned, due, and payable upon entry of the Interim Order; and
>
> c)   (i) during the term of the DIP Facility, the outstanding principal balance drawn under the DIP Facility shall bear interest for the period commencing on the Closing Date through the date such DIP Facility is paid in full at LIBOR (subject to a 1.00% LIBOR floor) plus 12.0% per annum, accruing monthly and payable in cash in arrears; and (ii) if an event of default were to occur, after delivery of notice by the DIP Agent, the applicable interest rate for all DIP Loans will be increased to, and overdue interest, fees, and other amounts (other than overdue principal) shall bear interest at 2.00% per annum above the rate otherwise applicable to such obligations.

21.     Under the Debtors' circumstances, I believe that the fees reflected in the DIP Facility are reasonable.  As described above, the marketing process did not produce an alternative financing option with terms superior to those provided in this DIP Facility.  In light of the marketing and negotiation process described herein, it is my view that the proposed DIP Facility represents the best presently available financing option for the Debtors.

## THE DEBTORS' NEED FOR INTERIM RELIEF

22.     The Debtors' businesses are cash intensive, with significant costs related to maintaining operations, retaining high quality nursing staff, and satisfying obligations to employees, residents, suppliers, and vendors—as well as to fund the additional expenses of the Chapter 11 Cases.  As such, and due to their current limited liquidity, the Debtors require prompt access to Cash Collateral and the DIP Facility to operate their business, preserve value, and pursue their restructuring goals in the interim period, as set forth in the DIP Budgets, and to avoid irreparable harm pending the Final Hearing.  Specifically, as illustrated in the DIP Budgets, the Debtors require an initial $15.75 million draw under the DIP Facility (and pursuant to its terms) upon entry of the Interim Order.  Notwithstanding their immediate liquidity concerns, the Debtors require interim approval of the DIP Facility for several reasons.

23.     *First*, the DIP Budgets assume a smooth entry into chapter 11.  Although the Debtors and their advisors are confident with these projections, the Debtors face considerable uncertainty due to their financial condition, the nature of their industry, and the commencement of the Chapter 11 Cases.  Given this uncertainty, there is a material risk that the Debtors do not achieve their anticipated cash flows.  In the face of this uncertainty, the DIP Facility provides essential liquidity now that the Debtors will use when the need arises.

24. ***Second***, access to committed financing today that the Debtors can use on an "as needed" basis throughout the Chapter 11 Cases will itself quell some of this uncertainty by providing, at the outset of the Chapter 11 Cases, assurance that the Debtors will have the necessary funding to bridge them to the comprehensive restructuring and transition of their facilities as contemplated under the RSA. I believe that the Debtors will materially benefit from the strong message this provides to the Debtors' employees, residents, healthcare partners, vendors, and contract counterparties that (a) operations are appropriately funded—and will continue to be throughout the Chapter 11 Cases, (b) that the bankruptcy filing will not affect the ordinary course operation of the Debtors' business and their ability to continue to provide top-quality care to their residents, and (c) that the Debtors have a plan to seamlessly transition their facilities to new operators and subsequently wind down their operations. I believe that this message will provide stability to the Debtors' operations at the outset of the Chapter 11 Cases, which will materially increase the Debtors' ability to mitigate the possible substantial harm that commencement of the Chapter 11 Cases could have on the Debtors' estates.

25. ***Third***, approval of the DIP Facility provides the bridge from the Petition Date through emergence from chapter 11 and was a focal point of the Debtors' negotiations with their creditors. Given the importance of the DIP Facility to the Debtors' proposed restructuring, the Debtors' creditors required that interim and final approval occur within three business days and 35 calendar days, respectively, of the Petition Date. These were required conditions of not only the DIP Term Sheet, but also the RSA. Thus, the Debtors' inability to obtain interim approval of the DIP Facility would threaten the Debtors' proposed restructuring.

26. In short, the Debtors believe that access to the DIP Facility and Cash Collateral will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates,

pursue their restructuring goals in the interim period, as set forth in the DIP Budgets, and responsibly administer the Chapter 11 Cases throughout the period that the Debtors expect will be necessary to implement and effectuate their restructuring as provided for in the RSA and Plan.

## **CONCLUSION**

27.  In sum, based on my experience and my involvement in assisting the Debtors with the marketing and negotiation of the DIP Facility in this matter, it is my view that the DIP Facility represents the best presently available postpetition financing option for the Debtors and contains terms that are reasonable given the circumstances. Furthermore, I believe that the negotiation process was conducted at arm's length and in good faith. The Debtors' marketing efforts, with the assistance of Ankura, led me to believe that there is no other potential financing option that would satisfy the Debtors' objectives on better terms.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: Pinehurst, North Carolina            By: /s/ M. Benjamin Jones
       October 14, 2021                        Name: M. Benjamin Jones
                                                      Title: Chief Restructuring Officer