**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| GULF COAST HEALTH CARE, LLC, *et al.*,[1] | ) Case No. 21-11336 (KBO) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |
|  | ) |

**DECLARATION OF M. BENJAMIN JONES IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, M. Benjamin Jones, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.       I am the Chief Restructuring Officer ("**CRO**") of Gulf Coast Health Care, LLC ("**Gulf Coast**") and its subsidiaries and affiliates that are debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**").  I am a Senior Managing Director at Ankura Consulting Group, LLC ("**Ankura**") in Ankura's Turnaround & Restructuring Advisory group.

2.       I have more than 20 years of financial restructuring, interim management, turnaround, and management consulting experience, with a significant emphasis on the U.S. healthcare industry.  I have served as president, chief restructuring officer, and chief financial officer for private and public companies.  In addition, I also have played key roles in dozens of other high-profile restructurings, mergers, and acquisitions, assisting clients both in and outside

---

[1]     The last four digits of Gulf Coast Health Care, LLC's federal tax identification number are 9281.  There are 62 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration.  A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GulfCoastHealthCare.  The location of Gulf Coast Health Care, LLC's corporate headquarters and the Debtors' service address is 40 South Palafox Place, Suite 400, Pensacola, FL 32502.

of chapter 11, including Balducci's New York LLC, High Ridge Brands Co., Trident Holdings,

Mariner Post-Acute Networks, Centennial Healthcare, World Health Alternatives, The Penn

Traffic Company, Milacron, Lionel, Caraustar Industries, Golden Books Family Entertainment,

and Signature Healthcare.  Prior to joining Ankura, I began my career at Ernst & Young,

focusing on valuations and middle-market corporate finance transactions and later joined CDG

Group to focus on restructurings and reorganizations.  I hold a Bachelor of Science in

Accounting, with distinction, from Wake Forest University.

3.      Ankura was initially retained to provide the Company with certain limited

financial advisory services under a prior engagement letter dated as of November 24, 2020,

which contemplated the creation and review of various financial analyses and corresponding

presentations.  Under an engagement letter dated as of June 1, 2021, Ankura was retained to

provide the Company with certain financial and restructuring advisory services in connection

with the Company's ongoing evaluation and development of strategic alternatives to address its

operational and liquidity challenges.  On October 13, 2021, I was appointed as the Debtors'

CRO.  As CRO, I report to Mr. Scott Vogel, in his capacity as independent manager of Gulf

Coast Health Care, LLC, Pensacola Administrative Holdings, LLC, and Gulf Coast Master

Tenant Holdings, LLC.

4.      In my capacity as CRO, I have personal knowledge of, and am familiar with, the

business affairs, day-to-day operations, books and records, and financial condition of the

Debtors, and I am authorized to submit this declaration (the "**Declaration**") on behalf of the

Debtors.  I submit this Declaration to assist the Court and parties-in-interest in understanding the

circumstances that led to the commencement of the Chapter 11 Cases and in support of (i) the

Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**") and (ii) the relief that the Debtors have requested pursuant to the motions and applications (the "**First Day Pleadings**") filed on the date hereof (the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  I am familiar with the contents of each of the First Day Pleadings and believe that the relief sought therein will allow the Debtors to fulfill their duties as debtors-in-possession, minimize the possible disruption to the Debtors' business that may be caused by commencement of the Chapter 11 Cases, and position the Debtors for the seamless transition of their skilled nursing facilities and wind down of their operations, all while prioritizing the continued and uninterrupted care of their residents.

5.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience, knowledge of the industry and of the Debtors' operations and financial condition, and information provided to me by management, advisors, employees, or other representatives of the Debtors (including management personnel of Health Care Navigator LLC, which, as more fully described below, provides essential business and administrative consulting services to the Debtors).  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

## **INTRODUCTION**

6.     The Debtors are licensed operators of 28 skilled nursing facilities (the "**Facilities**" and, each, a "**Facility**") comprising nearly 3,350 licensed beds across Florida, Georgia, and Mississippi.  The Company is a leader among skilled nursing facility operators in the Southeastern United States and provides short-term rehabilitation, comprehensive post-acute skilled care, long-term care, assisted living, and therapy services in each of their Facilities, and has earned a reputation for excellence in resident care.

7.     The Debtors do not own the underlying real property at the Facilities, but rather lease or sublease their respective facilities from two landlords.  The Debtors lease 24 Facilities (the "**Omega Facilities**") from certain indirect affiliates and subsidiaries of Omega Healthcare Investors, Inc. ("**Omega**" and, collectively, the "**Omega Landlords**") and four Facilities (the "**Blue Mountain Facilities**") from certain affiliates and subsidiaries of Eagle Arc Partners LLC (f/k/a Blue Mountain Holdings) ("**Blue Mountain**" and, collectively, the "**Blue Mountain Landlords**").

8.     Over the last year and a half, the Debtors have faced significant fiscal challenges emanating from the unprecedented and still ongoing COVID-19 pandemic, as they grappled with caring for their residents and maintaining sufficient operational liquidity amidst constantly changing conditions.  Among other things, the Debtors, as a result of COVID-19, have experienced decreased resident occupancy levels, crippling staffing and employee retention issues, and increased operating expenses associated with personal protective equipment, labor pressures, and other associated costs, all of which have impacted the healthcare sector generally and operators of skilled nursing facilities in particular.  While federal relief provided the Company with some relief from COVID-19 related losses and expenses, the Company has received only very limited state relief.  The federal and state funds (in Georgia and Mississippi only) received by the Company have either (i) been exhausted in the ordinary course of business or, (ii) in the case of funds previously received through the Medicare Accelerated and Advanced Payment Program (the "**MAAP Payments**"), are currently being recovered by the Centers for Medicare and Medicaid Services ("**CMS**") on a rolling basis, which has added significant additional pressure to the Company's already constrained liquidity.

9.    In light of these developments, the Company engaged financial and legal advisors earlier this year to explore potential paths forward, including in- and out-of-court strategic alternatives and restructuring initiatives.  As part of this work, the Company and its advisors critically compared scenarios where the Debtors would continue to operate all or some of their Facilities with scenarios where the Debtors would transfer their Facilities to new operators. Following months of financial and operational analysis with their restructuring advisors, as well as an accelerated period of intense, confidential restructuring negotiations with certain of the Debtors' key stakeholders, including the Omega Landlords and the Debtors' senior secured lender, New Ark Capital, LLC ("**New Ark**")—which is an affiliated entity with some common indirect beneficial ownership with the Debtors—the Debtors determined that the most appropriate course of action would be to transfer the operations of all of the Debtors' Facilities to new operators and subsequently wind down the Company's operations.  The commencement of the Chapter 11 Cases represents the culmination of those negotiations and agreement among the Debtors, New Ark, and an indirect affiliate of Omega to provide substantial funding to facilitate the Debtors' transfer of the Omega Facilities, and the Blue Mountain Facilities, with support for the Debtors' proposed chapter 11 plan.

