**EXHIBIT A**

<u>**Restructuring Support Agreement**</u>

EXECUTION VERSION

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1125. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. UNTIL THE OCCURRENCE OF THE RESTRUCTURING SUPPORT AGREEMENT EFFECTIVE DATE NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT is made and entered into as of October 14, 2021 (as amended, modified, or supplemented from time to time, and including all exhibits, schedules, or annexes hereto, this "***Agreement***") by and among (i) Gulf Coast Health Care, LLC ("***Gulf Coast***"); (ii) Gulf Coast Master Tenant I, LLC ("***Master Tenant I***"); (iii) the Existing Operators (as defined below); (iv) the remaining entities set forth on the "Company" signature page to this Agreement (together with Gulf Coast, Master Tenant I, and the Existing Operators, the "***Company***"); (v) OHI Asset Funding (DE), LLC ("***Omega***"); (vi) the Existing Landlords (as defined below, and, together with Omega, the "***Omega Entities***"); (vii) the Equity Sponsors (as defined below); (viii) the Service Providers (as defined below); and (ix) New Ark Capital, LLC, in its capacity as senior secured lender and administrative agent under the Credit Agreement (as defined below) ("***New Ark***"). The Company, the Omega Entities and New Ark are collectively referred to as the "***Parties***," and any one of the foregoing is referred to individually as a "***Party***."

## RECITALS

**WHEREAS**, Gulf Coast, certain of its subsidiaries, and Wells Fargo Bank, N.A. ("***Wells Fargo***") are parties to that certain Credit Agreement, effective July 6, 2018 (as amended, modified, renewed, or restated from time to time, the "***Credit Agreement***"), through which Wells Fargo provided Gulf Coast with a revolving credit facility of up to $15 million (the "***A/R Working Capital Line***"). New Ark and Wells Fargo are party to that certain Loan, Commitment and Agency Assignment Agreement (the "***Assignment Agreement***"), effective November 2, 2020, through which Wells Fargo assigned its interests and obligations under the Credit Agreement to New Ark, who now acts as lender and administrative agent thereunder;

**WHEREAS**, Master Tenant I and the Existing Landlords are parties to that certain Second Consolidated Amended and Restated Master Lease Agreement, effective July 1, 2013, as amended by that certain First Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of October 2, 2013, that certain Second Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of October 1, 2014, that certain Third Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of September 29, 2015, that certain Fourth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of February 25, 2016, that certain Fifth Amendment to Second Consolidated Amended and Restated Master Lease

Agreement, dated as of May 26, 2016, that certain Sixth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of December 15, 2016, that certain Seventh Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of January 26, 2017, that certain Eighth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of June 8, 2017, that certain Ninth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of December 19, 2017, that certain Tenth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of July 6, 2018, and that certain Eleventh Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of August 19, 2019 (collectively, the "***Master Lease***");

 **WHEREAS**, the Company agrees and acknowledges that the Master Lease (i) is a "true lease" and not a financing arrangement and (ii) is a single, indivisible, and integrated document and not divisible in any way;

 **WHEREAS**, the Existing Operators operate various skilled nursing or similar facilities, including the facilities currently owned by the Existing Landlords listed on **Exhibit A** attached hereto (collectively, the "***Facilities***" and individually, a "***Facility***");

 **WHEREAS**, Master Tenant I has been unable and remains unable to fulfill its obligations arising under the Master Lease, including, among other things, payment of Rent (as defined in the Master Lease) to the Existing Landlords;

 **WHEREAS**, the Company acknowledges that it is in default of certain of its obligations under the Master Lease, including due to the non-payment of monetary obligations, and that it does not have the financial ability or wherewithal to assume or resume repayment of Rent or its other monetary obligations under the Master Lease;

 **WHEREAS**, on August 10, 2021, the Company having failed to timely pay at least $7,659,580.08 owed under the Master Lease, the Existing Landlords exercised their right to accelerate all of the unpaid Rent due and owing under the Master Lease and demanded immediate payment in the amount of $216,920,493.55 in accordance with the terms of the Master Lease;

 **WHEREAS**, as of the date hereof, the Company has not paid the foregoing amount due under the Master Lease or any of its other monetary obligations since the Master Lease was accelerated;

 **WHEREAS**, the Company acknowledges that it is in default of certain of its obligations under the Credit Agreement;

 **WHEREAS**, after considering the unavailability of other viable alternatives as of the date hereof, the Company determined, with the advice of its legal and financial advisors, that the transactions contemplated by this Agreement are in the best interests of the Company, its creditors, and the residents of the Facilities;

 **WHEREAS**, each of the Parties has engaged in arm's-length, good faith negotiations regarding certain transactions, consistent with the terms set forth in this Agreement, which

transactions facilitate (collectively, the "***Restructuring Transactions***"),[1] among other things, (i) the continued operation of the Facilities through the use of cash collateral, provision of DIP Financing and New Ark Financing; (ii) the transition of the management and operations of the Portfolio to one or more New Operators (as defined below) designated by the Omega Entities on the terms set forth in one or more MOTA(s) (as defined below) to be entered into between the Existing Operators and the New Operator(s); (iii) the transfer of the applicable Medicare provider agreements to New Operators(s); and (iv) confirmation of a chapter 11 plan and associated wind-down of the Company; and

    **WHEREAS**, the Company intends to commence voluntary cases (the "***Bankruptcy Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") and to propose and consummate, once confirmed by the Bankruptcy Court, a chapter 11 plan providing for the treatment and other terms set forth in the Plan Term Sheet (as defined below) attached hereto as **Exhibit C** (such plan, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, the "***Plan***"; and the accompanying disclosure statement, the "***Disclosure Statement***").

    **NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

    Definitions.  As used herein, the following terms shall have the meanings given to them below.

    "***A/R Working Capital Line***" has the meaning set forth in the recitals.

    "***Agreement***" has the meaning set forth in the introduction.

    "***Alternative Transaction***" means any new money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, winding up, assignment for the benefit of creditors, transaction, debt investment, equity investment, joint venture, partnership, sale, plan proposal, restructuring of the Company, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more entities of the Company or the debt, equity, or other interests in any one or more entities of the Company that is inconsistent with the Plan or other Restructuring Transactions.

    "***Assignment Agreement***" has the meaning set forth in the recitals.

    "***Bankruptcy Cases***" has the meaning set forth in the recitals.

    "***Bankruptcy Code***" has the meaning set forth in the recitals.

---

[1]    For the avoidance of doubt, the term "Restructuring Transactions" does not include any Alternative Transactions (as defined below).

"***Bankruptcy Court***" has the meaning set forth in the recitals.

"***BM Eagle Facilities***" means Lakeside Health and Rehabilitation Center, Shelby Health and Rehabilitation Center, Singing River Health and Rehabilitation Center, and SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC, which are currently operated by the Company and leased from the BM Eagle Landlords.

"***BM Eagle Landlords***" means certain affiliates and subsidiaries of BME Florida RealCo Holdings, LLC, including 3401 Main Street MS LLC, 191 Highway 511 East MS LLC, 1108 Church Street MS LLC, and 101 Cobblestone Trace GA LLC.

"***Business Day***" means a day (other than a Saturday or Sunday) on which banks are open for general business in New York, New York.

"***Company***" has the meaning set forth in the introduction.

"***Confirmation Order***" means an order entered by the Bankruptcy Court, consistent in all material respects with this Agreement and otherwise in form and substance reasonably acceptable to the Company, New Ark and the Omega Entities, confirming the Plan.

"***Credit Agreement***" has the meaning set forth in the recitals.

"***Definitive Documents***" has the meaning set forth in Section 1(b) of this Agreement.

"***DIP Credit Agreement***" has the meaning set forth in Section 1(b) of this Agreement.

"***DIP Financing***" means secured debtor-in-possession financing in the amount up to $25,000,000 to be provided to the Company by the Omega Entities or their designee on the terms substantially set forth in the DIP Term Sheet.

"***DIP Financing Interim Order***" has the meaning ascribed to "Interim DIP Order" in the DIP Term Sheet.

"***DIP Financing Final Order***" has the meaning ascribed to "Final DIP Order" in the DIP Term Sheet.

"***DIP Financing Orders***" means the DIP Financing Interim Order and the DIP Financing Final Order.

"***DIP Loan Documents***" has the meaning ascribed to "DIP Loan Documents" in the DIP Financing Orders.

"***DIP Term Sheet***" means the term sheet setting forth the terms of the DIP Financing and the New Ark Financing, attached hereto as **Exhibit B**.

"***Disclosure Statement***" has the meaning set forth in the recitals.

"***Effective Date***" means the date first set forth above.

"***Equity Sponsors***" means, collectively, (a)(i) Gulf Coast Health Care Holdings, LLC, PAH II, LLC, and GCMTH II, LLC, as the holders of the existing equity interests in the Debtors, and (ii) their equity owners, including BSREF III Parallel Investor I, LLC, BSREF III Parallel Investor II, L.P., BSREF III Parallel Investor III, L.P., BSREF III Parallel Investor IV, LLC, BSREF III Parallel Investor V, L.P., and Barrow Street Real Estate Fund III, L.P., and (b) Argent Properties 2012, LLC and Barrow Agent LLC, as affiliates of the foregoing equity sponsors.

"***Event of Default***" has the meaning set forth in the DIP Term Sheet.

"***Exhibits and Schedules***" has the meaning set forth in Section 1(a) of this Agreement.

"***Existing Landlords***" means the affiliates of Omega Healthcare Investors, Inc. identified as Landlords under the Master Lease, as reflected on **Exhibit A** attached hereto.

"***Existing Operators***" means the subsidiaries of Gulf Coast currently operating the Facilities, as reflected on **Exhibit A** attached hereto.

"***Facility***" or "***Facilities***" has the meaning set forth in the recitals.

"***Gulf Coast***" has the meaning set forth in the introduction.

"***Master Lease***" has the meaning set forth in the recitals.

"***Master Tenant I***" has the meaning set forth in the introduction.

"***Milestones***" has the meaning set forth in Section 6(a) of this Agreement.

"***MOTA Order***" has the meaning set forth in the DIP Term Sheet.

"***MOTA(s)***" has the meaning set forth in the DIP Term Sheet.

"***New Ark***" has the meaning set forth in the introduction.

"***New Ark Administrative Claim***" means New Ark's administrative claim for the New Ark Funding.

"***New Ark Allowed Secured Claim***" means New Ark's allowed secured claim against the Company for amounts owed under the Credit Agreement, which the Company stipulates and agrees is an allowed senior secured claim for the outstanding obligations under the A/R Working Capital Line in an amount equal to $14,343,316.85 as of October 13, 2021, plus interest, fees, expenses and other charges under the Credit Agreement accruing thereafter (whether arising prior to or after the Petition Date).

"***New Ark Financing***" means, collectively, the New Ark Funding and the New Ark Operating Advance.

"***New Ark Funding***" means the funding to be provided to the Company by New Ark or its designee on the terms and subject to the conditions substantially set forth in the DIP Term Sheet and the DIP Financing Orders.

"*New Ark Operating Advance*" has the meaning set forth in the DIP Term Sheet.

"*New Landlord(s)*" means the party or parties that acquire ownership of the Portfolio from the Existing Landlords, if any.

"*New Operator(s)*" means the party or parties designated by the Existing Landlords or one or more New Landlord(s), in their sole and absolute discretion, to effectuate the MOTA(s) and the transactions contemplated thereunder.

"*Omega*" has the meaning set forth in the introduction.

"*Omega Administrative Claims*" means the Existing Landlords' claims (other than Omega DIP Claims) constituting a cost or expense of administration pursuant to Bankruptcy Code section 503(b) incurred during the Bankruptcy Cases and entitled to priority under Bankruptcy Code sections 507(a)(2), 507(b), or 1114(e)(2), including claims for rental charges due and payable under the Master Lease for the period beginning on the Petition Date through the Operations Transfer Date.

"*Omega Allowed Unsecured Claim*" means the Omega Entities' allowed claim against the Company in the amount of $48,996,164 for amounts owed under the Master Lease, comprising (i) an allowed unsecured claim for the Omega Prepetition Rent Claim and (ii) an allowed unsecured claim for the Omega Rejection Damages Claims.

"*Omega DIP Claims*" means any claim (as defined in the Bankruptcy Code) held by an Omega Entity arising out of or under the DIP Financing.

"*Omega Entities*" has the meaning set forth in the introduction.

"*Omega Prepetition Rent Claim*" means a claim in the amount of $237,711,978, which is the amount of accrued prepetition rent and other payments, charges and impositions due and owing under the Master Lease as of the Petition Date.

"*Omega Rejection Damages Claims*" means a claim in the amount of $35,904,343, which is the amount of rejection damages arising upon the rejection of the Master Lease, as capped under Bankruptcy Code section 502(b)(6).

 "*Operations Transfer Date*" means the earliest date upon which a MOTA between the Existing Operators and the New Operator(s) becomes effective.

"*Party*" or "*Parties*" has the meaning set forth in the introduction.

"*Person*" means and includes any individual, partnership, joint venture, limited liability company, corporation, trust, unincorporated organization, or any other legal entity or association.

"*Petition Date*" means the date on which the Company commences the Bankruptcy Cases in the Bankruptcy Court.

"*Plan*" has the meaning set forth in the recitals, and which shall contain all substantive terms and conditions set forth in the Plan Term Sheet and shall otherwise be reasonably acceptable to Omega, New Ark, and the Company.

"*Plan Releases*" means the mutual releases and third-party releases in favor of each of the Parties to this Agreement and the other Released Parties (as defined in the Plan Term Sheet), as set forth more fully in the Plan Term Sheet.

"*Plan Term Sheet*" means the term sheet setting forth the key provisions of the Plan, attached hereto as **Exhibit C**.

"*Portfolio*" means the real estate, operations, and related assets of the Facilities.

"*Restructuring Transactions*" has the meaning set forth in the recitals.

"*Service Providers*" means, collectively, Health Care Navigator LLC, Halcyon Rehabilitation, LLC, and HMS Purchasing, LLC.

"*Service Providers' Allowed Unsecured Claims*" means, collectively, (i) the allowed unsecured claim of Health Care Navigator LLC in the amount of $2,405,990.80, (ii) the allowed unsecured claim of Halcyon Rehabilitation, LLC in the amount of $3,662,733.53, and (iii) the allowed unsecured claim of HMS Purchasing, LLC in the amount of $339,194.15.

"*Solicitation Materials*" has the meaning set forth in Section 1(b) of this Agreement.

"*Solicitation Order*" has the meaning set forth in Section 1(b) of this Agreement.

"*Termination Date*" has the meaning set forth in Section 7(d) of this Agreement.

"*Wells Fargo*" has the meaning set forth in the recitals.

1.    Term Sheet; Exhibits; Definitive Documents.

a)    Each of the exhibits attached hereto and any schedules or exhibits to such exhibits (collectively, the "*Exhibits and Schedules*") are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (excluding the Exhibits and Schedules) and the Exhibits and Schedules, the Exhibits and Schedules shall govern.  In the event of any inconsistency between the terms of this Agreement (including the Exhibits and Schedules) and the Definitive Documents, as applicable, the terms of the Definitive Documents shall govern.

b)    The definitive documents and agreements governing the Restructuring Transactions (collectively, the "*Definitive Documents*") are:

i.    all first day pleadings;

ii.    the Plan;

iii. the Confirmation Order and any motion or other pleadings related to the Plan or to confirmation of the Plan;

iv. the Disclosure Statement;

v. the motion seeking approval of, and the order of the Bankruptcy Court approving, the Disclosure Statement and the related solicitation materials (the "***Solicitation Materials***" and, such order, including to the extent combined with the Confirmation Order, the "***Solicitation Order***");

vi. the DIP Financing Orders;

vii. the postpetition debtor-in-possession credit agreement for the DIP Financing (the "***DIP Credit Agreement***"), including any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents and instruments (including any amendments, restatements, supplements or modifications of any of the foregoing) related to or executed in connection therewith;

viii. the MOTA(s) and MOTA Order and any motion or other pleadings related to seeking entry of the MOTA Order;

ix. the organizational documents for the Company entities upon consummation of the Plan;

x. any documents to be included in the plan supplement; and

xi. any other material documents necessary or customarily required to consummate the Restructuring Transactions.

c) Except as set forth or provided for herein, the Definitive Documents (and any modifications, restatements, supplements or amendments to any of them) will, after the Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all respects with the terms of this Agreement (including the Exhibits and Schedules) and otherwise be in form and substance reasonably satisfactory in all respects to each of: (1) the Company, (2) the Omega Entities, and (3) New Ark except for the Definitive Documents set forth in clauses (vii) and (viii) (except to the extent New Ark is affected thereby), and (4) the Equity Sponsors and the Service Providers except for the Definitive Documents set forth in clauses (vi), (vii), and (viii).

2. <u>Commitment of the Equity Sponsors</u>.  Between the date hereof and the Termination Date, each of the Equity Sponsors agrees to take any and all reasonably necessary and appropriate actions, and make all commercially reasonable efforts, to:

a) support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) entry of the DIP Financing Orders;

b)      support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) entry of the MOTA Order and the implementation and consummation of the MOTA(s);

c)      support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) approval, implementation, confirmation, and consummation of the Plan, including, without limitation, to vote to accept the Plan by the deadlines set forth in the Disclosure Statement (to the extent entitled to vote on the Plan);

d)      not vote against the Plan or otherwise agree to, consent to, or provide any support to any other chapter 11 plan or other restructuring, Alternative Transaction, sale, or liquidation of assets concerning either the Company or its assets other than the transactions contemplated under this Agreement;

e)      not directly or indirectly seek, support, solicit, or encourage any objection to approval of the Disclosure Statement or confirmation of the Plan;

f)      not take any other action that is inconsistent with, or that would materially delay the negotiation, execution, implementation or consummation of the MOTA(s), any proposed sale (if any) of the Facilities to one or more New Landlords, confirmation of the Plan, or any other transactions contemplated by this Agreement;

g)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment, *provided* that no additional economic consideration shall be required from such party unless agreed to by such party in their sole discretion; and

h)      consent to and not object to (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) all actions taken by the Company or the Omega Entities to transition the BM Eagle Facilities to new operator(s) and/or new landlord(s).

3.      <u>Commitment of the Service Providers</u>.  Between the date hereof and the Termination Date, each of the Service Providers agrees to take any and all reasonably necessary and appropriate actions, and make all commercially reasonable efforts, to:

a)      support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) entry of the DIP Financing Orders;

b)      support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) entry of the MOTA Order and the implementation and consummation of the MOTA(s);

c)      support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) approval, implementation, confirmation, and consummation of the Plan, including, without limitation, to vote to accept the Plan by the deadlines set forth in the Disclosure Statement (to the extent entitled to vote on the Plan);

d)      vote the Service Providers' Allowed Unsecured Claims, and any other claims for which the Service Providers have voting authority, to accept the Plan by the deadlines set forth in the Disclosure Statement;

e)      not vote against the Plan or otherwise agree to, consent to, or provide any support to any other chapter 11 plan or other restructuring, Alternative Transaction, sale, or liquidation of assets concerning either the Company or its assets other than the transactions contemplated under this Agreement;

f)      not directly or indirectly seek, support, solicit, or encourage any objection to approval of the Disclosure Statement or confirmation of the Plan;

g)      not take any other action that is inconsistent with, or that would materially delay the negotiation, execution, implementation or consummation of the MOTA(s), any proposed sale (if any) of the Facilities to one or more New Landlords, confirmation of the Plan, or any other transactions contemplated by this Agreement;

h)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment, *provided* that no additional economic consideration shall be required from such party unless agreed to by such party in their sole discretion; and

i)      consent to and not object to (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) all actions taken by the Company or the Omega Entities to transition the BM Eagle Facilities to new operator(s) and/or new landlord(s).

4.      <u>Commitment of New Ark</u>.  Between the date hereof and the Termination Date, New Ark agrees to take any and all reasonably necessary and appropriate actions, and make all commercially reasonable efforts, to:

a)      consent to debtor-in-possession financing to the Company by the applicable Omega Entities during the Bankruptcy Cases and negotiate, execute, and deliver definitive documentation in connection therewith, on terms and conditions materially consistent with this Agreement, the DIP Term Sheet, and the DIP Financing Orders;

b)      provide the New Ark Financing to the Company during the Bankruptcy Cases and negotiate, execute, and deliver definitive documentation in connection therewith, on terms and conditions materially consistent with this Agreement, the DIP Term Sheet, and the DIP Financing Orders;

c)      consent to and permit the use of cash collateral by the Company during the Bankruptcy Cases and negotiate, execute, and deliver definitive documentation, in connection therewith, on terms and conditions materially consistent with this Agreement, the DIP Term Sheet, and the DIP Financing Orders;

d)    support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) and in good faith take all actions necessary or reasonably requested by the Company or the Omega Entities to obtain entry of the DIP Financing Orders;

e)    support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) and in good faith take all actions necessary or reasonably requested by the Company or the Omega Entities to obtain entry of the MOTA Order and the implementation and consummation of the MOTA(s);

f)    support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) and in good faith take all actions necessary or reasonable toward the approval, implementation, confirmation, and consummation of the Plan, including, without limitation, to vote to accept the Plan by the deadlines set forth in the Disclosure Statement;

g)    agree to the treatment of the New Ark Administrative Claim in the Plan;

h)    negotiate in good faith with the Company and the Omega Entities the forms of the Definitive Documents (to the extent that New Ark is a party thereto or affected thereby);

i)    vote the New Ark Allowed Claim, and any other claims for which New Ark has voting authority, to accept the Plan by the deadlines set forth in the Disclosure Statement;

j)    not vote against the Plan or otherwise agree to, consent to, or provide any support to any other chapter 11 plan or other restructuring, Alternative Transaction, sale, or liquidation of assets concerning either the Company or its assets other than the transactions contemplated under this Agreement;

k)    not directly or indirectly seek, support, solicit, or encourage any objection to approval of the Disclosure Statement or confirmation of the Plan;

l)    not take any other action that is inconsistent with, or that would materially delay the negotiation, execution, implementation or consummation of the MOTA(s), any proposed sale (if any) of the Facilities to one or more New Landlords, confirmation of the Plan, or any other transactions contemplated by this Agreement;

m)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment, *provided* that no additional economic consideration shall be required from such party unless agreed to by such party in their sole discretion; and

n)    consent to and not object to (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) all actions taken by

the Company or the Omega Entities to transition the BM Eagle Facilities to new operator(s) and/or new landlord(s).

5.    <u>Commitment of the Omega Entities</u>.  Between the date hereof and the Termination Date, the Omega Entities agree to take any and all reasonably necessary and appropriate actions, and make all commercially reasonable efforts, to:

a)    provide debtor-in-possession financing to the Company during the Bankruptcy Cases and negotiate, execute, and deliver definitive documentation in connection therewith, on terms and conditions materially consistent with this Agreement, the DIP Term Sheet, and the DIP Financing Orders;

b)    consent to and permit use of cash collateral by the Company during the Bankruptcy Cases and negotiate, execute, and deliver definitive documentation, in connection therewith, on terms and conditions materially consistent with this Agreement, the DIP Term Sheet, and the DIP Financing Orders;

c)    consent to the New Ark Financing by New Ark to the Company during the Bankruptcy Cases and negotiate, execute, and deliver definitive documentation in connection therewith, on terms and conditions materially consistent with this Agreement, the DIP Term Sheet, and the DIP Financing Orders;

d)    support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) and in good faith take all actions necessary or reasonably requested by the Company or New Ark to obtain entry of the DIP Financing Orders;

e)    support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) and in good faith take all actions necessary or reasonably requested by the Company to obtain entry of the MOTA Order and the negotiation, implementation, and consummation of the MOTA(s);

f)    not take any other action that is inconsistent with, or that would materially delay consummation of the DIP Financing, the New Ark Financing, entry of the MOTA Order, consummation of the MOTA(s), or any other transactions contemplated by this Agreement;

g)    support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) and in good faith take all actions necessary or reasonable toward the approval, implementation, confirmation, and consummation of the Plan;

h)    agree to the treatment of the Omega DIP Claims, the Omega Administrative Claims, and the Omega Allowed Unsecured Claim, in the manner designated in the Plan Term Sheet;

i)    vote the Omega Allowed Unsecured Claim, and any other claims for which the Omega Entities have voting authority, to accept the Plan by the deadlines set forth in the Disclosure Statement;

j)      negotiate in good faith with the Company and New Ark the forms of the Definitive Documents (to the extent that Omega is a party thereto);

k)      not vote against the Plan or otherwise agree to, consent to, or provide any support to any Alternative Transaction, other chapter 11 plan or other restructuring, sale, or liquidation of assets concerning either the Company or its assets other than the transactions contemplated under this Agreement;

l)      not directly or indirectly seek, support, solicit, or encourage any objection to approval of the Disclosure Statement or confirmation of the Plan;

m)      not take any other action that is inconsistent with the consummation of the Plan;

n)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment, *provided* that no additional economic consideration shall be required from such party unless agreed to by such party in their sole discretion; and

o)      consent to and not object to (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) all actions taken by the Company or New Ark to transition the BM Eagle Facilities to new operator(s) and/or new landlord(s).