10.    Thus, the Debtors believe they have formulated a clear path to a seamless transition of their Facilities to new operators and an efficient wind down of their estates, while simultaneously protecting the interests of the residents of the Facilities, prioritizing care for the residents while in chapter 11, and minimizing administrative costs and impact to the Debtors' Facilities, residents, employees, and creditors.  As part of that process, the Debtors have reached agreement on a comprehensive Restructuring Support Agreement (the "**RSA**"), a copy of which is attached hereto as **Exhibit A**, with the Omega Landlords, an indirect affiliate of Omega acting

as DIP Lender (the "**Omega DIP Lender**"), New Ark, the Debtors' equity sponsors, and the Affiliated Service Providers (as defined herein).  The RSA provides for a resolution of the myriad financial, legal, and other issues confronting the Debtors, and permits the Debtors to proceed with the transition and liquidation process with the support of their key stakeholders. Importantly, given the Debtors' ongoing and substantial operating losses and the fragile nature of the Debtors' residents, the Debtors believe they have limited time to execute the transactions contemplated by the RSA if they are to be successful.  These concerns are even more acute in the face of the evolving nature of the COVID-19 pandemic, the recent Delta variant outbreak, and the extremely tight and competitive labor market, among other factors.

11.     To familiarize the Court with the Debtors and the relief the Debtors seek early in the Chapter 11 Cases, this Declaration is organized in four separate sections.  **Section I** provides an introduction to the Debtors and detailed information regarding the Debtors' corporate history and business operations.  **Section II** provides an overview of the Debtors' organizational structure, prepetition capital structure, and debt obligations.  **Section III** describes the circumstances leading to the commencement of the Chapter 11 Cases, the Debtors' efforts to negotiate the RSA and the Proposed Plan (as defined below) with key constituencies, and the objectives of the Chapter 11 Cases.  Finally, **Section IV** sets forth the various First Day Pleadings filed in connection with the Chapter 11 Cases, which the Debtors believe are critical to administering the Chapter 11 Cases and preserving and maximizing the value of the Debtors' estates.

I.    **OVERVIEW OF THE DEBTORS' CORPORATE HISTORY AND BUSINESS OPERATIONS**

A.    **Corporate History**

12.    The Company was formed in 2008 in connection with the acquisition of 44 skilled nursing facilities and related assets.  In the years following its formation, the Company expanded and, at the height of its operations, operated more than 50 facilities in the Southeastern United States.  In recent years, however, the Company has divested or closed a number of its facilities, including the divestiture of 20 facilities in November 2020 previously leased from affiliates of Argent (as defined below).  As of the Petition Date, the Debtors operate 28 Facilities located in Florida, Georgia, and Mississippi, as depicted in the map below.



B.    **Business Operations**

i.    **General**

13.    The Company is a leader among skilled nursing facility operators in the United States and provides post-acute skilled nursing services in each of their Facilities, which have

cultivated a reputation for excellence in resident care.  In February 2021, the Company received

an average care quality rating from CMS of 3.50 stars, above the national average of 3.35 stars.

In 2020, five of the Debtors' Facilities were named by *Newsweek* magazine as among the best 54

nursing homes in Florida and two of the Debtors' Facilities were included on U.S. News &

World Report's "Best Nursing Homes" for 2020-2021, recognizing each as "high performing"

(the publication's highest rating).

14.    An individual interested in occupying a unit in one of the Facilities must first

enter into an admission agreement (an "**Admission Agreement**") with one of the Debtors, which

establishes the terms and conditions under which a resident will reside in a Facility and gain

access to a number of services.  The services and accommodations covered by the daily room

rate include meals, utilities, laundry, assistance with daily living (including dressing, bathing,

and grooming), housekeeping, planned activities, nursing services, and local transportation for

private appointments.  As of the Petition Date, the Facilities have approximately 3,343 licensed

beds and approximately 2,244 residents.

15.    The Debtors receive revenue from several sources, including: (i) Medicare

reimbursements, (ii) Medicaid reimbursements, and (iii) other third party and private payors.

The Debtors use the revenue generated by the receipt of daily basic rates and service fees to fund

their daily operations, pay rent to the Omega Landlords and the Blue Mountain Landlords,

service their legacy liabilities and other debt obligations, and make capital improvements to the

Facilities.

16.    In operating and managing their Facilities, the Debtors employ approximately

3,100 employees, including nurses, certified nursing assistants, other caregivers, maintenance

workers, and corporate and administrative personnel.  Due to the COVID-19 pandemic, the

Debtors experienced an unprecedented labor shortage at their Facilities and, as a result, the Debtors were forced to turn to employment agencies to supplement their workforce, and in particular to help staff their Facilities and provide care to their residents.  Like other skilled nursing facility operators, the Debtors have continued to combat staffing shortages and employee retention issues in 2021 due to, among other things, increased COVID positivity rates among their current employees, federal government vaccine mandates,[2] and increased competition from other industries for the Debtors' workers.  Accordingly, the Debtors are seeking authority in their First Day Pleadings to continue utilizing employment agencies throughout the Chapter 11 Cases to supplement the Debtors' workforce as necessary.

### ii.    Intercompany Arrangements

17.    As is typical in the skilled nursing industry, the Debtors rely on various intercompany service agreements to achieve economies of scale by consolidating certain key functions necessary for operating the Facilities.  In order to provide for the management of their day-to-day operations, the Operating Debtors (as defined below) are party to various intercompany management service agreements (collectively, the "**Debtor Management Service Agreements**") with Debtor Gulf Coast.  Under the Debtor Management Service Agreements, Gulf Coast provides the Operating Debtors with certain management and administrative services, respectively.  In exchange for these services, Gulf Coast receives an annual management fee from each of the Operating Debtors equal to 5% of the adjusted gross revenue of the applicable Facilities.

---

[2]    As of September 30, 2021, all staff in Medicare and Medicaid participating long-term care facilities are required to be vaccinated against COVID-19 in order for facilities to continue to receive funding from Medicare and Medicaid.  *See New CMS Regulation Will Require Vaccination for Nursing Home Staff*, THE NATIONAL LAW REVIEW (Aug. 24, 2021), https://www.natlawreview.com/article/new-cms-regulation-will-require-vaccination-nursing-home-staff; *Nursing Homes Face Quandary: Vaccinate Staff or Don't Get Paid*, THE NEW YORK TIMES (Aug. 19, 2021), https://www.nytimes.com/2021/08/19/health/coronavirus-nursing-homes-vaccination.html.

18.     The Debtors also rely on certain non-Debtor affiliates to provide critical services to the Debtors.  Specifically, and as discussed more fully below, the Debtors rely on (i) Health Care Navigator LLC ("**HCN**") for certain consulting and advisory services; (ii) Halcyon Rehabilitation, LLC ("**Halcyon**") to provide physical therapy, occupational therapy, and speech language pathology services to the Facilities; and (iii) HMS Purchasing, LLC ("**HMS**" and collectively with HCN and Halcyon, the "**Affiliated Service Providers**"), which functions as a group purchasing organization on behalf of the Debtors.  The Debtors intend to pay their post-petition obligations to the Affiliated Service Providers in the ordinary course of business but do not seek approval to pay outstanding amounts owing to such Affiliated Service Providers as of the Petition Date.