6.      <u>Commitment of the Company</u>.  Between the date hereof and the Termination Date, the Company agrees to take any and all reasonably necessary and appropriate actions, and make all commercially reasonable efforts, to:

a)      implement the Restructuring Transactions in accordance with the following milestones (the "***Milestones***"):

i.      the Bankruptcy Court shall have entered the DIP Financing Interim Order on an interim basis within three (3) Business Days after the Petition Date;

ii.      the Bankruptcy Court shall have entered the DIP Financing Final Order on a final basis within thirty-five (35) days after the Petition Date;

iii.      the Bankruptcy Court shall have entered an order authorizing assumption of this Agreement within thirty-five (35) days after the Petition Date;

iv.      the Bankruptcy Court shall have entered the MOTA Order within thirty-five (35) days after the Petition Date; *provided that* the deadline to obtain entry of the MOTA Order may be extended by the Company to an earlier of (i) an additional fifteen (15) days or (ii) December 1, 2021 if the Company is diligently pursuing the MOTA Order and the Company's failure to obtain the MOTA Order within the first thirty-five (35) Days after the Petition Date is primarily attributable to the Omega Entities or the New Operator(s);

v.      the MOTA(s) shall have been consummated and gone into effect by no later than the first day of the first month following entry of the MOTA Order;

vi.      the Plan and accompanying Disclosure Statement shall have been filed within ten (10) Business Days after the Petition Date;

vii.      the Bankruptcy Court shall have entered an order, by no later than fifty (50) days after the Petition Date, approving the Disclosure Statement, solicitation procedures for the Plan, and a deadline or bar date for the filing of all prepetition claims;

viii.      the Bankruptcy Court shall have entered the Confirmation Order within one-hundred (100) days after the Petition Date; and

ix.      the Plan shall have gone effective within thirty (30) calendar days following entry of the Confirmation Order.

b)      negotiate in good faith with the Omega Entities the form of the Definitive Documents and (as applicable) execute the Definitive Documents;

c)      prosecute, expeditiously seek approval of on a timeline consistent with the Milestones, support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) and in good faith take all actions necessary or reasonably requested by the Omega Entities or New Ark to obtain entry of the DIP Financing Orders, including the DIP Financing and the New Ark Financing;

d)      not pursue or seek entry of any other debtor-in-possession financing or cash collateral order (other than the DIP Financing Orders) not acceptable to the Omega Entities and New Ark, respectively, in their sole discretion;

e)      enter into the MOTA(s) on terms reasonably acceptable to the Company;

f)      prosecute, expeditiously seek approval of on a timeline consistent with the Milestones, support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) and in good faith take all actions necessary or reasonably requested by the Omega Entities to obtain entry of the MOTA Order and the implementation and consummation of the MOTA(s), including without limitation, to use commercially reasonable efforts to obtain, or assist New Operator(s) in obtaining, any and all required regulatory approvals required to implement the MOTA(s);

g)      not take any other actions inconsistent with this Agreement that would hinder the transfer of the Portfolio to New Operator(s);

h)      not (i) directly or indirectly seek, solicit, support, propose, assist, encourage, vote for, consent to, enter, or participate in any discussion regarding the negotiation or formulation of an Alternative Transaction, (ii) publicly announce its intention not to pursue the Restructuring Transactions, or (iii) object to, impede, delay, or take any other action that is inconsistent with, or that would prevent, interfere with, impede, or delay the proposal,

solicitation, confirmation, or consummation of the Restructuring Transactions as soon as reasonably practicable;

i)    promptly (but in any event within one (1) Business Day) notify the Omega Entities and its counsel in writing of any bona fide written proposals, offers, or expressions of interest received after the Effective Date by the Company or any of its affiliates relating to an Alternative Transaction, which such notice shall include a copy thereof;

j)    (i) submit drafts to the Omega Entities of any press releases and public documents related to this Agreement, the Restructuring Transactions, and the Plan at least two (2) Business Days prior (where practicable) to making such disclosure and (ii) afford the Omega Entities an opportunity to comment on such documents and disclosures and address any comments received from such parties in good faith;

k)    cooperate in good faith with, and take all commercially reasonable actions reasonably requested by the Omega Entities and any potential New Landlord(s) during the marketing and sale of the Facilities to one or more potential New Landlord(s);

l)    provide draft copies of all material motions or applications and other material documents related to the transactions contemplated under this Agreement (including, without limitation, all first day pleadings, all documents relating to the DIP Financing and/or the New Ark Financing, the motion seeking entry of the MOTA Order, the Plan, and the Disclosure Statement) at least two (2) Business Days prior to the date when the Company intends to file any such document (*provided* that if delivery of such document at least two (2) Business Days in advance is not reasonably practicable under the circumstances, such document shall be delivered as soon as otherwise practicable prior to filing) and consult in good faith with the Parties regarding the form and substance of any such proposed filing with the Bankruptcy Court;

m)    until the Operations Transfer Date, preserve its businesses and assets, maintain its operating assets in their present condition (ordinary wear and tear expected), and maintain its existing insurance coverage, all in a manner consistent with past practice;

n)    until the Operations Transfer Date, operate its business in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (i) resulting from or relating to the filing or prosecution of the Bankruptcy Cases or (ii) imposed by the Bankruptcy Court, including any restrictions set forth in the DIP Financing Orders) and confer with the Omega Entities and their respective representatives, as reasonably requested, to report on operational matters and the general status of ongoing operations;

o)    obtain, or assist New Operator(s) in obtaining, any required regulatory and/or third-party approvals to consummate the Restructuring Transactions;

p)    maintain good standing and legal existence under the laws of the state or other jurisdiction in which such entity is incorporated, organized or formed;

q)    not sell, or file any motion or application seeking to sell, any assets other than in the ordinary course of business, except (i) as otherwise provided in this Agreement or (ii) with the prior written consent of the Omega Entities;

r)       promptly provide written notice to the Omega Entities of (i) the occurrence, or failure to occur, of any event of which the Company has actual knowledge which occurrence or failure would be likely to cause (A) any representation or warranty of the Company contained in this Agreement to be untrue or inaccurate in any material respect, (B) any covenant of the Company contained in this Agreement not to be satisfied in any material respect, or (C) any condition precedent contained in this Agreement not to occur or become impossible to satisfy, (ii) the receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring Transactions, (iii) receipt of any written notice from any governmental body in connection with this Agreement or the transactions contemplated by the Restructuring Transactions, (iv) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the transactions contemplated by this Agreement or the Restructuring Transactions, and (v) any failure of the Company to comply in any material respect with or satisfy any covenant, condition, or agreement to be complied with or satisfied by it hereunder;

s)       promptly notify the Omega Entities in writing following the receipt, in writing, of notice of any material governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened) that may have a material and adverse impact on the Company's operations or ability to fulfill its commitments under this Agreement;

t)       except as provided in the DIP Budgets, not adopt any new executive compensation or retention plans (whether a key employee retention plan or a key employee incentive plan), approve any executive bonuses, retention payments, or terminate any employee that would give rise to severance obligations, without the prior written consent of the Omega Entities;

u)       not agree to reduce the budgeted amount of the New Ark Financing in a manner inconsistent with the DIP Term Sheet without the prior written consent of the Omega Entities;

v)       not dispute that the Master Lease (i) is a "true lease" and not a financing arrangement and (ii) is a single, indivisible, and integrated document and not divisible in any way, and timely file with the Bankruptcy Court a written objection to any motion or pleading seeking to do the same;

w)       to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, negotiate in good faith appropriate additional, or alternative provisions to address any such impediment, *provided* that no additional economic consideration shall be required from such party unless agreed to by such party in their sole discretion;

x)       timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of an examiner with expanded powers or a trustee, (ii) converting any of the

Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Bankruptcy Cases, or (iv) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization; and

        y)     support (and not directly or indirectly, seek, support, solicit, or encourage the efforts of any other Person to oppose or object to) and in good faith take all actions necessary or reasonably requested by Omega or New Ark to transition the BM Eagle Facilities to new operator(s) and/or new landlord(s).

      7.    <u>Termination</u>.

        a)     This Agreement may be terminated as set forth in <u>Section 7(b)</u> below. Upon such termination, all rights and obligations of the Parties hereunder shall immediately terminate and be of no further force and effect, *provided that* the rights, stipulations, and obligations of the Parties hereto under <u>Sections 7-9, 17-26</u> shall remain valid, in force, and unaffected by termination, and survive such termination in all events.

        b)     This Agreement may be terminated:

           i.     by the written mutual consent of the Parties;

           ii.     by the Equity Sponsors, upon written notice to the Company and the Omega Entities (as applicable) of the occurrence of any of the following events:

           A.     a material breach by the Company of any of its undertakings, representations, warranties, covenants, or obligations under this Agreement that materially and adversely affects the Equity Sponsors, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to the Company;

           B.     a material breach by the Omega Entities of any of their undertakings, representations, warranties, covenants, or obligations under this Agreement that materially and adversely affects the Equity Sponsors, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to the Omega Entities;

           C.     the Bankruptcy Court grants relief that is materially inconsistent with this Agreement;

           D.     the Equity Sponsors do not receive the Plan Releases or the Bankruptcy Court does not approve the Plan Releases; or

           E.     (i) the conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (ii) the appointment of a trustee in the Bankruptcy Cases pursuant to Bankruptcy Code section 1104, or (iii) the appointment of an examiner with expanded powers in the Bankruptcy Cases;

           iii.     by the Service Providers, upon written notice to the Company and the Omega Entities (as applicable) of the occurrence of any of the following events:

A.      a material breach by the Company of any of its undertakings, representations, warranties, covenants, or obligations under this Agreement that materially and adversely affects the Service Providers, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to the Company;

B.      a material breach by the Omega Entities of any of their undertakings, representations, warranties, covenants, or obligations under this Agreement that materially and adversely affects the Service Providers, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to the Omega Entities;

C.      the Bankruptcy Court grants relief that is materially inconsistent with this Agreement;

D.      the Service Providers do not receive the Plan Releases or the Bankruptcy Court does not approve the Plan Releases; or

E.      (i) the conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (ii) the appointment of a trustee in the Bankruptcy Cases pursuant to Bankruptcy Code section 1104, or (iii) the appointment of an examiner with expanded powers in the Bankruptcy Cases;

iv.      by New Ark, upon written notice to the Company and the Omega Entities (as applicable) of the occurrence of any of the following events:

A.      a material breach by the Company of any of its undertakings, representations, warranties, covenants, or obligations under this Agreement that materially and adversely affects New Ark, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to the Company;

B.      a material breach by the Omega Entities of any of their undertakings, representations, warranties, covenants, or obligations under this Agreement that materially and adversely affects New Ark, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to the Omega Entities;

C.      the Company fails to meet a Milestone set forth in Section 6(a) of this Agreement (other than the Milestones set forth in Section 6(a)(iv) and (v)) and New Ark has not otherwise waived or extended such Milestone;

D.      the Bankruptcy Court grants relief that is materially inconsistent with this Agreement;

E.      the failure of the Omega Entities to provide the DIP Financing to the Company;

F.      the occurrence of an Event of Default under the New Ark Financing that has not been cured (if susceptible to cure) or waived in accordance with the terms of the DIP Financing Orders, as applicable; or

G.    (i) the conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (ii) the appointment of a trustee in the Bankruptcy Cases pursuant to Bankruptcy Code section 1104, or (iii) the appointment of an examiner with expanded powers in the Bankruptcy Cases;

v.    by the Company upon written notice to New Ark and the Omega Entities of the occurrence of any of the following events:

A.    a material breach by the Omega Entities of any of their undertakings, commitments, representations, warranties, covenants, or obligations under this Agreement and the DIP Financing that materially and adversely affects the Company, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to the Omega Entities;

B.    a material breach by New Ark of any of its undertakings, representations, warranties, covenants, or obligations under this Agreement that materially and adversely affects the Company, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to New Ark;

C.    the issuance by any governmental authority, including any regulatory authority or Bankruptcy Court of competent jurisdiction, of any ruling or order denying any requisite approval of, or enjoining, the consummation of the MOTA(s);

D.    the failure of the Omega Entities to provide the DIP Financing to the Company; or

E.    the failure of New Ark to provide the New Ark Financing to the Company;

vi.    by the Omega Entities or New Ark upon approval by the board of directors (or any such analogous governing body) of any Company entity of any material action to structure, consummate, or otherwise further any Alternative Transaction, including approving the retention of any additional counsel or other advisors in connection therewith;

vii.    by the Omega Entities upon written notice to the Company and New Ark of the occurrence of any of the following events, *provided, however*, that notwithstanding anything to the contrary contained in this Agreement, the DIP Term Sheet, or the DIP Loan Documents, in the event that any of the following termination events are exercised by the Omega Entities following the Operations Transfer Date (and so long as (i) the Company is not in default under the MOTA(s) after the Operations Transfer Date (except to the extent cured or otherwise waived) or otherwise taken actions to  interfere with or with the purpose to inhibit transition of the Portfolio to New Operator(s), (ii) the Company has not provided notice under Section 8 of this Agreement or (iii) it has not been one-hundred and eighty (180) days following the Petition Date and the Plan has not been confirmed), the commitments of the Omega Entities under Section 5(b), (g)-(n) shall not be terminated and shall continue in full force and effect, and the Omega Entities shall be obligated to take any and all reasonably necessary and appropriate actions toward such commitments and shall not exercise any rights or remedies under the DIP Financing Orders or any other DIP Loan Documents except to terminate the Company's ability

to use cash collateral (other than proceeds of prepetition accounts receivable subject to New Ark's liens) solely to the extent in excess of the applicable DIP budget then in effect (subject to permitted variances and permitted carrybacks/carryforwards):

      A.     the Company fails to meet a Milestone set forth in <u>Section 6(a)</u> of this Agreement and the Omega Entities have not otherwise waived or extended such Milestone;

      B.     the occurrence of an Event of Default under the DIP Financing that has not been cured (if susceptible to cure) or waived in accordance with the terms of the DIP Credit Agreement or DIP Financing Orders, as applicable;

      C.     a material breach by the Company of any of its undertakings, representations, warranties, covenants, or obligations under this Agreement, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to the Company;

      D.     a material breach by New Ark of any of its undertakings, representations, warranties, covenants, or obligations under this Agreement, which breach is not cured on or within three (3) Business Days after the giving of written notice of such breach to New Ark;

      E.     the issuance by any governmental authority, including any regulatory authority or Bankruptcy Court of competent jurisdiction, of any ruling or order denying any requisite approval of, or enjoining, the consummation of the MOTA(s);

      F.     the failure of New Ark to provide the New Ark Financing to the Company;

      G.     the Company or New Ark take a position that is inconsistent with the Master Lease being (i) a "true lease" and not a financing arrangement and (ii) a single, indivisible, and integrated document and not divisible in any way;

      H.     the Bankruptcy Court grants relief that is materially inconsistent with this Agreement;

      I.     the Company (i) withdraws the Plan or (ii) publicly announces its intention not to support the Restructuring Transactions;

      J.     the Bankruptcy Court enters an order terminating or otherwise limiting the Company's exclusive right to file and/or solicit acceptances of a chapter 11 plan;

      K.     the Omega Entities do not receive the Plan Releases or the Bankruptcy Court does not approve the Plan Releases;

      L.     the Confirmation Order is reversed or vacated;

M.     any Court of competent jurisdiction enters an order declaring this Agreement unenforceable, or null and void;

N.     after notice and an opportunity to cure, the Company fails to pay fees and expenses the Company is required to pay in connection with or under the DIP Financing;

O.     except as otherwise provided in the DIP Budgets, the Company (i) adopts a new executive compensation or retention plan, approves any executive bonuses, retention payments, or terminates any employee that would give rise to severance obligations or (ii) attempts to seek authority from the Bankruptcy Court to do any of the foregoing, in each case without the prior written consent of the Omega Entities; or

P.     (i) the conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (ii) the appointment of a trustee in the Bankruptcy Cases pursuant to Bankruptcy Code section 1104, or (iii) the appointment of an examiner with expanded powers in the Bankruptcy Cases.

c)     This Agreement shall terminate automatically without any further action required by any Party, upon the effective date of a confirmed Plan.

d)     The date on which this Agreement is terminated in accordance with the foregoing shall be referred to as the "***Termination Date***."

e)     Notwithstanding any provision in this Agreement to the contrary, the right to terminate this Agreement shall not be available to any Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the occurrence of a termination event.

f)     The Company acknowledges and agrees and shall not dispute that after the commencement of the Bankruptcy Cases, as applicable, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of Bankruptcy Code section 362 (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); *provided that* nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

8.     <u>Fiduciary Duties</u>.  Notwithstanding anything to the contrary contained in this Agreement, until the entry of the Confirmation Order, nothing in this Agreement shall require the Company or any director, manager, or officer of the Company (in such person's capacity as a director, manager, or officer) to take any action, or to refrain from taking any action, to the extent that doing so would be inconsistent with its fiduciary obligations under applicable law (as determined by it after consultation with outside legal counsel), *provided that* within one (1) day of approval by the board of directors (or such analogous governing body) of the Company of any material action to evaluate, structure, or consummate an Alternative Transaction, including approving the retention of additional counsel or other advisors in connection therewith, the Company shall have delivered written notice to the Omega Entities, New Ark, the Equity Sponsors, and the Service Providers (which may be provided by email).

9. <u>Remedies; Specific Performance</u>.  The Parties agree that any breach of this Agreement would give rise to irreparable damages for which monetary damages would be an inadequate remedy (although nothing in this section or Agreement shall in any way limit the monetary damages any Party may also seek against any other Party for any breach of this Agreement) and any of the Parties, as the case may be, will be entitled to enforce the terms of this Agreement by decree of specific performance and to obtain injunctive relief against any breach or threatened breach without the necessity of proving the inadequacy of monetary damages as a remedy.  A suit for specific performance must be filed no later than ten (10) Business Days following an alleged breach by any Party.

10. <u>Transfer and Acquisition of Claims</u>.  New Ark, the Equity Sponsors, the Service Providers, and the Omega Entities each agree that they will not sell, transfer, assign, or otherwise dispose of any of their claims against or interests in the Company, unless any such transferee executes a joinder hereto and otherwise assumes the rights and obligations in their entirety under this Agreement.

11. <u>Confidentiality; Public Announcements</u>.  Prior to the Petition Date, and (a) absent the advance written notice to the other Parties hereto or (b) unless required by disclosure requirements of the United States Securities and Exchange Commission or other applicable governmental agencies or departments, the Parties each agree to keep confidential and not disclose (i) the terms or existence of this Agreement, the MOTA(s), or any of the transactions contemplated by this Agreement and (ii) the Company's consideration of the MOTA(s) and potential filing of the Bankruptcy Cases; *provided that*, this shall in no way limit any disclosure to a regulator having jurisdiction over a Party or any of its representatives in the course of such regulator's general or specific examination or inspection, or its review of this Agreement or the transactions contemplated hereby; *provided further that* the Company, New Ark, and the Omega Entities may disclose anything to potential investors, lenders, transfer parties, or others (and representatives thereof) if necessary in their respective reasonable discretion to induce such potential parties to go forward with any of the transactions or events contemplated by this Agreement.  In addition, prior to the Petition Date, if any Party hereto determines in good faith that it is required to make any disclosure, issue any press release, or make any public statement relating to the terms or existence of this Agreement, the MOTA(s), or any of the transactions contemplated by this Agreement under applicable law or regulation, it may do so, in which case that Party will use all commercially reasonable efforts to consult with the other Parties before making such disclosure, issuing any such release, or making any such public statement.

12. <u>Party Representations</u>.  Each Party represents and warrants to each other Party that:

a) <u>Corporate Form</u>.  As of the date of this Agreement, (i) such Party is duly organized, validly existing, and in good standing under the laws of the state of its organization; (ii) such Party has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement; and (iii) the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, or limited liability company action on its part.

b)      No Conflicts.  The execution and delivery of this Agreement and the performance of each Party's respective obligations hereunder do not and shall not (i) violate any provision of material law, rule, or regulation applicable to it or its certificate of incorporation or by-laws (or other organizational documents) or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both and exclusive of defaults relating to solvency and bankruptcy) a default under, any material contractual obligation to which it is a party.  Each Party is not aware of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement.

c)      Binding Obligation.  This Agreement is the legally valid and binding obligation of each Party, enforceable against it in accordance with its terms.  The Parties hereto know of no regulatory authority whose consent or approval, or any filing with, is required in order to execute this Agreement or perform their respective obligations hereunder.

d)      No Litigation.  No litigation or case before any court, arbitrator, or administrative or governmental body is pending against any Party that would adversely affect its ability to enter into this Agreement, perform its obligations hereunder, or consummate the transactions contemplated hereby.

e)      Legal Representation.  Each Party has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement, and each Party has had the contents hereof fully explained by such counsel and is fully aware of such contents and legal effect.  The Parties each mutually represent and acknowledge that each has relied upon the advice of such Party's attorneys concerning the legal consequence of this Agreement, that terms of this Agreement are fully understood and voluntarily accepted and entered into, and that the execution of this Agreement is beneficial to each Party.

13.      Time is of the Essence.  Time is of the essence with respect to all aspects of this Agreement, including with respect to any obligation to take any action, pay any money or other consideration, or complete any undertaking.

14.      No Additional Fiduciary Duties or Responsibilities.  Except for the obligations under this Agreement, the Master Lease (or any related documents), the Credit Agreement (or any related documents), the DIP Financing agreements, and any other written contracts between any of the Parties, or as may be imposed under applicable law, neither the Omega Entities, New Ark, nor the Company have any other duties or responsibilities to each other whatsoever.

15.      Entire Agreement.  This Agreement, including its exhibits, constitutes the entire agreement of the Parties with respect to the subject matter hereof, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to such matters.  Each Party acknowledges that in entering into this Agreement it has not relied on any representations made by the other Party that are not expressed in the Agreement.

16.      Waiver.  If the transactions contemplated herein are not consummated, or following the occurrence of the Termination Date, if applicable, nothing (except the parts of this Agreement that survive termination, as set forth in Section 7(a)) shall be construed as a waiver

by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.

17.    <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented without the prior written consent of the Company, New Ark, and the Omega Entities.

18.    <u>Governing Law</u>.  This Agreement and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement (including any claim or cause of action based upon, arising out of, or related to any representation or warranty made in this Agreement, in connection with this Agreement, or as an inducement to enter into this Agreement), shall be governed by, and enforced in accordance with, the internal laws of the State of Delaware, including its statutes of limitations, and without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.

19.    <u>Venue</u>.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit, or case against it with respect to any matter arising under, out of, or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or case, must be brought in the United States District Court for the District of Delaware (unless there would be no subject matter jurisdiction in that court, in which case such action, suit, or case must be brought in a court of competent jurisdiction in Wilmington, Delaware), and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such courts, generally and unconditionally, with respect to any such action, suit, or case.  Notwithstanding the foregoing, if the Bankruptcy Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

20.    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES (TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW) ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, CASE, OR COUNTERCLAIM ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT.

21.    <u>Expenses</u>.  The Company is responsible for (i) any and all fees and expenses of its professionals, including counsel, consultants, or other third parties of any kind, in connection with the preparation of, revisions to, and negotiation of, this Agreement and related matters; and (ii) the Omega Entities and New Ark shall be responsible for their own fees and expenses of their respective professionals in connection with the preparation of, revisions to, and negotiation of, this Agreement and related matters.