19.     Non-Debtor affiliate HCN provides a myriad of essential consulting and advisory services, including back-office administrative support to the Debtors pursuant to the Consulting and Advisory Services Agreement, dated as of July 1, 2010 by and between Gulf Coast and HCN (the "**HCN Consulting Agreement**").  These services, include but are not limited to, (i) strategic planning; (ii) compliance review and support; (iii) billing and collections; (iv) operations assessment and review; (v) vendor and third party relations assessment and monitoring; (vi) accounting and financial services, including cash management, tax services, and financial reporting; (vii) insurance procurement, monitoring, maintenance, and management services; (viii) legal services, including contract review, litigation management, and dispute resolution; (ix) information and technology services; (x) human resources, including employee training and development; (xi) benefits administration and payroll services; and (xii) credit and treasury management services, along with any other additional services upon agreement between the parties from time to time.  Historically, HCN has received a flat monthly fee of $1,380,000 in

exchange for these critical services.  As of the Petition Date, HCN is owed approximately $2.4 million.

20.    Non-Debtor affiliate Halcyon and each of the Facility Debtors (as defined below) are party to a Therapy and Administrative Services Agreement (each, a "**Therapy and Services Agreement**"), whereby Halcyon provides physical therapy, occupational therapy, and speech language pathology services to the Facilities.  Under the Therapy and Services Agreement, Halcyon provides qualified therapists to each of the Facilities to perform therapy services for the Debtors' residents.  As of the Petition Date, the Debtors owe approximately $3.7 million to Halcyon.

21.    Non-Debtor affiliate HMS is party to an agreement (each, a "**Membership Agreement**") with each of the Facility Debtors to perform the function of a "Group Purchasing Organization" for purchasing medical supplies, dietary food items, medical equipment, and a variety of products used by long-term care facilities.  HMS provides a program to its members whereby it negotiates pricing with vendors so that its members can purchase a broad selection of products in bulk at a more favorable rate from suppliers.  In exchange for participating in the program, each of the Facility Debtors pays a monthly membership fee calculated based on the number of licensed beds in a Facility, which has historically totaled approximately $45,630 per month.  As of the Petition Date, the Debtors owe approximately $340,000 to HMS.

### C.    Regulatory Agencies

22.    Operators of skilled nursing facilities, including the Debtors' Facilities, are heavily regulated by various state and federal agencies.  In particular, nearly every aspect of the Debtors' operation of the Facilities, including the services provided to residents as well as billing and collections, is subject to rules and regulations promulgated by (i) the United States

Department of Health and Human Services' Centers for Medicare & Medicaid Services, (ii) the Department of Aging, Office of Health Assurance and Licensing, Bureau of Long Term Care, Bureau of Regulatory Enforcement, and (iii) the Department of Medicaid, Department of Health, and Division of Health Services Regulation in each state in which the Facilities operate.

### D.    Operational Composition

23.     As noted above, the Company's footprint has ebbed and flowed throughout the years, depending on the landscape of the skilled nursing industry generally, as well as the composition of the facilities within its portfolio.  Specifically, a variety of factors have contributed to the Company's desire for various acquisitions or divestitures, including aging demographics, market dynamics, occupancy trends, geographical concentration, regulatory changes impacting reimbursements, payor mix, and average length of stay variables.

24.     The Omega Landlords initially leased its facilities to Delta Health Group, LLC ("**Delta**"), Cordova Rehab, LLC ("**Cordova**"), and Pensacola Health Trust, LLC (together with Delta and Cordova, the "**Delta Group**").  The Delta Group assigned their leasehold interests to the Company in 2008, who subsequently entered into a consolidated master lease with the Omega Landlords to operate, at that time, 17 facilities owned by the Omega Landlords.  In the years that followed, the Company acquired certain additional facilities under the Omega Master Lease, including Arcadia Health & Rehabilitation Center in 2013 and the Southern Lifestyle Senior Living Center in 2014.  In addition, in 2017, 2019, and 2020, the Company and the Omega Landlords partnered on the construction and opening of four new state-of-the art Facilities: Olive Branch Health and Rehabilitation Center, De Luna Health and Rehabilitation Center, Viera del Mar Health & Rehabilitation Center, and The Rehabilitation Center of Lake

City.[3]  In October 2018, two of the Omega Facilities, Chipola Health & Rehabilitation Center and Panama City Health and Rehabilitation Center, sustained significant damage from Hurricane Michael, which was the first Category 5 hurricane on record to impact the Florida panhandle. Hurricane repairs are nearly complete on Panama City Health & Rehabilitation Center, which will allow it to reopen in 2022.

25.    The four Blue Mountain Facilities currently operated by the Company, on the other hand, originate from the sale of certain of the Company's former facilities and related assets in November 2020.  Prior to November 2020, in addition to the Debtors' current Facilities, Gulf Coast also operated 20 facilities that were owned by Argent Properties 2012, LLC and certain of its subsidiaries (collectively, the "**Argent Sellers**") and operated pursuant to a lease between Argent and Debtor Gulf Coast Master Tenant II, LLC.  On November 2, 2020, Argent closed the sale of its facilities, which resulted in the (i) sale and transfer of 17 of the Company's former skilled nursing facilities to new owners, (ii) a new lease with affiliates of Blue Mountain, as purchaser, for three facilities contracted to be operated by the Company, and (iii) the acquisition by the Company of one new facility in Georgia (the "**Argent Transaction**").[4]  In connection with the Argent Transaction, the Debtors transferred the operations of those facilities to 17 new operators and received approximately $13 million in consideration in connection with the transaction.

---

[3]    In 2020, De Luna Health and Rehabilitation Center and Viera del Mar Health & Rehabilitation Center were designated by the state of Florida as COVID-19 recovery centers.

[4]    A component of the Argent Transaction was the sale by the Argent Sellers of three facilities operated by the Debtors, which were subsequently leased back to the Debtors by affiliates of Blue Mountain as purchasers.

II.    **THE DEBTORS' ORGANIZATIONAL STRUCTURE, PREPETITION CAPITAL STRUCTURE, AND DEBT OBLIGATIONS**

A.    **Organizational Structure**

26.    The Chapter 11 Cases comprise 62 debtor entities as reflected in the organizational chart attached hereto as **Exhibit B**.  Together, the Debtor entities' organizational structure is typical of the skilled nursing care industry.  The activities and business affairs of the Debtors generally fall into five categories: (i) holding companies that directly or indirectly hold a portfolio of certain assets (the "**HoldCo Debtors**");[5] (ii) entities that are tenants (the "**Tenant Debtors**")[6] under master leases with the Omega Landlords and the Blue Mountain Landlords; (iii) entities that oversee the operations of the Debtors' Facilities (the "**Operating Debtors**");[7] (iv) entities that provide administrative and management services to the Operating Debtors (the "**Manager Debtors**");[8] and (v) entities which are either currently subtenants under the subleases with the Tenant Debtors and operate the Facilities (the "**Facility Debtors**")[9] or previously were involved with the operations of facilities that have been divested in recent years.[10]  Each of the

---

[5]    The HoldCo Debtors are Pensacola Administrative Holdings, LLC and Gulf Coast Master Tenant Holdings, LLC.