22.    <u>Notices</u>.  All notices, requests, and other communications required hereunder to be in writing will be deemed to have been duly given only if (i) delivered personally (with receipt confirmed telephonically), (ii) delivered by email transmission (with receipt confirmed telephonically or via return email), or (iii) delivered by overnight courier (signature required) to the parties at the following addresses or email addresses:

a)      If to the Company:

        **Gulf Coast Health Care, LLC**
        c/o M. Benjamin Jones (ben.jones@ankura.com)
        485 Lexington Avenue, 10th Floor
        New York, NY 10017

with a copy to:

        **McDermott Will & Emery LLP**
        Attn: Daniel M. Simon (dmsimon@mwe.com)
        1180 Peachtree Street NE, Suite 3350
        Atlanta, GA 30309

b)      If to the Equity Sponsors:

        c/o Health Care Navigator LLC
        Attn: Raymond Mulry (rmulry@hcnavigator.net)
        2 Bridge Street, Suite 210
        Irvington, NY 10533

with a copy to:

        **Paul, Weiss, Rifkind, Wharton & Garrison LLP**
        Attn: Alice Eaton (aeaton@paulweiss.com)
            Kelley Cornish (kcornish@paulweiss.com)
        1285 Avenue of the Americas
        New York, NY 10019

c)      If to the Service Providers:

        c/o Health Care Navigator LLC
        Attn: Raymond Mulry (rmulry@hcnavigator.net)
        2 Bridge Street, Suite 210
        Irvington, NY 10533

with a copy to:

        **DLA Piper LLP (US)**
        Attn: James Muenker (James.Muenker@dlapiper.com)
        1900 N. Pearl Street, Suite 2200
        Dallas, TX 75201

d)      If to New Ark:

        **New Ark Capital, LLC**
        Attn: Steven Lebowitz

2 Bridge Street, Suite 210
Irvington, NY 10533

with a copy to:

**DLA Piper LLP (US)**
Attn: James Muenker (James.Muenker@dlapiper.com)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201

e)      If to the Omega Entities:

**Omega Healthcare Investors, Inc.**
Attn: Daniel J. Booth (dbooth@omegahealthcare.com)
303 International Circle, Suite 200
Hunt Valley, MD 21030

with a copy to:

**Weil, Gotshal & Manges LLP**
Attn: Gary Holtzer (gary.holtzer@weil.com)
       Robert Lemons (Robert.Lemons@weil.com
       Jason Hufendick (Jason.Hufendick@weil.com)
767 Fifth Avenue
New York, NY 10153

-and-

**Ferguson Braswell Frazer Kubasta PC**
Attn: Leighton Aiken (laiken@fbfk.law)
2500 Dallas Parkway, Suite 600
Plano, TX 75093

23.     <u>Successors and Assigns</u>.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party hereto, without the prior written consent of the other Parties hereto, and then only to a Person who has agreed to be bound by the provisions of this Agreement.  This Agreement is intended to and shall bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives.

24.     <u>No Third-Party Beneficiaries</u>.  The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other person, except that each and every recipient of or Person named or described in the Plan Releases, whether specifically named therein or described generally therein, shall in all respects be entitled to rely on and enforce the Plan Releases once they become effective.

25.    <u>Not a Solicitation</u>.  This Agreement does not constitute (i) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act of 1933 or the Securities Exchange Act of 1934, or (ii) a solicitation of votes on a chapter 11 plan of reorganization or liquidation for purposes of the Bankruptcy Code.

26.    <u>Interpretation/Construction</u>.

a)    <u>Time Periods</u>.  If any time period or other deadline provided in this Agreement expires or falls on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

b)    <u>Headings</u>.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

c)    <u>Interpretation</u>.  For purposes of this Agreement, unless otherwise specified: (i) each term, whether stated in the singular or the plural, includes both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender include the masculine, feminine, and the neuter gender; (ii) all references herein to "Sections," "Exhibits," or other such subparts are references to sections, exhibits, or such subparts of this Agreement; (iii) any reference to this Agreement automatically includes reference to the exhibits attached to this Agreement; and (iv) the words "herein," "hereof," "hereunder," and "hereto" refer to this Agreement in its entirety rather than to a particular portion of this Agreement.

d)    <u>Construction</u>.  Each Party acknowledges that it has received adequate information to enter into this Agreement, and that this Agreement and the Exhibits attached hereto have been prepared through the joint efforts of all of the Parties.  Neither the provisions of this Agreement nor the Exhibits attached hereto nor any alleged ambiguity herein or therein shall be interpreted or resolved against any Party on the ground that such Party's counsel drafted this Agreement or the Exhibits attached hereto, or based on any other rule of strict construction. Whenever the words "include," "includes," or "including" are used in this Agreement, they are not limiting, and shall be deemed to be followed by the phrase "without limitation" unless preceded by a negative predicate.

27.    <u>Reservation of Rights</u>.  Except as provided in this Agreement, nothing contained herein shall (i) limit the rights of any Omega Entity under the Master Lease; (ii) constitute a waiver or amendment of any provision of the Master Lease or any agreements executed in connection with the Master Lease; (iii) limit the rights of New Ark under the Credit Agreement; (iv) constitute a waiver or amendment of any provision of the Credit Agreement or any agreements executed in connection with the Credit Agreement; (iv) limit the rights of any Service Provider under any contract or agreement between any Service Provider and the Company; or (v) limit the rights of any Equity Sponsor or the DIP Lenders.

28.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

*[Signature Pages Follow]*

27

IN WITNESS WHEREOF, the Parties hereto have executed this Restructuring Support Agreement or caused the same to be executed by their respective duly authorized officers as of the date first set forth above (the "***Effective Date***").

COMPANY:

| | |
|---|---|
| Gulf Coast Health Care, LLC | MF Lake Eustis, LLC |
| GCH Management Services, LLC | SF Lake Placid, LLC |
| Pensacola Administrative Services, LLC | MF Longwood, LLC |
| Pensacola Administrative Holdings, LLC | FL HUD Margate, LLC |
| Gulf Coast Master Tenant Holdings, LLC | SF Oakbrook, LLC |
| Gulf Coast Master Tenant I, LLC | SF Kissimmee, LLC |
| Gulf Coast Master Tenant II, LLC | NF Panama, LLC |
| Gulf Coast Master Tenant III, LLC | MF Oakwood, LLC |
| HUD Facilities, LLC | NF River Chase, LLC |
| Gulf Coast Facilities, LLC | FL HUD Rosewood, LLC |
| Florida Facilities, LLC | SF Royal Manor, LLC |
| MS HUD Boyington, LLC | SF Salerno, LLC |
| MS HUD Dixie, LLC | NF Manor, LLC |
| MS Greenbough, LLC | FL HUD Silvercrest, LLC |
| MS Lakeside, LLC | FL HUD Pensacola, LLC |
| MS HUD Ocean Springs, LLC | NF Suwannee, LLC |
| MS HUD Pine View, LLC | MF Winter Park, LLC |
| MS Shelby, LLC | SF Carnegie, LLC |
| MS Singing, LLC | NF Windsor, LLC |
| NF Pensacola Manor, LLC | NF Escambia, LLC |
| FL HUD Baybreeze, LLC | Brevard Oaks Center, LLC |
| FL HUD Bayside, LLC | SF Brevard, LLC |
| SF Boynton, LLC | NF Nine Mile, LLC |
| NF Brynwood, LLC | SF Lake Placid ALF, LLC |
| NF Chipola, LLC | SF Fountainhead, LLC |
| MF Halifax, LLC | SF Berkshire, LLC |
| MF Debary, LLC | SF Tampa, LLC |
| MF Flagler, LLC | AL Citronelle, LLC |
| SF Glen Oaks, LLC | AL Willow Tree, LLC |
| NF Glen Cove, LLC | SC-GA2018 Cobblestone Rehabilitation and |
| FL HUD Destin, LLC | Healthcare Center, LLC |
| MF Heritage, LLC | |

By: _____

Name:  M. Benjamin Jones

Title:   Chief Restructuring Officer

OMEGA ENTITIES:

OHI Asset Funding (DE), LLC
CSE Pine View LLC
Dixie White Nursing Home, LLC
Ocean Springs Nursing Home, LLC
Pensacola Real-Estate Holdings I, LLC
Pensacola Real-Estate Holdings II, LLC
Pensacola Real-Estate Holdings III, LLC
Pensacola Real-Estate Holdings IV, LLC
Pensacola Real-Estate Holdings V, LLC
Skyler Boyington, LLC
Skyler Florida, LLC
Skyler Pensacola, LLC
Carnegie Gardens LLC
Greenbough, LLC
Marianna Holdings, LLC
Panama City Nursing Center LLC
Skyler Maitland LLC
Suwanee, LLC
OHI Asset (FL) Lake Placid, LLC
OHI Asset (FL) Pensacola – Hillview, LLC
OHI Asset (FL) Eustis, LLC
OHI Asset (FL) Pensacola, LLC
OHI Asset (FL) Melbourne, LLC
OHI Asset (FL) Pensacola – Nine Mile, LLC
OHI Asset (FL) Lake City, LLC

By: _____
Name:        Daniel J. Booth
Title:        Chief Operating Officer

*[Signature Page to Restructuring Support Agreement]*

SENIOR SECURED LENDER:

New Ark Capital, LLC

By:      _____
Name: Steven Lebowitz
Title:   Vice President

SERVICE PROVIDERS:

Health Care Navigator LLC

By:     _Eric M. Roth_____
Name:   Eric M. Roth
Title:  President

HMS Purchasing, LLC

By:     _Mitchell Starer_____
Name:   Mitchell Starer
Title:  President

Halcyon Rehabilitation, LLC

By:     _Connie L. Rusynyk_____
Name:   Connie L. Rusynyk
Title:  President

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

GULF COAST HEALTH CARE HOLDINGS, LLC

By:    Southeast US Holdings, LLC, its manager

       By:    Asset Navigator, LLC, its manager

       By: _____
       Name: Eric M. Roth
       Title:  President

PAH II, LLC

       By:    Southeast Admin Holdings, LLC, its manager

       By: _____
       Name: Judith Schwartzberg Starer
       Title:  Manager

GCMTH II, LLC

       By:    Southeast MT Holdings, LLC, its manager

       By: _____
       Name: Judith Schwartzberg Starer
       Title:  Manager

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

ARGENT PROPERTIES 2012, LLC

By: _____

Name: Eric M. Roth
Title:   Authorized Representative

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**Barrow Street Real Estate Fund III, L.P.**,
a Delaware limited partnership

    By: **Barrow Street Capital III, LLC,**
        a Delaware limited liability company, its general partner

        By: **Barrow Street Capital, LLC,**
            Its manager

By:    _____
Name:   Robert F. Greenhill, Jr.
Title:    Co-Chief Executive Officer

By:    _____
Name:   Nicholas Chermayeff
Title:    Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**BSREF III Parallel Investor I, LLC**,
a Delaware limited liability company

     By: **Barrow Street Capital III, LLC,**
        a Delaware limited liability company, its managing member

        By: **Barrow Street Capital, LLC,**
          Its manager

By:      _____
Name:  Robert F. Greenhill, Jr.
Title:   Co-Chief Executive Officer

By:      _____
Name:  Nicholas Chermayeff
Title:   Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**BSREF III Parallel Investor II, L.P.,**
a Delaware limited liability company

      By: **Barrow Street Capital III, LLC,**
          a Delaware limited liability company, its managing member

            By: **Barrow Street Capital, LLC,**
               Its manager

By: _____
Name:  Robert F. Greenhill, Jr.
Title:   Co-Chief Executive Officer

By: _____
Name:  Nicholas Chermayeff
Title:   Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**BSREF III Parallel Investor III, L.P.,**
a Delaware limited liability company

    By: **Barrow Street Capital III, LLC,**
       a Delaware limited liability company, its managing member

        By: **Barrow Street Capital, LLC,**
           Its manager

By: _____
Name:  Robert F. Greenhill, Jr.
Title:  Co-Chief Executive Officer

By: _____
Name:  Nicholas Chermayeff
Title:  Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**BSREF III Parallel Investor IV, LLC,**
a Delaware limited liability company

      By: **Barrow Street Capital III, LLC,**
          a Delaware limited liability company, its managing member

            By: **Barrow Street Capital, LLC,**
               Its manager

By: _____
Name:  Robert F. Greenhill, Jr.
Title:   Co-Chief Executive Officer

By: _____
Name:  Nicholas Chermayeff
Title:   Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**BSREF III Parallel Investor V, LLC,**
a Delaware limited liability company

By: **Barrow Street Capital III, LLC,**
a Delaware limited liability company, its managing member

By: **Barrow Street Capital, LLC,**
Its manager

By: _____
Name:   Robert F. Greenhill, Jr.
Title:   Co-Chief Executive Officer

By: _____
Name:   Nicholas Chermayeff
Title:   Co-Chief Executive Officer

EQUITY SPONSORS:

**Barrow Argent, LLC,**
a Delaware limited liability company

    By: **Barrow Street Capital, LLC,**
      a Delaware limited liability company, its manager

By: _____
Name:   Robert F. Greenhill, Jr.
Title:    Co-Chief Executive Officer

By: _____
Name:   Nicholas Chermayeff
Title:    Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**Barrow Street Real Estate Fund III, L.P.**,
a Delaware limited partnership

By: **Barrow Street Capital III, LLC**,
a Delaware limited liability company, its general partner

By: **Barrow Street Capital, LLC**,
Its manager

By: _____
Name:    Robert F. Greenhill, Jr.
Title:    Co-Chief Executive Officer

By: _____
Name:    Nicholas Chermayeff
Title:    Co-Chief Executive Officer

EQUITY SPONSORS:

**BSREF III Parallel Investor I, LLC,**
a Delaware limited liability company

      By: **Barrow Street Capital III, LLC,**
         a Delaware limited liability company, its managing member

         By: **Barrow Street Capital, LLC,**
           Its manager

By: _____
Name:    Robert F. Greenhill, Jr.
Title:     Co-Chief Executive Officer

By: _____
Name:    Nicholas Chermayeff
Title:     Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**BSREF III Parallel Investor II, L.P.**,
a Delaware limited liability company

      By: **Barrow Street Capital III, LLC**,
         a Delaware limited liability company, its managing member

            By: **Barrow Street Capital, LLC**,
               Its manager

By: _____
Name:    Robert F. Greenhill, Jr.
Title:     Co-Chief Executive Officer

By: _____
Name:    Nicholas Chermayeff
Title:     Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**BSREF III Parallel Investor III, L.P.**,
a Delaware limited liability company

   By: **Barrow Street Capital III, LLC**,
      a Delaware limited liability company, its managing member

      By: **Barrow Street Capital, LLC**,
         Its manager

By: _____
Name:   Robert F. Greenhill, Jr.
Title:    Co-Chief Executive Officer

By: _____
Name:   Nicholas Chermayeff
Title:    Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**BSREF III Parallel Investor IV, LLC**,
a Delaware limited liability company

> By: **Barrow Street Capital III, LLC**,
> a Delaware limited liability company, its managing member

> > By: **Barrow Street Capital, LLC**,
> > Its manager

By:        _____
Name:    Robert F. Greenhill, Jr.
Title:      Co-Chief Executive Officer

By:        _____
Name:    Nicholas Chermayeff
Title:      Co-Chief Executive Officer

EQUITY SPONSORS:

**BSREF III Parallel Investor V, LLC**,
a Delaware limited liability company

By: **Barrow Street Capital III, LLC**,
a Delaware limited liability company, its managing member

By: **Barrow Street Capital, LLC**,
Its manager

By: _____
Name:    Robert F. Greenhill, Jr.
Title:    Co-Chief Executive Officer

By: _____
Name:    Nicholas Chermayeff
Title:    Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

EQUITY SPONSORS:

**Barrow Argent, LLC**,
a Delaware limited liability company

      By: **Barrow Street Capital, LLC**,
          a Delaware limited liability company, its manager

By:       _____
Name:   Robert F. Greenhill, Jr.
Title:    Co-Chief Executive Officer

By:       _____
Name:   Nicholas Chermayeff
Title:    Co-Chief Executive Officer

*[Signature Page – Restructuring Support Agreement]*

## Exhibit A

## Portfolio Facilities

| Facility Name | Existing Landlord | Existing Operator |
|---|---|---|
| Pine View Health and Rehabilitation Center | CSE Pine View LLC | MS HUD Pine View, LLC |
| Pass Christian Health and Rehabilitation Center | Dixie White Nursing Home, LLC | MS HUD Dixie, LLC |
| Ocean Springs Health and Rehabilitation Center | Ocean Springs Nursing Home, LLC | MS HUD Ocean Springs, LLC |
| Specialty Health and Rehabilitation Center | Pensacola Real-Estate Holdings I, LLC | FL HUD Pensacola, LLC |
| Bayside Health and Rehabilitation Center | Pensacola Real-Estate Holdings II, LLC | FL HUD Bayside, LLC |
| Bay Breeze Senior Living and Rehabilitation Center | Pensacola Holdings III, LLC | FL HUD Baybreeze, LLC |
| Grand Boulevard Health and Rehab Center | Pensacola Holdings IV, LLC | FL HUD Destin, LLC |
| Silvercrest Health and Rehabilitation Center | Pensacola Holdings V, LLC | FL HUD Silvercrest, LLC |
| Boyington Health and Rehabilitation Center | Skyler Boyington, LLC | MS HUD Boyington, LLC |
| Rosewood Healthcare and Rehabilitation Center | Skyler Florida, LLC | FL HUD Rosewood, LLC |
| Margate Health and Rehabilitation Center | Skyler Pensacola, LLC | FL HUD Margate, LLC |
| Wave Crest Health and Rehabilitation Center | Carnegie Gardens LLC | SF Carnegie, LLC |
| Greenbough Health and Rehabilitation Center | Greenbough, LLC | MS Greenbough, LLC |
| Chipola Health and Rehabilitation Center | Marianna Holdings, LLC | NF Chipola, LLC |
| Panama City Health and Rehabilitation Center | Panama City Nursing Center, LLC | NF Panama, LLC |
| The Rehabilitation Center of Winter Park | Skyler Maitland LLC | MF Winter Park, LLC |
| Suwannee Health and Rehabilitation Center | Suwanee, LLC | NF Suwannee, LLC |
| Southern Lifestyle Senior Living Center | OHI Asset (FL) Lake Placid, LLC | SF Lake Placid ALF, LLC |
| Arcadia Health & Rehabilitation Center | OHI Asset (FL) Pensacola – Hillview, LLC | NF Pensacola Manor, LLC |
| Lake Eustis Health and Rehabilitation Center | OHI Asset (FL) Eustis, LLC | MF Lake Eustis, LLC |
| Olive Branch Health and Rehabilitation Center | OHI Asset (FL) Pensacola, LLC | NF Escambia, LLC |
| Viera del Mar Health and Rehabilitation Center | OHI Asset (FL) Melbourne, LLC | Brevard Oaks Center, LLC |
| De Luna Health and Rehabilitation Center | OHI Asset (FL) Pensacola – Nine Mile, LLC | NF Nine Mile, LLC |
| The Rehabilitation Center of Lake City | OHI Asset (FL) Lake City, LLC | SF Brevard, LLC |

**Exhibit B**

**DIP Term Sheet**

CONFIDENTIAL
SUBJECT TO FRE 408 AND SIMILAR RULES

GULF COAST HEALTH CARE, LLC AND CERTAIN AFFILIATES AND SUBSIDIARIES
THEREOF

SUMMARY OF TERMS AND CONDITIONS

UP TO $25 MILLION SECURED DEBTOR-IN-POSSESSION CREDIT FACILITY

October 14, 2021

This Summary of Terms and Conditions (the "**Term Sheet**") outlines the material terms and conditions of a debtor-in-possession credit facility that may be provided by the DIP Lenders (as defined below), and would be funded pursuant to the conditions precedent set forth under "Conditions to Effectiveness" below.

Reference is made to that certain Second Consolidated Amended and Restated Master Lease Agreement, by and among, the entities listed on Schedule A thereto (collectively "**Landlord**"), and GULF COAST MASTER TENANT I, LLC, a Delaware limited liability company ("**Tenant**"), dated as of July 1, 2013, as amended by that certain First Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of October 2, 2013, that certain Second fAmendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of October 1, 2014, that certain Third Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of September 29, 2015, that certain Fourth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of February 25, 2016, that certain Fifth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of May 26, 2017, that certain Sixth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of December 15, 2016, that certain Seventh Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of January 26, 2017, that certain Eighth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of June 8, 2017, that certain Ninth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated December 19, 2017, that certain Tenth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated July 6, 2018, and that certain Eleventh Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of August 19, 2019, as may have been further amended (collectively, the "**Lease**").

Reference is made to that certain Credit Agreement, dated as of July 6, 2018, among GULF COAST HEALTH CARE, LLC, a Delaware limited liability company ("**Parent**"), FL HUD BAYBREEZE, LLC, a Delaware limited liability company, FL HUD BAYSIDE, LLC, a Delaware limited liability company, FL HUD DESTIN, LLC, a Delaware limited liability company, FL HUD MARGATE, LLC, a Delaware limited liability company, FL HUD PENSACOLA, LLC, a Delaware limited liability company, FL HUD ROSEWOOD, LLC, a Delaware limited liability company, FL HUD SILVERCREST, LLC, a Delaware limited liability company, MF LAKE EUSTIS, LLC, a Delaware limited liability company, MF WINTER PARK, LLC, a Delaware limited liability company, MS GREENBOUGH, LLC, a Delaware limited liability company, MS HUD BOYINGTON, LLC, a Delaware limited liability company, MS HUD DIXIE, LLC, a Delaware limited liability company, MS HUD OCEAN SPRINGS, LLC, a Delaware limited liability company, MS HUD PINE VIEW, LLC, a Delaware limited liability company, NF CHIPOLA, LLC, a Delaware limited liability company, NF ESCAMBIA, LLC, a Delaware limited liability company NF PANAMA, LLC, a Delaware limited liability company, NF PENSACOLA MANOR, LLC, a Delaware limited liability company, NF SUWANNEE, LLC, a Delaware limited liability company, SF CARNEGIE, LLC, a Delaware limited liability company, SF LAKE PLACID ALF, LLC, a Delaware limited liability company, BREVARD OAKS CENTER, LLC, a Florida limited liability company, SF BREVARD, LLC, a Delaware limited liability company, NF NINE MILE, LLC, a Delaware limited liability company (collectively, "**Prepetition Borrowers**"), the lenders from time to time party thereto

(the "**Prepetition Lenders**") and NEW ARK CAPITAL, LLC, as administrative agent for the Prepetition Lenders (the "**Prepetition Agent**" or "**New Ark**"), issuing bank and swingline lender, as such Credit Agreement has been modified and supplemented from time to time (the "**Prepetition Credit Agreement**").

Terms used herein but not defined herein shall have the meaning assigned to such terms on **Annex C** attached hereto or the DIP Orders, as applicable.