[6]    The Tenant Debtors are Gulf Coast Master Tenant I, LLC; Gulf Coast Master Tenant II, LLC; and Gulf Coast Master Tenant III, LLC.

[7]    The Operating Debtors are HUD Facilities, LLC; Gulf Coast Facilities, LLC; and Florida Facilities, LLC.

[8]    The Manager Debtors are Gulf Coast Health Care, LLC; GCH Management Services, LLC; and Pensacola Administrative Services, LLC.

[9]    The Facility Debtors are FL HUD Baybreeze, LLC; FL HUD Bayside, LLC; FL HUD Destin, LLC; FL HUD Margate, LLC; FL HUD Pensacola, LLC; FL HUD Rosewood, LLC; FL HUD Silvercrest, LLC; MS HUD Boyington, LLC; MS HUD Dixie, LLC; MS HUD Ocean Springs, LLC; MS HUD Pine View, LLC; NF Chipola, LLC; NF Panama, LLC; NF Pensacola Manor, LLC; NF Suwannee, LLC; Brevard Oaks Center, LLC; MS Greenbough, LLC; NF Nine Mile, LLC; NF Escambia, LLC; SF Carnegie, LLC; SF Lake Placid ALF, LLC; MF Winter Park, LLC; MF Lake Eustis, LLC; SF Brevard, LLC; MS Lakeside, LLC; MS Shelby, LLC; MS Singing, LLC; and SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC.

[10]    The remaining Debtors are NF Brynwood, LLC; NF Glen Cove, LLC; NF Manor, LLC; NF River Chase, LLC; NF Windsor, LLC; AL Citronelle, LLC; AL Willow Tree, LLC; SF Berkshire, LLC; MF Halifax, LLC; SF Boynton, LLC; SF Glen Oaks, LLC; SF Kissimmee, LLC; MF Oakwood, LLC; SF Lake Placid, LLC; SF

Facility Debtors holds a license to operate a skilled nursing facility and is certified to participate in the Medicare and Medicaid programs.

27.     Certain family trusts, for which members of the Schwartzberg family acted as settlors, maintain 50% of the indirect beneficial ownership of each of the Debtors, and certain limited liability companies and limited partnerships owned by funds affiliated with Barrow Street Capital LLC maintain the other 50% of the indirect beneficial ownership of each of the Debtors.

28.     As reflected in the organizational chart attached hereto as **Exhibit B**, Gulf Coast is a wholly-owned subsidiary of non-Debtor Gulf Coast Health Care Holdings, LLC ("**Holdings**"), which is a non-operating holding company.  Historically, Gulf Coast has been manager-managed, with Holdings acting as its sole manager.  Pensacola Administrative Holdings, LLC is a wholly-owned subsidiary of non-Debtor PAH II, LLC ("**PAH**"), which is a non-operating holding company.  Historically, Pensacola Administrative Holdings, LLC has been manager-managed, with PAH acting as its sole manager.  Gulf Coast Master Tenant Holdings, LLC is a wholly-owned subsidiary of non-Debtor GCMTH II, LLC ("**GCMTH**"), which is a non-operating holding company.  Historically, Gulf Coast Master Tenant Holdings, LLC has been manager-managed, with GCMTH acting as its sole manager.  Any significant decision to be made by Holdings, PAH, and GCMTH is made by a management committee comprising of five members (the "**Management Committee**").

29.     On October 8, 2021, the Management Committee amended the limited liability company agreements of Gulf Coast, Pensacola Administrative Holdings, LLC, and Gulf Coast Master Tenant Holdings, LLC to provide for the appointment of Scott Vogel as independent manager at those entities.  Prior to his appointment as independent manager, Mr. Vogel had

---

Oakbrook, LLC; SF Tampa, LLC; SF Royal Manor, LLC; SF Salerno, LLC; MF Flagler, LLC; MF Debary, LLC; MF Longwood, LLC; MF Heritage, LLC; and SF Fountainhead, LLC.

served as a consultant to Gulf Coast since July 12, 2021. As independent manager, Mr. Vogel has sole authority to take any "Restructuring Actions" (as defined in the limited liability company agreements of Gulf Coast, Pensacola Administrative Holdings, LLC, and Gulf Coast Master Tenant Holdings, LLC).

**B.      Secured Debt Obligations**

30.      Because the Debtors do not own the underlying real property and hold leasehold interests in their Facilities, the primary collateralized assets owned by the Debtors are cash and accounts receivable. Although other assets of the Debtors are secured, with respect to the cash and accounts receivable (and as described more fully below): (i) New Ark holds a first priority security interest in the Debtors' cash and accounts receivable held by the Omega Facility Debtors (as defined below); (ii) the Omega Landlords hold a second priority security interest in the Debtors' cash and accounts receivable held by the Omega Facility Debtors; and (iii) the HUD Lender (as defined below) holds a first priority security interest in the Debtors' cash and accounts receivable held by the Debtors at the Blue Mountain HUD Facilities (as defined below). The accounts receivable generated at the two Blue Mountain non-HUD Facilities are unencumbered as of the Petition Date.

**i.      New Ark Obligations**

31.      On July 6, 2018, Gulf Coast and certain other Debtors as borrowers, certain other parties designated as guarantors thereto, the lenders from time to time party thereto (the "**Prepetition Lenders**", and Wells Fargo Bank, N.A. as administrative agent for the Prepetition Lenders ("**Wells Fargo**"), executed that certain Credit Agreement (as amended, modified, renewed, or restated from time to time, and all documents entered into in connection therewith, the "**Prepetition Working Capital Credit Agreement**"), which provided for a revolving credit

facility in an amount up to $15 million.  On November 2, 2020, Wells Fargo and New Ark executed that certain Loan, Commitment and Agency Assignment Agreement (the "**Assignment Agreement**"), through which Wells Fargo assigned its interests and obligations under the Prepetition Working Capital Credit Agreement to New Ark (as assigned, the "**New Ark Credit Agreement**").  As noted above, New Ark is an entity affiliated with the Debtors, as these entities share some common indirect beneficial ownership.

32.    As of the Petition Date, the outstanding principal balance owed to New Ark under the New Ark Credit Agreement is approximately $14 million (such principal amount, together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the New Ark Credit Agreement, the "**New Ark Obligations**").

33.    The New Ark Obligations are secured by senior secured liens in favor of New Ark (the "**New Ark Liens**") encumbering the applicable Debtors' cash, accounts, and other assets (collectively, the "**New Ark Collateral**").

34.    On August 31, 2021, New Ark issued a notice of default to the Debtors, identifying certain events of default under the New Ark Credit Agreement, including failure to maintain the minimum Fixed Charge Coverage Ratio (as defined in the New Ark Credit Agreement) and the failure to make required payments under the Delta Seller Note (as defined below) and under the Omega Master Lease (as defined below).  In connection with the notice, New Ark did not exercise any rights or remedies, but reserved all such rights and remedies it may have under the New Ark Credit Agreement.