Subject to entry of the Interim DIP Order (as defined below), the undersigned parties agree as follows:

| | |
|---|---|
| **Borrowers:** | The Prepetition Borrowers, in each case as debtors and debtors-in-possession in cases under chapter 11 (including any cases filed by subsidiaries or controlled Affiliates of any Borrower that are jointly administered with the cases of the Borrowers, the "**Chapter 11 Cases**") or any other chapter of the United States Bankruptcy Code (as amended, the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| **Guarantors:** | The obligations of the Borrowers under the DIP Facility (the "**DIP Facility Obligations**") shall be guaranteed, jointly and severally, and secured as provided in and consistent with the priority set forth below under the heading "Security", by Parent, Tenant, and each of the "Guarantors" under and as defined in the Prepetition Credit Agreement and those additional entities set forth on **Annex B** hereto in each case as debtors and debtors-in-possession in the Chapter 11 Cases (the "**Guarantors**," and together with the Borrowers, the "**Loan Parties**"). Each Loan Party, in its capacity as a debtor and debtor-in-possession in the Chapter 11 Cases, is referred to herein as a "**Debtor**". |
| **DIP Agent:** | OHI Asset Funding (DE), LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"). |
| **DIP Lenders:** | One or more funds managed by, or other entities affiliated with, the DIP Agent (such funds or entities, collectively, the "**DIP Lenders**"). |
| **DIP Facility:** | A secured debtor-in-possession term loan credit facility in an aggregate principal amount of up to $25 million (the "**DIP Facility**"), composed of new term loans made by, and other obligations owed to, the DIP Lenders on, and from time to time after, the Closing Date (such new loans and obligations, the "**DIP Loans**" and commitments with respect to such DIP Loans, the "**DIP Commitments**") to be funded as set forth below under the heading "Availability" with no more than one draw each week, provided that the DIP Agent shall receive at least three business days' notice of any draw request, unless otherwise agreed to by the DIP Agent. DIP Loans that are repaid or prepaid may not be reborrowed. |
| **Closing Date:** | As used herein, "**Closing Date**" shall mean the date on which each of the conditions specified under the heading "**Conditions to Effectiveness**" below shall have been satisfied (or waived by the DIP Agent and the Required Lenders). The Closing Date shall occur as promptly as is practical after the entry of the Interim DIP Order (as defined below) by the Bankruptcy Court. |

| | |
|---|---|
| **Maturity Date:** | All amounts outstanding under the DIP Facility shall be due and payable in full (subject to the RSA (as defined below)), and the DIP Commitments thereunder shall terminate, on the Maturity Date. The "**Maturity Date**" shall be that date which is the earliest to occur of (a) the date that is 8 months after the Closing Date, (b) the date that is 35 days after the entry of the Interim DIP Order if the Final DIP Order (as defined below) has not been entered by the Bankruptcy Court prior to such date, (c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases, and (d) the date the DIP Agent, or the DIP Agent at the direction of the Required Lenders, provides written notice to the Borrowers of the existence of an Event of Default (subject to applicable notice and cure provisions, if any) by the Borrowers as specified in the Documentation. |
| **Cash Collateral:** | "**Cash Collateral**" has the meaning ascribed to it in section 363(a) of the Bankruptcy Code. |
| **Use of Proceeds:** | The Debtors will be permitted to use the proceeds of the DIP Facility to fund the operational, employee, wind-down and other costs of the Loan Parties, including, without limitation, payments authorized to be made under "first day" or "second day" orders, post-MOTA transition and employee costs, and costs associated with providing shared services to New Operator or plan administrator post-transition, and, in each case, consistent with, subject to, and within the limitations contained in, the budget depicting on a 13-week basis cash revenue, receipts, expenses and disbursements (the "**DIP Budget**"), taking into account Permitted Variances (as defined in Annex F) and Permitted Carrybacks/Carryforwards (as defined in Annex F). Except as expressly set forth in the DIP Budget, proceeds of the DIP Facility shall not be used to pay the costs and expenses (including professional fees) of administering the Chapter 11 Cases. Other costs and expenses (including professional fees) of administering the Chapter 11 Cases are scheduled to be funded from the Cash Collateral of the Prepetition Lenders on the terms outlined herein, and as specifically identified in a budget associated therewith (the "**New Ark Budget**" and, together with the DIP Budget, the "**Budgets**"). For the avoidance of doubt, the fees, costs and expenses detailed in the New Ark Budget shall not be revised in a manner that would shift the burden for such fees, costs and expenses to the DIP Budget and/or the DIP Lenders and (2)(x) payments on account of claims under section 503(b)(9) of the Bankruptcy Code and (y) payments on account of critical vendor claims shall be included in the DIP Budget and not the New Ark Budget. For the further avoidance of doubt, proceeds of the DIP Facility shall not be used to pay professionals, directors' fees, or U.S. Trustee fees. |
| **Budgets:** | The use of borrowings under the DIP Facility and the New Ark Funding shall be limited in accordance with each of the respective Budgets, subject to permitted variances (at a 10% level) determined on the basis of aggregate cash disbursements payable to Persons other than the DIP Lenders and tested every other week on a four-week rolling basis (each a "**Reporting Period**"), beginning testing with the fourth full calendar week after the Closing Date ("**Budget Testing Start Date**"), with |

| | |
|---|---|
| | Permitted Carrybacks/Carryforwards. In addition, prior to the Budget Testing Start Date, subject to "Use of Proceeds" above, any disbursements approved by the Bankruptcy Court and of the type reflected in the Initial Budgets (as defined below) may be financed with DIP Facility proceeds. |
| | The initial Budgets covering the 13-week period commencing on the Petition Date (the "**Initial Budgets**") shall be the budgets attached as **Annex A** to this Term Sheet. Thereafter, on the first Thursday of each weekly period after the Budget Testing Start Date, the Loan Parties shall provide the DIP Agent and New Ark with updated Budgets covering the subsequent 13-week period commencing on the first day of each Reporting Period, respectively. The updated DIP Budget will replace the previously delivered DIP Budget, unless the Required Lenders otherwise object within 2 business days of the receipt thereof to the substance of such updated DIP Budget on the basis of such DIP Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the DIP Facility or being based on information that is incorrect in any material respect, in which case the updated DIP Budget will be as agreed reasonably and in good faith by the Required Lenders and the Borrowers. Subject to clause (1) of "Use of Proceeds" above, the updated New Ark Budget will replace the previously delivered New Ark Budget, unless New Ark otherwise objects within 2 business days of the receipt thereof to the substance of such updated New Ark Budget on the basis of such New Ark Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the New Ark Financing or being based on information that is incorrect in any material respect, in which case the updated New Ark Budget will be as agreed reasonably and in good faith by New Ark and the Borrowers; *provided further* that the aggregate disbursements to be made under the New Ark Budget from and after the Petition Date shall not exceed $8 million without written consent from New Ark in its sole discretion. Until such time as a replacement budget is in effect pursuant to the provisions above, the Budgets, for all purposes, shall be the prior Budgets in effect prior to delivery of the updated budgets. |
| **Availability:** | The DIP Loans shall be made for the purposes set forth above under the heading "Use of Proceeds" (1) in principal amounts in an aggregate amount of up to $15.75 million on or after the first business day following the entry of the Interim DIP Order and satisfaction of the conditions under the heading "Conditions to Effectiveness" (the "**Initial Draws**") and (2) in additional principal amounts in an aggregate amount of up to $25 million on or after the first business day following the entry of the Final DIP Order subject to, in each case of the foregoing clauses (1) and (2), (a) compliance with the terms and conditions set forth in the paragraphs below in this section with respect to the Pre-MOTA Funding Amount (as defined below), (b) no Default or Event of Default having occurred and be continuing as of the date of such draw, (c) accuracy of the Representations and Warranties (as defined below) in all material respects as of the date of such draw (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date or (ii) such representation |

and/or warranty is already qualified by materiality or material adverse effect or similar language, in which case such representation and warranty shall be true and correct in all respects, as of such date), (d) compliance with the Milestones as of the date of such draw and (e) the amount of such draw being limited to the amount required to comply with the DIP Budget (and any Permitted Variances or Permitted Carrybacks/Carryforwards with respect thereto) after giving effect to the minimum liquidity set forth therein, or except as otherwise determined by the Borrowers in consultation with the DIP Agent (each, a "**Delayed Draw**").

Subject to ongoing compliance with the DIP Budget (and any Permitted Variances or Permitted Carrybacks/Carryforwards with respect thereto) and the terms and conditions contained herein and in the Documentation (including conditions to a Delayed Draw above), the DIP Lenders and New Ark shall, collectively, make available to the Borrowers up to $24.5 million (the "**Pre-MOTA Funding Amount**") consisting of (x) up to $17.5 million of DIP Loans to be provided by the DIP Lenders and (y) up to $7 million in funding from the Prepetition Loan Account (as defined below) to be provided by New Ark (this clause (y), "**New Ark Operating Advance**"), in each case of the foregoing clauses (x) and (y), for expenses set forth in the DIP Budget for the period of time prior to the Operations Transfer Date (the "**Pre-MOTA Funding**"). The Pre-MOTA Funding shall be funded by the DIP Lenders and New Ark as follows (the "**Pre-MOTA Funding Waterfall**"):

> *First*, on or prior to the end of the first full week after the Petition Date, by the DIP Lenders in amounts consistent with the DIP Budget (subject to any Permitted Variances or Permitted Carrybacks/Carryforwards),

> *Second*, beginning with the first day of the second full week after the Petition Date, by New Ark until such time as that the ratio of (a) the funds provided by the DIP Lenders under the DIP Facility to (b) funds provided to the Debtors under the New Ark Operating Advance (such ratio, the "**Pre-MOTA Funding Ratio**"), is equal to 2.50:1.00,

> *Third*, from and after the time on which the Pre-MOTA Funding Ratio is equal to 2.50:1.00, by the DIP Lenders and New Ark on a *pro rata* basis based on the remaining portion of their initial maximum funding amounts under this paragraph (*i.e.* New Ark shall concurrently fund $1.00 for each $2.50 funded by the DIP Lenders).

For the avoidance of doubt, and notwithstanding the foregoing, (i) the New Ark Operating Advance shall be funded solely through New Ark's consent to the Debtors' use of Cash Collateral of the Prepetition Lenders, (ii) to the extent that collections of prepetition receivables are insufficient for the New Ark Operating Advance to be utilized in accordance with the Pre-MOTA Funding Waterfall, the DIP Lenders may (but, for the avoidance of doubt, shall have no obligation to), in their sole discretion, advance additional funds such that the Pre-MOTA Funding Ratio is greater than 2.50:1.00 (and, if funded, such failure to adhere to the Pre-MOTA Funding Waterfall shall not constitute an

|  | Event of Default under this DIP Term Sheet), and (iii) if at any time after the second full week after the Petition Date (x) the Pre-MOTA Funding Ratio is greater than 2.50:1.00 and (y) there are sufficient funds in the Prepetition Loan Account to be utilized under the New Ark Operating Advance to cause the Pre-MOTA Funding Ratio to equal 2.50:1.00, then the Debtors shall solely utilize the New Ark Operating Advance until such time as the Pre-MOTA Funding Ratio is equal to 2.50:1.00 at which time any subsequent funding shall be made in accordance with the "*Third*" paragraph of the Pre-MOTA Funding Waterfall. |
|---|---|
| **Security:** | The DIP Facility Obligations will be secured by the "**DIP Liens**," which shall include a fully perfected (which shall be, in the case of Stimulus Proceeds (as defined below) for the avoidance of doubt, first priority) security interest pursuant to section 364(d) in all DIP Collateral and the proceeds thereof, subject and subordinate to only (x) to the extent encumbering the DIP Collateral, Liens provided to the Prepetition Agent and Prepetition Lenders pursuant to the Prepetition Credit Agreement and related documents, (y) to the extent encumbering the DIP Collateral, Liens provided to the Prepetition HUD Lender pursuant to the Prepetition HUD Documents  and (z) other Permitted Liens.

"**DIP Collateral**" shall mean all of the Loan Parties' tangible and intangible assets, including, without limitation, any collateral granted in respect of the Prepetition Credit Agreement and the following, but in each case subject to certain customary exclusions to be agreed: Stimulus Proceeds, accounts receivable, equipment, inventory, contracts, fee owned real estate, real property leaseholds, investment property, insurance proceeds, deposit accounts, monies, equity interests of subsidiaries of each Debtor and the products and proceeds thereof, and, upon entry of the Final Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code; provided, however, that the DIP Collateral shall not include any funds maintained in the New Ark Reserve Account (as defined below).

"**Stimulus Proceeds**" means any rights or funds (whether a cash payment, or proceeds of any grant, loan or otherwise) available to or received by any Borrower with respect to the Leased Property or operations thereof under or pursuant to the COVID Aid, Relief and Economic Security (CARES) Act, the Paycheck Protection Program under the CARES Act, the U.S. Department of Health and Human Services Provider Relief Funds under the CARES Act, any replacement, supplement or modification of any of the foregoing, or any other federal, state or local program, act, order or legislation providing relief or stimulus funding related to the COVID/coronavirus pandemic of 2020/2021.

The DIP Agent, for the benefit of the DIP Lenders, shall also be granted an administrative expense claim having priority over all other administrative expense claims in the Debtors' Chapter 11 Cases, other than those granted as adequate protection to the Prepetition Agent, the Prepetition HUD Lender (solely with respect to the Prepetition HUD Obligors), and the Carve-Out (the "**Superpriority Claims**"). |

|  | The New Ark Funding shall provide funding for a customary carve-out, including amounts for professionals paid by the Debtors, U.S. Trustee fees, and any amounts for a chapter 7 trustee) as further set forth in the DIP Orders (as defined below) and the New Ark Budget.<br><br>Subject to entry of the Final DIP Order, the DIP Liens shall not be subject to marshalling or sections 551 or 552(b) of the Bankruptcy Code, nor shall the DIP Collateral be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
|---|---|
| **Interest Rate:** | During the term of the DIP Facility, the outstanding principal balance drawn under the DIP Facility shall bear interest for the period commencing on the Closing Date through the date such DIP Facility is Paid in Full at LIBOR (subject to a 1.00% LIBOR floor) plus 12.0% per annum, accruing monthly and payable in cash in arrears (but subject to the RSA). All per annum rates shall be calculated on the basis of a 360-day year (with respect to LIBOR Advances) or 365-day year (with respect to other obligations) and actual days elapsed. |
| **Default Rate** | 2.00% above the applicable interest rate, payable in cash on demand (but subject to the RSA) upon written notice from the Required Lenders while an Event of Default is continuing. |
| **Fees:** | $250,000 upfront fee, earned, due and payable upon entry of the Interim DIP Order.<br><br>0.50% unused commitment fee, commencing upon entry of the Interim DIP Order and payable monthly in arrears based on the average daily balance of (a) prior to entry of the Final DIP Order, the undrawn DIP Commitments available to the Borrowers under the Interim DIP Order and (b) following entry of the Final DIP Order, the undrawn DIP Commitments. |
| **Amortization:** | None. |
| **Voluntary Prepayments:** | The DIP Facility may be voluntarily prepaid by the Borrowers, in whole or in part, without premium or penalty, at any time upon 2 business days' notice to the DIP Agent (subject to actual breakage costs with respect to LIBOR Advances, if any). |

| | |
|---|---|
| **Mandatory Prepayments:** | Mandatory repayments shall be limited to the events listed below and applied to borrowings under DIP Facility until Paid in Full (subject to certain exceptions and basket amounts to be negotiated):<br><br>Asset Sales: Prepayments in an amount equal to 100% of the net cash proceeds of the disposition of any property or assets outside the ordinary course of business of the Borrowers and their subsidiaries.<br><br>Insurance Proceeds: Prepayments in an amount equal to 100% of the net cash proceeds of insurance (other than business interruption insurance) paid on account of any loss or damage of any property or assets of any Borrower, other than net cash proceeds that are promptly applied to restoration of the Leased Properties.<br><br>Incurrence of Not-Permitted Indebtedness: Prepayments in an amount equal to 100% of the cash proceeds of any Indebtedness incurred in violation of covenants under the DIP Facility. |
| **Documentation:** | The documentation in respect of the DIP Facility (collectively, the "**Documentation**"), including, without limitation, the secured DIP promissory note (the "**DIP Note**") and all motions relating thereto, shall be in form and substance reasonably acceptable to the DIP Lenders and their counsel; *provided* that on the Closing Date, this Term Sheet shall govern the terms of the DIP Facility (including, for the avoidance of doubt, the affirmative covenants, negative covenants (including financial covenants) and events of default described herein).  The Documentation shall be consistent with the terms and conditions set forth in the Term Sheet (other than to the extent any additional representations and warranties or covenants are contained in ancillary documentation (including collateral agreements and/or guarantees), which such representations and warranties or covenants shall be reasonably acceptable to the DIP Agent and the Debtors) (the "**Documentation Principles**"); *provided that*, to the extent any of the Documentation reflects terms or conditions that are inconsistent with the Documentation Principles, any such terms and conditions shall be reasonably acceptable to New Ark.<br><br>The documentation in respect of the New Ark Funding shall consist of the RSA, this Term Sheet and the Interim and Final DIP Orders (in each case, including any exhibits or schedules attached thereto) (the "**New Ark Funding Documentation**"), each of which shall be in a form acceptable to New Ark in all respects. |
| **Transfer Assistance Obligations/MOTA:** | The Loan Parties shall provide cooperation as reasonably requested by the Landlord, including hosting site visits, with any efforts by the Landlord or any of its Affiliates to transfer ownership of all or any portion or portions of the property subject to the Lease (the "**Leased Property**") in one or more transactions ("**Transfer Assistance Obligations**").  Upon the DIP Agent's written direction, the applicable Loan Parties shall enter into one or more Management Operations Transfer Agreements, satisfactory to the Debtors, the DIP Agent and one or more new operators (collectively, the "**New Operator**"), and customary for similar transactions, and under which New Operator shall |

| | |
|---|---|
| | be responsible for funding all operating costs of and shall be entitled to all payments generated by the Leased Property on and after the date the New Operator assumes responsibility for operating the Leased Property (collectively, the "**MOTA**").  As soon as practicable after entering into the MOTA, the Debtors shall seek entry of an order, in form and substance satisfactory to the DIP Agent, of the Bankruptcy Court (1) approving their entry into the MOTA, (2) the assumption and assignment, free and clear of all liens, claims, and encumbrances to the extent permitted under applicable law, of the Medicare provider agreements applicable to the Leased Property to one or more of the Landlords' designees which assumption and assignment shall be without any additional consideration other than the consideration supporting the DIP Facility; provided, however, that all such liabilities arising under such assumption and assignment, to the extent such MOTA Order does not provide for the assumption and assignment, free and clear of all liens, claims, and encumbrances, shall be borne by the New Operator, (3) providing for the rejection and termination of the Lease *nunc pro tunc* to the Petition Date upon the license approval date under the MOTA, (4) allowance upon the rejection of the Lease of a rejection damages claim by Landlord in the amount of $35,904,343, as capped under section 502(b)(6) of the Bankruptcy Code, and (5) authorization for the Landlord, to the extent necessary, to transfer the Leased Property to one or more third parties (the "**MOTA Order**"). <br><br> Contemporaneously with the Operations Transfer Date, the Debtors shall repay the New Ark Operating Advance in full in cash by transfer of funds to the Prepetition Loan Account on the Operations Transfer Date. |
| **Representations and Warranties** | Limited to (a) prior to execution of the DIP Note, the representations and warranties set forth on **Annex D** hereto and (b) upon execution and delivery of the DIP Note, the representations and warranties contained in the DIP Note that correspond to the representations and warranties set forth on **Annex D** hereto (each, a "**Representation and Warranty**") |
| **Affirmative Covenants:** | Limited to (a) prior to execution of the DIP Note, the affirmative covenants set forth on **Annex E** hereto and (b) upon execution and delivery of the DIP Note, the affirmative covenants contained in the DIP Note that correspond to the affirmative covenants set forth on **Annex E** hereto (each, an "**Affirmative Covenant**"). |
| **Negative Covenants:** | Limited to (a) prior to execution of the DIP Note, the negative covenants set forth on **Annex F** hereto and (b) upon execution and delivery of the DIP Note, the negative covenants contained in the DIP Note that correspond to the negative covenants set forth on **Annex F** hereto (each, a "**Negative Covenant**"). |
| **Financial Covenant:** | Limited to item 12 [Financial Covenant] of the Negative Covenants (the "**Financial Covenant**"). |
| **Prepetition Secured Claims/Adequate Protection** | The Interim and Final DIP Orders shall provide for the segregation into an account acceptable to New Ark, in its sole discretion (the "**Prepetition Loan Account**"), of proceeds from prepetition accounts |

receivable in an amount equal to the claims under the Prepetition Credit Agreement, including for postpetition interest to the extent the value of the Prepetition Agent's prepetition collateral exceeds principal, accrued prepetition interest, and other claims accrued prepetition under the Prepetition Credit Agreement, which, for the avoidance of doubt, shall not include additional funding for any fees and expenses incurred after the Petition Date.

The Final DIP Order shall require, unless otherwise agreed to in writing by the Prepetition Agent, the ongoing repayment of an amount (the "**Prepetition Loan Paydown Amount**") equal to (i) claims under the Prepetition Credit Agreement, including for postpetition interest to the extent the value of the Prepetition Agent's prepetition collateral exceeds principal, accrued prepetition interest, and other claims accrued prepetition under the Prepetition Credit Agreement, but excluding reimbursement for any fees and expenses incurred after the Petition Date _less_ (ii) the projected amount necessary to fully fund the New Ark Reserve Account (which shall include amounts necessary to fully fund adequate protection payments for postpetition fees and expenses of the Prepetition Lenders in accordance with this DIP Term Sheet and the New Ark Budget), with such Prepetition Loan Paydown Amount to be paid from proceeds of prepetition accounts receivable of the Prepetition Agent in the Prepetition Loan Account (the "**Prepetition Loan Paydown**"); _provided further_ that the Prepetition Loan Paydown Amount shall exclude the New Ark Operating Advance unless and until such New Ark Operating Advance is repaid to the Prepetition Loan Account on the Operations Transfer Date in accordance with this DIP Term Sheet.

The Interim and Final DIP Orders shall provide as adequate protection for the Prepetition Agent and Prepetition Lenders the following: (i) current cash payment of interest on the obligations under the Prepetition Credit Agreement at the non-default rate provided for thereunder (subject to recharacterization as repayments of principal to the extent the value of the Prepetition Agents prepetition collateral does not exceed the amount of principal, accrued prepetition interest, other claims accrued under the Prepetition Credit Agreement, and any amounts paid postpetition to the Prepetition Agent on account of the Prepetition Credit Agreement), (ii) current cash reimbursement of actual, reasonable, and documented fees and expenses and other disbursements of the Prepetition Lenders, incurred in connection with the Chapter 11 Cases (subject to customary procedures for the payment of such amounts, which amounts shall be included in the New Ark Budget and paid from the Prepetition Loan Account), and (iii) replacement liens on accounts receivable generated postpetition and superpriority claims to the extent of diminution in the value of the Prepetition Agent's collateral (excluding diminutions caused by funds used to repay the Prepetition Agent and Prepetition Lenders), all as more specifically set forth in the Interim and Final Orders. In addition, New Ark shall receive copies of all reports and other information provided to the DIP Agent.