### ii.    Omega Master Lease Obligations

35.    Twenty-four of the Debtors' Facilities are currently subject to (i) that certain Second Consolidated Amended and Restated Master Lease Agreement dated as of July 18, 2013

(as amended, modified, renewed, or restated from time to time, the "**Omega Master Lease**"), by and among Debtor Gulf Coast Master Tenant I ("**GC Master Tenant I**") and certain Omega Landlords; and (ii) certain subleases between GC Master Tenant I and each Facility Debtor that operates an Omega Facility (collectively, the "**Omega Facility Debtors**").  Information regarding the Omega Facilities is summarized below:

| Omega Landlord | Facility Name | Facility Debtor | # of Licensed Beds |
|---|---|---|---|
| CSE Pine View LLC | Pine View Health and Rehabilitation Center | MS HUD Pine View, LLC | 90 |
| Dixie White Nursing Home, LLC | Pass Christian Health and Rehabilitation Center | MS HUD Dixie, LLC | 60 |
| Ocean Springs Nursing Home, LLC | Ocean Springs Health and Rehabilitation Center | MS HUD Ocean Springs, LLC | 115 |
| Pensacola Real-Estate Holdings I, LLC | Specialty Health and Rehabilitation Center | FL HUD Pensacola, LLC | 120 |
| Pensacola Real-Estate Holdings II, LLC | Bayside Health and Rehabilitation Center | FL HUD Bayside, LLC | 120 |
| Pensacola Holdings III, LLC | Bay Breeze Senior Living and Rehabilitation Center | FL HUD Baybreeze, LLC | 120 SNF / 60 ALF |
| Pensacola Holdings IV, LLC | Grand Boulevard Health and Rehab Center | FL HUD Destin, LLC | 97 SNF / 16 ALF |
| Pensacola Holdings V, LLC | Silvercrest Health and Rehabilitation Center | FL HUD Silvercrest, LLC | 60 |
| Skyler Boyington, LLC | Boyington Health and Rehabilitation Center | MS HUD Boyington, LLC | 180 |
| Skyler Florida, LLC | Rosewood Healthcare and Rehabilitation Center | FL HUD Rosewood, LLC | 155 |
| Skyler Pensacola, LLC | Margate Health and Rehabilitation Center | FL HUD Margate, LLC | 170 |
| Carnegie Gardens, LLC | Wave Crest Health and Rehabilitation Center | SF Carnegie, LLC | 138 |
| Greenbough, LLC | Greenbough Health and Rehabilitation Center | MS Greenbough, LLC | 66 |
| Marianna Holdings, LLC | Chipola Health and Rehabilitation Center | NF Chipola, LLC | 60 SNF / 76 ALF |
| Panama City Nursing Center, LLC | Panama City Health and Rehabilitation Center | NF Panama, LLC | 120 |
| Skyler Maitland, LLC | The Rehabilitation Center of Winter Park | MF Winter Park, LLC | 180 |

| Omega Landlord | Facility Name | Facility Debtor | # of Licensed Beds |
|---|---|---|---|
| Suwanee, LLC | Suwannee Health and Rehabilitation Center | NF Suwannee, LLC | 180 |
| OHI Asset (FL) Lake Placid, LLC | Southern Lifestyle Senior Living Center | SF Lake Placid ALF, LLC | 97 ALF |
| OHI Asset (FL) Pensacola – Hillview, LLC | Arcadia Health & Rehabilitation Center | NF Pensacola Manor, LLC | 150 |
| OHI Asset (FL) Eustis, LLC | Lake Eustis Health and Rehabilitation Center | MF Lake Eustis, LLC | 90 |
| OHI Asset (FL) Pensacola, LLC | Olive Branch Health and Rehabilitation Center | NF Escambia, LLC | 90 |
| OHI Asset (FL) Melbourne, LLC | Viera del Mar Health and Rehabilitation Center | Brevard Oaks Center, LLC | 131 |
| OHI Asset (FL) Pensacola – Nine Mile, LLC | De Luna Health and Rehabilitation Center | NF Nine Mile, LLC | 90 |
| OHI Asset (FL) Lake City, LLC | The Rehabilitation Center of Lake City | SF Brevard, LLC | 113 |

36.     The Omega Master Lease's initial term expires on June 30, 2028, with two ten-year renewal options.  Current monthly rent under the Omega Master Lease is approximately $2.4 million.

37.     The Omega Master Lease Obligations are secured by second priority liens in favor of the Omega Landlords (the "**Prepetition Omega Liens**") encumbering the applicable Debtors' cash, accounts, and other assets (collectively, the "**Omega Master Lease Collateral**").

38.     On July 8, 2021, Omega issued a notice of default based upon a failure to timely pay rent and certain other charges.  The notice provided that Omega had applied a portion of its security deposit to the outstanding rent amounts, and demanded replenishment of the security deposit in the amount of $2,457,827.43 within ten days.  No other remedies were taken, and Omega reserved all other rights and remedies it may have under the Omega Master Lease.

39.     On August 10, 2021, Omega issued a second notice of default (the "**Rent Acceleration Letter**"), identifying certain events of default under the Omega Master Lease, including non-payment of rent and failure to replenish the security deposit as demanded in the July 8, 2021 letter.  Under the Rent Acceleration Letter, Omega accelerated all rent due and owing under the Omega Master Lease and demanded payment of $216,920,493.55, and reserved all other rights and remedies it may have under the Omega Master Lease.

### iii.     Blue Mountain Master Lease Obligations

40.     Two of the Debtors' Facilities, Singing River Health and Rehabilitation Center and Lakeside Health and Rehabilitation Center (the "**Blue Mountain Non-HUD Facilities**"), are subject to that certain Master Lease dated as of November 2, 2020 (as amended, modified, renewed, or restated from time to time, the "**Blue Mountain Non-HUD Master Lease**") by and among Debtor Gulf Coast Master Tenant III, LLC and certain landlords (the "**Blue Mountain Non-HUD Landlords**").  Additionally, two of the Debtors' Facilities, Shelby Health and Rehabilitation Center, and Cobblestone Rehabilitation and Healthcare Center  (the "**Blue Mountain HUD Facilities**" and, together with the Blue Mountain Non-HUD Facilities, the "**Blue Mountain Facilities**"), are subject to that certain Master Lease dated as of April 6, 2021 (as amended, modified, renewed, or restated from time to time, the "**Blue Mountain HUD Master Lease**" and, together with the Blue Mountain Non-HUD Master Lease, the "**Blue Mountain Master Leases**"), by and among Debtor Gulf Coast Master Tenant II, LLC ("**GC Master Tenant II**") and certain landlords (the "**Blue Mountain HUD Landlords**" and, together with the Blue Mountain Non-HUD Landlords, the "**Blue Mountain Landlords**").