The Interim and Final Orders shall provide as adequate protection for the Landlord replacement liens and superpriority claims, in all cases junior to liens and claims of the DIP Agent and adequate protection liens and superpriority claims of the Prepetition Agent and Prepetition

| | |
|---|---|
| | Lenders, to the extent of diminution in the value of the Landlord's collateral. |
| | Subject to entry of the Final DIP Order, the liens and claims of the Prepetition Lenders shall not be subject to marshalling or sections 551 or 552(b) of the Bankruptcy Code, nor shall the Prepetition Lenders' collateral be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
| | No secured creditors shall be entitled as adequate protection to payment of postpetition fees and expenses or any other amounts other than the Prepetition Loan Paydown and any postpetition interest and fees payable as adequate protection to the Prepetition Agent pursuant to the terms in this Term Sheet. |
| **New Ark Funding/Consent to Use of Cash Collateral and Intercreditor Provisions:** | During the time period commencing on the Petition Date and continuing until the occurrence of the New Ark Funding Termination Date, the Prepetition Lenders shall consent to the use of Cash Collateral of the Prepetition Lenders solely to the extent necessary to: |
| | i.  provide funding for those amounts and during applicable period set forth in the New Ark Budget, subject to permitted variances thereto, which amounts shall be withdrawn from the Prepetition Loan Account and deposited into a segregated escrow account maintained therefor (the "**New Ark Reserve Account**"), on a weekly basis, to reserve for professional fees and other expenses set forth in the New Ark Budget pending approval of the Bankruptcy Court (if required) and disbursed by the Debtors to the respective beneficiaries thereof (not to exceed the amounts allocated for each such beneficiary under the New Ark Budget) (the "**New Ark Funding**"), all in accordance with and subject to the New Ark Funding Documentation.  To the extent that any funds remain in the New Ark Reserve Account following the payment of all allowed claims set forth in the New Ark Budget, including, without limitation, (a) the allowed amount of any claim set forth in the New Ark Budget is less than the budgeted amounts, (b) any funds in the New Ark Reserve Account are not allowed by the Bankruptcy Court to be disbursed to a beneficiary of the New Ark Budget, or (c) such reserved funds relate to any period during which such beneficiary of the New Ark Budget is no longer employed by the Debtors, such excess funds shall revert to New Ark; and |
| | ii. provide the New Ark Operating Advance; *provided*, *however* that the Debtors shall (1) repay the New Ark Operating Advance in full and in cash to the Prepetition Loan Account on the Operations Transfer Date (and the DIP Budget shall reflect and provide for such repayment) and (2) if at any time (x) the New Ark Operating Advance exceeds $6,000,000 and (y) there is Excess Cash as determined on the last business day of each week, the Debtors shall make a payment to the Prepetition Loan Account on the first business day of the immediately succeeding week in an amount equal to the lesser of (a) the amount of such Excess Cash and (b) the amount by which the New Ark Operating Advance exceeds $6,000,000 (each, an |

|  | "Excess Cash Payment"). For purposes of this DIP Term Sheet, "Excess Cash" shall mean, as of any date of determination, the amount by which the projected unrestricted cash available to the Debtors for operations exceeds (i) projected cash disbursements to be made by the Debtors for the following week as reasonably determined by the Debtors' chief restructuring officer *plus* (ii) $2,500,000. For the avoidance of doubt and subject to the final paragraph of "Availability", any amounts repaid to the Prepetition Loan Account prior to the Operations Transfer Date under clause (2) above remain available to the Debtors to be utilized up to the full amount of the New Ark Operating Advance in accordance with this DIP Term Sheet. |
|  | The "**New Ark Funding Termination Date**" shall be the date upon which New Ark provides written notice in accordance with the DIP Orders of the occurrence of one or more events of default set forth on **Annex G** hereto. |
|  | The New Ark Funding shall be secured by liens on all DIP Collateral and shall receive superpriority claims, in all cases junior to the liens and claims under the DIP Facility. |
|  | The Interim and Final DIP Orders (together, the "**DIP Orders**") shall provide, among other things, that (1) the DIP Agent shall have no control over the New Ark Budget and its approval; (2) New Ark shall have no control over the DIP Budget and its approval (other than with respect to the repayment of the New Ark Operating Advance); (3) adequate protection as set forth above; (4) subject to the RSA, none of the Prepetition Agent or the Prepetition Lenders will interfere with the Loan Parties' performance of their obligations under the Documentation, including their Transfer Assistance Obligations and their obligations to enter into and perform under the MOTA and (5) subject to the RSA, none of the Prepetition Agent or the Prepetition Lenders shall oppose or otherwise interfere with any enforcement by the DIP Agent or DIP Lenders of rights and remedies under the Documentation, the Interim DIP Order or the Final DIP Order (the "**DIP Order Intercreditor Provisions**"). |
| **Conditions to Effectiveness:** | The availability of the DIP Facility on the Closing Date shall be conditioned upon satisfaction (or waiver) of solely the following: |
|  | • The Bankruptcy Court shall have entered an interim order in form and substance satisfactory to the DIP Agent and the Required Lenders in their sole discretion (the "**Interim DIP Order**"), which shall also be satisfactory to New Ark, authorizing the transactions contemplated by the DIP Facility and the New Ark Funding including, without limitation, authorizing the granting of superpriority claim status for the Superpriority Claims and granting of the liens and charges (which liens and charges shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected), authorizing the DIP Facility in a principal amount equal to $25 million (with $15.75 million available under the Interim DIP Order), granting the adequate protection liens and claims described above, approving the New Ark Funding and the |

|  | establishment and use of the New Ark Reserve Account set forth herein, providing for the DIP Order Intercreditor Provisions, and subject to entry of the Final DIP Order, providing that the DIP Liens and the liens of the Prepetition Lenders shall not be subject to marshaling or sections 551 and 552(b) of the Bankruptcy Code and the DIP Collateral and the collateral of the Prepetition Lenders shall not be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise; <u>provided</u> that such Interim DIP Order shall not have been reversed, modified, amended or stayed (other than with the prior written consent of New Ark, the DIP Agent and the Required Lenders, which may be withheld in their sole discretion). |
|  | • Completion (after giving effect to the Interim DIP Order) of all filings and recordings necessary to provide the DIP Agent, for the benefit of the DIP Lenders and the DIP Agent, with perfected liens, charges and security interests in the DIP Collateral and of the priority contemplated herein, <u>provided</u> <u>however</u>, that, subject to the DIP Agent's satisfaction with the perfection provisions of the Interim DIP Order, no filings or recordings shall be required in connection with any owned or leased real property, any foreign assets, any intellectual property assets, and any certificates of title to any vehicles. |
|  | • Receipt by the DIP Agent of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations to the extent requested at least three business days prior to the Closing Date. |
|  | • Receipt by the DIP Agent of satisfactory Budgets (with the DIP Agent and DIP Lenders agreeing that the Initial Budgets are satisfactory). |
|  | • Accuracy of the Representations and Warranties in all material respects as of the Closing Date (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date or (ii) such representation and/or warranty is already qualified by materiality or material adverse effect or similar language, in which case such representation and warranty shall be true and correct in all respects, as of such date), as certified by the Borrowers. |
| **Restructuring Support Agreement** | Prior to the Petition Date, the Loan Parties, DIP Agent, DIP Lenders, Landlord, Prepetition Agent, Prepetition Lenders, Equity Sponsors (as defined therein) and Service Providers (as defined therein) shall enter into a Restructuring Support Agreement (the "**RSA**") in a form acceptable to each party. |
| **Events of Default:** | The events of default under the DIP Facility (each, an "**Event of Default**," and collectively, the "**Events of Default**") shall be limited to: |
|  | • Failure to make any payment to the DIP Agent and DIP Lenders when due |

- failure of any Representation and Warranty of any Loan Party to be true and correct in all material respects when made;

- any breach or failure to comply with (i) the Affirmative Covenants identified in items 7 [Cooperation with DIP Agent Financial Advisors], 8 [Milestones], 9 [Financial Reporting], and 13 [Use of Proceeds] of **Annex E** or (ii) any other Affirmative Covenant to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from the DIP Agent;

- any breach or failure to comply with the Negative Covenants;

- any other breach or failure to comply with the terms of Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, as applicable, to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from the DIP Agent;

- failure to comply with the Milestones;

- (x) failure to timely perform Transfer Assistance Obligations as reasonably requested by Landlord or New Operator or (y) the occurrence of a default (or equivalent concept) under the MOTA, in each case, that is not cured within three business days of the earlier to occur of the Borrowers' knowledge of such default (or equivalent) or written notice from the DIP Agent;

- prior to entry of the MOTA Order, the occurrence of a New Ark Event of Default that results in any limitation, suspension or termination of funding under the New Ark Funding;

- any Loan Party filing of a motion to convert any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the commencement by any of the Debtors of any winding up or liquidation proceeding (other than the Chapter 11 Cases) under any other applicable law;

- the appointment of a receiver, receiver and manager, interim receiver, or similar official over any substantial portion of the DIP Collateral;

- the dismissal of the Chapter 11 Cases;

- the appointment in the Chapter 11 Cases of a chapter 11 trustee or an examiner with expanded powers;

- any Loan Party shall (A) contest or dispute the validity or enforceability of any Documentation or any obligation owed under any Documentation in writing or deny in writing that it has any liability thereunder, (B) contest or dispute the validity or perfection of the DIP Loan, or the liens and security interests securing the DIP Loan in writing or (C) pursue, negotiate, solicit interest in, or agree to any sale or liquidation of the Debtors' assets or any restructuring,

|  | reorganization, refinancing, or other transaction other than on the terms provided for in the MOTA; |
|---|---|

- the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code so as to allow a third party to exercise remedies against the DIP Collateral in excess of $250,000, including, for the avoidance of doubt, in connection with any monetary non-appealable judgment not otherwise stayed, bonded or satisfied within 60 days; provided that the foregoing shall not apply to any stay relief order or unstayed judgment solely seeking to recover from applicable insurance coverage, if any;

- the grant of any super priority administrative expense claim or any lien or charge which is pari passu with or senior to those of the DIP Agent and the DIP Lenders under the DIP Facility (other than as permitted by this Term Sheet and/or the DIP Facility);

- cessation of liens or superpriority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein; and

- the entry of the Final DIP Order shall not have occurred within thirty-five (35) days after entry of the Interim DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any substantive modification or amendment, without the prior written consent of the DIP Agent and Required Lenders.

- If any of the following shall occur:

  o   any material Health Care Permit of a Loan Party shall be revoked, fail to be renewed, suspended or otherwise terminated,

  o   any Loan Party shall fail to continue to be eligible for any reason to participate in any Government Reimbursement Program or to accept assignments or rights to reimbursement thereunder,

  o   any Account Debtor shall terminate, revoke or fail to renew any Loan Party's right to participate in any material Third-Party Payor Arrangement that provides reimbursement for Medical Services,

  o   any Loan Party shall enter into a settlement or other agreement with CMS or any other Governmental Authority without the DIP Agent's written consent not to be unreasonably withheld, conditioned, or delayed,

  o   any Loan Party or any officer, director, partner, shareholder or managing employee of a Loan Party (i) shall have been found guilty of an act of fraud or (ii) shall have been indicted for or convicted of a felony crime that relates to any Medical Services or Third-Party Payor Arrangement.

| | |
|---|---|
| | • The occurrence of any Health Care Proceeding that could reasonably be expected to have a material adverse impact on any Health Care Facility (a "<u>Health Care Proceeding Default</u>"), provided any such Health Care Proceeding Default shall not be an Event of Default hereunder if the same is resolved to the reasonable satisfaction of the DIP Agent within sixty (60) days following the commencement thereof (or such longer period as DIP Agent shall permit in writing);<br><br>A "**Final DIP Order**" is an order in form and substance satisfactory to New Ark, the DIP Agent and the Required Lenders in their sole discretion authorizing the transactions contemplated by the DIP Facility including, without limitation, authorizing the granting of superpriority claim status and the liens and charges (which liens and charges shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected); authorizing the DIP Facility in a principal amount equal to the sum of the Initial Draw and all Delayed Draws; granting the adequate protection described above; providing for the DIP Order Intercreditor Provisions; approving the New Ark Funding and the establishment and use of the New Ark Reserve Account set forth herein, providing that the DIP Liens and the liens of the Prepetition Lenders shall not be subject to marshaling or sections 551 or 552(b) of the Bankruptcy Code and the DIP Collateral and the collateral of the Prepetition Lenders shall not be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
| **Remedies:** | Immediately upon the occurrence (subject to applicable notice and cure provisions) and during the continuation of an Event of Default (and without the need for any further relief from the automatic stay), unless such Event of Default has been waived by the DIP Agent and subject in all respects to the RSA:<br><br>(a) the DIP Agent may, or at the direction Required Lenders shall, declare (i) all DIP Facility Obligations owing under the Documentation to be immediately due and payable, and (ii) the termination of the DIP Facility and any other Documentation as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the Liens or the DIP Facility Obligations; and<br><br>(b) the DIP Agent may, or at the direction Required Lenders shall, declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (other than proceeds of prepetition accounts receivable that are subject to the Prepetition Agent's valid and perfected liens, which the DIP Agent shall not withhold consent therefrom) upon expiration of the five business day period referenced below, any of the foregoing declarations shall be made to the Debtors, and shall be referred to herein as a "**Termination Declaration**" and the date that is the earliest to occur of any such Termination Declaration and the Maturity Date being herein referred to as the "**Termination Declaration Date**." For the avoidance of doubt, the Debtors may continue to use any Cash Collateral prior to the expiration of the five business day period referenced below so long as such Cash Collateral is used in accordance with the DIP Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards). |

|  | Subject to the RSA, in addition to remedies described above and other customary remedies, five business days following the Termination Declaration Date, the DIP Agent shall have relief from the automatic stay in the Chapter 11 Cases and may setoff against deposits and financial assets of the Debtors and foreclose on all or any portion of the DIP Collateral (other than proceeds of prepetition accounts receivable that are subject to the Prepetition Agent's valid and perfected liens, which may only be foreclosed upon by the DIP Agent after repayment in full of any allowed the Prepetition Credit Agreement obligations). During such five business day notice period, the Debtors, the Office of the U.S. Trustee, and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred.  Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the DIP Lenders and the DIP Agent, shall be automatically terminated at the end of such notice period and without further notice or order. <br><br> In addition, upon the occurrence and during the continuation of an Event of Default, the DIP Agent will have the right to utilize, at no cost or expense, any tradenames, trademarks, copyrights or other intellectual property to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the DIP Collateral. |
|---|---|
| **Required Lenders:** | The DIP Lenders holding more than 50% of the outstanding DIP Loans and unfunded DIP Commitments under the DIP Facility. |
| **Expenses:** | All parties will be responsible for their out-of-pocket expenses associated with due diligence, negotiation and preparation of the DIP. |
| **Indemnity:** | Customary for similar debtor-in-possession financings. |
| **Assignments; Participations:** | Customary for similar debtor-in-possession financings. |
| **Governing Law:** | New York and, to the extent applicable, the Bankruptcy Code |
| **DIP Lenders' counsel:** | Weil, Gotshal & Manges LLP; Morris, Nichols, Arsht & Tunnell LLP; Ferguson Braswell Fraser Kubasta PC |

[Signature Page(s) to Follow]

IN WITNESS WHEREOF, the parties hereto have executed and agree to be bound by the terms set forth in this Term Sheet or caused the same to be executed by their respective duly authorized officers.

BORROWERS:

Gulf Coast Health Care, LLC
Brevard Oaks Center, LLC
FL HUD Baybreeze, LLC
FL HUD Bayside, LLC
FL HUD Destin, LLC
FL HUD Margate, LLC
FL HUD Pensacola, LLC
FL HUD Rosewood, LLC
FL HUD Silvercrest, LLC
MF Lake Eustis, LLC
MF Winter Park, LLC
MS Greenbough, LLC
MS HUD Boyington, LLC
MS HUD Dixie, LLC
MS HUD Ocean Springs, LLC
MS HUD Pine View, LLC
NF Chipola, LLC
NF Escambia, LLC
NF Nine Mile, LLC
NF Panama, LLC
NF Pensacola Manor, LLC
NF Suwannee, LLC
SF Brevard, LLC
SF Carnegie, LLC
SF Lake Placid ALF, LLC


By: _____
Name: M. Benjamin Jones
Title:  Chief Restructuring Officer

GUARANTORS:

GCH Management Services, LLC
Pensacola Administrative Services, LLC
Pensacola Administrative Holdings, LLC
Gulf Coast Master Tenant Holdings, LLC
Gulf Coast Master Tenant I, LLC
Gulf Coast Master Tenant II, LLC
Gulf Coast Master Tenant III, LLC
Gulf Coast Facilities, LLC
HUD Facilities, LLC
Florida Facilities, LLC
AL Citronelle, LLC
AL Willow Tree, LLC
MF Debary, LLC
MF Flagler, LLC
MF Halifax, LLC
MF Heritage, LLC
MF Longwood, LLC
MF Oakwood, LLC
MS Shelby, LLC
NF Brynwood, LLC
NF Glen Cove, LLC
NF Manor, LLC
NF River Chase, LLC
NF Windsor, LLC
SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC
SF Berkshire, LLC
SF Boynton, LLC
SF Fountainhead, LLC
SF Glen Oaks, LLC
SF Kissimmee, LLC
SF Lake Placid, LLC
SF Oakbrook, LLC
SF Royal Manor, LLC
SF Salerno, LLC
SF Tampa, LLC

By:    _____
Name: M. Benjamin Jones
Title:  Chief Restructuring Officer

*[Signature Page to DIP Term Sheet]*

GUARANTORS:

MS Lakeside, LLC
MS Singing, LLC


By: _____
Name:  M. Benjamin Jones
Title:   Chief Restructuring Officer

DIP AGENT:

OHI Asset Funding (DE), LLC

By: _____
Name:         Daniel J. Booth
Title:         Chief Operating Officer

PREPETITION AGENT:

New Ark Capital, LLC

By: _____
Name: Steven Lebowitz
Title:  Vice President

ANNEX A
TO TERM SHEET

**INITIAL BUDGETS**

[Attached]

Subject to Further Revision

**Gulf Coast Health Care, LLC, et al.**
**Omega DIP Lender DIP Budget**

| ($ in thousands) | Week 1 14-Oct-21 15-Oct-21 | Week 2 16-Oct-21 22-Oct-21 | Week 3 23-Oct-21 29-Oct-21 | Week 4 30-Oct-21 5-Nov-21 | Week 5 6-Nov-21 12-Nov-21 | Week 6 13-Nov-21 19-Nov-21 | Week 7 20-Nov-21 26-Nov-21 | Week 8 27-Nov-21 3-Dec-21 | Week 9 4-Dec-21 10-Dec-21 | Week 10 11-Dec-21 17-Dec-21 | Week 11 18-Dec-21 24-Dec-21 | Week 12 25-Dec-21 31-Dec-21 | Week 13 1-Jan-22 7-Jan-22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1 Receipts** | 109.1 | 388.2 | 564.2 | 390.3 | 4,635.2 | 3,968.8 | 5,424.6 | 5,345.2 | 2,141.0 | 2,309.1 | 2,620.7 | 5,170.4 | 508.2 | **33,575.0** |
| 2 Employee Costs | (337.1) | (2,337.5) | (3,332.0) | (3,174.1) | (3,545.8) | (2,112.0) | (3,097.0) | (2,102.0) | (3,310.8) | (2,102.0) | (681.4) | (429.4) | (296.4) | **(26,857.4)** |
| 3 Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4 Halcyon (therapy) | (184.3) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (43.0) | (43.0) | (43.0) | (43.0) | (43.0) | **(3,409.3)** |
| 5 Food | (185.0) | (150.0) | (185.0) | (150.0) | (150.0) | (150.0) | (150.0) | (185.0) | (15.0) | (18.5) | (15.0) | (18.5) | (15.0) | **(1,387.0)** |
| 6 Agency | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (1,028.8) | (548.8) | (548.8) | (548.8) | (7.5) | **(5,682.5)** |
| 7 Provider Fee | - | (1,185.0) | - | - | - | (1,185.0) | - | - | - | - | - | (1,185.0) | - | **(3,555.0)** |
| 8 Pharmacy | (737.8) | - | - | (737.8) | - | - | - | (669.9) | - | - | - | (56.0) | - | **(2,201.5)** |
| 9 Medical Supplies | (150.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (41.5) | (17.5) | (17.5) | (17.5) | (41.5) | **(1,510.5)** |
| 10 Laboratory & X-ray | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | **(425.0)** |
| 11 Utilities | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (15.6) | (15.6) | (15.6) | (15.6) | (15.6) | **(1,166.0)** |
| 12 Shared Service Fees[1] | - | (400.6) | (426.4) | (345.0) | (345.0) | (345.0) | (390.6) | - | - | - | - | - | - | **(2,252.7)** |
| 13 Misc. & Local Vendors | (550.7) | (500.0) | (234.3) | (247.8) | (254.6) | (353.6) | (234.3) | (213.5) | (48.1) | (34.0) | (22.5) | (27.0) | (152.5) | **(2,872.8)** |
| **14 Total Disbursements b/f Rx Disbursements** | **(2,705.9)** | **(5,739.2)** | **(5,343.8)** | **(5,820.7)** | **(5,461.4)** | **(5,311.6)** | **(5,038.0)** | **(4,336.4)** | **(4,507.8)** | **(2,784.3)** | **(1,348.7)** | **(2,345.7)** | **(576.4)** | **(51,319.7)** |
| 15 Process Costs[2] | - | - | (300.2) | - | - | - | - | - | - | - | - | - | - | **(300.2)** |
| 16 Professional Fees[3][4] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 17 Financing Costs | (250.0) | - | - | (153.4) | - | - | - | (226.9) | - | - | - | - | (275.8) | **(906.0)** |
| **18 Total Disbursements** | **(2,955.9)** | **(5,739.2)** | **(5,643.9)** | **(5,974.0)** | **(5,461.4)** | **(5,311.6)** | **(5,038.0)** | **(4,563.2)** | **(4,507.8)** | **(2,784.3)** | **(1,348.7)** | **(2,345.7)** | **(852.2)** | **(52,525.9)** |
| **19 Net Cash Flow before Financing** | **(2,846.8)** | **(5,351.0)** | **(5,079.8)** | **(5,583.8)** | **(826.2)** | **(1,342.7)** | **386.7** | **782.0** | **(2,366.8)** | **(475.3)** | **1,272.0** | **2,824.7** | **(344.0)** | **(18,951.0)** |
| 20 New Ark Capital, LLC Cash Collateral Use / (Repayment) | - | - | 4,500.0 | 1,600.0 | 200.0 | 400.0 | 300.0 | (7,000.0) | - | - | - | - | - | - |
| 21 DIP Draw | 6,000.0 | 4,500.0 | 750.0 | 4,000.0 | 500.0 | 1,000.0 | 750.0 | 7,000.0 | 500.0 | - | - | - | - | 25,000.0 |
| **22 Net Cash Flow** | **3,153.2** | **(851.0)** | **170.2** | **16.2** | **(126.2)** | **57.3** | **1,436.7** | **782.0** | **(1,866.8)** | **(475.3)** | **1,272.0** | **2,824.7** | **(344.0)** | **6,049.0** |
| 23 Book Cash Roll-Forward | | | | | | | | | | | | | | |
| 24 Beginning Book Cash Balance | - | 3,153.2 | 2,302.2 | 2,472.4 | 2,488.7 | 2,362.5 | 2,419.8 | 3,856.4 | 4,638.4 | 2,771.7 | 2,296.4 | 3,568.4 | 6,393.1 | - |
| 25 Cash Generated / (Needed) | 3,153.2 | (851.0) | 170.2 | 16.2 | (126.2) | 57.3 | 1,436.7 | 782.0 | (1,866.8) | (475.3) | 1,272.0 | 2,824.7 | (344.0) | 6,049.0 |
| **26 Ending Book Cash Balance** | **3,153.2** | **2,302.2** | **2,472.4** | **2,488.7** | **2,362.5** | **2,419.8** | **3,856.4** | **4,638.4** | **2,771.7** | **2,296.4** | **3,568.4** | **6,393.1** | **6,049.0** | **6,049.0** |

Notes:
 1. Shared Service Costs post-transition to be determined as negotiated between Health Care Navigator, Omega and the New operator(s).
 2. Process costs include adequate assurance utility deposit.
 3. Post-petition professional fees have been shown as paid to escrow in the week incurred.
 4. Professional fees include debtor legal counsel and financial advisor fees, independent manager fees, New Ark legal counsel fees, Unsecured Creditor Committee fees, US Trustee fees,  and patient care ombudsman fees.

Subject to Further Revision

**Gulf Coast Health Care, LLC, et al.**
**New Ark Financing Cash Collateral Budget**

| ($ in thousands) | Week 1 14-Oct-21 15-Oct-21 | Week 2 16-Oct-21 22-Oct-21 | Week 3 23-Oct-21 29-Oct-21 | Week 4 30-Oct-21 5-Nov-21 | Week 5 6-Nov-21 12-Nov-21 | Week 6 13-Nov-21 19-Nov-21 | Week 7 20-Nov-21 26-Nov-21 | Week 8 27-Nov-21 3-Dec-21 | Week 9 4-Dec-21 10-Dec-21 | Week 10 11-Dec-21 17-Dec-21 | Week 11 18-Dec-21 24-Dec-21 | Week 12 25-Dec-21 31-Dec-21 | Week 13 1-Jan-22 7-Jan-22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 **Receipts** | **931.5** | **3,246.3** | **6,510.4** | **1,814.0** | **497.8** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **13,000.0** |
| 2 Debtor Professional Fees[1] | (388.3) | (345.1) | (345.1) | (336.8) | (366.8) | (336.8) | (336.8) | (236.8) | (236.8) | (266.8) | (261.8) | (236.8) | (436.8) | (4,131.2) |
| 3 UCC Professional Fees[1] | - | - | (37.5) | (37.5) | (37.5) | (37.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (237.5) |
| 4 Other Professional Fees[1 2] | (26.3) | (26.3) | (26.3) | (26.3) | (26.3) | (56.3) | (26.3) | (26.3) | (26.3) | (56.3) | (26.3) | (26.3) | (26.3) | (402.1) |
| 5 US Trustee Fees[1] | - | - | - | - | - | - | - | - | - | - | - | (250.0) | - | (250.0) |
| 6 **Total Disbursements** | **(414.6)** | **(371.4)** | **(408.9)** | **(400.6)** | **(430.6)** | **(430.6)** | **(375.6)** | **(275.6)** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **(5,020.8)** |
| 7 **Net Cash Flow before Financing** | **516.8** | **2,874.9** | **6,101.5** | **1,413.4** | **67.2** | **(430.6)** | **(375.6)** | **(275.6)** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **7,979.2** |
| 8 New Ark Capital, LLC (Proceeds to) / Repayment from Omega | - | - | (4,500.0) | (1,600.0) | (200.0) | (400.0) | (300.0) | 7,000.0 | - | - | - | - | - | - |
| 9 **Net Cash Flow** | **516.8** | **2,874.9** | **1,601.5** | **(186.6)** | **(132.8)** | **(830.6)** | **(675.6)** | **6,724.4** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **7,979.2** |
| 10 Book Cash Roll-Forward | | | | | | | | | | | | | | |
| 11 Beginning Book Cash Balance | 1,500.0 | 2,016.8 | 4,891.7 | 6,493.2 | 6,306.6 | 6,173.9 | 5,343.3 | 4,667.7 | 11,392.1 | 11,116.5 | 10,781.0 | 10,480.4 | 9,954.8 | 1,500.0 |
| 12 Cash Generated / (Needed) | 516.8 | 2,874.9 | 1,601.5 | (186.6) | (132.8) | (830.6) | (675.6) | 6,724.4 | (275.6) | (335.6) | (300.6) | (525.6) | (475.6) | 7,979.2 |
| 13 **Net Ending Cash Collateral Balance** | **2,016.8** | **4,891.7** | **6,493.2** | **6,306.6** | **6,173.9** | **5,343.3** | **4,667.7** | **11,392.1** | **11,116.5** | **10,781.0** | **10,480.4** | **9,954.8** | **9,479.2** | **9,479.2** |

Notes:
1. Post-petition professional and trustee fees have been shown as paid to escrow in the week incurred.
2. Other professional fees include New Ark legal counsel fees, and patient care ombudsman fees.