41.     In turn, Debtors GC Master Tenant II, LLC and Gulf Coast Master Tenant III, LLC, as applicable, are party to subleases with each Facility Debtor that operates a Blue

Mountain Facility (collectively, the "**Blue Mountain Facility Debtors**").[11]  Information

regarding the Blue Mountain Facilities is summarized below:

| Blue Mountain Landlord | Facility Name | Facility Debtor | # of Licensed Beds | HUD Facility |
|---|---|---|---|---|
| 1108 Church Street MS LLC | Shelby Health and Rehabilitation Center | MS Shelby, LLC | 60 | No |
| 101 Cobblestone Trace GA LLC | Cobblestone Rehabilitation and Healthcare Center | SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC | 59 | No |
| 3401 Main Street MS LLC | Singing River Health and Rehabilitation Center | MS Singing, LLC | 160 | Yes |
| 191 Highway 511 East MS LLC | Lakeside Health and Rehabilitation Center | MS Lakeside, LLC | 120 | Yes |

42.     The Blue Mountain Master Leases' initial terms expire on October 31, 2035, with

one ten-year renewal option.  In addition, the Blue Mountain Landlords have the option to

terminate the lease at any time after August 1, 2022, upon 90 days' written notice to the

applicable Debtors, upon which the Landlords owe the Debtors a termination fee as set forth in

the Blue Mountain Master Leases.  Monthly rent under the Blue Mountain Master Leases is

approximately $333,333 in the aggregate.[12]

---

[11]   The Blue Mountain Non-HUD Facilities also entered into subordination, non-disturbance, and attornment agreements dated November 22, 2020 (the "**SDNA Agreements**") with Capital Funding, LLC to secure the obligations of the Blue Mountain Non-HUD Landlords owed under certain loan agreements between the Blue Mountain Non-HUD Landlords and Capital Funding, LLC.
.

[12]   In contrast to the Blue Mountain Non-HUD Master Lease, the Blue Mountain HUD Master Lease is subject to a lease addendum (the "**HUD Addendum**") as long as the U.S. Department of Housing and Urban Development ("**HUD**") is the holder or insurer of any indebtedness secured by the Blue Mountain HUD Facilities.  Under the HUD Addendum, the Blue Mountain HUD Master Lease Documents are expressly made subject to the applicable statutes and regulations issued by HUD and all current requirements in HUD handbooks and guides, notices, and mortgagee letters (the "**HUD Program Obligations**").  The HUD Addendum also places certain restrictions on the transfer of the Blue Mountain HUD Facilities, including that prior written approval from HUD is required for (i) any assignment of the Blue Mountain HUD Master Lease and the related subleases, (ii) any change in or transfer of the management, operation, or control of the Blue Mountain HUD Facilities, or (iii) any changes in the ownership that requires HUD approval under any HUD Program Obligations.

43.     As of the Petition Date, the outstanding rent owed to the Blue Mountain Landlords under the Blue Mountain Master Leases is approximately $376,000 (such rent amount, together with all other amounts incurred or accrued but unpaid prior to the Petition Date, the "**Blue Mountain Master Lease Obligations**").

### iv.     Prepetition HUD Obligations

44.     A portion of the Argent Transaction was structured as a sale and leaseback to allow certain of the Debtors to continue operating the Blue Mountain Facilities.  In connection with that transaction, GC Master Tenant II entered into those certain Master Tenant Security Agreements dated as of April 6, 2021 (the "**Prepetition HUD Security Agreements**") in favor of Housing & Healthcare Finance, LLC (the "**HUD Lender**") to secure, among others, (i) obligations of GC Master Tenant II and the Blue Mountain HUD Landlords owed to the HUD Lender under the Prepetition HUD Security Agreements (together with all other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition HUD Loan Documents, the "**Prepetition HUD Obligations**") and (ii) obligations of GC Master Tenant II owed to the Blue Mountain HUD Landlords under the Blue Mountain HUD Security Agreements.  As of the Petition Date, the Debtors do not believe that any amounts are due and owing under the Prepetition HUD Obligations.

45.     The Prepetition HUD Obligations are secured by liens in favor of the HUD Lender (the "**HUD Liens**") encumbering substantially all of the assets of GC Master Tenant II and those assets located in or related to the Blue Mountain HUD Facilities, including first priority security interests in the applicable Debtors' cash, accounts receivable and other assets, as described in greater detail in the Prepetition HUD Security Agreements.

          **v.**        **Prepetition Seller Note Obligations**

46.     In connection with the Debtors' acquisition of certain Facilities in 2008, certain Debtors (collectively, the "**Prepetition Seller Note Obligors**") entered into that certain Loan Agreement dated as of December 4, 2008 (as amended, modified, renewed, or restated from time to time, the "**Prepetition Seller Note Loan Agreement**"), with the Delta Group, pursuant to which the Prepetition Seller Note Obligors obtained $62,800,000 to fund the acquisition and related legal and closing costs.

47.     On July 6, 2018, the Prepetition Seller Note Obligors executed an Amended and Consolidating Promissory Note, issued pursuant to the Prepetition Seller Note Loan Agreement, which amends, restates, consolidates, and supersedes in their entirety the amounts outstanding under the Prepetition Seller Note Loan Agreement, in the principal amount of $44,124,638.94.

48.     As of the Petition Date, the entire principal balance owed to the Delta Group under the Prepetition Seller Note Documents remains outstanding, plus additional interest, fees, and other charges due and owing under the Prepetition Seller Note, in the aggregate amount of approximately $49,402,516 (the "**Prepetition Seller Note Obligations**").

49.     The Prepetition Seller Note Obligations are secured by liens in favor of the Delta Group (the "**Prepetition Seller Note Liens**") encumbering 100% of the equity interests in the following Debtors:  (i) GC Master Tenant I; (ii) GC Master Tenant II; (iii) HUD Facilities, LLC; (iv) Gulf Coast Facilities, LLC; and (v) Florida Facilities, LLC.

          **vi.**        **Subordination Agreements**

50.     The Debtors' secured lenders (other than those relating to the Blue Mountain Facilities) executed three separate Subordination and Intercreditor Agreements, dated as of July 6, 2018, which provide that, among other things: (i) the Prepetition Omega Liens are

subordinated to the New Ark Liens; (ii) the Prepetition Seller Note Obligations are subordinated in right of payment to the New Ark Obligations; and (iii) the Prepetition Seller Note Obligations are subordinated in right of payment to the Omega Master Lease Obligations.

### C.    Unsecured Debt Obligations

51.    In addition to the secured debt obligations described above, the Debtors are liable for other unsecured debt obligations, which include, among other things (i) general liability tort claims (including those subject to settlements, those currently in pending litigation, and other incurred but not yet reported claims); (ii) amounts owing to the Affiliated Service Providers; (iii) MAAP Payment amounts currently being recovered by CMS; and (iv) other trade and vendor claims.