ANNEX B
TO TERM SHEET

**DEBTORS**

| Debtor Name | Type of Loan Party |
|---|---|
| AL Citronelle, LLC | Guarantor |
| AL Willow Tree, LLC | Guarantor |
| Brevard Oaks Center, LLC | Borrower |
| FL HUD Baybreeze, LLC | Borrower |
| FL HUD Bayside, LLC | Borrower |
| FL HUD Destin, LLC | Borrower |
| FL HUD Margate, LLC | Borrower |
| FL HUD Pensacola, LLC | Borrower |
| FL HUD Rosewood, LLC | Borrower |
| FL HUD Silvercrest, LLC | Borrower |
| Florida Facilities, LLC | Guarantor |
| GCH Management Services, LLC | Guarantor |
| Gulf Coast Facilities, LLC | Guarantor |
| Gulf Coast Health Care, LLC | Guarantor |
| Gulf Coast Master Tenant Holdings, LLC | Guarantor |
| Gulf Coast Master Tenant I, LLC | Guarantor |
| Gulf Coast Master Tenant II, LLC | Guarantor |
| Gulf Coast Master Tenant III, LLC | Guarantor |
| HUD Facilities, LLC | Guarantor |
| MF Debary, LLC | Guarantor |
| MF Flagler, LLC | Guarantor |
| MF Halifax, LLC | Guarantor |
| MF Heritage, LLC | Guarantor |
| MF Lake Eustis, LLC | Borrower |
| MF Longwood, LLC | Guarantor |
| MF Oakwood, LLC | Guarantor |
| MF Winter Park, LLC | Borrower |
| MS Greenbough, LLC | Borrower |
| MS HUD Boyington, LLC | Borrower |
| MS HUD Dixie, LLC | Borrower |
| MS HUD Ocean Springs, LLC | Borrower |
| MS HUD Pine View, LLC | Borrower |
| MS Lakeside, LLC | Guarantor |
| MS Shelby, LLC | Guarantor |
| MS Singing, LLC | Guarantor |
| NF Brynwood, LLC | Guarantor |
| NF Chipola, LLC | Borrower |
| NF Escambia, LLC | Borrower |
| NF Glen Cove, LLC | Guarantor |
| NF Manor, LLC | Guarantor |
| NF Nine Mile, LLC | Borrower |
| NF Panama, LLC | Borrower |
| NF Pensacola Manor, LLC | Borrower |

| Debtor Name | Type of Loan Party |
|---|---|
| NF River Chase, LLC | Guarantor |
| NF Suwannee, LLC | Borrower |
| NF Windsor, LLC | Guarantor |
| Pensacola Administrative Holdings, LLC | Guarantor |
| Pensacola Administrative Services, LLC | Guarantor |
| SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC | Guarantor |
| SF Berkshire, LLC | Guarantor |
| SF Boynton, LLC | Guarantor |
| SF Brevard, LLC | Borrower |
| SF Carnegie, LLC | Borrower |
| SF Fountainhead, LLC | Guarantor |
| SF Glen Oaks, LLC | Guarantor |
| SF Kissimmee, LLC | Guarantor |
| SF Lake Placid ALF, LLC | Borrower |
| SF Lake Placid, LLC | Guarantor |
| SF Oakbrook, LLC | Guarantor |
| SF Royal Manor, LLC | Guarantor |
| SF Salerno, LLC | Guarantor |
| SF Tampa, LLC | Guarantor |

**ANNEX C**
**TO TERM SHEET**

**CERTAIN DEFINITIONS**

"<u>Affiliate</u>" has the meaning set forth in Bankruptcy Code section 101(2).

"<u>Anti-Corruption Laws</u>" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any of the Loan Parties or their Subsidiaries is located or is doing business.

"<u>Anti-Money Laundering Laws</u>" means the applicable laws or regulations in any jurisdiction in which any of the Loan Parties or their Subsidiaries is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"<u>Board of Governors</u>" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>CHAMPVA</u>" means, collectively, the Civilian Health and Medical Program of the Department of Veterans Affairs, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"<u>CMS</u>" means The Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, and any Governmental Authority successor thereto.

"<u>Default</u>" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"<u>Government Reimbursement Program</u>" means (a) Medicare, (b) Medicaid, (c) the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902 et seq., (d) TRICARE, (e) CHAMPVA, or (f) if applicable within the context of this Agreement, any agent, administrator, administrative contractor, intermediary or carrier for any of the foregoing.

"<u>Governmental Authority</u>" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank), including CMS and any Medicare or Medicaid administrative contractors, intermediaries or carriers.

"<u>Health Care Facility</u>" means each facility from which any of Loan Parties or their Subsidiaries provides or furnishes goods or Medical Services, including, without limitation, any skilled nursing facility, assisted living facility, independent living facility or similar facility.

"<u>Health Care Laws</u>" means, collectively, any and all federal, state or local laws, rules, regulations and orders relating to any of the following: (a) fraud and abuse (including the following statutes, as amended, modified or supplemented from time to time and any successor statutes thereto and regulations promulgated from time to time thereunder:  the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn and § 1395(q)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the federal health care program exclusion provisions (42 U.S.C. § 1320a-7), the Civil Monetary Penalties Act (42 U.S.C. § 1320a-7a), and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173)); (b) any Government Reimbursement Program; (c) the licensure or regulation of healthcare providers, suppliers,

professionals, facilities or payors (including all statutes and regulations administered by the FDA); (d) the operation of any Health Care Facilities or the provision of, or payment for, Medical Services, items or supplies; (e) quality, safety certification and accreditation standards and requirements; (f) the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (g) HIPAA and Other Privacy Laws; (h) the practice of medicine and other health care professions or the organization of medical or professional entities; (i) fee-splitting prohibitions; (j) requirements for maintaining federal, state and local tax-exempt status of any of Loan Parties or their Subsidiaries; (k) charitable trusts or charitable solicitation laws; (l) health planning or rate-setting laws, including laws regarding certificates of need and certificates of exemption; and (m) any and all other applicable federal, state or local health care laws, rules, codes, regulations, manuals, orders, ordinances, professional or ethical rules, administrative guidance and requirements, as the same may be amended, modified or supplemented from time to time.

"Health Care Permits" means any and all permits, licenses, authorizations, certificates, certificates of need and accreditations of third-party accreditation agencies (such as The Joint Commission) that are (a) necessary to enable any Loan Party to operate any Health Care Facility or provide Medical Services, participate in and receive payment under any Government Reimbursement Program or other Third-Party Payor Arrangement, as applicable, or otherwise continue to conduct its business as it is conducted on the Closing Date, or (b) required under any Health Care Law.

"Health Care Proceeding" means any investigations, probes, audits, hearings, litigation or proceedings (in each case, whether civil, criminal, administrative or investigative) concerning any alleged or actual non-compliance by any Loan Party with any Health Care Laws or the requirements of any Health Care Permit or Third-Party Payor Arrangement (including any investigations, probes, audits or procedures initiated by a Fiscal Intermediary/Medicare Administrator Contractor, a Medicaid Integrity Contractor, a Recovery Audit Contractor, a Program Safeguard Contractor, a Zone Program Integrity Contractor, an Attorney General, the Office of Inspector General, the Department of Justice or any similar governmental agencies or contractors for such agencies).

"HIPAA and Other Privacy Laws" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time (including the provisions of the Health Information Technology for Economic and Clinical Health Act contained in the American Recovery and Reinvestment Act of 2009), and any successor statute thereto, any and all rules or regulations promulgated from time to time thereunder and any other applicable federal, state or local laws and regulations regulating, governing or relating to the privacy and/or security of patient protected health or personally identifiable information.

"Government Account Debtor" means the United States government or a political subdivision thereof, or any state, county or municipality or department, agency or instrumentality thereof (including privately administered "Managed Medicaid" programs), that is responsible for payment of an Account under any Government Reimbursement Program, or any agent, administrator, intermediary or carrier for the foregoing.

"Government Reimbursement Program" means (a) Medicare, (b) Medicaid, (c) the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902 et seq., (d) TRICARE, (e) CHAMPVA, or (f) if applicable within the context of this Agreement, any agent, administrator, administrative contractor, intermediary or carrier for any of the foregoing.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases (as defined in the Prepetition Credit Agreement), (d) all obligations or liabilities of others secured by a lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and, for the avoidance of doubt, other than royalty payments payable in the ordinary

course of business in respect of non-exclusive licenses), (f) all monetary obligations of such Person owing under Hedge Agreements (as defined in the Prepetition Credit Agreement) (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Disqualified Equity Interests (as defined in the Prepetition Credit Agreement) of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"Margin Stock" as defined in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" shall mean a material adverse effect on (i) the operations, business, assets, properties or financial condition of the Loan Parties taken as a whole, (ii) the ability of the Loan Parties to perform payment or other material obligations under any Interim DIP Document, (iii) the legality, validity or enforceability of this Term Sheet or any other Interim DIP Document, (iv) the rights and remedies of the DIP Agent and the DIP Lenders under any Interim DIP Document, or (v) the validity, perfection or priority of a lien in favor of DIP Lenders on any of the DIP Collateral; provided, however that "Material Adverse Effect" shall expressly exclude any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases, the MOTA, or such other changes during the Chapter 11 Cases that occur in a manner consistent with the RSA.

"Medicaid" means, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, or requirements pertaining to such program, including all state statutes and plans for medical assistance enacted in connection with such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Medical Services" means medical and health care items, services or supplies provided to a patient, including without limitation physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home health care services, residential and out-patient behavioral healthcare services, and medicine or health care equipment provided by any of Loan Parties or their Subsidiaries to a patient for a valid and proper medical or health purpose.

"Medicare" means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, or requirements pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Paid in Full" means, in respect of the DIP Facility, (i) all of the DIP Facility Obligations, pursuant to the DIP Term Sheet and this Interim Order, have been indefeasibly paid in full in cash (other than contingent indemnification obligations as to which no claim has been asserted) unless the DIP Lenders have agreed to such other treatment under the RSA or othwerise, including, for the avoidance of doubt, satisfaction of all of the DIP Facility Obligations upon confirmation of a Plan, and (ii) all commitments to extend credit under the DIP Facility are terminated.

"Permitted Indebtedness" means:  (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Term Sheet and the

other Documentation; (c) Indebtedness arising under the New Ark Funding, (d) obligations under the Prepetition Credit Agreement; (e) deferred taxes and other expenses incurred in the ordinary course of business; (f) any Indebtedness existing on the Petition Date; (g) administrative expenses of Loan Parties; (h) endorsement of instruments or other payment items for deposit; (i) Indebtedness incurred in the ordinary course of business under performance, surety, statutory, or appeal bonds; (j) Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any of the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year; (k) Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business, and (l) any other unsecured Indebtedness incurred by any of the Loan Parties in an aggregate outstanding amount not to exceed $25,000 at any one time.

"Permitted Lien" means; (a) liens in favor of the DIP Agent as contemplated by the Term Sheet, (b) liens provided to the Prepetition Agent and Prepetition Lenders pursuant to the Prepetition Credit Agreement and related documents, (c) liens provided to New Ark pursuant to the New Ark Funding and related documents, (d) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code;  (e) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding liens under ERISA); (f) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (g) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (h) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (i) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (i) liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code); (j) to the extent constituting liens, liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements; (k) any adequate protection liens permitted under the DIP Orders; (l) liens arising in favor of utility providers in any adequate assurance deposits arising under an order approved by the Bankruptcy Court; (m) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the ordinary course of business; and (n) other liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $25,000.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other equity interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other equity interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person

resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by The Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC").

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any member of the Loan Parties or their Subsidiaries.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the equity interests having ordinary voting power to elect a majority of the board of directors (or other governing body) of such corporation, partnership, limited liability company, or other entity.

"Third-Party Payor" means (i) a commercial medical insurance company, health maintenance organization, professional provider organization or other third-party payor that reimburses providers for Medical Services provided to individual patients, (ii) a nonprofit medical insurance company (such as the Blue Cross, Blue Shield entities), and (iii) a Government Account Debtor making payments under a Government Reimbursement Program.

"Third-Party Payor Arrangement" shall mean a written agreement or arrangement with a Third-Party Payor pursuant to which the Third-Party Payor pays all or a portion of the charges of any Loan Party or its Subsidiaries for providing Medical Services.

"TRICARE" means, collectively, the program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Department of Defense, Health and Human Services and Transportation, and all laws, rules, regulations, orders or requirements pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

**ANNEX D**
**TO TERM SHEET**

## REPRESENTATIONS AND WARRANTIES

Each of the Loan Parties represents as follows:

1. **Due Organization**.  Each of the Loan Parties are duly formed and/or organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdiction) under the laws of their jurisdictions of incorporation or formation;

2. **Due Authorization**.

   a. Upon entry of the Interim DIP Order, the execution and delivery of this Term Sheet and the other Documentation and the performance by each Loan Party of such Loan Party's obligations under the Documentation (i) are within its corporate or limited liability company (or equivalent) powers, (ii) have been duly authorized by all necessary corporate or limited liability company (or equivalent) action of such Loan Party, (iii) have received all necessary bankruptcy, insolvency or governmental approvals, (iv) do not and will not contravene or conflict with any provisions of such Loan Party's corporate charter or by-laws (or equivalent organizational documents, and (v) do not and will not materially contravene or materially conflict with any provisions of applicable material law or of any material agreements binding upon or applicable to such Loan Party or any of its Subsidiaries or any of their properties;

   b. The Chapter 11 Cases of each Loan Party have been duly authorized by all corporate or limited liability company (or equivalent) action of such Loan Party;

3. **Binding Obligations**.  Upon entry of the Interim DIP Order, this Term Sheet and the other Documentation, constitute the legal, valid and binding obligation, enforceable against the Loan Parties in accordance with its respective terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, including the entry of the Interim DIP Order and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

4. **Title to Assets**.  Other than as a result of the Chapter 11 Cases and subject to any necessary orders or authorization of the Bankruptcy Court, the Loan Parties have good and marketable title to, or valid leasehold interests in, all of its material property and assets; none of the properties and assets of the Loan Parties are subject to any liens other than Permitted Liens;

5. **Disclosure**. No written statement furnished by or on behalf of the Loan Parties or their subsidiaries to the DIP Lenders in accordance with the terms of this Term Sheet and the Documentation (other than any projections, the DIP Budget, estimates and information of a general economic nature or general industry nature), when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of all of the circumstances under which they were made;

6. **Perfected Liens**.  Upon entry of the Interim DIP Order, the liens granted to the DIP Lenders in accordance with the Term Sheet, the Documentation and the Interim DIP Order will at all times be fully perfected liens in and to the DIP Collateral described therein, subject, as to priority, only to liens permitted to have such priority under the Interim DIP Order;

7. **No Litigation**.  Except for proceedings in the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Loan Parties, threatened in writing against any Loan Party before any governmental authority or before any arbitrator or panel of arbitrators

that challenges the rights or powers of the Loan Parties to enter into or perform any of their obligations under the Interim DIP Documents to which it is a party, or the validity or enforceability of any Interim DIP Document or any action taken thereunder;

8. **Compliance with Laws**.  No Loan Party (a) is in material violation of any applicable laws, rules, regulations, executive orders, or codes, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, are material;

9. **Investment Company Act**.  None of the Loan Parties is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940;

10. **Material Adverse Effect**. Since the Petition Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect;

11. **Payment of Taxes**.  The Loan Parties have filed (or obtained extensions to file) all federal, state and other tax returns and reports required to be filed, and have paid all federal, state and other taxes, assessments, fees and other governmental charges levied or imposed by a governmental authority upon them or their properties, income or assets otherwise due and payable other than those (i) not yet delinquent or are being contested in good faith by appropriate proceedings, (ii) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this DIP Term Sheet, or (iii) taxes allocable to the facilities operated by the Debtors for which the Debtors have agreed to pay under any master lease pertaining to such facilities or any sub-leases related thereto, including, without limitation, under the Lease or the Blue Mountain Master Leases (as defined in the First Day Declaration);

12. **Use of Proceeds**. The proceeds of the DIP Facility received by the Borrowers have been used in accordance with the Affirmative Covenant identified in item 13 [Use of Proceeds] of **Annex E**.

13. **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.  None of the Loan Parties or any of their Subsidiaries is in violation of any Sanctions. None of Loan Parties or any of their Subsidiaries nor, to the knowledge of any Loan Party, any director, officer, employee, or agent of Loan Parties or any of their Subsidiaries (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and any of their Subsidiaries has, to the extent applicable to their business activities, implemented and maintains in effect policies and procedures designed to ensure compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties and their Subsidiaries, and to the knowledge of each Loan Party, each director, officer, employee, and agent of each of the Loan Parties and their Subsidiaries, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any funding hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person'

14. **Margin Stock**.  None of the Loan Parties or any of their Subsidiaries owns any Margin Stock or is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the loans made to Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors. None of the Loan Parties or any of their Subsidiaries expects to acquire any Margin Stock.

WEIL:\98150122\30\66205.0003

15. **MOTA**. The Loan Parties are not aware of any events or circumstances that would make the representation and warranties contained in Section 11(j) and 11(l) of the MOTA not true and correct in all respects as and when such representations and warranties are required to be made in accordance with the MOTA.

16. **Health Care Matters**.

    a.   Compliance with Health Care Laws; Health Care Permits; Third-Party Payors.  Each of the Loan Parties and their Subsidiaries is in compliance in material respects with all Health Care Laws and requirements of Third-Party Payor Arrangements applicable to it and its assets, business or operations. Each of Loan Parties and their Subsidiaries (i) holds in full force and effect (without default, violation or noncompliance) all Health Care Permits necessary for it to own, lease, sublease or operate its assets and Health Care Facilities or to conduct its business and operations as presently conducted (including to obtain reimbursement under all Third-Party Payor Arrangements in which it participates), and (ii) has obtained and maintains accreditation from all generally recognized accreditation agencies material to the operations of the Loan Parties and their Subsidiaries. To Loan Parties' knowledge after due inquiry, no circumstance exists or event has occurred which could reasonably be expected to result in the suspension, revocation, termination, restriction, limitation, modification or non-renewal of any material Health Care Permit. The Health Care Facilities operated by any of Loan Parties or their Subsidiaries and the Medical Services provided at such Health Care Facilities are qualified for participation in the Government Reimbursement Programs, and each of Loan Parties and their Subsidiaries is entitled to reimbursement under the Government Reimbursement Programs for services rendered at such Health Care Facilities to qualified beneficiaries. All Persons providing professional health care services for or on behalf of any of the Loan Parties or their Subsidiaries (either as an employee or independent contractor) are appropriately licensed in every jurisdiction in which they hold themselves out as professional health care providers.

    b.   Cost Reports; Overpayments; Civil Money Penalties.  Each of Loan Parties and their Subsidiaries has timely filed or caused to be timely filed all cost reports and other reports of every kind whatsoever required by any Government Reimbursement Program to have been filed or made with respect to the operations of any of the Loan Parties or their Subsidiaries. There are no claims, actions or appeals pending before CMS, any administrative contractor, intermediary or carrier or any other Governmental Authority with respect to any Government Reimbursement Programs cost reports or claims filed by any of the Loan Parties or their Subsidiaries, or any disallowance by any Governmental Authority in connection with any audit of such cost reports. None of the Loan Parties or their Subsidiaries (i) to Loan Parties' knowledge, after due inquiry, has retained an overpayment received from, or failed to refund any amount due to any Government Reimbursement Program or other Third-Party Payor in violation of any Health Care Law or Third-Party Payor Arrangement, (ii) has received written notice of, or has knowledge of, any overpayment or refunds due to any Third-Party Payor or (iii) has been subject to civil money penalties during the period beginning three (3) years prior to the date hereof, except for civil money penalties imposed following a survey of a Health Care Facility as a result of noncompliance with requirements for participation in Medicare and/or Medicaid so long as the aggregate amount of all such civil money penalties outstanding at any one time does not exceed $250,000.

    c.   Material Statements.  None of the Loan Parties or their Subsidiaries, nor any officer, employee or agent of any of the Loan Parties or their Subsidiaries, has made an untrue statement of a material fact or fraudulent statement to any Governmental Authority, failed to disclose a material fact that must be disclosed to any Governmental Authority, or committed an act, made a statement or failed to make a statement that, at the time such statement, disclosure or failure to disclose occurred, would constitute a material violation of any Health Care Law.

WEIL:\98150122\30\66205.0003

d.  <u>Exclusion</u>.  None of the Loan Parties or their Subsidiaries, nor any owner, officer, director, partner, agent or managing employee or Person with a "<u>direct or indirect ownership interest</u>" (as that phrase is defined in 42 C.F.R. § 420.201) in any of the Loan Parties or their Subsidiaries , has (i) been excluded from any Third-Party Payor Arrangement or had a civil monetary penalty assessed pursuant to 42 U.S.C. § 1320a-7; (ii) been convicted (as that term is defined in 42 C.F.R. § 1001.2) of or investigated for any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347 or 1518, including any of the following categories of offenses: (A) criminal offenses relating to the delivery of an item or service under any federal health care program (as that term is defined in 42 U.S.C. § 1320a-7b) or healthcare benefit program (as that term is defined in 18 U.S.C. § 24b), (B) criminal offenses under federal or state law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service, (C) criminal offenses under laws relating to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickbacks, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state or local governmental agency, (D) laws relating to the interference with or obstruction of any investigations into any criminal offenses described in this clause (d), or (E) criminal offenses under laws relating to the unlawful manufacturing, distribution, prescription or dispensing of a controlled substance; or (iii) been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.

e.  <u>HIPAA and Other Privacy Laws</u>.  Each of the Loan Parties and their Subsidiaries is in compliance in all material respects with HIPAA and Other Privacy Laws. Further, in each contractual arrangement that is subject to HIPAA or Other Privacy Laws, each of the Loan Parties and their Subsidiaries has: (i) entered into a written business associate agreement (as such term is defined under the regulations implementing HIPAA) that substantially meets the requirements of HIPAA; (ii) at all times complied in all material respects with such business associate agreements in respect of the applicable privacy or security standards; and (iii) to its knowledge after due inquiry, at no time experienced or had a material unauthorized use or disclosure of Protected Health Information (as such term is defined in the regulations implementing HIPAA) or privacy or security breach or other privacy or security incident within the meaning of HIPAA.

f.  <u>Proceedings</u>. There is no pending (or, to the knowledge of any Loan Party, threatened) Health Care Proceeding commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator against or affecting any of the Loan Parties or their Subsidiaries. To Loan Parties' knowledge after due inquiry, there are no facts, circumstances or conditions that would reasonably be expected to form the basis for any such Health Care Proceeding against or affecting any of the Loan Parties or their Subsidiaries.

g.  <u>Corporate Integrity Agreement</u>. None of the Loan Parties or their Subsidiaries, nor any owner, officer, director, partner, agent or managing employee of any of Loan Parties or any of their Subsidiaries, is a party to or bound by any individual integrity agreement, corporate integrity agreement, corporate compliance agreement, deferred prosecution agreement, or other formal or informal agreement with any Governmental Authority concerning compliance with Health Care Laws, any Government Reimbursement Programs or the requirements of any Health Care Permit.

17.  **Loan Party Information.** The exact legal name of each Loan Party, as such name appears in its respective certificate of formation or any other organizational document, is set forth below. Each Loan Party is (i) the type of entity disclosed next to its name as set forth below and (ii) a registered organization except to the extent disclosed below. Also set forth below is the organizational identification number, if any, of each Loan Party that is a registered organization, and the jurisdiction of formation of each Loan Party.