## III.    EVENTS LEADING UP TO THE CHAPTER 11 CASES

### A.    COVID-19 Pandemic

52.    Like other skilled nursing facility operators, the COVID-19 pandemic severely impacted (and continues to impact) the Company's operations, liquidity, and cash flows, as it caused both a sharp decrease in resident occupancy levels and an increase in operating expenses. While prior to the pandemic occupancy levels at most of the Debtors' facilities hovered above 90%, the collective resident occupancy levels of the Debtors' Facilities now has dipped below 80%. At the same time, expenses have increased by tens of millions of dollars on an annual basis due to, among other things, dramatically higher labor costs and costs for additional personal protective equipment. What's more, neither of these trends appear to be reversing, notwithstanding the improved (but cautious) outlook for the broader economy. Although the Company has taken steps in recent months to improve resident occupancy levels, maximize staffing efficiencies, and reduce their operational costs, these efforts have not come close to

addressing the Debtors' operating shortfalls.  And, even more troubling, labor pressures not only

persist, but appear to be worsening.[13]

53.    Most recently, on August 18, 2021, President Biden announced plans to require

all nursing homes to mandate staff COVID-19 vaccinations as a condition for facilities to receive

ongoing funding from Medicare and Medicaid.  This announcement came as the highly

contagious Delta variant caused a dramatic rise in COVID cases in recent months, which has

only led to additional uncertainty within the industry regarding the long-term effects of the

COVID-19 pandemic.  As of the Petition Date, while approximately 79% of Facility residents

are fully vaccinated, only approximately 45% of the Debtors' employees are vaccinated.  Given

the reluctance of many employees to receive COVID-19 vaccinations, the Debtors expect that

the Biden administration's vaccination mandate may drive further attrition.  As noted above,

even before news of the vaccination mandates, the Debtors had been forced to turn to

employment agencies to help staff their Facilities and provide care to their residents.  Going

forward, the Debtors likely will be forced to rely even more heavily on employment agencies to

obtain the labor necessary to provide appropriate patient care, and maintain staffing ratios in

compliance with applicable regulatory requirements.[14]

54.    In addition to these challenges, the Company—like all other operators in the

industry—has been reliant upon governmental relief to counteract the effects of the COVID-19

---

[13]    According to a June 2021 American Healthcare Association survey, 94% of nursing homes are currently facing staffing shortages, with 73% reporting that the situation has worsened since the end of 2020.  *See* State of Nursing Home and Assisted Living Industry: Facing Workforce Challenges, AHCA/NCAL (June 2021), https://www.ahcancal.org/News-and-Communications/Fact-Sheets/FactSheets/Workforce-Survey-June2020.pdf.

[14]    By the *Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Wages, Compensation, and Employee Benefits, (II) Continue Certain Employee Benefit Programs in the Ordinary Course, and (III) Granting Related Relief*, filed concurrently herewith, the Debtors seek to pay approximately $4.0 million in prepetition claims of their employment agencies.

pandemic.  And while some federal relief was forthcoming in the early stages of the pandemic, additional stimulus has not materialized and, as noted previously, the Debtors have received very limited state stimulus funds.  In the event that the Debtors do receive additional stimulus relief,[15] it may provide additional liquidity to help transition the operations, but it would not entirely offset the substantial operating losses that the Debtors currently face.  What's more, in April 2021, CMS began to recover the approximately $25 million in MAAP Payments that the Company received throughout 2020 by reducing each payment of Medicare receivables payable to the Company by 25%.  This action by CMS has further exacerbated the Company's already dire liquidity position.

55.      In light of these developments and continuing liquidity constraints beginning in Spring 2021, the Company retained McDermott Will & Emery LLP as legal counsel, and Ankura Consulting Group as financial advisors, to assist the Debtors in assessing their strategic options, including potential restructurings in-court and out-of-court.[16]

### B.      Negotiations with Key Stakeholders

56.      In June 2021, the Debtors informed the Omega Landlords that they no longer had sufficient liquidity to continue payment of rent to the Omega Landlords.  In light of this development, the Debtors and their advisors proposed a potential lease restructuring to the Omega Landlords.  The Debtors initially proposed reorganizing around (i) 13 of the Omega Facilities in Florida and Mississippi pursuant to a new master lease with the Omega Landlords

---

[15]    On September 10, the Department of Health and Human Services announced that it will distribute an additional $17 billion in "Phase 4" distribution from the Provider Relief Fund, based upon providers' lost revenues and expenditures from July 1, 2020 through March 31, 2021.  The application process recently opened on September 29, 2021, and the Debtors expect to apply for such funds during the Chapter 11 Cases.

[16]    The Company also retained Houlihan Lokey in connection with a proposed lease restructuring transaction or other reinvestment in the Company.  However, because the agreements reached under the RSA contemplate a transition and wind-down of the Debtors, the Debtors do not, at this time, intend to engage Houlihan Lokey as investment banker in the Chapter 11 Cases.

and (ii) the four Blue Mountain Facilities, with the remaining 11 Omega Facilities to be transitioned to new operators designated by the Omega Landlords.  The success of this initial lease restructuring proposal was contingent upon agreement among the Debtors, New Ark, and the Omega Landlords on the terms of a modified lease.

57.    During the summer months, the operating performance of the Facilities worsened and the extent and timing of the Facilities' rebound from COVID-19 became less clear. Ultimately, based upon the increased funding necessary to bridge to recovery, the Debtors concluded that their initial lease restructuring proposal was no longer viable.  As a result, the Debtors determined that they should work with their landlords to effectuate the smooth transition of its Facilities, to protect the health and well-being of their residents.

58.    Following the Rent Acceleration Letter, the Omega Landlords indicated to the Debtors that they were considering a sale of its facilities which—because the real property is owned by the Omega Landlords, and not the Debtors—could be effectuated out-of-court.  In the weeks leading up to the Petition Date, the Omega Landlords engaged in a marketing process for their real property interests in the Omega Facilities, with the sale being coupled with the transition of the operations of the Omega Facilities to one or more new operators designated by Omega, pursuant to "management and operations transfer agreements" (the "**MOTAs**") between the Debtors and the new operator(s).  The Debtors expect to seek Court approval of the terms of the MOTAs and the transfer of the management and operations of the Omega Facilities by separate motion in the early days of the Chapter 11 Cases.  In addition, the Debtors are in ongoing discussions with the Blue Mountain Landlords regarding the transition of the Blue Mountain Facilities to new operators.

59.     Concurrently with the Debtors' negotiations with the Omega Landlords, the Debtors engaged in parallel discussions with New Ark (as senior secured lender) regarding potential financing options for the transition of the Debtors' facilities and residents, and the ultimate wind down of the Debtors' business.  On September 18, 2021, the Omega Landlords delivered to the Debtors a DIP term sheet providing for a senior secured DIP facility in an amount of up to $12 million, which would prime New Ark as senior secured lender.  Because such a facility would require the consent of New Ark,[17] and New Ark would not consent to be primed, the Omega Landlords' initial funding proposal was not viable.  On September 23, 2021, New Ark submitted a DIP term sheet to the Debtors which provided sufficient funding for the Debtors to transition their Facilities to new operators, followed by the wind-down of the Debtors through a chapter 11 plan.  New Ark's proposal required the Omega Landlords to contribute a negotiated amount of funding to offset the operating costs associated with the Omega Facilities through the transition of those facilities to new operators pursuant to a MOTA.  This proposal was rejected by the Omega Landlords.