34

| Legal Name | Entity Type | Organizational ID Number | Jurisdiction of Organization |
|---|---|---|---|
| AL Citronelle, LLC | Limited Liability Company | 4544017 | Delaware |
| AL Willow Tree, LLC | Limited Liability Company | 4544021 | Delaware |
| FL HUD Baybreeze, LLC | Limited Liability Company | 4543875 | Delaware |
| FL HUD Bayside, LLC | Limited Liability Company | 4543878 | Delaware |
| FL HUD Destin, LLC | Limited Liability Company | 4543876 | Delaware |
| FL HUD Margate, LLC | Limited Liability Company | 4543879 | Delaware |
| FL HUD Pensacola, LLC | Limited Liability Company | 4543877 | Delaware |
| FL HUD Rosewood, LLC | Limited Liability Company | 4544027 | Delaware |
| FL HUD Silvercrest, LLC | Limited Liability Company | 4543880 | Delaware |
| Florida Facilities, LLC | Limited Liability Company | 4525132 | Delaware |
| GCH Management Services, LLC | Limited Liability Company | 4554298 | Delaware |
| Gulf Coast Facilities, LLC | Limited Liability Company | 4525133 | Delaware |
| Gulf Coast Health Care, LLC | Limited Liability Company | 4522903 | Delaware |
| Gulf Coast Master Tenant Holdings, LLC | Limited Liability Company | 4554297 | Delaware |
| Gulf Coast Master Tenant I, LLC | Limited Liability Company | 4542028 | Delaware |
| Gulf Coast Master Tenant II, LLC | Limited Liability Company | 4542029 | Delaware |
| Gulf Coast Master Tenant III, LLC | Limited Liability Company | 3902710 | Delaware |
| HUD Facilities, LLC | Limited Liability Company | 4525131 | Delaware |
| MF Debary, LLC | Limited Liability Company | 4544039 | Delaware |
| MF Flagler, LLC | Limited Liability Company | 4544041 | Delaware |
| MF Halifax, LLC | Limited Liability Company | 4625418 | Delaware |
| MF Heritage, LLC | Limited Liability Company | 4544032 | Delaware |
| MF Lake Eustis, LLC | Limited Liability Company | 4544031 | Delaware |
| MF Longwood, LLC | Limited Liability Company | 4544033 | Delaware |
| MF Oakwood, LLC | Limited Liability Company | 4544028 | Delaware |
| MF Winter Park, LLC | Limited Liability Company | 4544036 | Delaware |
| MS Greenbough, LLC | Limited Liability Company | 4544006 | Delaware |
| MS HUD Boyington, LLC | Limited Liability Company | 4543884 | Delaware |
| MS HUD Dixie, LLC | Limited Liability Company | 4543881 | Delaware |
| MS HUD Ocean Springs, LLC | Limited Liability Company | 4543883 | Delaware |
| MS HUD Pine View, LLC | Limited Liability Company | 4543882 | Delaware |
| MS Lakeside, LLC | Limited Liability Company | 4544010 | Delaware |
| MS Shelby, LLC | Limited Liability Company | 4544007 | Delaware |
| MS Singing, LLC | Limited Liability Company | 4544008 | Delaware |
| NF Brynwood, LLC | Limited Liability Company | 4543999 | Delaware |
| NF Chipola, LLC | Limited Liability Company | 4544016 | Delaware |
| NF Escambia, LLC | Limited Liability Company | 5586593 | Delaware |
| NF Glen Cove, LLC | Limited Liability Company | 4544001 | Delaware |
| NF Manor, LLC | Limited Liability Company | 4543684 | Delaware |
| NF Nine Mile, LLC | Limited Liability Company | 6324810 | Delaware |
| NF Panama, LLC | Limited Liability Company | 4544003 | Delaware |
| NF Pensacola Manor, LLC | Limited Liability Company | 5376207 | Delaware |
| NF River Chase, LLC | Limited Liability Company | 4544013 | Delaware |
| NF Suwannee, LLC | Limited Liability Company | 4544004 | Delaware |
| NF Windsor, LLC | Limited Liability Company | 4544012 | Delaware |
| Pensacola Administrative Holdings, LLC | Limited Liability Company | 4587598 | Delaware |
| Pensacola Administrative Services, LLC | Limited Liability Company | 4522905 | Delaware |
| SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC | Limited Liability Company | 7091668 | Delaware |

35

| Legal Name | Entity Type | Organizational ID Number | Jurisdiction of Organization |
|---|---|---|---|
| SF Berkshire, LLC | Limited Liability Company | 4544060 | Delaware |
| SF Boynton, LLC | Limited Liability Company | 4544051 | Delaware |
| SF Brevard, LLC | Limited Liability Company | 5586592 | Delaware |
| SF Carnegie, LLC | Limited Liability Company | 4544057 | Delaware |
| SF Fountainhead, LLC | Limited Liability Company | 4544025 | Delaware |
| SF Glen Oaks, LLC | Limited Liability Company | 4544055 | Delaware |
| SF Kissimmee, LLC | Limited Liability Company | 4544048 | Delaware |
| SF Lake Placid ALF, LLC | Limited Liability Company | 5374667 | Delaware |
| SF Lake Placid, LLC | Limited Liability Company | 4544022 | Delaware |
| SF Oakbrook, LLC | Limited Liability Company | 4544046 | Delaware |
| SF Royal Manor, LLC | Limited Liability Company | 4544054 | Delaware |
| SF Salerno, LLC | Limited Liability Company | 4544045 | Delaware |
| SF Tampa, LLC | Limited Liability Company | 4544043 | Delaware |
| Brevard Oaks Center, LLC | Limited Liability Company | L14000169683 | Florida |

36

ANNEX E
TO TERM SHEET

**CERTAIN AFFIRMATIVE COVENANTS**

The Loan Parties agree that until the DIP Facility is Paid in Full:

1.  **Inspection**.  Upon reasonable request of the DIP Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the DIP Agent to audit, review, make extracts from or copy, at the Loan Parties' expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Loan Parties will permit the DIP Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any DIP Collateral or any other property of the Loan Parties at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the DIP Agent (or any agent or representative thereof) that is prohibited by applicable law, subject to confidentiality restrictions or is subject to attorney-client or similar privilege or constitutes attorney work product.

2.  **Compliance with Laws**.  (i) The Loan Parties will comply, in all materials respects, with all requirements of applicable law, except as executed by, or otherwise prohibited by, the provisions of the Bankruptcy Code or as a result of the Chapter 11 Cases and (ii) the Loan Parties will obtain, maintain in effect and comply, in all materials respects, with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the DIP Budget or the Interim DIP Order.

3.  **Taxes**.  The Loan Parties will pay or discharge, when due, (i) all material taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Loan Parties (including, without limitation, the DIP Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (a) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Loan Parties, (b) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this DIP Term Sheet, or (c) taxes allocable to the facilities operated by the Debtors for which the Debtors have agreed to pay under any master lease pertaining to such facilities or any sub-leases related thereto, including, without limitation, under the Lease or the Blue Mountain Master Leases and (ii) all federal, state and local taxes required to be withheld by it.

4.  **Maintenance of Properties**.  Each the Loan Parties will keep and maintain the DIP Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the DIP Budget or the Interim DIP Order,.

5.  **Insurance**.  The Loan Parties will maintain insurance with respect to the DIP Collateral, covering liabilities, losses or damages as are customarily are insured against by other Persons engaged in same or similar businesses and similarly situated and located.  All such policies of insurance shall be with financially sound and reputable insurance companies (including self-funded insurance programs and captive insurers) acceptable to Agent and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to DIP Agent.  All property insurance policies covering the Collateral are to be made payable to Agent for the benefit of DIP Agent and the DIP Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully

protect the Lenders' interest in the Collateral and to any payments to be made under such policies. If any Loan Party or any Subsidiary of any Loan Party fails to maintain such insurance, DIP Agent may arrange for such insurance, but at Borrowers' expense and without any responsibility on DIP Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, DIP Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the DIP Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

6. **Existence**. Each of the Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to, at all times preserve and keep in full force and effect such Person's valid existence and good standing in its jurisdiction of organization and, except as could not reasonably be expected to result in a Material Adverse Effect, good standing with respect to all other jurisdictions in which it is qualified to do business and any rights, franchises, permits, licenses, accreditations, authorizations, or other approvals material to their businesses.

7. **Cooperation with DIP Agent Financial Advisors**. The Loan Parties shall at all times provide reasonable access for, and reasonable cooperation with, any financial advisors to the DIP Agent.

8. **Milestones**. The Loan Parties shall take all actions necessary to cause each of the following to occur (the "Milestones"):

    a. no later than three (3) business days after the Petition Date, the Interim DIP Order approving the Term Sheet shall be entered by the Bankruptcy Court;

    b. on or before the entry of the Final DIP Order by the Bankruptcy Court, the Loan Parties, the DIP Agent and the DIP Lenders shall have executed (i) the DIP Note, consistent with the Documentation Principles, and (ii) any other Documentation reasonably requested by the DIP Agent at least two (2) business days prior to the Final Hearing;

    c. no later than thirty-five (35) days after the Petition Date, the Final Order approving the DIP Facility shall be entered by the Bankruptcy Court;

    d. no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered an order authorizing the Debtors' assumption of the RSA;

    e. no later than 90 days after the Petition Date (*provided that* the deadline may be extended by the Loan Parties by up to an additional thirty (30) days solely to comply with licensing requirements), (i) the Bankruptcy Court shall have entered an order rejecting the Blue Mountain Master Leases, and (ii) the Loan Parties shall have transitioned the properties subject to the Blue Mountain Master Leases;

    f. the Bankruptcy Court shall have entered the MOTA Order within thirty-five (35) days after the Petition Date; *provided that* the deadline to obtain entry of the MOTA Order may be extended by the Borrowers until the earlier of (i) an additional fifteen (15) days or (ii) December 1, 2021 if the Loan Parties are diligently pursuing the MOTA Order and the Loan Parties' failure to obtain the MOTA Order within the first thirty-five (35) Days after the Petition Date is primarily attributable to the Omega Entities (as defined in the RSA) or the New Operator(s); and

    g. No later than the first day of the first month following entry of the MOTA Order, the MOTA(s) shall have been consummated and gone into effect;

h.  No later than fifty (50) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement, solicitation procedures for the Plan (as defined in the RSA, and a deadline or bar date for filing of all prepetition claims;

i.  No later than 100 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order (as defined in the RSA); and

j.  No later than 30 calendar days after the date that the Court entered the Confirmation Order, the Plan shall have been consummated.

9.  **Financial Reporting**.  The Loan Parties shall deliver (which delivery may be made by electronic communication (including email)) to the DIP Agent each of the reports and other items set forth on Exhibit A attached hereto no later than the times specified therein (or such later time as the Required Lenders may agree).  Upon reasonable request by the DIP Agent, the Loan Parties shall make their senior management and advisors available at reasonable times and upon reasonable notice to the DIP Agent and DIP Lenders to discuss the financial position, cash flows, variances, operations, sale process and general case status of the Loan Parties.

10.  **Transfer Assistance Obligations**.  The Loan Parties shall promptly satisfy the Transfer Assistance Obligations.

11.  **Operations**.  The Loan Parties shall:

a.  prior to effectiveness of the MOTA, maintain (i) operation of the business at the Leased Property, and (ii) billing and collections procedures and practices, in each case, in the ordinary course of business and consistent with historical practices; and

b.  at all times following effectiveness of the MOTA, comply with and perform their respective obligations under and in accordance with the MOTA.

12.  **Bankruptcy Pleadings**.  The Loan Parties shall cooperate in good faith with the DIP Lenders to address the DIP Lenders' comments with respect to any material pleadings, motions, applications, financial information or other material documents filed on behalf of any Debtor in the Chapter 11 Cases.  Any such material pleadings, motions, applications, financial information or other material documents shall (i) be consistent with the DIP Facility, including, without limitation, the DIP Budget, and (ii) in the case of the Debtors' "first-day" and "second-day" motions, be reasonably acceptable to the DIP Lenders.

13.  **Use of Proceeds**.  The proceeds of the DIP Facility will be used to fund the operational, employee, wind-down and other costs of the Loan Parties, including, without limitation, payments authorized to be made under "first day" or "second day" orders, post-MOTA transition and employee costs, and costs associated with providing shared services to New Operator or plan administrator post-transition, and, in each case, consistent with, subject to, and within the limitations contained in the DIP Budget (including Permitted Variances and Permitted Carrybacks/Carryforwards). Except as expressly set forth in the DIP Budget, proceeds of the DIP Facility will not be used to pay the costs and expenses (including professional fees) of administering the Chapter 11 Cases.

14.  **Compliance with Health Care Laws**. Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to:

a.  comply in all material respects with all applicable Health Care Laws.

b.  (i) obtain, maintain and preserve, and take all necessary action to timely renew, all material Health Care Permits (including, as applicable, Health Care Permits necessary for it to be eligible to receive

39

payment and compensation from and to participate in any Third-Party Payor Arrangements) which are necessary or useful in the proper conduct of its business; (ii) be and remain in material compliance with all requirements for participation in, and for licensure required to provide the goods or services that are reimbursable under, all Third-Party Payor Arrangements; (iii) cause all Persons providing professional health care services for or on behalf of any of Loan Parties or their Subsidiaries (either as an employee or independent contractor) to comply with all applicable Health Care Laws in the performance of their duties, and to maintain in full force and effect all professional licenses and other Health Care Permits required to perform such duties; and (iv) keep and maintain all records required to be maintained by any Governmental Authority or otherwise under any Health Care Law.

c.    Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to, maintain a corporate and health care regulatory compliance program ("RCP") which addresses the requirements of Health Care Laws, including HIPAA and Other Privacy Laws, and includes at least the following components: (i) standards of conduct and procedures that describe compliance policies regarding laws with an emphasis on prevention of fraud and abuse; (ii) a specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including fraud and abuse laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including publicizing a reporting system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies including discipline of individuals responsible for the failure to detect violations of the RCP; and (vi) mechanisms to immediately respond to detected violations of the RCP. Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to, modify such RCPs from time to time, as may be necessary to ensure continuing compliance with all applicable Health Care Laws. Upon request, the DIP Agent (and/or its consultants) shall be permitted to review such RCPs.

d.    Provide to DIP Agent upon request, an accurate, complete and current list of all Third-Party Payor Arrangements with respect to the business of any of the Loan Parties.

15.  **Blue Mountain Master Leases**. The Loan Parties shall use commercially reasonable efforts to cause the rejection of the Blue Mountain Master Leases to be effective *nunc pro tunc* to the Petition Date.

Exhibit A to Annex E

Deliver (which delivery may be made by electronic communication (including email)) to the DIP Agent (for distribution by the DIP Agent to the DIP Lenders), each of the financial statements, reports, or other items set forth below at the following times in form reasonably satisfactory to the Required Lenders:

| | |
|---|---|
| on the Budget Testing Start Date and every Thursday of every other week ending thereafter: | (a)    a certificate which shall include such detail as is reasonably satisfactory to the Required Lenders (i) certifying that the Loan Parties are in compliance with the DIP Budget (including Permitted Variances and Permitted Carrybacks/Carryforwards) and (ii) certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and attaching thereto a report identifying any variances and/or any use of any Permitted Carrybacks/Carryforwards.

(b)    a revised proposed budget (it being understood that upon written approval of such proposed budget by the Required Lenders (and not before such written approval), in their sole discretion, such proposed budget shall become the DIP Budget) and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the Agent and DIP Lenders. |
| three (3) business days prior to any such filing or, where it is not practically possible to do so within such time, as soon as possible and in any event not less than one (1) business day prior to such filing: | (c)    copies of all material pleadings, motions, applications, financial information or other material documents filed on behalf of any Debtor in the Chapter 11 Cases. |
| promptly, but in any event within five (5) business days after Loan Parties have knowledge of any event or condition that constitutes a default or an Event of Default: | (d)    notice of such event or condition and a statement of the curative action that Loan Parties propose to take with respect thereto. |
| as soon as available, but in any event within 30 days after the end of each month during each of Parent's fiscal years | (e)    an unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of shareholder's equity of Parent and its Subsidiaries during such period and compared to the prior period and plan, together with a corresponding discussion and analysis of results from management, and

(f)    an unaudited combined and combining income statement of Borrowers containing facility level detail during such period and compared to the prior period and plan, and

(g)    a Compliance Certificate (as defined in the Prepetition Credit Agreement) along with,

(i) the underlying calculations, including the calculations to arrive at Consolidated EBITDA (as defined in the Prepetition Credit |

41

| | |
|---|---|
| | Agreement), EBITDA (as defined in the Prepetition Credit Agreement), the Consolidated Fixed Charge Coverage Ratio EBITDA (as defined in the Prepetition Credit Agreement), the Fixed Charge Coverage Ratio EBITDA (as defined in the Prepetition Credit Agreement), and the Cash Velocity Ratio EBITDA (as defined in the Prepetition Credit Agreement); |
| | (ii) to the extent applicable, a schedule regarding the outstanding balance (and remaining monthly payments) owing under any PL/GL settlement, any longterm payment agreement or tax settlement with any Governmental Authority or other long-term payment agreement, together with evidence of payment by Borrowers of all amounts owing thereunder for the most recently concluded month, and |
| | (iii) a statistical report, including census, statistics, and such other information (including information relating to payor mix, skilled mix, quality mix, and average length of stay) as may be reasonably requested by Agent, and |
| | (h)    unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of shareholder's equity the Master Tenant Affiliates (as defined in the Prepetition Credit Agreement) during such period and compared to the prior period and plan, together with a corresponding discussion and analysis of results from management. |
| Promptly after the commencement thereof, but in any event within 5 Business Days after the service of process with respect thereto on Parent or any Borrower, | (i)    notice of all actions, suits, or proceedings brought by or against any of Borrowers, their Subsidiaries or the other Loan Parties before any Governmental Authority which reasonably could be expected to result in a Material Adverse Effect including, without limitation, an condemnation proceeding involving any Health Care Facility. |
| | |
| Promptly after the commencement or occurrence thereof, but in event within 10 Business Days thereafter, any of the following: | (j)    [reserved]. <br><br> (k)    notice that any of Borrowers, their Subsidiaries or the other Loan Parties, or any owner, officer, manager, managing employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in Borrowers, their Subsidiaries or the other Loan Parties: (A) is subject to any Health Care Proceeding or other investigations or audits (including cost reports or similar audits regarding the valuation of receivables payments) conducted by any federal, state or county Governmental Authority or its agents or designees, except in accordance with applicable settlement or appeals procedures that are timely and diligently pursued with respect to which the amount at issue (for any single investigation or audit) does not |

WEIL:\98150122\30\66205.0003

exceed $250,000, (B) has had a civil monetary penalty assessed pursuant to 42 U.S.C. § 1320a-7a or is the subject of a proceeding seeking to assess such penalty; (C) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b) or is the subject of a proceeding seeking to assess such penalty; (D) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; or (E) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or in any qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.;

(l)      notice of (A) any material reduction to any rate for reimbursement under any Third Party Payor Arrangement, or (B) any changes in any Health Care Law (including the adoption of a new Health Care Law) that could, in the aggregate, have a Material Adverse Effect;

(m)      notice of (A) any claim to recover any alleged overpayments with respect to any Accounts (as defined in the Prepetition Credit Agreement) in excess of $250,000, (B) any material modification to the billing systems or practices of Borrowers, their Subsidiaries or the other Loan Parties as in effect as of the Petition Date, (C) any validation review, program integrity review or any material reimbursement audits related to Borrowers, their Subsidiaries or the other Loan Parties in connection with any Third Party Payor Arrangement, or (D) the disclosure by any Borrower to the Office of the Inspector General of the United States Department of Health and Human Services, or any Third Party Payor program (including to any intermediary, carrier or contractor of such program), of an actual or potential overpayment involving the submission of claims in an amount greater than $250,000;

(n)      the pending imposition of any material fine or penalty by any Governmental Authority under any Health Care Law against Borrowers, their Subsidiaries or the other Loan Parties;

(o)      any pending revocation, suspension, termination, probation, restriction, limitation, denial, or non-renewal with respect to any Health Care Permit or Third Party Payor Arrangement, except for any such non-renewal at the election of Borrowers, their Subsidiaries or the other Loan Parties as would not, in the aggregate, have a Material Adverse Effect; provided that, for the avoidance of doubt, the inclusion by a Governmental Authority or Third Party Payor of language in a notice letter advising Borrowers, their Subsidiaries or the other Loan Parties that failure to comply with the terms of such letter could result in such Governmental Authority or Third Party Payor taking steps to revoke, suspend, terminate, impose probation, restrict, limit, deny or not renew such Person's Health Care Permit or Third Party Payor Arrangement shall not automatically be deemed a "pending" action for purposes of this clause (5);

| | |
|---|---|
| | (p)      any non-routine and material inspection of any facility of Borrowers, their Subsidiaries or the other Loan Parties by any Governmental Authority; |
| | (q)      notice of the occurrence of any reportable event as defined in any corporate integrity agreement, corporate compliance agreement or deferred prosecution agreement pursuant to which any of the Borrowers, their Subsidiaries or the other Loan Parties has to make a submission to any Governmental Authority or other Person under the terms of such agreement; |
| | (r)      any threatened or actual ban on admissions by from any Governmental Authority to all or any substantial portion of any Health Care Facility; |
| | (s)      upon request, copies of material Health Care Permits required in connection with the operation of Borrower's business; |
| | (t)      copies of (a) any surveys (i) that are conducted following an "immediate jeopardy" complaint or (ii) with respect to which one or more condition-level deficiencies are found, (b) all plans of correction submitted with respect to such surveys described in clause (a), and (c) upon request, copies of any other surveys and plans of correction related thereto; |
| | (u)      notice of the occurrence of any New Ark Event of Default; |
| | (v)      notices and copies of any subpoenas from the Office of the Inspector General or other Governmental Authority; |
| | (w)      notice of any material default under any Lease of a Health Care Facility, notice from the landlord of any Health Care Facility that such landlord is exercising its termination rights under the Lease applicable thereto or has elected not to renew the Lease applicable thereto, or notice given by any of the Borrowers, their Subsidiaries or the other Loan Parties to such landlord that such Borrower, Subsidiary or other Loan Party is not electing to renew (or is otherwise terminating) the Lease applicable thereto; |
| | (x)      notice of any changes in any director of reimbursement or similar senior executive with respect to the billing and collections personnel of any of the Borrowers, their Subsidiaries or the other Loan Parties; and |
| | (y)      notice of any comprehensive system changes updating the charge master with new billing rates that would affect the Expected Net Value (as defined in the Prepetition Credit Agreement) of Eligible Accounts (as defined in the Prepetition Credit Agreement) of any Borrower. |
| Monthly (no later than the fifteenth day of each month) | (z)      an executed Borrowing Base Certificate (as defined in the Prepetition Credit Agreement) |

| | |
|---|---|
| | (aa)     a detailed aging, by total, of Borrowers' Accounts, together with a reconciliation (if applicable) and supporting documentation for any reconciling items noted (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), in a format consistent with past practices,<br><br>(bb)     a monthly Account roll-forward, in a format consistent with past practices, tied to the beginning and ending account receivable balances of Borrowers' general ledger,<br><br>(cc)     any action, suit, proceeding, dispute, set-off, deduction, defense or counterclaim that is asserted by any obligor in an amount in excess of $250,000, and<br><br>(dd)     a reconciliation of Accounts and trade accounts payable Borrowers' general ledger accounts to its monthly financial statements including any book reserves related to each category. |
| Promptly upon the reasonable request of the Required Lenders: | (ee)     any other information relating to the business, financial, legal or corporate affairs of the Loan Parties. |

45

**ANNEX F**
**TO TERM SHEET**

**CERTAIN NEGATIVE COVENANTS**

Until the DIP Facility is Paid in Full, the Loan Parties shall not, without the consent of the Required Lenders:

1. **Restrictions on Fundamental Changes**.  Directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or equity interests of, or otherwise combine with or acquire, any Person, other than, in each case, any such action approved by an order of the Bankruptcy Court in form and substance satisfactory to the Required Lenders.

2. **Permitted Indebtedness**.  Create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Interim DIP Order, Permitted Indebtedness.

3. **Permitted Liens**.  Create, incur, assume or permit to exist any lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Liens.

4. **Permitted Restricted Payments**.  Make any Restricted Payment, except (x) dividends and distributions by Subsidiaries of the Loan Parties paid to the Loan Parties or other wholly-owned Subsidiaries of the Loan Parties and (y) the Prepetition Loan Paydown.