60.     However, on September 24, 2021, the Omega Landlords provided another DIP funding proposal, this time on a junior basis to the prepetition liens of New Ark, in a maximum amount of $25 million.  Under this proposal, which in concept was acceptable to New Ark and ultimately formed the basis of the DIP financing for which the Debtors seek Court approval, (i) the Omega DIP Lender would provide up to $25 million to fund the operations of the Debtors relating to both the Omega Facilities and the Blue Mountain Facilities during transition, and fund other costs as further outlined under a DIP budget determined by the Omega DIP Lender (the

---

[17]   Because the Omega Landlords and New Ark are parties to an intercreditor and subordination agreement, any DIP financing proposal by either the Omega Landlords or New Ark likely would require the consent of the other party.

"**Omega DIP Facility**"), and (ii) New Ark would provide (i) availability to the Debtors to use of up to $7 million of its cash collateral to fund operations prior to the implementation of MOTAs related to the Omega Facilities to reduce the Omega DIP Lender's initial DIP funding requirement (subject to reimbursement by the Omega DIP Lender following implementation of the MOTAs); and (ii) funding of the professional fees and other process costs incurred during the Chapter 11 Cases as further outlined in a budget determined by New Ark (the "**New Ark Financing**").[18]  Unfortunately, given the substantial operating losses generated by the Facilities, and the lack of any additional collateral to support the DIP financing obligations, the projected recovery of the funding to be provided by the Omega DIP Lender and New Ark under the proposed DIP facility remains uncertain.

      **C.**     **Restructuring Support Agreement**

     61.     In the weeks leading up to the Petition Date, the Debtors engaged in extensive negotiations with the Omega Landlords and New Ark, as proposed lenders, regarding not only the proposed financing structures, but also a global settlement among the parties to provide a pathway to a prompt and efficient transfer of the Omega Facilities and wind-down of the Debtors through a plan process.  Given the complexity of the financing structures, numerous competing interests, and dwindling liquidity, all in the face of the stark reality that the health and well-being of the Debtors' residents was at stake, these negotiations proved lengthy, intense, delicate, and complex.[19]  These negotiations—which were completed immediately before the commencement

---

[18]    The terms of both the Omega DIP Facility and the New Ark Funding are discussed in more detail in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*, filed contemporaneously herewith.

[19]    In order to provide several weeks of additional runway to reach resolution on the DIP Financing and RSA, to ensure a more seamless transition into chapter 11 for the benefit of the Debtors' residents and employees, on September 23, 2021, the Argent Sellers provided an additional $3,250,000 in additional cash liquidity to the Debtors.

of the Chapter 11 Cases—culminated in the agreements memorialized in the RSA among the

Debtors, the Omega Landlords, New Ark, the Affiliated Service Providers and the Debtors'

equity sponsors, which provides for a comprehensive process to fund, implement, and

consummate the transition of the Debtors' Facilities through MOTAs and the Debtors' chapter

11 plan process.

62.     The Debtors have determined, after extensive diligence and in consultation with

their advisors and key stakeholders, that maximizing the value of the Debtors' estates and

protecting the health, safety and well-being of their residents is best accomplished through

transactions memorialized in the RSA, including the DIP Financing, the transfer of the Debtors'

Facilities through MOTAs, and the proposed chapter 11 plan.  This global resolution among the

Debtors, the Omega Landlords, the Omega DIP Lender, New Ark, the Affiliated Service

Providers and the Debtors' equity sponsors represents the best available alternative for the

Debtors and, most significantly, will enable the Debtors to continue to provide quality care for

the Debtors' residents through transition of operations.  The various transactions outlined in the

RSA are inextricably interwoven, and reflect months of extensive, arm's-length, and good faith

negotiations among the parties, recognizing the substantial stakes for all of the Debtors'

stakeholders.  Accordingly, the Debtors believe that the effectuation of transactions as

memorialized in the RSA represents the best option for the Debtors to maximize the value of

their estates and ensure the safety and continued care of the Debtors' residents.

## IV.     FIRST DAY PLEADINGS

63.     To minimize the possible adverse effects on the Company's business, the Debtors

have filed various First Day Pleadings to allow the Debtors to meet necessary obligations and

fulfill their duties as debtors-in-possession for the purposes of preserving value for all of the

Debtors' stakeholders.  I am familiar with the contents of each First Day Pleading and believe

that the relief sought therein (i) is necessary to enable the Debtors to operate during the pendency

of the Chapter 11 Cases with minimal disruption or loss of productivity and value; (ii) constitutes

a critical element in achieving a seamless and efficient transfer of the Facilities and subsequent

liquidation and wind down of the Company's operations; and (iii) is in the best interests of the

Debtors' estates, residents, and creditors.  The facts set forth in each First Day Pleading are

incorporated herein by reference.

      64.    The First Day Pleadings that are sought to be heard at the first day hearing

include:

    (a)    Motion of Debtors for Entry of an Order (I) Directing the Joint Administration of Their Chapter 11 Cases and (II) Granting Related Relief;

    (b)    Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Forty Largest Unsecured Creditors, (C) Redact Employee Home Address Information from Certain Bankruptcy Documents, and (II) Granting Related Relief;

    (c)    Motion of Debtors for Entry of Interim and Final Orders Authorizing the Implementation of Procedures to Maintain and Protect Confidential Health Information as Required by Applicable Privacy Rules;

    (d)    Application of Debtors for Entry of Order Appointing Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date;

    (e)    Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, (C) Maintain Purchasing Card Program and Honor Prepetition Obligations Related Thereto, and (D) Continue to Perform Intercompany Transactions; (II) Extending the Time for the Debtors to Comply with 11 U.S.C. § 345(b) Deposit and Investment Requirements; and (III) Granting Related Relief;

(f)     Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Wages, Compensation, and Employee Benefits, (II) Continue Certain Employee Benefit Programs in the Ordinary Course, and (III) Granting Related Relief;

(g)     Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees;

(h)     Motion of Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service;

(i)     Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain, Administer, and Modify Their Refund Programs and Practices, and (II) Honor Obligations Related Thereto;

(j)     Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder and (II) Renew, Revise, Extend, Supplement, Change, or Enter into New Insurance Policies; and

(k)     Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.

65.     I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) listed above and, to the best of my knowledge, I believe the facts set forth in the First Day Pleadings are true and correct. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

66.     Further, based on my personal knowledge, information supplied to me by other members of the Debtors' management, personnel at HCN, and my colleagues that perform services for the Debtors, my review of relevant documents, and my opinion based on my

experience, discussions with the Debtors' advisors, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First Day Pleadings is necessary for the Debtors to effectuate a smooth transition into chapter 11 and to avoid irreparable harm to their businesses and estates during the pendency of the Chapter 11 Cases, and is in the best interests of the Debtors' residents, creditors, estates, and other stakeholders.

67.     Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I believe that the relief sought in the First Day Pleadings should be granted by the Court in its entirety, together with such other and further relief for the Debtors as this Court deems just and proper, in the most expeditious manner possible.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: Pinehurst, North Carolina
     October 14, 2021

By: _____

Name: M. Benjamin Jones
Title:   Chief Restructuring Officer