5. **Guarantees of Obligations**.  Assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Loan Parties or any of their Subsidiaries), except the endorsement of negotiable instruments by Loan Parties and their Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

6. **Permitted Asset Sales**.  Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (i) the sales or dispositions of assets in the ordinary course of business, (ii) the sale or disposition of obsolete equipment, (iii) the sale of other property on terms acceptable to the Required Lenders, and (iv) the transfer, sale or disposition of assets approved by an order of the Bankruptcy Court in form and substance satisfactory to the Required Lenders.

7. **Modifications to Material Documents; Payments of Obligations**.  Consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to (i) the Interim DIP Order or (ii) the New Ark Funding or the Prepetition Obligations except, in the case of this clause (ii), where such amendment, supplement or other modification is not materially adverse to the interests of the DIP Lenders.  Except for (A) payments authorized to be made under "first day" or "second day" orders entered by the Bankruptcy Court and identified in the DIP Budget, subject to Permitted Variances and Permitted Carrybacks/Carryforwards, and (B) payments permitted by the Interim DIP Order and the DIP Budget, subject to Permitted Variances and Permitted Carrybacks/Carryforwards, no Loan Party shall make any payment in respect of, or repurchase, redeem, retire or defease any, Indebtedness arising prior to the Petition Date.

8. **Permitted Investments**.  Make any investment in, or make loans or advances of money to, any Person (other than another Loan Party), through the direct or indirect lending of money, holding of securities or otherwise.

9. **Change in Fiscal Year**.  Change their fiscal year.

46

10. **Affiliate Transactions**.  Make any other payments of prepetition claims to Affiliates (other than payments to New Ark and the Prepetition Lenders made in accordance with the New Ark Funding Documentation) nor shall the Loan Parties make any other payments of postpetition claims to Affiliates other than as set forth in the Budgets.

11. **Financial Covenant**.  As of the last day of each Reporting Period commencing with the Budget Testing Start Date, permit the aggregate amount of operating cash disbursements payable to Persons other than the DIP Lenders made by the Debtors to exceed 110% of the aggregate amount of operating cash disbursements for such Reporting Period as set forth in the Approved DIP Budget (such variance that does not breach this covenant, a "Permitted Variance").  Notwithstanding the foregoing, the Borrower may (a) carry-forward any disbursement amounts that are available and unused during a prior Reporting Period to any of the following subsequent Reporting Periods (a "Permitted Carryforward") and (b) may carry-backwards up to 50% of any amounts available to be used in up to two subsequent Reporting Periods to be used in the Reporting Period then in effect (a "Permitted Carryback" and, together with Permitted Carryforwards, "Permitted Carrybacks/Carryforwards") (which Permitted Carrybacks will not be available in any subsequent Reporting Periods).

WEIL:\98150122\30\66205.0003

**ANNEX G**
**TO TERM SHEET**

The events of default under the New Ark Funding (each, a "**New Ark Event of Default**," and collectively, the "**New Ark Events of Default**") shall be limited to:

1. failure to make any payment to the New Ark or the Prepetition Lenders when due;

2. failure to repay the New Ark Operating Advance to the Prepetition Loan Account by no later than December 3, 2021.

3. any breach or failure to comply with the terms of the Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, as applicable, to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from New Ark;

4. failure to comply with the Milestones;

5. prior to entry of the MOTA Order, the occurrence of an Event of Default under the DIP Facility that results in any limitation, suspension or termination of funding thereunder;

6. any Loan Party filing of a motion to convert any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the commencement by any of the Debtors of any winding up or liquidation proceeding (other than the Chapter 11 Cases) under any other applicable law;

7. the appointment of a receiver, receiver and manager, interim receiver, or similar official over any substantial portion of the Prepetition Lenders' collateral;

8. the dismissal of the Chapter 11 Cases;

9. the appointment in the Chapter 11 Cases of a chapter 11 trustee or an examiner with expanded powers;

10. any Loan Party shall (A) contest or dispute the validity or enforceability of any New Ark Funding Documentation or any obligation owed under any New Ark Funding Documentation in writing or deny in writing that it has any liability thereunder, (B) contest or dispute the validity or perfection of the Prepetition Credit Agreement, or the liens and security interests securing the claims under the Prepetition Credit Agreement in writing or (C) pursue, negotiate, solicit interest in, or agree to any sale or liquidation of the Debtors' assets or any restructuring, reorganization, refinancing, or other transaction other than on the terms provided for in the RSA;

11. the grant of any super priority administrative expense claim or any lien or charge which is pari passu with or senior to those of New Ark and the Prepetition Lenders (other than as permitted by this Term Sheet and/or the New Ark Funding Documentation);

12. cessation of liens or adequate protection claims granted with respect to the New Ark Funding to be valid, perfected and enforceable in all respects with the priority described herein;

13. the entry of the Final DIP Order shall not have occurred within thirty-five (35) days after entry of the Interim DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any substantive modification or amendment, without the prior written consent of New Ark; and

14. the incurrence by any Loan Party of postpetition administrative or priority expenses individually or in the aggregate in excess of $500,000, the payment for which is not permitted under the Budgets (subject to Permitted Variances and Permitted Carrybacks/Carryforwards).

## Exhibit C

**Plan Term Sheet**

EXECUTION VERSION

## GULF COAST HEALTH CARE, LLC
**Plan Term Sheet**

This term sheet (together with any annexes, exhibits, and schedules attached hereto, the "**Term Sheet**") sets forth certain material terms of a proposed chapter 11 plan of liquidation (the "**Plan**") of Gulf Coast Health Care, LLC, a Delaware limited liability company ("**Gulf Coast**" or the "**Company**"), and certain of its affiliates and subsidiaries (collectively, the "**Debtors**").

**THIS TERM SHEET DOES NOT CONSTITUTE A SOLICITATION OF VOTES FOR A CHAPTER 11 PLAN FOR PURPOSES OF BANKRUPTCY CODE SECTIONS 1125 AND 1126. SUCH SOLICITATION MAY ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND AFTER DELIVERY OF THE PLAN AND DISCLOSURE STATEMENT IN ACCORDANCE WITH APPLICABLE ORDERS OF THE BANKRUPTCY COURT.  THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH THE PROPOSED TRANSACTION OR THAT WILL BE SET FORTH IN DEFINITIVE DOCUMENTATION.**

| Transaction Overview | |
|---|---|
| **The Chapter 11 Cases** | Prior to the commencement of the Debtors' chapter 11 cases (the "**Chapter 11 Cases**"), which are to be filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), the following parties will have executed a restructuring support agreement (the "**RSA**")[1]: <br><br> • the Debtors, including Gulf Coast Master Tenant I, LLC and the Existing Operators (as defined in the RSA); <br><br> • OHI Asset Funding (DE), LLC ("**Omega**"); <br><br> • the other Omega Entities; <br><br> • the Equity Sponsors; <br><br> • the Service Providers; and <br><br> • New Ark Capital, LLC ("**New Ark**" and, collectively, with the Debtors, Omega, the Omega Entities, the Equity Sponsors, and the Service Providers, the "**RSA Parties**"). <br><br> The RSA will, among other things, obligate the RSA Parties to pursue and implement the Plan consistent with the terms and conditions contained in the RSA and as set forth in this Term Sheet. |

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the RSA.

| DIP Financing[1] | In conjunction with the commencement of the Chapter 11 Cases and execution of the RSA, Omega (or its designee) (the "**DIP Lender**") has agreed to provide a debtor-in-possession financing facility (the "**DIP Facility**") to fund up to $25,000,000 in accordance with the terms of the DIP Term Sheet, a copy of which is annexed to the RSA.  Among other conditions precedent to the funding of the DIP Facility is approval of the New Ark Financing, as described below. |
|---|---|
| New Ark Financing | In conjunction with the commencement of the Chapter 11 Cases and execution of the RSA, and as a condition to Omega funding the DIP Facility, New Ark (or its designee) has agreed to fund certain professional fees and other amounts as set forth and subject to the DIP Term Sheet (the "**New Ark Funding**"), and the New Ark Operating Advance (as defined in the DIP Term Sheet and, together with the New Ark Funding, the "**New Ark Financing**").  A description of the New Ark Financing is set forth in the DIP Term Sheet annexed to the RSA. |
| Facility Transfer Process | Subject to Bankruptcy Court approval, the Debtors will transition the management and operation of each of the Facilities set forth on Exhibit A of the RSA through MOTA(s) to be negotiated by the Debtors and the applicable New Operators identified by the Omega Entities, in form and substance reasonably acceptable to the Debtors and New Operators.  The transition of the Facilities shall occur in a manner consistent with and on the timeline set forth in the RSA. |
| Plan and Disclosure Statement | The Debtors, as Plan proponents, will draft and file a disclosure statement (the "**Disclosure Statement**") and Plan that implements the terms set forth in this Term Sheet.  The final version of the Plan, order confirming the Plan (the "**Confirmation Order**"), and all related Plan documents, schedules, and Plan exhibits, including the Plan supplement(s), shall contain all substantive terms and conditions in this Term Sheet and otherwise shall be in form and substance reasonably acceptable to the Debtors, New Ark, the Equity Sponsors, the Service Providers, Omega, and the Omega Entities. |

| Proposed Treatment of Claims and Interests |
|---|

Holders of allowed claims against and equity interests in the Debtors will receive the following treatment in full and final satisfaction of such allowed claims and equity interests, which shall be released and discharged under the Plan.

| Class No. | Type of Claim | Treatment | Impairment / Voting |
|---|---|---|---|

---

[1]    This summary, as well as the summary of New Ark Financing discussed below, are each qualified by reference to the DIP Term Sheet.  To the extent there is an inconsistency between these summaries and the DIP Term Sheet, the DIP Term Sheet shall govern.

| N/A | **DIP Facility Claims** | On the Effective Date, each holder of an Allowed DIP Facility Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim, (a) the Debtors' cash on the Effective Date; (b) the Debtors' accounts receivable existing as of the Effective Date; (c) proceeds of the Retained Causes of Action (as defined below); and (d) all other assets of the Debtors, including all prepetition accounts receivable, except the Prepetition A/R Reserve and the Unsecured Claims Cash Amount (collectively, the "**Distribution Trust Assets**"), after satisfaction of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims. For the avoidance of doubt, to the extent that the Distribution Trust Assets are insufficient to satisfy the DIP Lender in full on account of the DIP Facility Claim, the DIP Lender shall receive no additional consideration on account of the DIP Facility Claim in connection with, and subject to, consummation of the Plan. | N/A |
| N/A | **Administrative Expense Claims** | Unless a holder agrees to less favorable treatment, each holder of an Allowed administrative expense claim (including all professional fee claims) shall have such claim satisfied in full, in cash, which payments shall be made in the ordinary course of business or on the later of the Effective Date and the date on which such claim become an allowed claim (or as soon as reasonably practicable thereafter), or otherwise receive treatment consistent with the provisions of section 1129(a)(9)(2) of the Bankruptcy Code.<br><br>Notwithstanding the foregoing, (a) so long as the MOTA Order is entered, the Omega Entities shall not receive any recovery on account of the Omega Administrative Claim and any other administrative or priority claims held by the Omega Entities in connection with, and subject to, consummation of the Plan, and (b) New Ark shall waive the New Ark Administrative Claim, and any other administrative or priority claims held by New Ark in connection with, and subject to, consummation of the Plan. | N/A |

| N/A | **Priority Tax Claims** | Unless a holder agrees to less favorable treatment, each holder of an Allowed priority tax claim shall receive treatment consistent with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
|---|---|---|---|
| **Class 1** | **New Ark Claims** | On the Effective Date, the holder of the Allowed[2] New Ark Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim, payment from the Prepetition A/R Reserve in cash in the amount of the New Ark Claim, less the amount of the New Ark Funding; *provided*, *however*, that if there are insufficient funds in the Prepetition A/R Reserve to provide payment in full on account of the New Ark Claim, New Ark shall waive any such deficiency in connection with, and subject to, consummation of the Plan.<br><br>"**Prepetition A/R Reserve**" means cash in the amount of all accounts receivable collected by the Debtors on or after the Petition Date on account of services rendered prior to the Petition Date, including, without limitation, cash in the Prepetition Loan Account (as defined in the DIP Term Sheet) and any excess funds remaining in the New Ark Reserve Account (as defined in the DIP Term Sheet). | Impaired – entitled to vote. |
| **Class 2** | **Other Secured Claims** | On the Effective Date (or as promptly thereafter as reasonably practicable), each holder of an Allowed Other Secured Claim shall receive, in the sole discretion of the Distribution Trust and full and final satisfaction of such claim, (a) payment in full by the Distribution Trust in cash, including the payment of any interest Allowed and payable under section 506(b) of the Bankruptcy Code; (b) delivery of the collateral securing such Allowed Other Secured Claim; or (c) treatment of such Allowed Other Secured Claim in any other matter that renders the claim unimpaired.<br><br>For the avoidance of doubt, Other Secured Claims do not include claims of holders of the | Unimpaired – deemed to accept. |

---

[2] "**Allowed**" means, with respect to any Claim (as defined in section 101(5) of the Bankruptcy Code), such Claim or portion thereof against any Debtor is allowed under the Plan, under the Bankruptcy Code, or by a final order, as applicable.

| | | Seller Subordinated Note or claims of the Omega Entities, which are classified below. | |
|---|---|---|---|
| **Class 3** | **Other Priority Claims** | On the Effective Date, each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired – deemed to accept. |
| **Class 4** | **Omega Claims** | Pursuant to the RSA, the Omega Entities shall receive on account of the Omega Entities' outstanding claims against the Debtors owing under the Master Lease, an Allowed claim against the Debtors in the amount of $48,996,164 comprising (i) an allowed unsecured claim for the Omega Prepetition Rent Claim and (ii) an allowed unsecured claim for the Omega Rejection Damages Claim (collectively, the "**Omega Allowed Unsecured Claim**"). On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim, the holders of the Omega Allowed Unsecured Claim shall receive *pro rata* distribution with Class 5, Class 6 , and Class 7 of the Unsecured Claims Cash Amount (as defined below); *provided, however*, that notwithstanding the foregoing, pursuant to that certain Amended and Restated Subordination Agreement between certain of the Debtors, Omega, and Delta dated as of July 6, 2018 (the "**Omega/Delta Subordination Agreement**"), the *pro rata* distribution owed to the holders of Subordinated Seller Note Claims will be paid to the holders of the Omega Allowed Unsecured Claim until the Omega Allowed Unsecured Claim is paid in full; *provided further* that in the event that Class 7 votes to accept the Plan, then the holders of the Omega Allowed Unsecured Claim shall contribute their *pro rata* distribution of the Unsecured Claims Cash Amount (inclusive of any distributions of the Unsecured Claims Cash Amount the Omega Entities are entitled to receive from the holders of Subordinated Seller Note Claims), to the holders of Class 7 General Unsecured Claims, each of whom shall receive their respective *pro rata* distribution of all such amounts. | Impaired – entitled to vote. |

| Class 5 | **Subordinated Seller Note Claims** | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim, each holder of a Subordinated Seller Note Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim shall receive a *pro rata* distribution with Class 4, Class 6, and Class 7 of the Unsecured Claims Cash Amount.<br><br>Notwithstanding the foregoing, pursuant to the Omega/Delta Subordination Agreement, the *pro rata* distribution owed to the holders of Subordinated Seller Note Claims will be paid to the holders of the Omega Allowed Unsecured Claim until the Omega Allowed Unsecured Claim is paid in full.<br><br>"**Subordinated Seller Note**" means that certain promissory note dated July 6, 2018 between certain of the Debtors and Delta Health Group, LLC, Cordova Rehab, LLC, and Pensacola Health Trust, LLC (collectively, "**Delta**") (as amended, modified, or supplemented from time to time). | Impaired – entitled to vote. |
| Class 6 | **Service Provider Claims** | Pursuant to the RSA, the Service Providers shall receive their respective portion of the Allowed Service Providers' Unsecured Claim.<br><br>On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim, the holders of the Service Providers' Allowed Unsecured Claim shall receive *pro rata* distribution with Class 4, Class 5, and Class 7 of the Unsecured Claims Cash Amount (as defined below); *provided, however*, that in the event that Class 7 votes to accept the Plan, then the holders of the Service Providers' Allowed Unsecured Claim shall contribute their *pro rata* distribution of the Unsecured Claims Cash Amount, to the holders of Class 7 General Unsecured Claims, each of whom shall receive their respective *pro rata* distribution of all such amounts. | |
| Class 7 | **General Unsecured Claims** | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim, each holder of a General Unsecured Claim shall receive, in full and final satisfaction, | Impaired – entitled to vote. |

| | | compromise, settlement, release, and discharge of and in exchange for such claim, a *pro rata* distribution with Class 4, Class 5, and Class 6 of the Unsecured Claims Cash Amount.<br><br>"**Unsecured Claims Cash Amount**" means \$[●] in cash, which will be contributed to the Debtors by one or more of New Ark and the Equity Sponsors, and which amount will be acceptable to New Ark and the Equity Sponsors in their absolute discretion. | |
| **Class 8** | **Intercompany Claims** | On the Effective Date, each Allowed Intercompany Claim shall be cancelled, extinguished, and discharged, as mutually agreed upon by each holder of such Intercompany Claim and the Debtors or the Distribution Trust, as applicable. | Impaired – deemed to reject |
| **Class 9** | **Existing Equity Interests** | On the Effective Date, all existing equity interests in Gulf Coast Health Care, LLC, Pensacola Administrative Holdings, LLC, and Gulf Coast Master Tenant Holdings, LLC will be cancelled.<br><br>On the Effective Date, all existing equity interests in the remaining Debtors shall be (a) reinstated solely to the extent necessary to maintain the Debtors' corporate structure post-Effective Date or (b) cancelled, released, or extinguished, as determined by the Debtors in their business judgment. | No distribution. |

| **Other Plan Terms** |
|---|
| **Subordination** — Except as otherwise set forth in this Term Sheet and the RSA, the classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Related Transactions** — The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the transactions therein. On the Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the liquidation. |
| **Implementation** — On or prior to the effective date of the Plan (the "**Effective Date**"), the Debtors shall enter into a distribution trust agreement (the "**Distribution Trust Agreement**"), to establish a distribution trust in form and substance |

|  | satisfactory to the DIP Lender, (the "**Distribution Trust**") for the purposes of collecting all accounts receivable outstanding as of the Effective Date, liquidating and distributing the Distribution Trust Assets as required under the Plan and Distribution Trust Agreement, and winding down the Debtors, with no objective to continue or engage in the conduct of a trade or business. |
|---|---|
|  | On the Effective Date, all existing equity interests in the Debtors will be canceled, and one membership interest in each of Gulf Coast Health Care, LLC, Pensacola Administrative Holdings, LLC, and Gulf Coast Master Tenant Holdings, LLC will be issued to the Distribution Trust (as defined below). The Distribution Trustee shall serve as the sole office and manager of each of the Debtors after the Effective Date. |
|  | The Distribution Trust shall be administered by the Distribution Trustee, who shall be selected by Omega in consultation with the Debtors and any statutory committee appointed in the Chapter 11 Cases (each, a "**Committee**"), pursuant to the Distribution Trust Agreement and the Plan. |
|  | In his or her sole discretion, the Distribution Trustee may enter into one or more transition services agreements with the Service Providers on terms to be mutually agreed upon by the Distribution Trustee and the Service Providers. |
|  | The Distribution Trust Assets shall be used to pay the costs of administration of the Distribution Trust (including the compensation of the Distribution Trustee and any professionals retained by the Distribution Trust), and to satisfy DIP Facility Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims as set forth herein. The Unsecured Claims Cash Amount shall be held in trust by the Distribution Trust after the Effective Date and used to fund the costs of unsecured claim reconciliation and to satisfy Allowed General Unsecured Claims (and, in the event Class 7 votes to reject the Plan, Allowed Omega Claims and Allowed Service Providers' Claims) under the Plan. |
|  | "**Distribution Trustee**" means the person appointed to administer the Distribution Trust with such rights, duties, and obligations as set forth in the Distribution Trust Agreement. |
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in this Term Sheet, the MOTA(s), or during the Chapter 11 Cases, all executory contracts and unexpired leases shall be rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date, unless otherwise determined to be assumed by the Debtors or the Distribution Trust (as applicable) and identified as such in the Plan, the Plan supplement or other motion to assume. |
|  | The Debtors shall reject and terminate the Master Lease pursuant to the MOTA Order. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |

| | |
|---|---|
| **Retained Causes of Action** | The Distribution Trust shall retain all rights to commence and pursue any Causes of Action,[3] other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions referenced in this Term Sheet and implemented pursuant to the Plan (the "**Retained Causes of Action**"); *provided, however*, that the Debtors retain the right to resolve and settle all such Retained Causes of Action in connection with the Plan. |
| **Organizational and Governance Matters** | The charter, bylaws, and/or other organizational documents of each of the Debtors shall be amended and restated as necessary appropriate, as determined by the Debtors or the Distribution Trust (as applicable) in connection with the wind-down and dissolution of the Debtors. |
| **Tax Matters** | The parties shall negotiate in good faith to determine a structure to implement the liquidation in a tax-efficient manner that (i) minimizes any current cash taxes payable by the Equity Sponsors, the Debtors, or the Distribution Trust and (ii) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes (including, among other things, tax basis)) of the liquidation to the Equity Sponsors, the Debtors, and the Distribution Trust. |
| **Conditions Precedent to Confirmation** | The occurrence of confirmation of the Plan ("**Confirmation**") shall be subject to the following conditions precedent:<br><br>• the Definitive Documents shall be in form and substance reasonably acceptable to the Debtors, the DIP Lender, New Ark, the Equity Sponsors, and the Service Providers;<br><br>• the MOTA Order shall have been entered by the Court and shall not have been stayed, modified, or vacated on appeal;<br><br>• the Operations Transfer Date shall have occurred; and<br><br>• the Confirmation Order shall have been entered by the Court. |
| **Conditions Precedent to the Effective Date** | The occurrence of the Effective Date shall be subject to the following conditions precedent: |

---

[3] "**Cause of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

|  | • the orders approving the Disclosure Statement and the Plan shall have been entered by the Court and such orders shall not have been stayed, modified, or vacated on appeal;<br><br>• the Confirmation Order shall have become a final order;<br><br>• the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless the DIP Lender and New Ark have provided written consent to such material amendment, alteration, or modification;<br><br>• the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;<br><br>• all Definitive Documents shall, where applicable, have been executed and remain in full force and effect in form and substance;<br><br>• the Debtors shall establish a professional fee escrow account funded in the amount of estimated accrued but unpaid professional fees incurred by the Debtors during the Chapter 11 Cases;<br><br>• the Operations Transfer Date shall have occurred; and<br><br>• the Distribution Trust Agreement shall have been executed and the Distribution Trustee shall have been appointed. |
|---|---|
| **Director and Officer Indemnification** | Any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person pursuant to the Debtors' operating agreements, bylaws, policy of providing employee indemnification, applicable state law or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtors shall survive confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; *provided, however*, that all related monetary obligations shall be limited solely to available insurance coverage and neither Omega, New Ark, the Distribution Trust, the Distribution Trustee, nor any of their assets shall be liable for any such obligations. This provision for indemnification obligations shall not apply to or cover any Claims, suits or actions against a Person that result in a final order determining that such Covered Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty. |

| | |
|---|---|
| **Mutual Releases between RSA Parties** | The Plan will include mutual releases by and among the Debtors, New Ark, DIP Lender, the Omega Entities, the Equity Sponsors, the Service Providers, any statutory Committee, and each of its members, and each of their respective predecessors, successors, affiliates, subsidiaries, equity holders, members (including managing members), directors, managers, officers, principals, employees, partners, trusts, trustees, independent contractors, agents, representatives, managed accounts or funds, agents, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (collectively, the "**Released Parties**") to the fullest extent permitted by Third Circuit law. |
| **Debtor & Third-Party Releases** | The Plan will include customary release provisions (including third-party releases) for the benefit of the Released Parties. |
| **Exculpations & Injunctions** | The Plan will include customary exculpation and injunction provisions to the fullest extent permitted by Third Circuit law. |
| **Other Customary Plan Provisions** | The Plan will provide for other standard and customary provisions, including provisions in respect of the cancellation of existing claims and interests; the vesting of assets; the compromise and settlement of claims; and the resolution of disputed claims. |