**EXHIBIT A**

**<u>Revised Proposed Order</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Gulf Coast Health Care, LLC, *et al.*,[1] | ) | Case No. 21-11336 (KBO) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Related to Docket No. 14** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO**
**(A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE**
**CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,**
**(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion")[2] of Gulf Coast Health Care, LLC ("Gulf Coast") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") for entry of an interim order (this "Interim Order") and a final order ("Final Order"), under sections 105, 361, 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, *inter alia*:

---

[1] The last four digits of Gulf Coast Health Care, LLC's federal tax identification number are 9281. There are 62 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GulfCoastHealthCare. The location of Gulf Coast Health Care, LLC's corporate headquarters and the Debtors' service address is 40 South Palafox Place, Suite 400, Pensacola, FL 32502.

[2] Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the Motion or the DIP Term Sheet (as defined herein).

(i)        authorizing the Debtors to obtain postpetition financing on a secured superpriority basis, consisting of a new money term loan facility (the "DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $25,000,000 pursuant to the terms and conditions set forth in this Interim Order and that certain term sheet annexed hereto as **Exhibit 1** (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Term Sheet"), executed by those certain Debtors identified as borrowers in the DIP Term Sheet (the "DIP Borrowers") and those certain Debtors identified as guarantors in the DIP Term Sheet (the "DIP Guarantors" and, together with the DIP Borrowers, the "DIP Loan Parties"), OHI Asset Funding (DE), LLC, as the administrative agent and collateral agent for the DIP Facility (the "DIP Agent"), each of the DIP Lenders (the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), and certain of the Prepetition Secured Parties (as defined below).

(ii)       authorizing the Debtors to enter into the DIP Term Sheet and, subject to final order, the DIP Note (as defined in the DIP Term Sheet) and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP Term Sheet and the DIP Note, the "DIP Loan Documents");

(iii)      authorizing the DIP Borrowers to incur, and for the DIP Guarantors to guarantee on an unconditional joint and several basis, obligations for principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts, as and when due

and payable under and in accordance with this Interim Order, the DIP Term Sheet, and the DIP

Loan Documents (collectively, the "DIP Facility Obligations");

(iv)    authorizing the DIP Loan Parties to perform such other and further acts as

may be necessary or desirable in connection with this Interim Order, the DIP Term Sheet, the DIP

Loan Documents, and the transactions contemplated hereby and thereby;

(v)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, and

authorizing the DIP Loan Parties to incur, the DIP Liens (as defined below), as applicable, in all

DIP Collateral (as defined below) having the priority described in this Interim Order;

(vi)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, and

authorizing the DIP Loan Parties to incur, allowed superpriority administrative expense claims

against each of the DIP Loan Parties, on a joint and several basis, in respect of all DIP Facility

Obligations, in each case, in accordance with the terms of this Interim Order;

(vii)    authorizing the DIP Loan Parties' use of Prepetition Collateral (as defined

below), including Cash Collateral (as defined below), as well as the proceeds of the DIP Facility

and New Ark Funding and the New Ark Operating Advance (each as defined in the DIP Term

Sheet and, collectively, the "New Ark Financing"), subject to the terms and conditions set forth in

this Interim Order and the DIP Loan Documents;

(viii)    providing adequate protection, to the Prepetition Secured Parties (as defined

below) and the Prepetition HUD Lender (as defined below) on account of any Diminution in Value

(as defined below) of the Prepetition Secured Parties' or Prepetition HUD Lender's interest in the

Prepetition Collateral or Prepetition HUD Lender Collateral (as defined below), as applicable;

(ix)    modifying the automatic stay imposed by section 362 of the Bankruptcy

Code solely to the extent necessary to implement and effectuate, including the right to exercise

remedies following an Event of Default and expiration of any applicable notice period, the terms and provisions of this Interim Order and the DIP Loan Documents, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(x)    upon entry of a Final Order providing for such relief and as set forth in paragraphs 24 and 26 herein, authorizing the Debtors to waive as to the DIP Lenders and Prepetition Secured Parties (a) certain of their rights to surcharge the DIP Collateral, Omega Landlord Collateral or any Prepetition Working Capital Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)    upon entry of a Final Order providing for such relief, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral, for the benefit of any party other than the DIP Secured Parties, and (b) the Prepetition Working Capital Collateral, for the benefit of any party other than the Prepetition Working Capital Secured Parties, subject to the Carve-Out (as defined below); and

(xii)    scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the DIP Term Sheet, the proposed Interim Order, the *Declaration of M. Benjamin Jones in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Declaration") and the *Declaration of M. Benjamin Jones in Support of Chapter*

*11 Petitions and First Day Pleadings* (the "First Day Declaration" and together with the DIP Declaration, the "Jones Declarations"), the pleadings filed with the Court, the evidence submitted and arguments proffered or adduced at the hearing held before the Court on October 15, 2021 (the "Interim Hearing"), and upon the record of these Chapter 11 Cases; and adequate notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001 and 9014 and all applicable Local Rules; and it appearing that no other or further notice need be provided; and all objections, responses and reservations of rights with respect to the entry of the Interim Order, if any, to the relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors, represents a sound exercise of the Debtors' business judgment, and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    **Petition Date**. On October 14, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (this "Court") commencing these Chapter 11 Cases.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

On October 15, 2021, this Court entered an order approving the joint administration of the Chapter 11 Cases for procedural purposes only.

B.    **Debtors-in-Possession**.  The Debtors continue in possession of and to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of these Chapter 11 Cases.

C.    **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases (together with any statutory committee that may appointed or formed in the Chapter 11 Cases or any such successor cases (collectively, the "Successor Cases"), the "Official Committee").

D.    **Jurisdiction and Venue**.  The Court has jurisdiction over the Debtors, property of the Debtors' estates, the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for these Chapter 11 Cases and the proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rule 9013-1.

E.    **Debtors' Stipulations**.  Subject to the limitations thereon contained in paragraph 23 hereof, the DIP Loan Parties, on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(i)     <u>Prepetition Credit Agreement</u>.   Gulf Coast and certain of its affiliates designated therein, as borrowers (such borrowers, collectively, the "<u>Prepetition Borrowers</u>"), certain other parties designated as guarantors thereto (such guarantors collectively, the "<u>Prepetition Guarantors</u>" and, together with the Prepetition Borrowers, the "<u>Prepetition Loan Obligors</u>"), the lenders from time to time party thereto (the "<u>Prepetition Lenders</u>"), and Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>") as administrative agent for the Prepetition Lenders, entered into a credit agreement, dated as of July 6, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Credit Agreement</u>" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Secured Parties, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "<u>Prepetition Loan Documents</u>").   On November 2, 2020, Wells Fargo and New Ark Capital, LLC ("<u>New Ark</u>") executed that certain Loan, Commitment and Agency Assignment Agreement dated as of the date thereof, through which Wells Fargo assigned its interests, liens and obligations provided by or under the Prepetition Credit Agreement to New Ark (in such capacity, the "<u>Prepetition Agent</u>" and, together with the Prepetition Lenders, the "<u>Prepetition Working Capital Secured Parties</u>").   As of the Petition Date, the Prepetition Loan Obligors were justly and lawfully indebted and liable to the Prepetition Working Capital Secured Parties, without defense, counterclaim or offset of any kind, with respect to $14,343,316.85 in principal amount of loans outstanding, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition Loan Documents), charges, indemnities and

all other Obligations (as defined in the Prepetition Credit Agreement) incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date) as provided in the Prepetition Loan Documents (collectively, the "Prepetition Working Capital Debt"), which Prepetition Working Capital Debt has been guaranteed on a joint and several basis by the Prepetition Guarantors.  The Prepetition Working Capital Debt is secured by first priority security interests in and liens on certain of the Prepetition Loan Obligors' assets as set forth in the Prepetition Loan Documents (such collateral, the "Prepetition Working Capital Collateral" and such liens on and security interests in the Prepetition Working Capital Collateral, the "Prepetition Working Capital Liens").

(ii)     Debtor Gulf Coast Master Tenant I, LLC (the "GC Master Tenant I") entered into that certain *Second Consolidated Amended and Restated Master Lease Agreement*, dated July 1, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Omega Master Lease Agreement" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Landlords (as defined therein) (the "Omega Landlords" and, together with the Prepetition Working Capital Secured Parties, the "Prepetition Secured Parties"), including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Omega Master Lease Documents").  GC Master Tenant I has subleased the facilities leased to GC Master Tenant I under the Omega Master Lease Agreement to certain operators set forth therein (the "Existing Operators").  Certain of the Debtors, the Existing Operators and other parties have entered into that certain Guaranty of Obligations, dated July 1, 2013 in respect of the Omega Master Lease Agreement (each an "Omega Master

Lease Guarantor", and collectively with GC Master Tenant I and the Existing Operators, the "Omega Master Lease Obligors," and together with the Prepetition Loan Obligors, the "Prepetition Obligors"). As of the Petition Date, the Omega Master Lease Obligors were justly and lawfully indebted and liable to the Omega Landlords, without defense, counterclaim or offset of any kind, with respect to $237,711,978 in principal amount of unpaid Rent (as defined in the Omega Master Lease Agreement), plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Omega Master Lease Documents), charges, indemnities and all other obligations arising under the Omega Master Lease Documents incurred in connection therewith (whether arising before, on, or after the Petition Date) as provided in the Omega Master Lease Documents (collectively, the "Omega Master Lease Obligations" and, together with the Prepetition Working Capital Obligations, the "Prepetition Secured Obligations"), which Omega Master Lease Obligations have been guaranteed on a joint and several basis by the Omega Master Lease Guarantors. The Omega Master Lease Obligations are secured by second priority security interests in and liens on property constituting Prepetition Working Capital Collateral and a first priority security interest in and liens on any other property as set forth in the Omega Master Lease Documents (the "Omega Landlord Collateral," and together with the Prepetition Working Capital Collateral, the "Prepetition Collateral," and such liens on and security interests in the Omega Landlord Collateral, the "Omega Landlord Liens," and together with the Prepetition Working Capital Liens, the "Prepetition Liens").

(iii)     Prepetition Secured Obligations. The Prepetition Secured Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective

terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Secured Obligations owing to, or any transfers made to any or all of the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other legal or equitable challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(iv)     <u>Prepetition Liens</u>.  The Prepetition Liens granted to the Prepetition Secured Parties respectively constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral were granted to, or for the benefit of, the applicable Prepetition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity or regulation by any person or entity, including in any Successor Cases.

(v)     <u>No Challenges/Claims</u>.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, no facts or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist and no portion of the Prepetition Liens or Prepetition Secured Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity.  The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the

Bankruptcy Code), objections, challenges, causes of action, and/or choses in action or basis for any equitable relief against any of the Prepetition Secured Parties or DIP Lenders or any of their respective predecessors, affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Loan Documents, the Omega Master Lease Documents, the Prepetition Secured Obligations, the Prepetition Liens, DIP Loan Documents, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other Claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable non-bankruptcy law equivalents. The Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(vi)    <u>Indemnity</u>.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility, the New Ark Financing and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), the DIP Superpriority Claims (as defined below), the 507(b) Claims (as defined below) and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors, joint and severally, in respect of any Claim or liability incurred in respect thereof or in any way related thereto, provided that no such party will be indemnified for any loss, cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to

have resulted primarily from any such party's gross negligence or willful misconduct. No exception or defense exists in contract, law, or equity as to any obligation set forth in this paragraph, in the Prepetition Loan Documents, the Omega Master Lease Documents, or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders, as the case may be.

(vii)    <u>Sale and Credit Bidding</u>.  The Debtors and the Prepetition Obligors admit, stipulate, acknowledge, and agree that any of the DIP Lenders, the DIP Agent, or the Prepetition Secured Parties, shall have the right to credit bid the entirety of (or any portion of) the Prepetition Secured Obligations and/or the DIP Facility Obligations, as applicable, secured by their respective Prepetition Liens.

(viii)    <u>Cash Collateral</u>.  All of the DIP Loan Parties' cash, whether existing as of the Petition Date or thereafter, wherever located, constitutes or will constitute "cash collateral" of the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>"); *provided* that, notwithstanding anything in this Interim Order to the contrary, the DIP Secured Parties' interest in any Cash Collateral held in, or traceable to, the accounts established for the Prepetition Loan Account (as defined below) and the New Ark Reserve Account (as defined in the DIP Term Sheet), and any proceeds thereof, shall be junior to the Prepetition Working Capital Liens, the Prepetition Working Capital Debt, the Working Capital Adequate Protection Liens (as defined below), and the Working Capital 507(b) Claims (as defined below); *provided further* that, notwithstanding anything in this Interim Order to the contrary, the DIP Secured Parties' interest in any Cash Collateral of the Prepetition HUD Obligors (as defined below) shall be junior to the Prepetition HUD Lender Liens (as defined below).

F. **Findings Regarding Corporate Authority**.  Subject to entry of this Interim Order, each of the DIP Loan Parties has all requisite power and authority to execute and deliver the DIP Term Sheet to which it is a party and to perform its obligations thereunder.

G. **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i)     <u>Good Cause</u>.  Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Facility, the New Ark Financing, and the DIP Loan Documents and to use Cash Collateral as set forth herein and consistent with the (i) Approved DIP Budget (as defined below), subject to Permitted Variances (as defined in the DIP Term Sheet) and Permitted Carrybacks/Carryforwards (as defined in the DIP Term Sheet), and (ii) the New Ark Budget Permitted Variances and Permitted Carrybacks/Carryforwards.

(ii)     <u>Immediate Need for Postpetition Financing and Use of Cash Collateral</u>.  The Debtors' need to use the Prepetition Collateral (including Cash Collateral) and to obtain credit pursuant to the DIP Facility as provided for herein is immediate and critical to avoid serious and irreparable harm to the Debtors, their estates, their creditors, and other parties in interest.  The Debtors have an immediate need to obtain the DIP Loans, the New Ark Financing, and other financial accommodations and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things: (i) permit the orderly continuation of the operation of their businesses (ii) maintain the health, safety, and well-being of their residents, (iii) maintain, amend, renew, or modify insurance policies in the ordinary course of business; (iv) maintain business relationships with customers, vendors, and suppliers, including purchasing necessary materials and services to maintain compliance with all applicable regulatory and safety requirements; (v) make payroll; (vi) satisfy other working capital, capital improvement, and

operational needs; (vii) pay professional fees, expenses, and obligations; (viii) pay costs, fees, and expenses associated with or payable under the DIP Facility, subject to the terms of this Interim Order and the DIP Loan Documents; and (ix) make adequate protection payments as set forth herein.  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of this Interim Order.  The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Loan Documents, and other financial accommodations provided under the DIP Loan Documents are necessary and vital to preserve and maintain the value of the Debtors' assets.  The terms of the proposed DIP Facility and the New Ark Financing, pursuant to the DIP Loan Documents, and this Interim Order are fair and reasonable, reflect each Debtor's exercise of its prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

(iii)    No Credit Available on More Favorable Terms.  The Debtors have been unable to obtain financing and other financial accommodations from sources other than (i) the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Loan Documents and (ii) New Ark on terms more favorable than those provided under the New Ark Financing set forth in the DIP Term Sheet and this Interim Order.  The Debtors have been unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors also have been unable to obtain adequate credit for money borrowed (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code or (b) secured only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien.  Postpetition financing is not otherwise available without granting the (i) the DIP Agent, for the benefit of the respective DIP Secured

14

Parties: (1) the DIP Liens on all DIP Collateral, as set forth herein, (2) the DIP Superpriority Claims, and (3) the other protections set forth in this Interim Order and (ii) New Ark, (1) Adequate Protection Liens (as defined below) on all DIP Collateral, (2) 507(b) Claims, and (3) the other protections set forth in this Interim Order. After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility and New Ark Financing represent the best financing available to them at this time, and are in the best interests of all of their stakeholders.

(iv)    Use of Proceeds of the DIP Facility and Cash Collateral. As a condition to entry into the DIP Facility, the extension of credit and other financial accommodations made under the DIP Facility and the consent to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), each of the DIP Secured Parties requires, and the Debtors have agreed, that Cash Collateral, the proceeds of the DIP Facility, and all other cash or funds of the Debtors, shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Loan Documents, and only for the expenditures set forth in and consistent with the Approved DIP Budget (as defined below) (subject to Permitted Variances), and for no other purpose.

(v)    Use of Proceeds of the New Ark Financing and Cash Collateral. As a condition to obtaining the New Ark Financing, the extension of credit and other financial accommodations made under the New Ark Funding Documentation (as defined in the DIP Term Sheet), and the consent to use Cash Collateral, New Ark requires, and the Debtors have agreed, that Cash Collateral and the proceeds of the New Ark Financing shall be used solely in accordance with the terms and conditions of this Interim Order and the New Ark Funding Documentation, and only for the expenditures set forth in and consistent with the Approved New Ark Budget (as

defined below) (subject to Permitted Variances and Permitted Carrybacks/Carryforwards), and for no other purpose.

(vi)    <u>Adequate Protection</u>.  The Debtors have agreed, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to provide the Prepetition Secured Parties and the Prepetition HUD Lender adequate protection, as and to the extent set forth in this Interim Order, against the risk of any diminution in the value of their respective interests in the Prepetition Collateral which is as a result of, or arises from, or is attributable to, the imposition of the automatic stay, or the use, sale or lease of such Prepetition Collateral, or the grant of a lien under section 364 of the Bankruptcy Code and applicable case law interpreting the same (any such diminution, "<u>Diminution in Value</u>").  Based on the DIP Motion, the declarations, or other evidence filed in support of the DIP Motion, and the record presented to the Court in connection with the Interim Hearing, the terms of the adequate protection arrangements and of the use of Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral).

(vii)    <u>Consent</u>.  The Prepetition Secured Parties have consented to the Debtors' use of Prepetition Collateral (including Cash Collateral), the New Ark Financing, and the DIP Loan Parties' entry into the DIP Facility, the DIP Loan Documents and the New Ark Funding Documentation, in each case, solely in accordance with and subject to the terms and conditions of this Interim Order, the DIP Loan Documents, and the New Ark Funding Documentation.

(viii)    <u>Limitation on Charging Expenses Against Collateral</u>.  upon entry of a Final Order providing for such relief and as set forth in paragraph 24 herein, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may

result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or any Prepetition Collateral (in each case, including Cash Collateral) as to the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Secured Parties with respect to DIP Collateral or the Prepetition Secured Parties with respect to the Prepetition Collateral, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, respectively, and nothing contained in this Interim Order or the DIP Loan Documents shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claims against the DIP Collateral or the Prepetition Collateral, respectively, under section 506(c) of the Bankruptcy Code or otherwise.

(ix)    No Marshaling.  upon entry of a Final Order providing for such relief, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations.  Further, upon entry of a Final Order providing for such relief, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Collateral.

(x)    Business Judgment and Good Faith Pursuant to Section 364(e).  Based on the DIP Motion, the Jones Declarations, and the record presented to the Court at the Interim Hearing, (i) the extension of credit and other financial accommodations made under the DIP Facility, (ii) the terms of the DIP Loan Documents, (iii) the fees and other amounts paid and to be paid thereunder, (iv) the extension of credit and other financial accommodations made under the

New Ark Financing, (v) the terms of the New Ark Financing, (vi) terms of adequate protection granted to the Prepetition Secured Parties and the Prepetition HUD Lender, (vii) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral), and (viii) the Cash Collateral arrangements described therein and herein, in each case, pursuant to this Interim Order and the DIP Loan Documents, (a) are fair, reasonable, and the best available to the Debtors under the circumstances; (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; (c) are supported by reasonably equivalent value and fair consideration; and (d) represent the best financing available.  The DIP Facility, the New Ark Financing, and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties.  The use of Prepetition Collateral (including Cash Collateral) and the credit to be extended under the DIP Facility and the New Ark Financing shall be deemed to have been so allowed, advanced, made, used, and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Secured Parties are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

   (xi) <u>Good Faith of DIP Secured Parties</u>.  The DIP Facility, the adequate protection granted to the Prepetition Secured Parties, and the use of Prepetition Collateral (including Cash Collateral) hereunder have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and their respective advisors, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Loan Documents, including, without limitation, all loans and other financial accommodations made to and guarantees issued by the Debtors pursuant to the DIP Loan

Documents and any DIP Facility Obligations shall be deemed to have been extended by the DIP

Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e)

of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of

the Bankruptcy Code, and the claims, security interests and liens, and other rights, benefits, and

protections granted to the DIP Secured Parties (and the successors and assigns thereof) pursuant

to this Interim Order and the DIP Loan Documents shall each be entitled to the full protection of

section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof

is reversed or modified on appeal; provided, however, that the DIP Secured Parties shall not be

entitled to protection under section 364(e) of the Bankruptcy Code with respect to any funds

advanced by the DIP Secured Parties under the DIP Loan Documents after entry of an order staying

this Interim Order or any provision of this Interim Order authorizing the Debtors to borrow funds

under the DIP Loan Documents..

(xii)    <u>Good Faith of Prepetition Secured Parties</u>.  The Prepetition Secured Parties

have acted in good faith regarding the DIP Facility and the New Ark Financing and the Debtors'

continued use of Prepetition Collateral (including Cash Collateral) to fund the administration of

the Debtors' estates and continued operation of their businesses (including the incurrence and

payment of any adequate protection obligations and the granting of adequate protection liens), in

accordance with the terms hereof.

(xiii)    <u>Initial DIP Budget</u>.  The Debtors have prepared and delivered to the DIP

Secured Parties the initial itemized cash flow forecast set forth on **<u>Exhibit 2</u>** attached hereto (the

"<u>Initial DIP Budget</u>"), which is acceptable to the Required Lenders (as defined in the DIP Term

Sheet and hereinafter referred to as the "<u>Required DIP Lenders</u>"), setting forth all line-item and

cumulative cash receipts and operating disbursements on a weekly basis for the period beginning

as of the week including the Closing Date (as defined in the DIP Term Sheet) through and including the end of the thirteenth calendar week following such week.  The DIP Secured Parties are relying upon the Debtors' agreement to comply with the Initial DIP Budget (as may be updated by the Debtors and approved by the Required DIP Lenders from time to time pursuant to and in accordance with the terms hereof and of the DIP Term Sheet, the "Approved DIP Budget"), in determining to enter into the postpetition financing arrangements provided for in this Interim Order and to allow the Debtors to use DIP Collateral (including Cash Collateral) subject to the terms of this Interim Order, respectively.  Notwithstanding the foregoing, in no circumstances shall an Approved DIP Budget include budgeted fees and expenses for persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals"), the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals"), or, if a patient care ombudsman (the "PCO") is appointed by order of the Court, by the PCO pursuant to section 327, 328, or 333 of the Bankruptcy Code (together with the PCO, the "PCO Professionals" and, together with the Debtor Professionals and the Committee Professionals, the "Professional Persons") .

(xiv)   Initial New Ark Budget.  The Debtors have prepared and delivered to New Ark the initial itemized cash flow forecast set forth on **Exhibit 3** attached hereto (the "Initial New Ark Budget"), which is acceptable to New Ark, setting forth all line-item and cumulative professional and other fees and expenses on a weekly basis for the period beginning as of the week including the Petition Date through and including the end of the thirteenth calendar week following such week.  New Ark is relying upon the Debtors' agreement to comply with the Initial New Ark Budget (as may be updated by the Debtors and approved by New Ark from time to time pursuant to and in accordance with the terms hereof and of the DIP Term Sheet, the "Approved New Ark

Budget"), in determining to enter into the postpetition financing arrangements provided for in this Interim Order and the DIP Term Sheet and to allow the Debtors to use Prepetition Collateral (including Cash Collateral) subject to the terms of this Interim Order, respectively. Any amounts budgeted for fees and expenses of Professional Persons remain subject to allowance and payment thereof in accordance with the Local Rules, the Bankruptcy Rules and the Bankruptcy Code, and New Ark reserves the right to object to any Professional Persons' fees and expenses notwithstanding its inclusion in the New Ark Budget.

(xv)    Notice. Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (a) the U.S. Trustee for the District of Delaware; (b) the holders of the 40 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to New Ark and the Prepetition Lenders; (d) counsel to the Omega Landlords; (e) the BM Eagle Landlords (as defined in the First Day Declaration); (f) counsel to the Prepetition HUD Lender, (g) the United States Department of Housing and Urban Development, (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for states in which the Debtors conduct business; (l) counsel to Barrow Street Capital LLC and its affiliates; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Under the circumstances, such notice of the Interim Hearing and the relief requested in the DIP Motion constitutes due, sufficient, and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c), and Local Rules 2002-1 and 4001-1.

(xvi)    <u>Relief Essential; Necessity of Immediate Entry</u>.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).    Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.    The Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and properties.

**NOW THEREFORE,** based upon the foregoing findings and conclusions, the DIP Motion, the Jones Declarations, and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.    **<u>DIP Motion Approved</u>.**    The DIP Motion is granted on an interim basis, and the Interim Financing (as defined below) is authorized and approved, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Term Sheet.    Any objections or other statements to any of the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights inconsistent with this Interim Order, are hereby overruled; provided that the rights of all parties in interest to object to the entry of a Final Order on the DIP Motion are fully reserved.

2.    **<u>Authorization of DIP Facility and New Ark Financing</u>.**

(a)    <u>DIP Facility</u>.

(1)    Subject to the terms and conditions of this Interim Order, each of the DIP Loan Parties is hereby authorized to execute, enter into, guarantee (as applicable), and perform all obligations under the DIP Facility and the DIP Term Sheet to which it is party. The DIP Term Sheet and this Interim Order govern the financial and credit accommodations to be provided to the DIP Loan Parties by the DIP Lenders in connection with the DIP Facility.

(2)     From the entry of this Interim Order through the entry of the Final Order, the DIP Borrowers are authorized to incur, and the DIP Guarantors are hereby authorized to unconditionally guarantee, on a joint and several basis, all of the DIP Loan Parties' DIP Facility Obligations on account of such incurrence under the DIP Facility, up to aggregate principal amount of $25,000,000 in new money DIP Loans on an interim basis, together with applicable interest, protective advances, fees, and other charges payable in connection with the DIP Facility; *provided*, that prior to entry of the Final Order, then such amount shall be reduced to $15,750,000 until the Final Order is entered (the "Interim Financing"), as applicable, in each case, subject to the terms and conditions set forth in this Interim Order and the DIP Term Sheet.

(3)     Without limiting the foregoing, and without the need for further approval of this Court, each DIP Loan Party is authorized to perform all acts to make, execute, and deliver all instruments and documents and to pay all fees or expenses that are authorized by the DIP Term Sheet and this Interim Order.

(4)     No DIP Secured Party shall have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and each DIP Secured Party may rely upon each DIP Loan Party's representations that the amount of the DIP Facility requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Term Sheet, and Bankruptcy Rule 4001(c)(2).

(b)     New Ark Financing.

(1)     Subject to the terms and conditions of this Interim Order, each of the DIP Loan Parties is hereby authorized to execute, enter into, and perform all obligations under the New Ark Financing and the DIP Term Sheet to which it is party. The DIP Term Sheet and this Interim Order govern the financial and credit accommodations to be provided to the DIP Loan Parties by New Ark in connection with the New Ark Financing.

(2)     Without the need for further approval of this Court, each DIP Loan Party is authorized to perform all acts to make, execute, and deliver all instruments and documents and to pay all fees or expenses that are authorized by this Interim Order, the New Ark Financing, and the DIP Term Sheet.

(3)     New Ark shall not have any obligation or responsibility to monitor any Debtor's use of the New Ark Financing, and New Ark may rely upon each DIP Loan Party's representations that the amount of the New Ark Financing requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Term Sheet, and Bankruptcy Rule 4001(c)(2).

3.     **DIP Facility and New Ark Financing Obligations.**  Upon entry of this Interim Order and execution and delivery of the DIP Term Sheet, the DIP Term Sheet shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and

shall be fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, and their creditors and other parties in interest, in each case, in accordance with the terms thereof and this Interim Order.  Upon execution and delivery of the DIP Loan Documents, the Debtors shall file the same with the Court within three (3) business days of their execution, and the DIP Facility Obligations will include all postpetition loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by any of the DIP Loan Parties to any of the DIP Agent or DIP Lenders, in each case, under, or secured by, and in accordance with, the DIP Loan Documents or this Interim Order, including all principal, interest, costs, fees, expenses, and other amounts under the DIP Loan Documents (including this Interim Order), but in all cases, subject to the Restructuring Support Agreement (as defined below).  The DIP Loan Parties shall be jointly and severally liable for the DIP Facility Obligations.  Subject to paragraph 18 of this Interim Order and after the expiration of the Remedies Notice Period (as defined below), but in all cases subject to the Restructuring Support Agreement, the DIP Facility Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease during the continuation of a DIP Termination Event (as defined below) or a New Ark Termination Event (each as defined below) or the occurrence and continuance of any event or condition set forth in paragraph 18 of this Interim Order.  No obligation, payment, transfer, or grant of security under the DIP Term Sheet or this Interim Order to the DIP Secured Parties or New Ark shall be stayed, restrained, voidable, or

recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 362, 502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, counterclaim, offset, or any other challenge under the Bankruptcy Code or any applicable law unless in accordance with paragraph 18 of this Interim Order.

4.      **No Obligation to Extend Credit.**  The DIP Secured Parties and New Ark shall have no obligation to make any loan or advance under the applicable DIP Term Sheet unless all of the conditions precedent to the making of such extension of credit by the applicable DIP Secured Parties or New Ark, as applicable, under the DIP Term Sheet and this Interim Order have been satisfied in full or waived in accordance with the terms of the DIP Term Sheet.

5.      **DIP Liens.**

(a)      As security for the DIP Facility Obligations, effective immediately upon the date of this Interim Order and execution of the DIP Term Sheet, as set forth more fully in this Interim Order, the DIP Agent, for the benefit of the DIP Secured Parties, is hereby granted (without the necessity of the execution by the DIP Loan Parties or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by the DIP Agent or the DIP Lenders) valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (as applicable, the "Priming DIP Liens" or the "Senior DIP Liens," and collectively, the "DIP Liens") in the DIP Collateral (as defined below), as collateral security for the prompt and complete performance and payment when

due (whether at the stated maturity, by acceleration or otherwise) of all DIP Facility Obligations, which DIP Liens shall have the following relative rank and priority:

(1)     *Priming DIP Liens*.  Pursuant to section 364(d) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected, senior priming security interest in and lien upon all of the DIP Loan Parties' right, title, and interest in, to, and under any tangible and intangible, real and personal prepetition and postpetition property of each DIP Loan Party, whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, to the extent such property is subject to the Prepetition Liens securing the Prepetition Secured Obligations (collectively, the "DIP Priming Collateral"), subject and subordinate only to (a) the Prepetition Working Capital Liens solely with respect to the Prepetition Working Capital Collateral, (b) any valid, binding, enforceable, non-avoidable, and properly perfected liens and security interests (the "Prepetition HUD Lender Liens") in favor of Housing & Healthcare Finance, LLC (the "Prepetition HUD Lender") securing the obligations owed to the Prepetition HUD Lender solely with respect to property of each of Gulf Coast Master Tenant II, LLC, MS Singing, LLC, and MS Lakeside, LLC (collectively, the "Prepetition HUD Obligors") (collectively, the "Prepetition HUD Lender Collateral") and (c) applicable Permitted Liens (as defined in the DIP Term Sheet);

(2)     *Senior DIP Liens*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected first priority senior security interest in and lien upon all of the DIP Loan Parties' right, title, and interest in, to, and under (w) the DIP Proceeds Account and any account that only holds the proceeds of any DIP Loans, (x) to the extent a Final Order is entered providing for such relief, Avoidance Actions Proceeds (as defined below) and solely to the extent set forth below, (y) Stimulus Proceeds (as defined in the DIP Term Sheet), and (z) any other tangible and intangible, real (including leaseholds) and personal prepetition and postpetition property of each DIP Loan Party (excluding assets that qualify as Prepetition Working Capital Collateral or Prepetition HUD Lender Collateral (as defined below)) (collectively, the "Unencumbered Property"), whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (all of the foregoing, collectively, the "DIP Priority Collateral," and, together with the DIP Priming Collateral, the "DIP Collateral"); *provided,* that, to the extent a Final Order is entered providing for such relief, the DIP Priority Collateral shall include the proceeds of causes of action under section 502(d), 544, 545, 547, 548, 550, 551 or 553 of the Bankruptcy Code, whether pursuant to federal law or applicable state law, of the DIP Loan Parties or their estates (such causes of action, collectively, the "Avoidance Actions" and the proceeds therefrom, the "Avoidance Actions Proceeds").

(b)     For the avoidance of doubt, the term "DIP Collateral" shall include all assets and properties of each of the DIP Loan Parties of any kind or nature whatsoever, whether tangible

or intangible, real, personal or mixed, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties, whether prior to or after the Petition Date, whether owned or consigned by or to, or leased from or to, the DIP Loan Parties, and wherever located, including, without limitation, each of the DIP Loan Parties' rights, title and interests in (i) all Prepetition Collateral, (ii) all Prepetition HUD Collateral, and (iii) all proceeds, products, offspring, and profits of each of the foregoing and all accessions to, substitutions, and replacements for, each of the foregoing, including any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to any DIP Loan Party from time to time with respect to any of the foregoing.

(c)      Except as expressly provided in this Order, the DIP Liens (i) shall not be made subject or subordinate to or *pari passu* with (A) lien that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, or (B) any intercompany or affiliate lien, and (ii) shall not be subject to sections 506(c) (to the extent a Final Order is entered providing for such relief), 510, 549, 550, or 551 of the Bankruptcy Code.

(d)      To the extent a Final Order is entered providing for such relief, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent, or the payment of any fees or obligations to, any governmental entity or non-governmental entity in order for the DIP Loan Parties to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest in any property or the proceeds thereof, is and shall hereby be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens or Adequate Protection Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any DIP Loan

Parties, in favor of the DIP Secured Parties or the Prepetition Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order; provided that, with respect to the Prepetition HUD Lender Collateral, the foregoing shall not apply to any consent rights that the Prepetition HUD Lender or the United States Department of Housing and Urban Development may have under the loan documents giving rise to the Prepetition HUD Lender's interest in the Prepetition HUD Lender Collateral and applicable law relating to the same.

6.     **DIP Superpriority Claims.**   Effective immediately upon entry of this Interim Order, the DIP Agent (on behalf of the DIP Secured Parties) is hereby granted, pursuant to section 364(c)(1) and 503(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the DIP Loan Parties' Chapter 11 Cases and any Successor Cases thereof on account of the DIP Facility Obligations, with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 328, 330, 331, 364(c)(1), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114, or any other provisions of the Bankruptcy Code and any other claims against the DIP Loan Parties (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall have recourse against each of the DIP Loan Parties, on a joint and several basis.  Notwithstanding anything contained herein or in any of the DIP Term Sheet to the contrary, the DIP Superpriority Claims shall, at all times be (x) in respect of any DIP Priming Collateral or proceeds or products thereof, (i) junior in right of payment to Prepetition Working Capital Liens, Prepetition HUD Lender Liens, and Permitted Liens, as applicable, and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases and (y) in respect of any DIP

Priority Collateral or proceeds or products thereof, senior to any and all other administrative

expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11

Cases and any Successor Cases.

7. **Use of Proceeds of the DIP Facility and Cash Collateral.**

(a)    The use of Prepetition Collateral and Prepetition HUD Lender Collateral (in

each case, including Cash Collateral) is authorized and approved, in each case, in accordance with

and subject to the terms and conditions of this Interim Order and the DIP Term Sheet.  From and

after the date of entry of this Interim Order, so long as no DIP Termination Event has occurred and

is continuing and, with respect to clause (x), no New Ark Termination Event has occurred and is

continuing, the DIP Loan Parties shall be (x)  authorized to use Prepetition Collateral and

Prepetition HUD Lender Collateral (in each case, including Cash Collateral), and (y) permitted to

draw upon the Interim Financing and the proceeds thereof, subject, in each case, to the terms and

conditions of this Interim Order and the DIP Term Sheet, and in accordance with (1) the Approved

DIP Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards) and (2) the

Approved   New   Ark   Budget   (subject   to   Permitted   Variances   and   Permitted

Carrybacks/Carryforwards), including, without limitation: (i) to pay amounts due to DIP Secured

Parties under the DIP Term Sheet incurred by the DIP Secured Parties; (ii) the payment of any

adequate protection payments approved by the Court; (iii) to fund the Carve-Out from of the New

Ark Funding as set forth herein; (iv) to provide working capital and for other general corporate

purposes of the DIP Loan Parties; and (v) to pay administration costs of the Chapter 11 Cases and

claims or amounts approved by the Court, including in the "first day" or "second day" orders or

as required under the Bankruptcy Code.  For the avoidance of doubt, none of the DIP Loan Parties

will use any DIP Loans, the proceeds of the DIP Facility or DIP Collateral (including Cash

Collateral) in a manner or for a purpose other than those consistent with the Approved DIP Budget, the New Ark Budget, the DIP Loan Documents, and this Interim Order unless otherwise ordered by the Court.  Except as expressly permitted in this Interim Order, the DIP Term Sheet, or the Approved DIP Budget, nothing in this Interim Order shall otherwise authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any DIP Collateral (including Cash Collateral) or other proceeds resulting therefrom.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents.

(b)    All proceeds (x) received by the Debtors after the Petition Date, (y) consisting of accounts receivable generated by the Debtors prior to the Petition Date, and (z) constituting Prepetition Working Capital Collateral (such proceeds satisfying the conditions set forth in (x), (y), and (z), the "Prepetition Receivables") shall be (i) first, deposited into a segregated deposit account (the "Prepetition Loan Account") until the amount held in such Prepetition Loan Account is equal to the sum of (a) the Prepetition Working Capital Debt, plus (b) to the extent the value of the Prepetition Working Capital Collateral exceeds the Prepetition Working Capital Debt, postpetition interest and attorneys' fees payable to the Prepetition Working Capital Secured Parties in accordance with this Interim Order and (ii) to the extent any Prepetition Receivables remain after funding the Prepetition Loan Account in accordance with clause (i) above, retained by the Debtors to be used in accordance with the terms of this Interim Order.

8.    **Disposition of DIP Collateral.**  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, Prepetition Collateral, or Prepetition HUD Lender Collateral (in each case, including Cash Collateral) (and, in each case,

the Debtors shall not enter into any binding agreement to do so) other than in accordance with the DIP Loan Documents or otherwise in the ordinary course of business without the prior written consent of the Required DIP Lenders and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders.

9.    **Adequate Protection.**    The Prepetition Secured Parties and Prepetition HUD Lender are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral and Prepetition HUD Lender Collateral (in each case, including the Cash Collateral), as applicable, (x) with respect to the Prepetition Secured Parties, to the extent of any Diminution in Value of such Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, and (y) with respect to the Prepetition HUD Lender, to the extent of any Diminution in Value of the Prepetition HUD Lender's interests in the Prepetition HUD Lender Collateral (including Cash Collateral) from and after the Petition Date, if any (such claims set forth in clauses (x) and (y), the "Adequate Protection Claims").  In consideration of the foregoing, the Prepetition Secured Parties and Prepetition HUD Lender, as applicable, are hereby granted the following adequate protection:

(a)    Prepetition HUD Lender's Adequate Protection Liens.    The Prepetition HUD Lender is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the aggregate amount of its Adequate Protection Claims (such claims, the "HUD Lender Adequate Protection Claims"), valid, perfected replacement security interests in and liens upon all DIP Collateral of the Prepetition HUD Obligors

(the "HUD Lender Adequate Protection Liens"); *provided* that the HUD Lender Adequate Protection Liens shall be junior to the Prepetition HUD Lender Liens.

(b)      Prepetition Working Capital Secured Parties' Adequate Protection Liens. The Prepetition Agent (for itself and for the benefit of the other Prepetition Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the aggregate amount of its Adequate Protection Claims (such claims, the "Working Capital Adequate Protection Claims"), valid, perfected replacement security interests in and liens upon all accounts receivable generated by the Debtors from the Petition Date onwards (the "Postpetition Accounts Receivable") and the proceeds thereof (the "Working Capital Adequate Protection Liens"); *provided* that the Working Capital Adequate Protection Liens shall be junior to the Prepetition Working Capital Liens and the Carve-Out.

(c)      Omega Landlords' Adequate Protection Liens.  The Omega Landlords are each hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the aggregate amount of their respective Adequate Protection Claims (such claims, the "Omega Landlord Adequate Protection Claims"), valid, perfected replacement security interests in and liens upon all of the DIP Collateral (the "Omega Landlord Adequate Protection Liens" and, together with the HUD Lender Adequate Protection Liens, and the Working Capital Adequate Protection Liens, the "Adequate Protection Liens"); *provided* that, the Omega Landlord Adequate Protection Liens shall be junior to the Prepetition HUD Lender Liens, the HUD Lender Adequate Protection Liens, the DIP Liens, Prepetition Working Capital Liens, the Working Capital Adequate Protection Liens, and the Carve-Out.

(d)    <u>Prepetition HUD Lender's 507(b) Claim</u>.  The Prepetition HUD Lender is hereby granted allowed superpriority administrative expense claims against the Prepetition HUD Obligors as provided for in section 507(b) of the Bankruptcy Code in the aggregate amount of the applicable HUD Lender Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>HUD Lender 507(b) Claims</u>").  The HUD Lender 507(b) Claims shall be senior to any and all other administrative expense claims or other claims against the Prepetition HUD Obligors or their estates, in the Chapter 11 Cases and any Successor Cases.

(e)    <u>Prepetition Working Capital Secured Parties' 507(b) Claim</u>.    The Prepetition Agent (for itself and for the benefit of the other Prepetition Lenders) is hereby granted allowed superpriority administrative expense claims as provided for in section 507(b) of the Bankruptcy Code in the aggregate amount of the applicable Working Capital Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>Working Capital 507(b) Claims</u>")  The Working Capital 507(b) Claims shall be (x) in respect of any DIP Collateral of the Prepetition HUD Obligors (other than DIP Priority Collateral) or proceeds or products thereof, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, the HUD Lender 507(b) Claims, the DIP Superpriority Claims, the Omega Landlord 507(b) Claims, and the Carve-Out and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, (y) in respect of any DIP Collateral that is subject to first priority Prepetition Working Capital Liens or first priority Working Capital Adequate

Protection Liens senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, and (z) in respect of any other DIP Collateral, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, the DIP Superpriority Claims, the Omega Landlord 507(b) Claims, and the Carve-Out, and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases.

(f)      Omega Landlord 507(b) Claim.  The Omega Landlords are hereby granted allowed superpriority administrative expense claims as provided for in section 507(b) of the Bankruptcy Code in the aggregate amount of the applicable Omega Landlord Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Omega Landlord 507(b) Claims" and, together with the HUD Lender 507(b) Claims and the Working Capital 507(b) Claims, the "507(b) Claims").  The Omega Landlord 507(b) Claims shall be (x) in respect of any DIP Collateral of the Prepetition HUD Obligors (other than DIP Priority Collateral) or proceeds or products thereof, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, the HUD Lender 507(b) Claims, and the DIP Superpriority Claims and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, (y) in respect of any DIP Collateral that is subject to first priority Prepetition Working Capital Liens or first priority Working Capital Adequate Protection Liens, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, the Prepetition Working Capital 507(b) Claims, and the DIP Superpriority Claims and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the

Chapter 11 Cases and any Successor Cases, and (z) in respect of any other DIP Collateral, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, and the DIP Superpriority Claims, and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases.

(g)    <u>Postpetition Interest on the Prepetition Working Capital Debt</u>. The Prepetition Agent (for the benefit of the other Prepetition Lenders) is hereby entitled to cash payment of interest on the Prepetition Working Capital Debt at the non-default rate provided for under the Prepetition Credit Agreement (subject to recharacterization as repayments of principal to the extent the value of the Prepetition Working Capital Collateral does not exceed the Prepetition Working Capital Debt and any amounts paid postpetition to the Prepetition Agent on account of the Prepetition Credit Agreement).

(h)    <u>Postpetition Attorneys' Fees</u>.

(1)    The Prepetition Agent (for the benefit of the other Prepetition Lenders) is hereby entitled to cash reimbursement of actual, reasonable, and documented fees and expenses and other disbursements of the Prepetition Lenders incurred in connection with the Chapter 11 Cases (the "<u>Working Capital Fees and Expenses</u>") (subject to recharacterization as repayments of principal to the extent the value of the Prepetition Working Capital Collateral does not exceed the Prepetition Working Capital Debt and any amounts paid postpetition to the Prepetition Agent on account of the Prepetition Credit Agreement). Subject to the review procedures set forth in this paragraph, Working Capital Fees and Expenses invoices may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall be provided to counsel to the Debtors, counsel to any Official Committee (if appointed), and the U.S. Trustee (the "<u>Fee Notice Parties</u>"). The rights of the Fee Notice Parties to seek additional information regarding the Working Capital Fees and Expenses remain fully reserved. If no objection to payment of the requested fees and expenses is made, in writing by any of the Fee Notice Parties within ten (10) business days after delivery of such invoices (the "<u>Fee Objection Period</u>"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors and, in any case, within five (5) business days following the expiration of the Fee Objection Period. If an objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the

requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors and, in any case, within five (5) business days of the expiration of the Fee Objection Period.

(2)    Notwithstanding anything to the contrary herein, the Debtors shall not pay, as adequate protection or otherwise, any fees or expenses incurred postpetition by any of the Omega Landlords, HUD Lender, the DIP Agent, or the DIP Lenders, each of which shall be responsible for paying its own fees and expenses.

(i)    <u>Reservation of Rights</u>.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and the Prepetition HUD Lender; *provided* that any of the Prepetition Agent, acting on its own behalf or at the direction of the Prepetition Lenders, or the Prepetition HUD Lender may request further or different adequate protection, and the Debtors, the DIP Secured Parties, or any other party in interest may contest any such request; *provided further*, *however*, that the Prepetition Agent shall not request any relief that modifies, impairs, diminishes, or is inconsistent with the relief and protections granted to the DIP Lenders hereunder.

10.    **Approved Budgets.**

(a)    *Approved DIP Budget*.  All borrowings under the DIP Facility, and the use of Cash Collateral (other than Cash Collateral consisting of Prepetition Working Capital Collateral), shall at all times comply with the Approved DIP Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards) and the DIP Term Sheet.  On the first Thursday of each weekly period after the Budget Testing Start Date (as defined in the DIP Term Sheet), the Debtors shall deliver updates to the Initial DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), covering the 13-week period that commences with the beginning of the week immediately following the week in which the supplemental budget is

required to be delivered, consistent with the form and level of detail set forth in the Initial DIP Budget (each such supplemental budget, an "Updated DIP Budget") and the Updated DIP Budget will replace the Initial DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), unless the Required Lenders otherwise object within 2 business days of the receipt thereof to the substance of such Updated DIP Budget on the basis of such Updated DIP Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the DIP Loan Documents, or being based on information that is incorrect in any material respect, in which case the Updated DIP Budget will be as agreed reasonably and in good faith by the Required Lenders and the Debtors; provided that, in the event of an objection to the Updated DIP Budget in accordance with this paragraph, the then-current Approved DIP Budget shall remain in effect, effective as of the beginning of the week immediately following the week in which it was delivered.  Each Approved DIP Budget shall be filed with the Court.

(b)     *Approved New Ark Budget*.  The use of Cash Collateral consisting of Prepetition Working Capital Collateral, shall at all times comply with the Approved New Ark Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards) and the DIP Term Sheet.  On the first Thursday of each weekly period after the Budget Testing Start Date (as defined in the DIP Term Sheet), the Debtors shall deliver updates to the Initial New Ark Budget (or the previously supplemented Approved New Ark Budget, as the case may be), covering the 13-week period that commences with the beginning of the week immediately following the week in which the supplemental budget is required to be delivered, consistent with the form and level of detail set forth in the Initial New Ark Budget (each such supplemental budget, an "Updated New Ark Budget") and the Updated New Ark Budget will replace the Initial New Ark Budget (or the previously supplemented Approved New Ark Budget, as the case may be), unless New Ark

otherwise objects within 2 business days of the receipt thereof to the substance of such Updated

New Ark Budget on the basis of such Updated New Ark Budget not being based on reasonable

assumptions, as being inconsistent with the terms, conditions and covenants under the DIP Term

Sheet or being based on information that is incorrect in any material respect, in which case the

Updated New Ark Budget will be as agreed reasonably and in good faith by New Ark and the

Debtors; provided that, in the event of an objection to the Updated DIP Budget in accordance with

this paragraph, the then-current Approved New Ark Budget shall remain in effect, effective as of

the beginning of the week immediately following the week in which it was delivered; *provided*

that the aggregate disbursements to be made under the Approved New Ark Budget from and after

the Petition Date shall not exceed $8,000,000.  Each Approved New Ark Budget shall be filed with

the Court.

      11.     **Modification of Automatic Stay.**  Subject to paragraph 18 hereof, the automatic

stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit:

(a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform

such acts as the DIP Secured Parties may reasonably request, to assure the perfection and priority

of the DIP Liens and the DIP Superpriority Claims; (b) the DIP Loan Parties to incur all liabilities

and obligations, including all the DIP Facility Obligations, to the DIP Secured Parties as

contemplated under this Interim Order and the DIP Loan Documents, and to perform under the

DIP Loan Documents any and all other instruments, certificates, agreements, and documents that

may be reasonably required, necessary, or prudent for the performance by the applicable DIP Loan

Parties under the DIP Loan Documents and any transactions contemplated therein or in this Interim

Order in each case in accordance therewith or herewith; (c) the DIP Loan Parties to take all

appropriate actions to grant the Adequate Protection Liens and the 507(b) Claims set forth herein,

and to take all appropriate actions (including such actions as the Prepetition Secured Parties may reasonably request) to ensure that the Adequate Protection Liens granted hereunder are perfected and maintain the priority set forth herein; (d) the DIP Loan Parties to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order; (e) the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order; (f) subject to paragraph 18 hereof, the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any DIP Termination Event (as defined below), all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein in accordance therewith; and (g) subject to paragraph 18 hereof, the implementation and exercise of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents, in each case, in accordance herewith and therewith, without further notice, motion or application to, or order of this Court.

12.     **Perfection of DIP Liens and Adequate Protection Liens.**  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of execution, filing, or recording any financing statement, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Secured Parties, the Prepetition Secured Parties, and the Prepetition HUD Lender to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent, the Prepetition Agent, and the Prepetition HUD Lender, without any further consent of any party, are

authorized to execute, file, or record, as the case may be (and the DIP Agent, Prepetition Agent, and Prepetition HUD Lender may reasonably request the execution, filing, or recording), as each, in its reasonable discretion deems necessary, such financing statements, notices of lien, and other similar documents to enable the DIP Agent, the Prepetition Agent, and the Prepetition HUD Lender to further validate, perfect, preserve, and enforce the applicable DIP Liens or other liens and security interests granted hereunder, perfect in accordance with applicable law or to otherwise evidence the applicable DIP Liens and/or the applicable Adequate Protection Liens, as applicable, and all such financing statements, notices, and other documents shall be deemed to have been filed or recorded as of the date of entry of the Interim Order; *provided* that no such filing or recordation shall be necessary or required in order to create, perfect, preserve, or enforce the DIP Liens and/or the Adequate Protection Liens.  The Debtors are authorized to execute and deliver promptly upon reasonable request and in accordance with the DIP Term Sheet to the DIP Agent and the Prepetition Agent all such financing statements, notices, and other security documents as the DIP Agent and the Prepetition Agent may reasonably request.  The DIP Agent, the Prepetition Agent, and the Prepetition HUD Lender, each in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments. To the extent that the Prepetition Agent is a secured party under any account control agreement, listed as an additional insured, loss payee under any of the Debtors' insurance policies, or is the secured party under any loan document, financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction to validate, attach, perfect, or prioritize liens (any such instrument or document, a "Security Document"), the DIP Agent shall also be deemed to be the secured party under each such Security

Document, and shall have all the rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Order and/or the Final Order, as applicable, and the other DIP Loan Documents. The Prepetition Agent shall serve as agent for the DIP Agent solely for the purposes of perfecting its security interests in and liens on all DIP Collateral that is of a type such that perfection of a security interest therein (but for the entry of this Interim Order) may be accomplished only by possession or control by a secured party to the extent such Prepetition Agent possesses or controls any such DIP Collateral.

13.    **Proceeds of Subsequent Financing.**    Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the indefeasible payment in full in cash of all of the DIP Facility Obligations, Omega Master Lease Obligations, and the Prepetition Working Capital Debt, in each case, other than contingent indemnification obligations as to which no claim has been asserted, the termination of the DIP Secured Parties' obligations to extend credit under the DIP Facility and this Interim Order (including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates), and the satisfaction of the DIP Superpriority Claims and the Adequate Protection Claims, either the DIP Loan Parties, the DIP Loan Parties' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in any of the DIP Loan Parties' Chapter 11 Cases or any Successor Cases thereof, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code then, unless otherwise agreed by the requisite DIP Lenders in their sole discretion: (i) all of the cash proceeds derived from such credit or debt and all DIP Collateral shall immediately be turned over to the DIP Agent for further distribution to the applicable DIP Secured Parties on account of their applicable DIP Facility Obligations pursuant to the applicable DIP Loan

Documents; and (ii) after indefeasible payment in full of all DIP Facility Obligations in cash (other than contingent indemnification obligations as to which no claim has been asserted), all the cash proceeds derived from DIP Collateral shall immediately be turned over to the Prepetition Agent, for further distribution to the applicable Prepetition Secured Parties pursuant to the terms of this Order and/or the applicable Prepetition Loan Documents.

14.     **Covenants**.  The DIP Loan Parties shall comply with the covenants set forth in the DIP Loan Documents in accordance with the terms thereof.

15.     **Milestones.**  It is a condition to the DIP Facility and the use of Cash Collateral that the Debtors shall comply with those certain case milestones set forth in the DIP Term Sheet (the "Milestones").  The failure to comply with any Milestone shall constitute an "Event of Default" in accordance with the terms of the DIP Note.

16.     **Maintenance of DIP Collateral.**  Until all DIP Facility Obligations are indefeasibly paid in full (other than contingent indemnification obligations as to which no claim has been asserted) and the DIP Secured Parties' obligation to extend credit under the DIP Facility has terminated, the Debtors shall continue to maintain all property, operational, and other insurance as required in the DIP Loan Documents.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the DIP Loan Parties that in any way relates to the DIP Collateral, and the DIP Agent shall distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Facility Obligations (other than

contingent indemnification obligations as to which no claim has been asserted), and second, to the payment of the Prepetition Working Capital Debt.

17.  **Termination Events.**

(a)  The (i) occurrence and continuance of any "Event of Default" under and as defined in the DIP Term Sheet, (ii) consent of the Debtors to the standing of any party, including an Official Committee to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenge (as defined below), or (iii) commencement of a Challenge Proceeding (as defined below) by any party, including the Debtors or an Official Committee, shall each constitute a "DIP Termination Event" under this Interim Order (each a "DIP Termination Event," and the date upon which such DIP Termination Event occurs, the "DIP Termination Date"), unless waived in writing by the DIP Agent in its sole discretion.

(b)  The occurrence and continuance of any "New Ark Event of Default" under and as defined in the DIP Term Sheet shall each constitute a "New Ark Termination Event" under this Interim Order (and the date upon which New Ark provides written notice to the Debtors of such New Ark Termination Event, the "New Ark Termination Date"), unless waived in writing by the Prepetition Agent in its sole discretion.

18.  **Exercise of Remedies.**

(a)  Remedies of the DIP Agent.  Immediately upon the occurrence and during the continuation of a DIP Termination Event, any automatic stay, whether arising under section 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order, including clause (c) of this paragraph, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent to, upon the delivery of written notice (which may include electronic mail) to the Remedies Notice Parties (as defined below): (i) declare

all DIP Facility Obligations owing under the DIP Facility to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend credit to the DIP Loan Parties under the DIP Facility (to the extent any such commitment remains); (iii) terminate the DIP Facility and the DIP Loan Documents as to any future liability or obligation thereunder, but without affecting the DIP Liens or the DIP Facility Obligations; (iv) charge interest at the default rate under the DIP Facility; (v) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the DIP Loan Documents to use any Cash Collateral of the DIP Secured Parties (other than proceeds of prepetition accounts receivable that are subject to the Prepetition Working Capital Liens); (vi) freeze monies or balances in the DIP Proceeds Account; (vii) otherwise enforce any and all rights against the DIP Collateral in the possession of the DIP Agent; and (viii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents, or applicable law; *provided* that prior to the exercise of any right in clauses (v) through (viii) of this paragraph, the DIP Agent shall be required to provide five (5) business days' written notice (by electronic mail or other electronic means) to counsel to the Debtors, counsel to the Prepetition Agent, counsel to any Official Committee (if appointed), and the U.S. Trustee (the "Remedies Notice Parties") of the DIP Agent's intent to exercise its rights and remedies (the "DIP Remedies Notice Period"); *provided*, *further*, that the DIP Lenders shall not be obligated to make any loans or advances under the DIP Facility during any Remedies Notice Period; *provided further* that, for the avoidance of doubt, the Debtors may continue to use any Cash Collateral prior to the expiration of the Remedies Notice Period so long as such Cash Collateral is used in accordance with the Approved DIP Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards).

(b)    Remedies of the Prepetition Agent.  Immediately upon the occurrence and during the continuation of a New Ark Termination Event, any automatic stay, whether arising

under section 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim

Order, including clause (c) of this paragraph, is hereby modified, without further notice to, hearing

of, or order from this Court, to the extent necessary to permit the Prepetition Agent to, upon the

delivery of written notice (which may include electronic mail) to the Remedies Notice Parties:

(i) [reserved]; (ii) terminate, reduce, or restrict any commitment to extend credit to the DIP Loan

Parties under the New Ark Financing (to the extent any such commitment remains); (iii) terminate

the New Ark Funding Documentation as to any future liability or obligation thereunder; (iv)

[reserved]; (v) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the

New Ark Funding Documentation to use any Cash Collateral of the Prepetition Working Capital

Secured Parties; (vi) freeze monies or balances in the Prepetition Loan Account; (vii) [reserved];

and (viii) take any other actions or exercise any other rights or remedies permitted under this

Interim Order, the New Ark Funding Documentation, or applicable law; *provided* that prior to the

exercise of any right in clauses (v) through (viii) of this paragraph, the Prepetition Agent shall be

required to provide five (5) business days' written notice (by electronic mail or other electronic

means) to the Remedies Notice Parties of the Prepetition Agent's intent to exercise its rights and

remedies (the "New Ark Remedies Notice Period" and, together with the DIP Remedies Notice

Period, each, a "Remedies Notice Period"); *provided further* that, for the avoidance of doubt, the

Debtors may continue to use any Cash Collateral prior to the expiration of the New Ark Remedies

Notice Period so long as such Cash Collateral is used in accordance with the Approved New Ark

Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards).

        (c)      During the applicable Remedies Notice Period, the Debtors, the Official

Committee or any other party in interest may seek an emergency hearing before the Court. Unless

during such Remedies Notice Period the Court enters an order to the contrary, the DIP Agent or

Prepetition Agent, as applicable, shall be deemed to have received relief from the automatic stay to exercise all rights and remedies available against the DIP Collateral (subject to the rights of the Prepetition Lenders in the Prepetition Working Capital Collateral and the Prepetition HUD Lender in the Prepetition HUD Lender Collateral) or Prepetition Working Capital Collateral, as applicable, permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code or otherwise (in each case, subject to paragraph 18(d) hereof). To the extent a Final Order is entered providing for such relief and in furtherance of the foregoing, upon the occurrence and during the continuation of a DIP Termination Event or New Ark Termination Event, as applicable, and the expiration of the applicable Remedies Notice Period without entry of a Court order to the contrary, the DIP Agent and any liquidator or other professional acting at the DIP Agent's direction (or Prepetition Agent and any liquidator or other professional acting at the Prepetition Agent's direction) shall (A) have the right to use, license or sub-license (without payment of royalty or other compensation) any or all intellectual property of the Debtors, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any DIP Collateral or Prepetition Working Capital Collateral, as applicable, and (B) have the right to access, and a rent free right to use, any and all owned or leased locations (including, without limitation, manufacturing facilities, warehouse locations, distribution centers and offices) for the purpose of arranging for and effecting the sale or disposition of DIP Collateral or Prepetition Working Capital Collateral, as applicable, including the production, completion, packaging and other preparation of such DIP Collateral or Prepetition Working Capital Collateral, as applicable,

for sale or disposition (it being understood and agreed that the DIP Agent and its representatives (and persons employed on their behalf) or Prepetition Agent and its representatives (and persons employed on their behalf), as applicable, may continue to operate, service, maintain, process and sell the DIP Collateral (subject to the rights of the Prepetition Lenders in the Prepetition Working Capital Collateral) or Prepetition Working Capital Collateral, as applicable, as well as to engage in bulk sales of such DIP Collateral or Prepetition Working Capital Collateral, as applicable.

(d)     The Debtors (i) shall reasonably cooperate with the DIP Agent or Prepetition Agent, as applicable, in its exercise of rights and remedies, whether against DIP Collateral (subject to the rights of the Prepetition Lenders in the Prepetition Working Capital Collateral and the Prepetition HUD Lender in the Prepetition HUD Lender Collateral) or Prepetition Working Capital Collateral, as applicable, or otherwise, (ii) waive any right to seek relief under section 105 of the Bankruptcy Code, and (iii) unless the Court orders otherwise, may not contest or challenge the exercise of any such rights or remedies other than to dispute whether a DIP Termination Event or New Ark Termination Event, as applicable, has in fact occurred.

(e)     So long as there are any DIP Facility Obligations outstanding or any DIP Lenders have any outstanding DIP Commitment (as defined in the DIP Term Sheet), in each case with respect to DIP Collateral that is secured by DIP Liens that in accordance with this Interim Order are senior to any liens held by Prepetition Secured Parties, then with respect to such DIP Collateral, such Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral, including in connection with the Adequate Protection Liens except to the extent required by an order of this Court; (ii) be deemed to have consented to any

transfer, disposition or sale of, or release of liens on, such DIP Collateral or proceeds thereof (until payment in full in cash of all DIP Facility Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitments), to the extent such transfer, disposition, sale, or release is authorized under the applicable DIP Loan Documents; and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iii), any of the applicable DIP Secured Parties have filed financing statements or other documents in respect of the liens granted pursuant to this Interim Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or securities interests as of the Petition Date.

19.     **Indemnification.**  The DIP Loan Parties shall jointly and severally indemnify and hold harmless the DIP Agent, each DIP Secured Party, and New Ark and each of their respective directors, officers, employees, agents, attorneys, accountants, advisors, controlling persons, equity holders, partners, members, and other representatives and each of their respective successors and permitted assigns (each, an "Indemnified Party") against, and to hold each Indemnified Party harmless from, any and all losses, claims, damages, liabilities, and reasonable, documented and invoiced out-of- pocket fees and expenses (including, without limitation, fees and disbursements of counsel but limited, in the case of counsel, to the extent set forth in the DIP Term Sheet) that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of, or in any way in connection with, or as a result of: (i) the execution or delivery of the DIP Term Sheet or DIP Note, any other DIP Loan Document, the performance by the parties thereto of their respective obligations thereunder and the other transactions contemplated thereby; (ii) the use of the proceeds of the DIP Loans or the New Ark Financing; (iii) the enforcement or protection of its

rights in connection with the DIP Term Sheet, the DIP Note, and any other DIP Loan Document; (iv) the negotiation of and consent to this Interim Order; or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnified Party is a party thereto and regardless of whether such matter is initiated by a third party or the Debtors or any of their subsidiaries or affiliates or creditors; *provided* that the foregoing indemnity shall not apply to any claims arising (i) prior to the Petition Date or (ii) out of, or in any way in connection with, or as a result of provisions of the Prepetition Loan Documents or Omega Master Lease Documents (for the avoidance of doubt, nothing in this Interim Order alters, amends, expands or minimizes any indemnification under the Prepetition Loan Documents or Omega Master Lease Documents, subject to applicable law); *provided further* that no Indemnitee will be indemnified for any loss, claim, damage, liability, cost, or other expense to the extent such loss, claim, damage, liability, cost, or expense that (i) is determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith, or willful misconduct of such Indemnitee or (B) a material breach of the obligations of such Indemnitee under the DIP Loan Documents or (ii) relates to any proceeding between or among Indemnitees other than claims arising out of any act or omission on the part of the DIP Loan Parties in accordance with this paragraph 19.

20.    **Proofs of Claim.**  The DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successors Cases for any claim allowed herein or therein in respect of the Prepetition Working Capital Debt or the Omega Master Lease Documents.  Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases shall not apply to the DIP Secured Parties or the Prepetition Secured Parties; *provided* that, notwithstanding any

order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Agent, on behalf of the DIP Secured Parties, and the Prepetition Agent, on behalf of the Prepetition Secured Parties, may (but are not required) in their discretion file (and amend and/or supplement) in the Debtors' lead chapter 11 case *In re Gulf Coast Health Care, LLC, et al.,* Case No. 21-11336 (KBO), or any Successor Cases, a single, master proof of claim on behalf of the Prepetition Working Capital Secured Parties or the Omega Landlords, as applicable, for any claim allowed herein or their claims arising under the applicable Prepetition Loan Documents or the Omega Master Lease Documents, and any such proof of claim may (but is not required to) be filed as one consolidated proof of claim against all of the Debtors (each, a "Master Proof of Claim"), rather than as separate proofs of claim against each Debtor.  Any proof of claim filed by the DIP Secured Parties or any of the Prepetition Secured Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to each Prepetition Secured Party.

21.    **Carve-Out.**

(a)    Subject to the terms, conditions and limitations contained in this Paragraph 21, but only to the extent and subject to the express exclusions set forth herein, the Prepetition Liens, the Adequate Protection Liens and the 507(b) Claims, and any other liens or

claims granted under this Interim Order, are all subordinate (except as otherwise provided herein) to the following (collectively, the "Carve-Out"):

> (1)    allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for statutory fees payable to the U.S. Trustee, together with the statutory rate of interest, and 28 U S.C. § 156(c) for fees required to be paid to the Clerk of this Court (collectively, the "Statutory Fees"), which shall not be subject to any budget;

> (2)    all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;

> (3)    to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees (other than any "success," "restructuring," "transaction" or similar fees), disbursements, costs, and expenses ("Allowed Professional Fees") incurred by Professional Persons, at any time on or before the second (2nd) business day following delivery of the Carve-Out Trigger Notice (as defined below) by New Ark, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, but in all cases, with respect to this clause (3), subject to the amounts set forth for such Professional Persons in the Approved New Ark Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards); and

> (4)    Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $250,000 incurred after the second (2nd) business day following deliver of a Carve-Out Trigger Notice by New Ark to the extent allowed at any time, whether by final order, procedural order, or otherwise (the amounts set forth in this clause (4) being the "Carve-Out Trigger Notice Cap").

For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by New Ark to the Debtors and their counsel, with a copy to the DIP Agent and their counsel, the U.S. Trustee, and counsel to the Official Committee, if any, which notice may be delivered following the occurrence and during the continuation of New Ark Funding Termination Event (as defined in the DIP Term Sheet) stating that the Carve-Out Trigger Notice Cap has been invoked.

> (b)    During the time period commencing on the Petition Date and continuing until the second (2nd) business day following delivery of the Carve-Out Trigger Notice, those amounts set forth in the Approved New Ark Budget (subject to Permitted Variances and Permitted

Carrybacks/Carryforwards) for the satisfaction of the amounts included in the Carve-Out shall be transferred from the Prepetition Loan Account to the New Ark Reserve Account, on a weekly basis, pending approval of the Court (if required) to disburse such funds to the respective beneficiaries thereof (not to exceed the aggregate amounts allocated for each such beneficiary under the New Ark Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards)).

(c)      Following the delivery of the Carve-Out Trigger Notice, the Prepetition Agent shall promptly transfer to the New Ark Reserve Account an amount equal to the sum of (i) the Carve-Out Trigger Notice Cap, plus (ii) the amounts reserved under clause (2) of the definition of Carve-Out, plus (iii) an estimate of amounts necessary to fund the remaining amounts to be paid or payable under clause (1) of the definition of Carve-Out.

(d)      To the extent that (a) any amounts held in the New Ark Reserve Account are not allowed by the Bankruptcy Court to be disbursed to a beneficiary of the Carve-Out or (b) such amounts relate to any period during which such beneficiary of the Carve-Out is no longer employed as a Professional Person, such funds shall revert to New Ark for application against the Prepetition Working Capital Debt, if any.

(e)      Nothing herein, including the inclusion of line items in the Approved New Ark Budget for Professional Persons, shall be construed as consent to the allowance of any particular professional fees or expense of the Debtors, of the Official Committee, or of any other person or shall affect the right of the DIP Agent, the Prepetition Agent, the U.S. Trustee, or any other party in interest to object to the allowance and payment of such fees and expenses. The Prepetition Working Capital Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection

with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Working Capital Secured Parties in any way to pay compensation to or to reimburse expenses of any Professional Persons, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)    Notwithstanding anything to the contrary contained in this Interim Order, the DIP Liens on DIP Priority Collateral shall not be subject to the Carve-Out.

22.    **Limitations on the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, the Carve-Out, and Other Funds.**  Notwithstanding anything contained in the DIP Loan Documents, this Interim Order, or any other order of the Court to the contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, any Official Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral, or Cash Collateral, so long as a DIP Termination Event has occurred and is continuing; or (b) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, against any of the Prepetition Secured Parties

and DIP Lenders, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) (collectively, the "Subject Parties") with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to this Interim Order, the DIP Facility, the DIP Loan Documents, the DIP Facility Obligations, the Prepetition Liens, the Prepetition Working Capital Debt, or the Prepetition Loan Documents or the transactions contemplated therein or thereby, including, without limitation, (A) any Avoidance Actions, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Facility Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Claims, or the Prepetition Working Capital Debt, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Facility Obligations, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the Prepetition Collateral, the Prepetition Working Capital Debt, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any of the DIP Secured Parties hereunder or under any of the DIP Loan Documents or the Prepetition Secured Parties under any of the Prepetition Loan Documents or the Omega Master Lease Documents, as applicable (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay

any of the DIP Secured Parties, or the Prepetition Secured Parties' assertions, enforcements, realizations, or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents or Prepetition Loan Documents and this Interim Order and/or the Final Order (as applicable)); *provided*, that (i) no more than $50,000 may be used for allowed fees and expenses incurred solely by any Official Committee (if appointed) in investigating, but not objecting to, challenging, litigating, opposing, prosecuting, or seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the Prepetition Liens, the Prepetition Working Capital Debt, the Prepetition Loan Documents, the Omega Master Lease Obligations, the Omega Master Lease Documents, the Adequate Protection Liens, or the Adequate Protection Claims prior to the Challenge Deadline (as defined below) and (ii) no DIP Collateral (including Cash Collateral) or any proceeds thereof shall be used to investigate, object to, challenge, litigate, oppose, or prosecute any cause of action against the DIP Secured Parties (in their capacity as such), including seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the DIP Liens, the DIP Superpriority Claims, the DIP Loans, or the DIP Loan Documents.  Except to the extent expressly permitted by the terms of the DIP Loan Documents and this Interim Order or any further order of the Court, none of the Debtors, any Official Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity may use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of the Required DIP Lenders.

23.    **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**.

(a)    Subject to the challenge rights described in this paragraph 23, each of the stipulations, admissions, and agreements contained in this Interim Order, including, without

55

limitation, in clauses (i) through (viii) of paragraph E of this Interim Order (collectively, the "Stipulations"), shall be binding upon the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes. The Stipulations shall be binding upon all parties in interest (including without limitation, (x) the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases or any Successor Cases), and (y) any Official Committee, if appointed) and any other person or entity acting or seeking to act on behalf of the DIP Loan Parties' estates, in all circumstances and for all purposes, unless  an Official Committee, if any, or a party in interest (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline (as defined below)) with respect to the Stipulations and a challenge has been filed with the Court (each, a "Challenge Proceeding") by the Challenge Deadline, objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Working Capital Debt, the Omega Master Lease Obligations, the Prepetition Liens, or the Prepetition Loan Documents, the Omega Master Lease Documents, or otherwise asserting or prosecuting any Avoidance Action or any other claim, counterclaim, cause of action, objection, contest, defense or other challenge (a "Challenge") against any of the Subject Parties arising under, in connection with or related to the Debtors, the Prepetition Working Capital Debt, the Prepetition Liens, the Prepetition Loan Documents, or the DIP Loan Documents, and there is entered a final non-appealable order in favor of the objector, movant or plaintiff in any such timely filed Challenge Proceeding; *provided* that (i) as to the Debtors (but not their estates), any and all such challenges are hereby irrevocably waived and relinquished as of the Petition Date, (ii) any pleadings filed in

56

any Challenge Proceeding shall set forth with the requisite specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Deadline shall be deemed forever, waived, released and barred), and (iii) such Challenge Proceeding may be pursued by the Official Committee or any other party in interest that timely commenced a Challenge Proceeding pursuant to the terms of this Interim Order.

(b)    If no such Challenge Proceeding is timely filed with the Court prior to the Challenge Deadline, then, without further notice to any person or entity or order of the Court, (i) the Stipulations shall be binding on all parties in interest (including, without limitation, any Official Committee, if appointed, the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases or any Successor Cases) and the Debtors; (ii) the Prepetition Working Capital Debt and Omega Master Lease Obligations shall constitute allowed claims and shall not be subject to any defense, claim, counterclaim, recharacterization, subordination, disgorgement, offset, avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases; (iii) the Prepetition Loan Documents and Omega Master Lease Documents shall be deemed to have been valid, as of the Petition Date, and enforceable against each of the DIP Loan Parties in the Chapter 11 Cases and any Successor Cases, and the Prepetition Obligors; (iv) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense; and (v) the Prepetition Working Capital Debt, the Omega Master Lease Obligations, the Prepetition Liens, the Omega Master Lease Documents, and the Prepetition Loan Documents shall not be subject to any other or further claim or Challenge by any Official Committee (if appointed), any non-statutory committees appointed or formed in these Chapter 11 Cases or any Successor

Cases or any other party in interest, whether acting or seeking to act on behalf of the Debtors'
estates or otherwise.

(c)    If any such Challenge Proceeding is timely filed prior to the Challenge
Deadline, the Stipulations shall nonetheless remain binding and preclusive (as provided in
paragraph 23(b) hereof) on any Official Committee (if appointed) and on any other person or
entity, the DIP Loan Parties and any successor thereto (including, without limitation, any chapter
7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases
or any Successor Cases), and the Debtors, except to the extent that such Stipulations were expressly
and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable
order of a court of competent jurisdiction.

(d)    The "Challenge Deadline" shall mean the date that is (A) the later of (i)
75 calendar days after entry of this Interim Order if no Official Committee has been formed by
such date, or (ii) 60 days after formation of an Official Committee (if appointed), (B) with respect
to any Subject Party, such later date that such Subject Party has agreed to in writing, prior to the
expiration of the deadline to commence a Challenge, or (C) any such later date as has been ordered
by the Court for cause upon a motion filed and served prior to the expiration of the deadline to
commence a Challenge, on (i) with respect to the Prepetition Credit Agreement, the Prepetition
Agent and (ii) with respect to the Omega Master Lease Obligations, the Omega Landlords;
*provided*, that the filing of a motion pursuant to subsection (C), *supra*, shall toll the Challenge
Period only as to the party that timely filed such standing motion until such motion is resolved or
adjudicated by the Court; *provided further*, if a chapter 7 trustee or a chapter 11 trustee is appointed
or elected during the Challenge Period, then the Challenge Period Termination Date with respect
to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date

that is twenty (20) calendar days after the date on which such trustee is appointed or elected.

Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code),

including any Official Committee (if appointed) or any non-statutory committees appointed or

formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action

belonging to the Debtors or their estates, including, without limitation, Challenges with respect to

the Prepetition Loan Documents, the Prepetition Working Capital Debt, the Omega Master Lease

Documents, the Omega Master Lease Obligations, or the Prepetition Liens, and all rights to object

to such standing are expressly reserved.

24.    **Limitations on Charging Expenses.**    To the extent a Final Order is entered

providing for such relief, and except to the extent of the Carve-Out and paragraph 22, and except

as otherwise provided under an Approved DIP Budget or an Approved New Ark Budget, no costs

or expenses of administration of the Chapter 11 Cases or any Successor Cases at any time,

including, without limitation, any costs and expenses incurred in connection with the preservation,

protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured

Parties (as the case may be) upon the DIP Collateral or Prepetition Collateral (as the case may be),

shall be charged against or recovered from (a) the DIP Secured Parties or the DIP Collateral

(including in respect of the Adequate Protection Liens), or any of the DIP Facility Obligations, or

(b) the Prepetition Secured Parties or the Prepetition Collateral, in each case, pursuant to sections

105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust

enrichment) or any similar principle of law, without the prior express written consent of the

Required DIP Lenders or the Prepetition Agent, each in their sole discretion, and no such consent

shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any

such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

25. **No Marshaling.**  To the extent a Final Order is entered providing for such relief, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, the Prepetition Collateral, the Prepetition Working Capital Debt, or the Omega Master Lease Obligations, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order, the DIP Term Sheet, the Prepetition Loan Documents, and the Omega Master Lease Documents, as applicable.

26. **Equities of the Case**.  Further, to the extent a Final Order is entered providing for such relief, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to any of the Prepetition Secured Parties or Prepetition Collateral.

27. **Joint and Several Liability.**  Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Interim Order.

28. **Right to Credit Bid.**

(a)   The DIP Agent or its designee (at the written direction of the Required DIP Lenders), on behalf of the DIP Secured Parties, unless the Court for cause orders otherwise, shall have the right to credit bid on the DIP Collateral, in accordance with the DIP Loan Documents, up to the full amount of the DIP Facility Obligations, subject to the Prepetition Secured Parties' and Prepetition HUD Lender's respective interests in the DIP Collateral, in connection with any sale or other disposition of all or any portion of the DIP Collateral, as provided for in section 363(k) of

the Bankruptcy Code, without the need for further Court order authorizing the same, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.

(b)     To the extent a Final Order is entered providing for such relief, the Prepetition Agent or its designee (at the written direction of the required Prepetition Lenders), on behalf of the Prepetition Working Capital Secured Parties, unless the Court for cause orders otherwise, shall have the right to credit bid on the Prepetition Working Capital Collateral, in accordance with the Prepetition Loan Documents, up to the full amount of the Prepetition Working Capital Debt in connection with any sale or other disposition of all or any portion of the Prepetition Working Capital Collateral, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of Prepetition Working Capital Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.

29.    **Rights Preserved.**  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or

implicitly: (a) the rights of the DIP Secured Parties or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents, the Prepetition Loan Documents, or the Omega Master Lease Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the DIP Loan Parties', or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order.

30. **Intercreditor Provisions.**

(a) <u>Intercreditor and Subordination Agreement</u>. The Prepetition Agent (as successor-in-interest to Wells Fargo Bank, National Association) and OHI (as defined in the Intercreditor Agreement) are parties to that certain Subordination and Intercreditor Agreement, dated as of July 6, 2018 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "<u>Intercreditor Agreement</u>"). Pursuant to section 510 of the Bankruptcy Code, the Intercreditor Agreement, and the DIP Term Sheet, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents and Omega Master Lease Documents (i) shall remain in full force and effect, and (ii) shall continue to govern the

relative priorities, rights, and remedies of the Prepetition Secured Parties and OHI. Notwithstanding the foregoing, subject to the Restructuring Support Agreement, neither the Prepetition Agent nor the Prepetition Lenders shall be permitted to interfere with the DIP Loan Parties' performance of their obligations under the DIP Loan Documents, including their Transfer Assistance Obligations (as defined in the DIP Term Sheet) and their obligations to enter into and perform under the MOTA (as defined in the DIP Term Sheet).

(b)        Intercreditor Covenants.

(1)        In consideration for New Ark's consent to the DIP Facility and other commitments under the DIP Loan Documents, including the New Ark Financing, upon entry of this Interim Order: each of the DIP Agent, on behalf of itself and the DIP Lenders, and the Omega Landlords covenants and agrees that it will not, individually, derivatively, or with any person or in any way, directly or indirectly, sue upon, file, or otherwise assert or interpose, or cause or assist others to sue upon, file, or otherwise assert or interpose, any claim, cause of action, or other right of recovery against New Ark, the Equity Sponsors, the Service Providers (as such terms are defined in the Restructuring Support Agreement) and their respective affiliates, assigns or successors and the respective members, managers, equity security holders, trusts, trustees, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (collectively, the "New Ark Related Parties"), whether arising at law or in equity (the "New Ark Related Party Claims"); provided, however, that the New Ark Related Party Claims do not include any claim of the DIP Agent or the DIP Lenders relating to or arising out of the breach by any New Ark Related Party of such party's obligations under the Restructuring Transaction Documents (as defined in the Restructuring Support Agreement). In the event that the DIP Agent or any of the DIP Lenders receive any proceeds of a New Ark Related Party Claim, such party shall immediately turn over such proceeds to New Ark; and

(2)        In consideration for providing the DIP Facility and other commitments under the DIP Loan Documents, upon entry of this Interim Order: each of New Ark, the Equity Sponsors, and the Service Providers (as such terms are defined in the Restructuring Support Agreement), covenants and agrees that it will not, individually, derivatively, or with any person or in any way, directly or indirectly, sue upon, file, or otherwise assert or interpose, or cause or assist others to sue upon, file, or otherwise assert or interpose, any claim, cause of action, or other right of recovery against the DIP Agent, the DIP Lenders, the Omega Landlords and their respective affiliates, assigns or successors and the respective members, managers, equity security holders, trusts, trustees, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (collectively, the "Omega Related Parties"), whether arising at law or in equity (the "Omega Related Party Claims"); provided, however, that the Omega Related Party Claims do not include any claim of New Ark, the Equity

Sponsors, and the Service Providers relating to or arising out of the breach by any Omega Related Party of such party's obligations under the Restructuring Transaction Documents (as defined in the Restructuring Support Agreement). In the event that a New Ark Related Party receives any proceeds of an Omega Related Party Claim, such party shall immediately turn over such proceeds to the DIP Agent.

31.    **No Waiver by Failure to Seek Relief.**  The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents, or the Omega Master Lease Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought.  No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties.

32.    **No Deemed Control.**  In determining to make, and in providing, any DIP Loans under the DIP Note, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, any Final Order or the DIP Loan Documents, no DIP Secured Party and no Prepetition Secured Party shall be deemed to be in control of any Debtor or its operations or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability

Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar state or federal statute) with respect to the operation or management of such Debtor.

33.    **Binding Effect of this Interim Order.**  Immediately upon entry of this Interim Order by the Court, this Interim Order shall inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and the Prepetition HUD Lender, and the provisions of this Interim Order (including all findings and conclusions of law herein) shall be valid and binding upon the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, the Prepetition HUD Lender any and all other creditors of the Debtors, any Official Committee (if appointed) or other committee appointed in the Chapter 11 Cases, any and all other parties in interest, and the respective successors and assigns of each of the foregoing, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Chapter 11 Cases or any Successor Cases, or upon dismissal of any of the Chapter 11 Cases; *provided* that (a) nothing in this paragraph shall confer final status on this Interim Order and (b) the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed for the estates of the Debtors.

34.    **Survival**.  The terms and provisions of this Interim Order, including, without limitation, (a) the Carve-Out and (b) all of the rights, privileges, benefits, and protections afforded herein and in the DIP Loan Documents (including the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Claims, and any other claims, liens, security interests, and other protections (as applicable)) granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Interim Order and the DIP Loan Documents (collectively, the "DIP Protections"), and any actions taken pursuant hereto or thereto, shall

survive, shall continue in full force and effect, shall remain binding on all parties in interest, and shall maintain their priorities, and shall not be modified, impaired, or discharged by (except to the extent consented to in writing by the applicable secured parties), entry of any order that may be entered (i) confirming any plan of reorganization in any of the Chapter 11 Cases, (ii) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any or all of the Chapter 11 Cases, or (iv) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases, in each case, until (x) in respect of the DIP Facility, all of the DIP Facility Obligations, pursuant to the DIP Term Sheet and this Interim Order, have been indefeasibly paid in full in cash (other than contingent indemnification obligations as to which no claim has been asserted) and all commitments to extend credit under the DIP Facility are terminated, and (y) in respect of the Prepetition Working Capital Debt, all of the Prepetition Working Capital Debt have been indefeasibly paid in full in cash (other than contingent indemnification obligations as to which no claim has been asserted).  This Court shall retain jurisdiction, notwithstanding any such confirmation, conversion, or dismissal, for the purposes of enforcing such DIP Protections and the Prepetition Secured Parties' adequate protection.

35.     **Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.**  The DIP Secured Parties and New Ark have acted in good faith in connection with the DIP Facility, the DIP Loan Documents, the Interim Financing, and with this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Loan Documents to the extent provided therein.  If any or all of the provisions of this Interim Order are

hereafter reversed or modified on appeal, such reversal or modification shall not affect the validity, priority, or enforceability of the DIP Facility Obligations or the DIP Liens; provided, however, that the DIP Secured Parties shall not be entitled to protection under section 364(e) of the Bankruptcy Code with respect to any funds advanced by the DIP Secured Parties or made available by the Prepetition Secured Parties, as applicable, under the DIP Loan Documents after entry of an order staying this Interim Order or any provision of this Interim Order authorizing the Debtors to borrow funds under the DIP Loan Documents.. Notwithstanding any such reversal or modification of this Interim Order or certain provisions thereof on appeal, any DIP Facility Obligations, DIP Liens, or Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Secured Parties or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and the Prepetition Agent of the effective date of such reversal, modification, or stay shall be governed in all respects by the original provisions of this Interim Order.

36. **Limitation on Exercise of Rights and Remedies**. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, the rights and remedies of (i) the DIP Agent and the DIP Lenders upon an Event of Default and (ii) the Prepetition Agent and Prepetition Lenders upon a New Ark Event of Default, in each case, shall be limited by, and subject in all respects to, the Restructuring Support Agreement dated as of October 14, 2021 by and among, among others, the Debtors, the DIP Secured Parties, and the Prepetition Working Capital Secured Parties (the "Restructuring Support Agreement").

37. **Amendment of the DIP Loan Documents**. The DIP Loan Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto without notice or a hearing if the amendment, amendment and restatement, modification, or supplement is not material, and is: (i) in accordance with the DIP Documents; and (ii) not adverse

or prejudicial in any material respect to the rights of the Debtors, the estates, or third parties; *provided, however*, all amendments, modifications and waivers of the DIP Documents shall require the consent of the Required DIP Lenders, except in the case of amendments, modifications, or waivers requiring consent from all DIP Lenders, all affected DIP Lenders, or the DIP Agent (or the DIP Agent with the consent in writing of the Required DIP Lenders), including without limitation, certain consent rights in respect of commitments, economics, maturity and the release of collateral as set forth in the DIP Loan Documents.  Any material amendment, restatement, modification or supplement to the DIP Loan Documents may only be made pursuant to an order of this Court, upon notice and a hearing.  The Debtors shall file all amendments, restatements, modification and supplements of the DIP Loan Documents with the Court and serve the same on the U.S. Trustee and the Official Committee, if any.

38.    **Adequate Assurance Deposits**.  Notwithstanding anything to the contrary in this Interim Order, the interests of the DIP Secured Parties and the Prepetition Secured Parties in any adequate assurance deposit ordered by this Court for the benefit of the Debtors' utilities shall be subordinate to the interests of the Debtors' utilities in such adequate assurance deposit until such time as the adequate assurance deposit is returned to the Debtors.

39.    **Limitation of Liability.**  Nothing in this Interim Order, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties (in each case, in their capacities as such) of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates.  So long as the DIP Secured Parties comply with their obligations under the DIP Loan Documents and their

obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

40.    **Interim Order Controls.**  In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order, any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the DIP Loan Documents, the terms and provisions of this Interim Order shall govern and control.

41.    **Payments Held in Trust.**  Except as expressly permitted in this Interim Order or the DIP Loan Documents and other than with respect to the Prepetition Debt Collateral, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Facility Obligations under the DIP Loan Documents, and termination of the DIP Commitments in accordance with the DIP Term Sheet, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the applicable DIP Agent or DIP Lender, for application in accordance with the DIP Term Sheet and this Interim Order.

42.    **Interim Order Effective as of the Petition Date.**  This Interim Order shall take effect and shall be enforceable as of the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), and 7062 or any other

Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

43.    **Bankruptcy Rules.**  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

44.    **Necessary Action.**  The Debtors are authorized and directed to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim Order.

45.    **Headings.**  Section headings used herein are for convenience only and are not to affect the **construction** of or to be taken into consideration in interpreting this Interim Order.

46.    **Medicare/Medicaid.**  Nothing contained in this Interim Order, the DIP Loan Documents, or the New Ark Funding Documentation shall (a) restrain, limit or impact any action by the U.S. Department of Health and Human Services, the Centers for Medicare & Medicaid Services or Medicare Administrative Contractors to administer, regulate and enforce the Medicare program; (b) affect, modify or impair any governmental unit's recoupment or setoff rights, claims, or defenses, in each case, to the extent such rights, claims, or defenses are available under applicable law; (c) be construed to affect the exclusive jurisdiction of the U.S. Department of Health and Human Services to adjudicate and pay Medicare claims in the ordinary course; or (d) affect, modify or impair the rights of the Debtors or any other parties in interest with respect to the foregoing.

47.    **Final Hearing.**  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for November 12, 2021 at 10:00 a.m., prevailing Eastern Time, at the United States Bankruptcy Court for the District of Delaware.

48.    **Objections.**  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon: counsel for each of the Debtors, the DIP Agent, the DIP Lenders, and any other party that has filed a request for notices with this Court, to allow actual receipt by the foregoing **no later than November 5, 2021, at 4:00 p.m., prevailing Eastern Time**.  Any objections by creditors or any other party in interest to the DIP Motion or any of the provisions of this Interim Order shall be deemed waived unless filed and received in accordance with the foregoing on or before such date.

49.    **Retention of Jurisdiction.**  The Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Interim Order.

###

**<u>Exhibit 1</u>**

DIP Term Sheet

**CONFIDENTIAL**
**SUBJECT TO FRE 408 AND SIMILAR RULES**

**GULF COAST HEALTH CARE, LLC AND CERTAIN AFFILIATES AND SUBSIDIARIES THEREOF**

**SUMMARY OF TERMS AND CONDITIONS**

**UP TO $25 MILLION SECURED DEBTOR-IN-POSSESSION CREDIT FACILITY**

**October 16, 2021**

This Summary of Terms and Conditions (the "**Term Sheet**") outlines the material terms and conditions of a debtor-in-possession credit facility that may be provided by the DIP Lenders (as defined below), and would be funded pursuant to the conditions precedent set forth under "Conditions to Effectiveness" below.

Reference is made to that certain Second Consolidated Amended and Restated Master Lease Agreement, by and among, the entities listed on Schedule A thereto (collectively "**Landlord**"), and GULF COAST MASTER TENANT I, LLC, a Delaware limited liability company ("**Tenant**"), dated as of July 1, 2013, as amended by that certain First Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of October 2, 2013, that certain Second Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of October 1, 2014, that certain Third Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of September 29, 2015, that certain Fourth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of February 25, 2016, that certain Fifth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of May 26, 2017, that certain Sixth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of December 15, 2016, that certain Seventh Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of January 26, 2017, that certain Eighth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of June 8, 2017, that certain Ninth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated December 19, 2017, that certain Tenth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated July 6, 2018, and that certain Eleventh Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of August 19, 2019, as may have been further amended (collectively, the "**Lease**").

Reference is made to that certain Credit Agreement, dated as of July 6, 2018, among GULF COAST HEALTH CARE, LLC, a Delaware limited liability company ("**Parent**"), FL HUD BAYBREEZE, LLC, a Delaware limited liability company, FL HUD BAYSIDE, LLC, a Delaware limited liability company, FL HUD DESTIN, LLC, a Delaware limited liability company, FL HUD MARGATE, LLC, a Delaware limited liability company, FL HUD PENSACOLA, LLC, a Delaware limited liability company, FL HUD ROSEWOOD, LLC, a Delaware limited liability company, FL HUD SILVERCREST, LLC, a Delaware limited liability company, MF LAKE EUSTIS, LLC, a Delaware limited liability company, MF WINTER PARK, LLC, a Delaware limited liability company, MS GREENBOUGH, LLC, a Delaware limited liability company, MS HUD BOYINGTON, LLC, a Delaware limited liability company, MS HUD DIXIE, LLC, a Delaware limited liability company, MS HUD OCEAN SPRINGS, LLC, a Delaware limited liability company, MS HUD PINE VIEW, LLC, a Delaware limited liability company, NF CHIPOLA, LLC, a Delaware limited liability company, NF ESCAMBIA, LLC, a Delaware limited liability company NF PANAMA, LLC, a Delaware limited liability company, NF PENSACOLA MANOR, LLC, a Delaware limited liability company, NF SUWANNEE, LLC, a Delaware limited liability company, SF CARNEGIE, LLC, a Delaware limited liability company, SF LAKE PLACID ALF, LLC, a Delaware limited liability company, BREVARD OAKS CENTER, LLC, a Florida limited liability company, SF BREVARD, LLC, a Delaware limited liability company, NF NINE MILE, LLC, a Delaware limited liability company (collectively, "**Prepetition Borrowers**"), the lenders from time to time party thereto

(the "**Prepetition Lenders**") and NEW ARK CAPITAL, LLC, as administrative agent for the Prepetition Lenders (the "**Prepetition Agent**" or "**New Ark**"), issuing bank and swingline lender, as such Credit Agreement has been modified and supplemented from time to time (the "**Prepetition Credit Agreement**").

Terms used herein but not defined herein shall have the meaning assigned to such terms on **Annex C** attached hereto or the DIP Orders, as applicable.

Subject to entry of the Interim DIP Order (as defined below), the undersigned parties agree as follows:

| | |
|---|---|
| **Borrowers:** | The Prepetition Borrowers, in each case as debtors and debtors-in-possession in cases under chapter 11 (including any cases filed by subsidiaries or controlled Affiliates of any Borrower that are jointly administered with the cases of the Borrowers, the "**Chapter 11 Cases**") or any other chapter of the United States Bankruptcy Code (as amended, the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| **Guarantors:** | The obligations of the Borrowers under the DIP Facility (the "**DIP Facility Obligations**") shall be guaranteed, jointly and severally, and secured as provided in and consistent with the priority set forth below under the heading "Security", by Parent, Tenant, and each of the "Guarantors" under and as defined in the Prepetition Credit Agreement and those additional entities set forth on **Annex B** hereto in each case as debtors and debtors-in-possession in the Chapter 11 Cases (the "**Guarantors**," and together with the Borrowers, the "**Loan Parties**"). Each Loan Party, in its capacity as a debtor and debtor-in-possession in the Chapter 11 Cases, is referred to herein as a "**Debtor**". |
| **DIP Agent:** | OHI Asset Funding (DE), LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"). |
| **DIP Lenders:** | One or more funds managed by, or other entities affiliated with, the DIP Agent (such funds or entities, collectively, the "**DIP Lenders**"). |
| **DIP Facility:** | A secured debtor-in-possession term loan credit facility in an aggregate principal amount of up to $25 million (the "**DIP Facility**"), composed of new term loans made by, and other obligations owed to, the DIP Lenders on, and from time to time after, the Closing Date (such new loans and obligations, the "**DIP Loans**" and commitments with respect to such DIP Loans, the "**DIP Commitments**") to be funded as set forth below under the heading "Availability" with no more than one draw each week, provided that the DIP Agent shall receive at least three business days' notice of any draw request, unless otherwise agreed to by the DIP Agent. DIP Loans that are repaid or prepaid may not be reborrowed. |
| **Closing Date:** | As used herein, "**Closing Date**" shall mean the date on which each of the conditions specified under the heading "**Conditions to Effectiveness**" below shall have been satisfied (or waived by the DIP Agent and the Required Lenders). The Closing Date shall occur as promptly as is practical after the entry of the Interim DIP Order (as defined below) by the Bankruptcy Court. |

| | |
|---|---|
| **Maturity Date:** | All amounts outstanding under the DIP Facility shall be due and payable in full (subject to the RSA (as defined below), and the DIP Commitments thereunder shall terminate, on the Maturity Date. The "**Maturity Date**" shall be that date which is the earliest to occur of (a) the date that is 8 months after the Closing Date, (b) the date that is 35 days after the entry of the Interim DIP Order if the Final DIP Order (as defined below) has not been entered by the Bankruptcy Court prior to such date, (c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases, and (d) the date the DIP Agent, or the DIP Agent at the direction of the Required Lenders, provides written notice to the Borrowers of the existence of an Event of Default (subject to applicable notice and cure provisions, if any) by the Borrowers as specified in the Documentation. |
| **Cash Collateral:** | "**Cash Collateral**" has the meaning ascribed to it in section 363(a) of the Bankruptcy Code. |
| **Use of Proceeds:** | The Debtors will be permitted to use the proceeds of the DIP Facility to fund the operational, employee, wind-down and other costs of the Loan Parties, including, without limitation, payments authorized to be made under "first day" or "second day" orders, post-MOTA transition and employee costs, and costs associated with providing shared services to New Operator or plan administrator post-transition, and, in each case, consistent with, subject to, and within the limitations contained in the budget depicting on a 13-week basis cash revenue, receipts, expenses and disbursements (the "**DIP Budget**"), taking into account Permitted Variances (as defined in Annex F) and Permitted Carrybacks/Carryforwards (as defined in Annex F). Except as expressly set forth in the DIP Budget, proceeds of the DIP Facility shall not be used to pay the costs and expenses (including professional fees) of administering the Chapter 11 Cases. Other costs and expenses (including professional fees) of administering the Chapter 11 Cases are scheduled to be funded from the Cash Collateral of the Prepetition Lenders on the terms outlined herein, and as specifically identified in a budget associated therewith (the "**New Ark Budget**" and, together with the DIP Budget, the "**Budgets**"). For the avoidance of doubt, the fees, costs and expenses detailed in the New Ark Budget shall not be revised in a manner that would shift the burden for such fees, costs and expenses to the DIP Budget and/or the DIP Lenders and (2)(x) payments on account of claims under section 503(b)(9) of the Bankruptcy Code and (y) payments on account of critical vendor claims shall be included in the DIP Budget and not the New Ark Budget. For the further avoidance of doubt, proceeds of the DIP Facility shall not be used to pay professionals, directors' fees, or U.S. Trustee fees. |
| **Budgets:** | The use of borrowings under the DIP Facility and the New Ark Funding shall be limited in accordance with each of the respective Budgets, subject to permitted variances (at a 10% level) determined on the basis of aggregate cash disbursements payable to Persons other than the DIP Lenders and tested every other week on a four-week rolling basis (each a "**Reporting Period**"), beginning testing with the fourth full calendar week after the Closing Date ("**Budget Testing Start Date**"), with |

| | |
|---|---|
| | Permitted Carrybacks/Carryforwards.  In addition, prior to the Budget Testing Start Date, subject to "Use of Proceeds" above, any disbursements approved by the Bankruptcy Court and of the type reflected in the Initial Budgets (as defined below) may be financed with DIP Facility proceeds. |
| | The initial Budgets covering the 13-week period commencing on the Petition Date (the "**Initial Budgets**") shall be the budgets attached as **Annex A** to this Term Sheet.  Thereafter, on the first Thursday of each weekly period after the Budget Testing Start Date, the Loan Parties shall provide the DIP Agent and New Ark with updated Budgets covering the subsequent 13-week period commencing on the first day of each Reporting Period, respectively.  The updated DIP Budget will replace the previously delivered DIP Budget, unless the Required Lenders otherwise object within 2 business days of the receipt thereof to the substance of such updated DIP Budget on the basis of such DIP Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the DIP Facility or being based on information that is incorrect in any material respect, in which case the updated DIP Budget will be as agreed reasonably and in good faith by the Required Lenders and the Borrowers. Subject to clause (1) of "Use of Proceeds" above, the updated New Ark Budget will replace the previously delivered New Ark Budget, unless New Ark otherwise objects within 2 business days of the receipt thereof to the substance of such updated New Ark Budget on the basis of such New Ark Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the New Ark Financing or being based on information that is incorrect in any material respect, in which case the updated New Ark Budget will be as agreed reasonably and in good faith by New Ark and the Borrowers; *provided further* that the aggregate disbursements to be made under the New Ark Budget from and after the Petition Date shall not exceed $8 million without written consent from New Ark in its sole discretion. Until such time as a replacement budget is in effect pursuant to the provisions above, the Budgets, for all purposes, shall be the prior Budgets in effect prior to delivery of the updated budgets. |
| **Availability:** | The DIP Loans shall be made for the purposes set forth above under the heading "Use of Proceeds" (1) in principal amounts in an aggregate amount of up to $15.75 million on or after the first business day following the entry of the Interim DIP Order and satisfaction of the conditions under the heading "Conditions to Effectiveness" (the "**Initial Draws**") and (2) in additional principal amounts in an aggregate amount of up to $25 million on or after the first business day following the entry of the Final DIP Order subject to, in each case of the foregoing clauses (1) and (2), (a) compliance with the terms and conditions set forth in the paragraphs below in this section with respect to the Pre-MOTA Funding Amount (as defined below), (b) no Default or Event of Default having occurred and be continuing as of the date of such draw, (c) accuracy of the Representations and Warranties (as defined below) in all material respects as of the date of such draw (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date or (ii) such representation |

and/or warranty is already qualified by materiality or material adverse effect or similar language, in which case such representation and warranty shall be true and correct in all respects, as of such date), (d) compliance with the Milestones as of the date of such draw and (e) the amount of such draw being limited to the amount required to comply with the DIP Budget (and any Permitted Variances or Permitted Carrybacks/Carryforwards with respect thereto) after giving effect to the minimum liquidity set forth therein, or except as otherwise determined by the Borrowers in consultation with the DIP Agent (each, a "**Delayed Draw**").

Subject to ongoing compliance with the DIP Budget (and any Permitted Variances or Permitted Carrybacks/Carryforwards with respect thereto) and the terms and conditions contained herein and in the Documentation (including conditions to a Delayed Draw above), the DIP Lenders and New Ark shall, collectively, make available to the Borrowers up to $24.5 million (the "**Pre-MOTA Funding Amount**") consisting of (x) up to $17.5 million of DIP Loans to be provided by the DIP Lenders and (y) up to $7 million in funding from the Prepetition Loan Account (as defined below) to be provided by New Ark (this clause (y), "**New Ark Operating Advance**"), in each case of the foregoing clauses (x) and (y), for expenses set forth in the DIP Budget for the period of time prior to the Operations Transfer Date (the "**Pre-MOTA Funding**"). The Pre-MOTA Funding shall be funded by the DIP Lenders and New Ark as follows (the "**Pre-MOTA Funding Waterfall**"):

> *First*, on or prior to the end of the first full week after the Petition Date, by the DIP Lenders in amounts consistent with the DIP Budget (subject to any Permitted Variances or Permitted Carrybacks/Carryforwards),

> *Second*, beginning with the first day of the second full week after the Petition Date, by New Ark until such time as that the ratio of (a) the funds provided by the DIP Lenders under the DIP Facility to (b) funds provided to the Debtors under the New Ark Operating Advance (such ratio, the "**Pre-MOTA Funding Ratio**"), is equal to 2.50:1.00,

> *Third*, from and after the time on which the Pre-MOTA Funding Ratio is equal to 2.50:1.00, by the DIP Lenders and New Ark on a *pro rata* basis based on the remaining portion of their initial maximum funding amounts under this paragraph (*i.e.* New Ark shall concurrently fund $1.00 for each $2.50 funded by the DIP Lenders).

For the avoidance of doubt, and notwithstanding the foregoing, (i) the New Ark Operating Advance shall be funded solely through New Ark's consent to the Debtors' use of Cash Collateral of the Prepetition Lenders, (ii) to the extent that collections of prepetition receivables are insufficient for the New Ark Operating Advance to be utilized in accordance with the Pre-MOTA Funding Waterfall, the DIP Lenders may (but, for the avoidance of doubt, shall have no obligation to), in their sole discretion, advance additional funds such that the Pre-MOTA Funding Ratio is greater than 2.50:1.00 (and, if funded, such failure to adhere to the Pre-MOTA Funding Waterfall shall not constitute an

<table>
<tr>
<td></td>
<td>Event of Default under this DIP Term Sheet), and (iii) if at any time after the second full week after the Petition Date (x) the Pre-MOTA Funding Ratio is greater than 2.50:1.00 and (y) there are sufficient funds in the Prepetition Loan Account to be utilized under the New Ark Operating Advance to cause the Pre-MOTA Funding Ratio to equal 2.50:1.00, then the Debtors shall solely utilize the New Ark Operating Advance until such time as the Pre-MOTA Funding Ratio is equal to 2.50:1.00 at which time any subsequent funding shall be made in accordance with the "*Third*" paragraph of the Pre-MOTA Funding Waterfall.</td>
</tr>
<tr>
<td>**Security:**</td>
<td>The DIP Facility Obligations will be secured by the "**DIP Liens,**" which shall include a fully perfected (which shall be, in the case of Stimulus Proceeds (as defined below) for the avoidance of doubt, first priority) security interest pursuant to section 364(d) in all DIP Collateral and the proceeds thereof, subject and subordinate to only (x) to the extent encumbering the DIP Collateral, Liens provided to the Prepetition Agent and Prepetition Lenders pursuant to the Prepetition Credit Agreement and related documents, (y) to the extent encumbering the DIP Collateral, Liens provided to the Prepetition HUD Lender pursuant to the Prepetition HUD Documents and (z) other Permitted Liens.

"**DIP Collateral**" shall mean all of the Loan Parties' tangible and intangible assets, including, without limitation, any collateral granted in respect of the Prepetition Credit Agreement and the following, but in each case subject to certain customary exclusions to be agreed: Stimulus Proceeds, accounts receivable, equipment, inventory, contracts, fee owned real estate, real property leaseholds, investment property, insurance proceeds, deposit accounts, monies, equity interests of subsidiaries of each Debtor and the products and proceeds thereof, and, upon entry of the Final Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code; provided, however, that the DIP Collateral shall not include any funds maintained in the New Ark Reserve Account (as defined below).

"**Stimulus Proceeds**" means any rights or funds (whether a cash payment, or proceeds of any grant, loan or otherwise) available to or received by any Borrower with respect to the Leased Property or operations thereof under or pursuant to the COVID Aid, Relief and Economic Security (CARES) Act, the Paycheck Protection Program under the CARES Act, the U.S. Department of Health and Human Services Provider Relief Funds under the CARES Act, any replacement, supplement or modification of any of the foregoing, or any other federal, state or local program, act, order or legislation providing relief or stimulus funding related to the COVID/coronavirus pandemic of 2020/2021.

The DIP Agent, for the benefit of the DIP Lenders, shall also be granted an administrative expense claim having priority over all other administrative expense claims in the Debtors' Chapter 11 Cases, other than those granted as adequate protection to the Prepetition Agent, the Prepetition HUD Lender (solely with respect to the Prepetition HUD Obligors), and the Carve-Out (the "**Superpriority Claims**").</td>
</tr>
</table>

|  | The New Ark Funding shall provide funding for a customary carve-out, including amounts for professionals paid by the Debtors, U.S. Trustee fees, and any amounts for a chapter 7 trustee) as further set forth in the DIP Orders (as defined below) and the New Ark Budget. |
|  | Subject to entry of the Final DIP Order, the DIP Liens shall not be subject to marshalling or sections 551 or 552(b) of the Bankruptcy Code, nor shall the DIP Collateral be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
| **Interest Rate:** | During the term of the DIP Facility, the outstanding principal balance drawn under the DIP Facility shall bear interest for the period commencing on the Closing Date through the date such DIP Facility is Paid in Full at LIBOR (subject to a 1.00% LIBOR floor) plus 12.0% per annum, accruing monthly and payable in cash in arrears (but subject to the RSA).  All per annum rates shall be calculated on the basis of a 360-day year (with respect to LIBOR Advances) or 365-day year (with respect to other obligations) and actual days elapsed. |
| **Default Rate** | 2.00% above the applicable interest rate, payable in cash on demand (but subject to the RSA) upon written notice from the Required Lenders while an Event of Default is continuing. |
| **Fees:** | $250,000 upfront fee, earned, due and payable upon entry of the Interim DIP Order. |
|  | 0.50% unused commitment fee, commencing upon entry of the Interim DIP Order and payable monthly in arrears based on the average daily balance of (a) prior to entry of the Final DIP Order, the undrawn DIP Commitments available to the Borrowers under the Interim DIP Order and (b) following entry of the Final DIP Order, the undrawn DIP Commitments. |
| **Amortization:** | None. |
| **Voluntary Prepayments:** | The DIP Facility may be voluntarily prepaid by the Borrowers, in whole or in part, without premium or penalty, at any time upon 2 business days' notice to the DIP Agent (subject to actual breakage costs with respect to LIBOR Advances, if any). |

| | |
|---|---|
| **Mandatory Prepayments:** | Mandatory repayments shall be limited to the events listed below and applied to borrowings under DIP Facility until Paid in Full (subject to certain exceptions and basket amounts to be negotiated): |
| | <u>Asset Sales</u>: Prepayments in an amount equal to 100% of the net cash proceeds of the disposition of any property or assets outside the ordinary course of business of the Borrowers and their subsidiaries. |
| | <u>Insurance Proceeds</u>: Prepayments in an amount equal to 100% of the net cash proceeds of insurance (other than business interruption insurance) paid on account of any loss or damage of any property or assets of any Borrower, other than net cash proceeds that are promptly applied to restoration of the Leased Properties. |
| | <u>Incurrence of Not-Permitted Indebtedness</u>: Prepayments in an amount equal to 100% of the cash proceeds of any Indebtedness incurred in violation of covenants under the DIP Facility. |
| **Documentation:** | The documentation in respect of the DIP Facility (collectively, the "**Documentation**"), including, without limitation, the secured DIP promissory note (the "**DIP Note**") and all motions relating thereto, shall be in form and substance reasonably acceptable to the DIP Lenders and their counsel; *provided* that on the Closing Date, this Term Sheet shall govern the terms of the DIP Facility (including, for the avoidance of doubt, the affirmative covenants, negative covenants (including financial covenants) and events of default described herein).  The Documentation shall be consistent with the terms and conditions set forth in the Term Sheet (other than to the extent any additional representations and warranties or covenants are contained in ancillary documentation (including collateral agreements and/or guarantees), which such representations and warranties or covenants shall be reasonably acceptable to the DIP Agent and the Debtors) (the "**Documentation Principles**"); *provided that*, to the extent any of the Documentation reflects terms or conditions that are inconsistent with the Documentation Principles, any such terms and conditions shall be reasonably acceptable to New Ark. |
| | The documentation in respect of the New Ark Funding shall consist of the RSA, this Term Sheet and the Interim and Final DIP Orders (in each case, including any exhibits or schedules attached thereto) (the "**New Ark Funding Documentation**"), each of which shall be in a form acceptable to New Ark in all respects. |
| **Transfer Assistance Obligations/MOTA:** | The Loan Parties shall provide cooperation as reasonably requested by the Landlord, including hosting site visits, with any efforts by the Landlord or any of its Affiliates to transfer ownership of all or any portion or portions of the property subject to the Lease (the "**Leased Property**") in one or more transactions ("**Transfer Assistance Obligations**").  Upon the DIP Agent's written direction, the applicable Loan Parties shall enter into one or more Management Operations Transfer Agreements, satisfactory to the Debtors, the DIP Agent and one or more new operators (collectively, the "**New Operator**"), and customary for similar transactions, and under which New Operator shall |

| | |
|---|---|
| | be responsible for funding all operating costs of and shall be entitled to all payments generated by the Leased Property on and after the date the New Operator assumes responsibility for operating the Leased Property (collectively, the "**MOTA**"). As soon as practicable after entering into the MOTA, the Debtors shall seek entry of an order, in form and substance satisfactory to the DIP Agent, of the Bankruptcy Court (1) approving their entry into the MOTA, (2) the assumption and assignment, free and clear of all liens, claims, and encumbrances to the extent permitted under applicable law, of the Medicare provider agreements applicable to the Leased Property to one or more of the Landlords' designees which assumption and assignment shall be without any additional consideration other than the consideration supporting the DIP Facility; provided, however, that all such liabilities arising under such assumption and assignment, to the extent such MOTA Order does not provide for the assumption and assignment, free and clear of all liens, claims, and encumbrances, shall be borne by the New Operator, (3) providing for the rejection and termination of the Lease *nunc pro tunc* to the Petition Date upon the license approval date under the MOTA, (4) allowance upon the rejection of the Lease of a rejection damages claim by Landlord in the amount of $35,904,343, as capped under section 502(b)(6) of the Bankruptcy Code, and (5) authorization for the Landlord, to the extent necessary, to transfer the Leased Property to one or more third parties (the "**MOTA Order**"). <br><br> Contemporaneously with the Operations Transfer Date, the Debtors shall repay the New Ark Operating Advance in full in cash by transfer of funds to the Prepetition Loan Account on the Operations Transfer Date. |
| **Representations and Warranties** | Limited to (a) prior to execution of the DIP Note, the representations and warranties set forth on **Annex D** hereto and (b) upon execution and delivery of the DIP Note, the representations and warranties contained in the DIP Note that correspond to the representations and warranties set forth on **Annex D** hereto (each, a "**Representation and Warranty**") |
| **Affirmative Covenants:** | Limited to (a) prior to execution of the DIP Note, the affirmative covenants set forth on **Annex E** hereto and (b) upon execution and delivery of the DIP Note, the affirmative covenants contained in the DIP Note that correspond to the affirmative covenants set forth on **Annex E** hereto (each, an "**Affirmative Covenant**"). |
| **Negative Covenants:** | Limited to (a) prior to execution of the DIP Note, the negative covenants set forth on **Annex F** hereto and (b) upon execution and delivery of the DIP Note, the negative covenants contained in the DIP Note that correspond to the negative covenants set forth on **Annex F** hereto (each, a "**Negative Covenant**"). |
| **Financial Covenant:** | Limited to item 12 [Financial Covenant] of the Negative Covenants (the "**Financial Covenant**"). |
| **Prepetition Secured Claims/Adequate Protection** | The Interim and Final DIP Orders shall provide for the segregation into an account acceptable to New Ark, in its sole discretion (the "**Prepetition Loan Account**"), of proceeds from prepetition accounts |

receivable in an amount equal to the claims under the Prepetition Credit Agreement, including for postpetition interest to the extent the value of the Prepetition Agent's prepetition collateral exceeds principal, accrued prepetition interest, and other claims accrued prepetition under the Prepetition Credit Agreement, which, for the avoidance of doubt, shall not include additional funding for any fees and expenses incurred after the Petition Date.

The Final DIP Order shall require, unless otherwise agreed to in writing by the Prepetition Agent, the ongoing repayment of an amount (the "**Prepetition Loan Paydown Amount**") equal to (i) claims under the Prepetition Credit Agreement, including for postpetition interest to the extent the value of the Prepetition Agent's prepetition collateral exceeds principal, accrued prepetition interest, and other claims accrued prepetition under the Prepetition Credit Agreement, but excluding reimbursement for any fees and expenses incurred after the Petition Date *less* (ii) the projected amount necessary to fully fund the New Ark Reserve Account (which shall include amounts necessary to fully fund adequate protection payments for postpetition fees and expenses of the Prepetition Lenders in accordance with this DIP Term Sheet and the New Ark Budget), with such Prepetition Loan Paydown Amount to be paid from proceeds of prepetition accounts receivable of the Prepetition Agent in the Prepetition Loan Account (the "**Prepetition Loan Paydown**"); *provided further* that the Prepetition Loan Paydown Amount shall exclude the New Ark Operating Advance unless and until such New Ark Operating Advance is repaid to the Prepetition Loan Account on the Operations Transfer Date in accordance with this DIP Term Sheet.

The Interim and Final DIP Orders shall provide as adequate protection for the Prepetition Agent and Prepetition Lenders the following:  (i) current cash payment of interest on the obligations under the Prepetition Credit Agreement at the non-default rate provided for thereunder (subject to recharacterization as repayments of principal to the extent the value of the Prepetition Agents prepetition collateral does not exceed the amount of principal, accrued prepetition interest, other claims accrued under the Prepetition Credit Agreement, and any amounts paid postpetition to the Prepetition Agent on account of the Prepetition Credit Agreement), (ii) current cash reimbursement of actual, reasonable, and documented fees and expenses and other disbursements of the Prepetition Lenders, incurred in connection with the Chapter 11 Cases (subject to customary procedures for the payment of such amounts, which amounts shall be included in the New Ark Budget and paid from the Prepetition Loan Account), and (iii) replacement liens on accounts receivable generated postpetition and superpriority claims to the extent of diminution in the value of the Prepetition Agent's collateral (excluding diminutions caused by funds used to repay the Prepetition Agent and Prepetition Lenders), all as more specifically set forth in the Interim and Final Orders.  In addition, New Ark shall receive copies of all reports and other information provided to the DIP Agent.

The Interim and Final Orders shall provide as adequate protection for the Landlord replacement liens and superpriority claims, in all cases junior to liens and claims of the DIP Agent and adequate protection liens and superpriority claims of the Prepetition Agent and Prepetition

| | |
|---|---|
| | Lenders, to the extent of diminution in the value of the Landlord's collateral. |
| | Subject to entry of the Final DIP Order, the liens and claims of the Prepetition Lenders shall not be subject to marshalling or sections 551 or 552(b) of the Bankruptcy Code, nor shall the Prepetition Lenders' collateral be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
| | No secured creditors shall be entitled as adequate protection to payment of postpetition fees and expenses or any other amounts other than the Prepetition Loan Paydown and any postpetition interest and fees payable as adequate protection to the Prepetition Agent pursuant to the terms in this Term Sheet. |
| **New Ark Funding/Consent to Use of Cash Collateral and Intercreditor Provisions:** | During the time period commencing on the Petition Date and continuing until the occurrence of the New Ark Funding Termination Date, the Prepetition Lenders shall consent to the use of Cash Collateral of the Prepetition Lenders solely to the extent necessary to: |
| | i. provide funding for those amounts and during applicable period set forth in the New Ark Budget, subject to permitted variances thereto, which amounts shall be withdrawn from the Prepetition Loan Account and deposited into a segregated escrow account maintained therefor (the "**New Ark Reserve Account**"), on a weekly basis, to reserve for professional fees and other expenses set forth in the New Ark Budget pending approval of the Bankruptcy Court (if required) and disbursed by the Debtors to the respective beneficiaries thereof (not to exceed the amounts allocated for each such beneficiary under the New Ark Budget) (the "**New Ark Funding**"), all in accordance with and subject to the New Ark Funding Documentation. To the extent that any funds remain in the New Ark Reserve Account following the payment of all allowed claims set forth in the New Ark Budget, including, without limitation, (a) the allowed amount of any claim set forth in the New Ark Budget is less than the budgeted amounts, (b) any funds in the New Ark Reserve Account are not allowed by the Bankruptcy Court to be disbursed to a beneficiary of the New Ark Budget, or (c) such reserved funds relate to any period during which such beneficiary of the New Ark Budget is no longer employed by the Debtors, such excess funds shall revert to New Ark; and |
| | ii. provide the New Ark Operating Advance; *provided, however* that the Debtors shall (1) repay the New Ark Operating Advance in full and in cash to the Prepetition Loan Account on the Operations Transfer Date (and the DIP Budget shall reflect and provide for such repayment) and (2) if at any time (x) the New Ark Operating Advance exceeds $6,000,000 and (y) there is Excess Cash as determined on the last business day of each week, the Debtors shall make a payment to the Prepetition Loan Account on the first business day of the immediately succeeding week in an amount equal to the lesser of (a) the amount of such Excess Cash and (b) the amount by which the New Ark Operating Advance exceeds $6,000,000 (each, an |

<table>
<tr>
<td></td>
<td>

"<u>Excess Cash Payment</u>").  For purposes of this DIP Term Sheet, "<u>Excess Cash</u>" shall mean, as of any date of determination, the amount by which the projected unrestricted cash available to the Debtors for operations exceeds (i) projected cash disbursements to be made by the Debtors for the following week as reasonably determined by the Debtors' chief restructuring officer *plus* (ii) $2,500,000.  For the avoidance of doubt and subject to the final paragraph of "Availability", any amounts repaid to the Prepetition Loan Account prior to the Operations Transfer Date under clause (2) above remain available to the Debtors to be utilized up to the full amount of the New Ark Operating Advance in accordance with this DIP Term Sheet.

The "**New Ark Funding Termination Date**" shall be the date upon which New Ark provides written notice in accordance with the DIP Orders of the occurrence of one or more events of default set forth on **Annex G** hereto.

The New Ark Funding shall be secured by liens on all DIP Collateral and shall receive superpriority claims, in all cases junior to the liens and claims under the DIP Facility.

The Interim and Final DIP Orders (together, the "**DIP Orders**") shall provide, among other things, that (1) the DIP Agent shall have no control over the New Ark Budget and its approval; (2) New Ark shall have no control over the DIP Budget and its approval (other than with respect to the repayment of the New Ark Operating Advance); (3) adequate protection as set forth above; (4) subject to the RSA, none of the Prepetition Agent or the Prepetition Lenders will interfere with the Loan Parties' performance of their obligations under the Documentation, including their Transfer Assistance Obligations and their obligations to enter into and perform under the MOTA and (5) subject to the RSA, none of the Prepetition Agent or the Prepetition Lenders shall oppose or otherwise interfere with any enforcement by the DIP Agent or DIP Lenders of rights and remedies under the Documentation, the Interim DIP Order or the Final DIP Order (the "**DIP Order Intercreditor Provisions**").

</td>
</tr>
<tr>
<td>

**Conditions to Effectiveness:**

</td>
<td>

The availability of the DIP Facility on the Closing Date shall be conditioned upon satisfaction (or waiver) of solely the following:

- The Bankruptcy Court shall have entered an interim order in form and substance satisfactory to the DIP Agent and the Required Lenders in their sole discretion (the "**Interim DIP Order**"), which shall also be satisfactory to New Ark, authorizing the transactions contemplated by the DIP Facility and the New Ark Funding including, without limitation, authorizing the granting of superpriority claim status for the Superpriority Claims and granting of the liens and charges (which liens and charges shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected), authorizing the DIP Facility in a principal amount equal to $25 million (with $15.75 million available under the Interim DIP Order), granting the adequate protection liens and claims described above, approving the New Ark Funding and the

</td>
</tr>
</table>

<table>
<tr>
<td></td>
<td>establishment and use of the New Ark Reserve Account set forth herein, providing for the DIP Order Intercreditor Provisions, and subject to entry of the Final DIP Order, providing that the DIP Liens and the liens of the Prepetition Lenders shall not be subject to marshaling or sections 551 and 552(b) of the Bankruptcy Code and the DIP Collateral and the collateral of the Prepetition Lenders shall not be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise; <u>provided</u> that such Interim DIP Order shall not have been reversed, modified, amended or stayed (other than with the prior written consent of New Ark, the DIP Agent and the Required Lenders, which may be withheld in their sole discretion).

• Completion (after giving effect to the Interim DIP Order) of all filings and recordings necessary to provide the DIP Agent, for the benefit of the DIP Lenders and the DIP Agent, with perfected liens, charges and security interests in the DIP Collateral and the priority contemplated herein, <u>provided</u> <u>however</u>, that, subject to the DIP Agent's satisfaction with the perfection provisions of the Interim DIP Order, no filings or recordings shall be required in connection with any owned or leased real property, any foreign assets, any intellectual property assets, and any certificates of title to any vehicles.

• Receipt by the DIP Agent of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations to the extent requested at least three business days prior to the Closing Date.

• Receipt by the DIP Agent of satisfactory Budgets (with the DIP Agent and DIP Lenders agreeing that the Initial Budgets are satisfactory).

• Accuracy of the Representations and Warranties in all material respects as of the Closing Date (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date or (ii) such representation and/or warranty is already qualified by materiality or material adverse effect or similar language, in which case such representation and warranty shall be true and correct in all respects, as of such date), as certified by the Borrowers.</td>
</tr>
<tr>
<td><strong>Restructuring Support Agreement</strong></td>
<td>Prior to the Petition Date, the Loan Parties, DIP Agent, DIP Lenders, Landlord, Prepetition Agent, Prepetition Lenders, Equity Sponsors (as defined therein) and Service Providers (as defined therein) shall enter into a Restructuring Support Agreement (the "<strong>RSA</strong>") in a form acceptable to each party.</td>
</tr>
<tr>
<td><strong>Events of Default:</strong></td>
<td>The events of default under the DIP Facility (each, an "<strong>Event of Default</strong>," and collectively, the "<strong>Events of Default</strong>") shall be limited to:

• Failure to make any payment to the DIP Agent and DIP Lenders when due</td>
</tr>
</table>

|  | <ul><li>failure of any Representation and Warranty of any Loan Party to be true and correct in all material respects when made;</li><li>any breach or failure to comply with (i) the Affirmative Covenants identified in items 7 [Cooperation with DIP Agent Financial Advisors], 8 [Milestones], 9 [Financial Reporting], and 13 [Use of Proceeds] of **Annex E** or (ii) any other Affirmative Covenant to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from the DIP Agent;</li><li>any breach or failure to comply with the Negative Covenants;</li><li>any other breach or failure to comply with the terms of Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, as applicable, to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from the DIP Agent;</li><li>failure to comply with the Milestones;</li><li>(x) failure to timely perform Transfer Assistance Obligations as reasonably requested by Landlord or New Operator or (y) the occurrence of a default (or equivalent concept) under the MOTA, in each case, that is not cured within three business days of the earlier to occur of the Borrowers' knowledge of such default (or equivalent) or written notice from the DIP Agent;</li><li>prior to entry of the MOTA Order, the occurrence of a New Ark Event of Default that results in any limitation, suspension or termination of funding under the New Ark Funding;</li><li>any Loan Party filing of a motion to convert any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the commencement by any of the Debtors of any winding up or liquidation proceeding (other than the Chapter 11 Cases) under any other applicable law;</li><li>the appointment of a receiver, receiver and manager, interim receiver, or similar official over any substantial portion of the DIP Collateral;</li><li>the dismissal of the Chapter 11 Cases;</li><li>the appointment in the Chapter 11 Cases of a chapter 11 trustee or an examiner with expanded powers;</li><li>any Loan Party shall (A) contest or dispute the validity or enforceability of any Documentation or any obligation owed under any Documentation in writing or deny in writing that it has any liability thereunder, (B) contest or dispute the validity or perfection of the DIP Loan, or the liens and security interests securing the DIP Loan in writing or (C) pursue, negotiate, solicit interest in, or agree to any sale or liquidation of the Debtors' assets or any restructuring,</li></ul> |
|---|---|

reorganization, refinancing, or other transaction other than on the terms provided for in the MOTA;

- the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code so as to allow a third party to exercise remedies against the DIP Collateral in excess of $250,000, including, for the avoidance of doubt, in connection with any monetary non-appealable judgment not otherwise stayed, bonded or satisfied within 60 days; provided that the foregoing shall not apply to any stay relief order or unstayed judgment solely seeking to recover from applicable insurance coverage, if any;

- the grant of any super priority administrative expense claim or any lien or charge which is pari passu with or senior to those of the DIP Agent and the DIP Lenders under the DIP Facility (other than as permitted by this Term Sheet and/or the DIP Facility);

- cessation of liens or superpriority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein; and

- the entry of the Final DIP Order shall not have occurred within thirty-five (35) days after entry of the Interim DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any substantive modification or amendment, without the prior written consent of the DIP Agent and Required Lenders.

- If any of the following shall occur:

  - o any material Health Care Permit of a Loan Party shall be revoked, fail to be renewed, suspended or otherwise terminated,

  - o any Loan Party shall fail to continue to be eligible for any reason to participate in any Government Reimbursement Program or to accept assignments or rights to reimbursement thereunder,

  - o any Account Debtor shall terminate, revoke or fail to renew any Loan Party's right to participate in any material Third-Party Payor Arrangement that provides reimbursement for Medical Services,

  - o any Loan Party shall enter into a settlement or other agreement with CMS or any other Governmental Authority without the DIP Agent's written consent not to be unreasonably withheld, conditioned, or delayed,

  - o any Loan Party or any officer, director, partner, shareholder or managing employee of a Loan Party (i) shall have been found guilty of an act of fraud or (ii) shall have been indicted for or convicted of a felony crime that relates to any Medical Services or Third-Party Payor Arrangement.

| | |
|---|---|
| | • The occurrence of any Health Care Proceeding that could reasonably be expected to have a material adverse impact on any Health Care Facility (a "<u>Health Care Proceeding Default</u>"), provided any such Health Care Proceeding Default shall not be an Event of Default hereunder if the same is resolved to the reasonable satisfaction of the DIP Agent within sixty (60) days following the commencement thereof (or such longer period as DIP Agent shall permit in writing); |
| | • The discharge of the DIP Facility Obligations by entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases unless the DIP Facility Obligations have been Paid in Full on or before the effective date of such confirmed plan of reorganization; |
| | • The Debtors proposal or support of any chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the DIP Facility Obligations being Paid in Full on or prior to the earlier to occur of the effective date of such chapter 11 plan or sale; |
| | • The Debtors seek or consent to, directly or indirectly, any modification, stay, vacatur or amendment of the Interim DIP Order without the consent of the Required Lenders; |
| | • The Debtors seek any order authorizing the use of Cash Collateral resulting from the DIP Collateral or the Prepetition Collateral that is inconsistent with the Interim DIP Order without the prior written consent of the DIP Agent (acting at the direction of the Required Lenders) or the Prepetition Agent, as applicable; |
| | • The Debtors grant any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition Liens or the Adequate Protection Liens, except to the extent expressly provided in the Interim DIP Order or this DIP Term Sheet without the consent of the Prepetition Agent. |
| | A "**Final DIP Order**" is an order in form and substance satisfactory to New Ark, the DIP Agent and the Required Lenders in their sole discretion authorizing the transactions contemplated by the DIP Facility including, without limitation, authorizing the granting of superpriority claim status and the liens and charges (which liens and charges shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected); authorizing the DIP Facility in a principal amount equal to the sum of the Initial Draw and all Delayed Draws; granting the adequate protection described above; providing for the DIP Order Intercreditor Provisions; approving the New Ark Funding and the establishment and use of the New Ark Reserve Account set forth herein, providing that the DIP Liens and the liens of the Prepetition Lenders shall not be subject to marshaling or sections 551 or 552(b) of the Bankruptcy Code and the DIP Collateral and the collateral of the Prepetition Lenders shall not be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
| **Remedies:** | Immediately upon the occurrence (subject to applicable notice and cure provisions) and during the continuation of an Event of Default (and |

without the need for any further relief from the automatic stay), unless such Event of Default has been waived by the DIP Agent and subject in all respects to the RSA:

(a) the DIP Agent may, or at the direction Required Lenders shall, declare (i) all DIP Facility Obligations owing under the Documentation to be immediately due and payable, and (ii) the termination of the DIP Facility and any other Documentation as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the Liens or the DIP Facility Obligations; and

(b) the DIP Agent may, or at the direction Required Lenders shall, declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (other than proceeds of prepetition accounts receivable that are subject to the Prepetition Agent's valid and perfected liens, which the DIP Agent shall not withhold consent therefrom) upon expiration of the five business day period referenced below, any of the foregoing declarations shall be made to the Debtors, and shall be referred to herein as a "**Termination Declaration**" and the date that is the earliest to occur of any such Termination Declaration and the Maturity Date being herein referred to as the "**Termination Declaration Date**."  For the avoidance of doubt, the Debtors may continue to use any Cash Collateral prior to the expiration of the five business day period referenced below so long as such Cash Collateral is used in accordance with the DIP Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards).

Subject to the RSA, in addition to remedies described above and other customary remedies, five business days following the Termination Declaration Date, the DIP Agent shall have relief from the automatic stay in the Chapter 11 Cases and may setoff against deposits and financial assets of the Debtors and foreclose on all or any portion of the DIP Collateral (other than proceeds of prepetition accounts receivable that are subject to the Prepetition Agent's valid and perfected liens, which may only be foreclosed upon by the DIP Agent after repayment in full of any allowed the Prepetition Credit Agreement obligations). During such five business day notice period, the Debtors, the Office of the U.S. Trustee, and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred.  Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the DIP Lenders and the DIP Agent, shall be automatically terminated at the end of such notice period and without further notice or order.

In addition, upon the occurrence and during the continuation of an Event of Default, the DIP Agent will have the right to utilize, at no cost or expense, any tradenames, trademarks, copyrights or other intellectual property to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the DIP Collateral.

| | |
|---|---|
| **Required Lenders:** | The DIP Lenders holding more than 50% of the outstanding DIP Loans and unfunded DIP Commitments under the DIP Facility. |

| | |
|---|---|
| **Expenses:** | All parties will be responsible for their out-of-pocket expenses associated with due diligence, negotiation and preparation of the DIP. |
| **Indemnity:** | Customary for similar debtor-in-possession financings. |
| **Assignments; Participations:** | Customary for similar debtor-in-possession financings. |
| **Governing Law:** | New York and, to the extent applicable, the Bankruptcy Code |
| **DIP Lenders' counsel:** | Weil, Gotshal & Manges LLP; Morris, Nichols, Arsht & Tunnell LLP; Ferguson Braswell Fraser Kubasta PC |

[Signature Page(s) to Follow]

IN WITNESS WHEREOF, the parties hereto have executed and agree to be bound by the terms set forth in this Term Sheet or caused the same to be executed by their respective duly authorized officers.

BORROWERS:

Gulf Coast Health Care, LLC
Brevard Oaks Center, LLC
FL HUD Baybreeze, LLC
FL HUD Bayside, LLC
FL HUD Destin, LLC
FL HUD Margate, LLC
FL HUD Pensacola, LLC
FL HUD Rosewood, LLC
FL HUD Silvercrest, LLC
MF Lake Eustis, LLC
MF Winter Park, LLC
MS Greenbough, LLC
MS HUD Boyington, LLC
MS HUD Dixie, LLC
MS HUD Ocean Springs, LLC
MS HUD Pine View, LLC
NF Chipola, LLC
NF Escambia, LLC
NF Nine Mile, LLC
NF Panama, LLC
NF Pensacola Manor, LLC
NF Suwannee, LLC
SF Brevard, LLC
SF Carnegie, LLC
SF Lake Placid ALF, LLC


By: _____
Name: M. Benjamin Jones
Title:   Chief Restructuring Officer

GUARANTORS:

GCH Management Services, LLC
Pensacola Administrative Services, LLC
Pensacola Administrative Holdings, LLC
Gulf Coast Master Tenant Holdings, LLC
Gulf Coast Master Tenant I, LLC
Gulf Coast Master Tenant II, LLC
Gulf Coast Master Tenant III, LLC
Gulf Coast Facilities, LLC
HUD Facilities, LLC
Florida Facilities, LLC
AL Citronelle, LLC
AL Willow Tree, LLC
MF Debary, LLC
MF Flagler, LLC
MF Halifax, LLC
MF Heritage, LLC
MF Longwood, LLC
MF Oakwood, LLC
MS Shelby, LLC
NF Brynwood, LLC
NF Glen Cove, LLC
NF Manor, LLC
NF River Chase, LLC
NF Windsor, LLC
SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC
SF Berkshire, LLC
SF Boynton, LLC
SF Fountainhead, LLC
SF Glen Oaks, LLC
SF Kissimmee, LLC
SF Lake Placid, LLC
SF Oakbrook, LLC
SF Royal Manor, LLC
SF Salerno, LLC
SF Tampa, LLC


By: _____
Name: M. Benjamin Jones
Title:   Chief Restructuring Officer

GUARANTORS:

MS Lakeside, LLC
MS Singing, LLC


By: _____

Name:  M. Benjamin Jones
Title:    Chief Restructuring Officer

DIP AGENT:

OHI Asset Funding (DE), LLC

By: _____

Name:        Daniel J. Booth
Title:        Chief Operating Officer

PREPETITION AGENT:

New Ark Capital, LLC

By: _____
Name: Steven Lebowitz
Title:  Vice President

**INITIAL BUDGETS**

[Attached]

*Subject to Further Revision*

**Gulf Coast Health Care, LLC, et al.**
**Omega DIP Lender DIP Budget**

| ($ in thousands) | Week 1 14-Oct-21 15-Oct-21 | Week 2 16-Oct-21 22-Oct-21 | Week 3 23-Oct-21 29-Oct-21 | Week 4 30-Oct-21 5-Nov-21 | Week 5 6-Nov-21 12-Nov-21 | Week 6 13-Nov-21 19-Nov-21 | Week 7 20-Nov-21 26-Nov-21 | Week 8 27-Nov-21 3-Dec-21 | Week 9 4-Dec-21 10-Dec-21 | Week 10 11-Dec-21 17-Dec-21 | Week 11 18-Dec-21 24-Dec-21 | Week 12 25-Dec-21 31-Dec-21 | Week 13 1-Jan-22 7-Jan-22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1 Receipts** | 109.1 | 388.2 | 564.2 | 390.3 | 4,635.2 | 3,968.8 | 5,424.6 | 5,345.2 | 2,141.0 | 2,309.1 | 2,620.7 | 5,170.4 | 508.2 | **33,575.0** |
| 2 Employee Costs | (337.1) | (2,337.5) | (3,332.0) | (3,174.1) | (3,545.8) | (2,112.0) | (3,097.0) | (2,102.0) | (3,310.8) | (2,102.0) | (681.4) | (429.4) | (296.4) | **(26,857.4)** |
| 3 Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4 Halcyon (therapy) | (184.3) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (43.0) | (43.0) | (43.0) | (43.0) | (43.0) | **(3,409.3)** |
| 5 Food | (185.0) | (150.0) | (185.0) | (150.0) | (150.0) | (150.0) | (150.0) | (185.0) | (15.0) | (15.0) | (18.5) | (15.0) | (15.0) | **(1,387.0)** |
| 6 Agency | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (1,028.8) | (548.8) | (548.8) | (548.8) | (7.5) | **(5,682.5)** |
| 7 Provider Fee | - | (1,185.0) | - | - | - | (1,185.0) | - | - | - | - | - | (1,185.0) | - | **(3,555.0)** |
| 8 Pharmacy | (737.8) | - | - | (737.8) | - | - | - | (669.9) | - | - | - | (56.0) | - | **(2,201.5)** |
| 9 Medical Supplies | (150.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (41.5) | (17.5) | (17.5) | (17.5) | (41.5) | **(1,510.5)** |
| 10 Laboratory & X-ray | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | **(425.0)** |
| 11 Utilities | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (15.6) | (15.6) | (15.6) | (15.6) | (15.6) | **(1,166.0)** |
| 12 Shared Service Fees[1] | - | (400.6) | (426.4) | (345.0) | (345.0) | (345.0) | (390.6) | - | - | - | - | - | - | **(2,252.7)** |
| 13 Misc. & Local Vendors | (550.7) | (500.0) | (234.3) | (247.8) | (254.6) | (353.6) | (234.3) | (213.5) | (48.1) | (34.0) | (22.5) | (27.0) | (152.5) | **(2,872.8)** |
| **14 Total Disbursements b/f Rx Disbursements** | **(2,705.9)** | **(5,739.2)** | **(5,343.8)** | **(5,820.7)** | **(5,461.4)** | **(5,311.6)** | **(5,038.0)** | **(4,336.4)** | **(4,507.8)** | **(2,784.3)** | **(1,348.7)** | **(2,345.7)** | **(576.4)** | **(51,319.7)** |
| 15 Process Costs[2] | - | - | (300.2) | - | - | - | - | - | - | - | - | - | - | **(300.2)** |
| 16 Professional Fees[3][4] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 17 Financing Costs | (250.0) | - | - | (153.4) | - | - | - | (226.9) | - | - | - | - | (275.8) | **(906.0)** |
| **18 Total Disbursements** | **(2,955.9)** | **(5,739.2)** | **(5,643.9)** | **(5,974.0)** | **(5,461.4)** | **(5,311.6)** | **(5,038.0)** | **(4,563.2)** | **(4,507.8)** | **(2,784.3)** | **(1,348.7)** | **(2,345.7)** | **(852.2)** | **(52,525.9)** |
| **19 Net Cash Flow before Financing** | **(2,846.8)** | **(5,351.0)** | **(5,079.8)** | **(5,583.8)** | **(826.2)** | **(1,342.7)** | **386.7** | **782.0** | **(2,366.8)** | **(475.3)** | **1,272.0** | **2,824.7** | **(344.0)** | **(18,951.0)** |
| 20 New Ark Capital, LLC Cash Collateral Use / (Repayment) | - | - | 4,500.0 | 1,600.0 | 200.0 | 400.0 | 300.0 | (7,000.0) | - | - | - | - | - | - |
| 21 DIP Draw | 6,000.0 | 4,500.0 | 750.0 | 4,000.0 | 500.0 | 1,000.0 | 750.0 | 7,000.0 | 500.0 | - | - | - | - | 25,000.0 |
| **22 Net Cash Flow** | **3,153.2** | **(851.0)** | **170.2** | **16.2** | **(126.2)** | **57.3** | **1,436.7** | **782.0** | **(1,866.8)** | **(475.3)** | **1,272.0** | **2,824.7** | **(344.0)** | **6,049.0** |
| 23 Book Cash Roll-Forward | | | | | | | | | | | | | | |
| 24 Beginning Book Cash Balance | - | 3,153.2 | 2,302.2 | 2,472.4 | 2,488.7 | 2,362.5 | 2,419.8 | 3,856.4 | 4,638.4 | 2,771.7 | 2,296.4 | 3,568.4 | 6,393.1 | - |
| 25 Cash Generated / (Needed) | 3,153.2 | (851.0) | 170.2 | 16.2 | (126.2) | 57.3 | 1,436.7 | 782.0 | (1,866.8) | (475.3) | 1,272.0 | 2,824.7 | (344.0) | 6,049.0 |
| **26 Ending Book Cash Balance** | **3,153.2** | **2,302.2** | **2,472.4** | **2,488.7** | **2,362.5** | **2,419.8** | **3,856.4** | **4,638.4** | **2,771.7** | **2,296.4** | **3,568.4** | **6,393.1** | **6,049.0** | **6,049.0** |

Notes:
1. Shared Service Costs post-transition to be determined as negotiated between Health Care Navigator, Omega and the New operator(s).
2. Process costs include adequate assurance utility deposit.
3. Post-petition professional fees have been shown as paid to escrow in the week incurred.
4. Professional fees include debtor legal counsel and financial advisor fees, independent manager fees, New Ark legal counsel fees, Unsecured Creditor Committee fees, US Trustee fees, and patient care ombudsman fees.

*Subject to Further Revision*

**Gulf Coast Health Care, LLC, et al.**
**New Ark Financing Cash Collateral Budget**

| ($ in thousands) | Week 1 14-Oct-21 15-Oct-21 | Week 2 16-Oct-21 22-Oct-21 | Week 3 23-Oct-21 29-Oct-21 | Week 4 30-Oct-21 5-Nov-21 | Week 5 6-Nov-21 12-Nov-21 | Week 6 13-Nov-21 19-Nov-21 | Week 7 20-Nov-21 26-Nov-21 | Week 8 27-Nov-21 3-Dec-21 | Week 9 4-Dec-21 10-Dec-21 | Week 10 11-Dec-21 17-Dec-21 | Week 11 18-Dec-21 24-Dec-21 | Week 12 25-Dec-21 31-Dec-21 | Week 13 1-Jan-22 7-Jan-22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1  Receipts** | 931.5 | 3,246.3 | 6,510.4 | 1,814.0 | 497.8 | - | - | - | - | - | - | - | - | **13,000.0** |
| 2  Debtor Professional Fees[1] | (388.3) | (345.1) | (345.1) | (336.8) | (366.8) | (336.8) | (336.8) | (236.8) | (236.8) | (266.8) | (261.8) | (236.8) | (436.8) | (4,131.2) |
| 3  UCC Professional Fees[1] | - | - | (37.5) | (37.5) | (37.5) | (37.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (237.5) |
| 4  Other Professional Fees[1 2] | (26.3) | (26.3) | (26.3) | (26.3) | (26.3) | (56.3) | (26.3) | (26.3) | (26.3) | (56.3) | (26.3) | (26.3) | (26.3) | (402.1) |
| 5  US Trustee Fees[1] | - | - | - | - | - | - | - | - | - | - | - | (250.0) | - | (250.0) |
| **6  Total Disbursements** | **(414.6)** | **(371.4)** | **(408.9)** | **(400.6)** | **(430.6)** | **(430.6)** | **(375.6)** | **(275.6)** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **(5,020.8)** |
| **7  Net Cash Flow before Financing** | **516.8** | **2,874.9** | **6,101.5** | **1,413.4** | **67.2** | **(430.6)** | **(375.6)** | **(275.6)** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **7,979.2** |
| 8  New Ark Capital, LLC (Proceeds to) / Repayment from Omega | - | - | (4,500.0) | (1,600.0) | (200.0) | (400.0) | (300.0) | 7,000.0 | - | - | - | - | - | - |
| **9  Net Cash Flow** | **516.8** | **2,874.9** | **1,601.5** | **(186.6)** | **(132.8)** | **(830.6)** | **(675.6)** | **6,724.4** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **7,979.2** |
| 10  Book Cash Roll-Forward | | | | | | | | | | | | | | |
| 11      Beginning Book Cash Balance | 1,500.0 | 2,016.8 | 4,891.7 | 6,493.2 | 6,306.6 | 6,173.9 | 5,343.3 | 4,667.7 | 11,392.1 | 11,116.5 | 10,781.0 | 10,480.4 | 9,954.8 | 1,500.0 |
| 12      Cash Generated / (Needed) | 516.8 | 2,874.9 | 1,601.5 | (186.6) | (132.8) | (830.6) | (675.6) | 6,724.4 | (275.6) | (335.6) | (300.6) | (525.6) | (475.6) | 7,979.2 |
| **13  Net Ending Cash Collateral Balance** | **2,016.8** | **4,891.7** | **6,493.2** | **6,306.6** | **6,173.9** | **5,343.3** | **4,667.7** | **11,392.1** | **11,116.5** | **10,781.0** | **10,480.4** | **9,954.8** | **9,479.2** | **9,479.2** |

Notes:
1. Post-petition professional and trustee fees have been shown as paid to escrow in the week incurred.
2. Other professional fees include New Ark legal counsel fees, and patient care ombudsman fees.

ANNEX B
TO TERM SHEET

**DEBTORS**

| Debtor Name | Type of Loan Party |
|---|---|
| AL Citronelle, LLC | Guarantor |
| AL Willow Tree, LLC | Guarantor |
| Brevard Oaks Center, LLC | Borrower |
| FL HUD Baybreeze, LLC | Borrower |
| FL HUD Bayside, LLC | Borrower |
| FL HUD Destin, LLC | Borrower |
| FL HUD Margate, LLC | Borrower |
| FL HUD Pensacola, LLC | Borrower |
| FL HUD Rosewood, LLC | Borrower |
| FL HUD Silvercrest, LLC | Borrower |
| Florida Facilities, LLC | Guarantor |
| GCH Management Services, LLC | Guarantor |
| Gulf Coast Facilities, LLC | Guarantor |
| Gulf Coast Health Care, LLC | Guarantor |
| Gulf Coast Master Tenant Holdings, LLC | Guarantor |
| Gulf Coast Master Tenant I, LLC | Guarantor |
| Gulf Coast Master Tenant II, LLC | Guarantor |
| Gulf Coast Master Tenant III, LLC | Guarantor |
| HUD Facilities, LLC | Guarantor |
| MF Debary, LLC | Guarantor |
| MF Flagler, LLC | Guarantor |
| MF Halifax, LLC | Guarantor |
| MF Heritage, LLC | Guarantor |
| MF Lake Eustis, LLC | Borrower |
| MF Longwood, LLC | Guarantor |
| MF Oakwood, LLC | Guarantor |
| MF Winter Park, LLC | Borrower |
| MS Greenbough, LLC | Borrower |
| MS HUD Boyington, LLC | Borrower |
| MS HUD Dixie, LLC | Borrower |
| MS HUD Ocean Springs, LLC | Borrower |
| MS HUD Pine View, LLC | Borrower |
| MS Lakeside, LLC | Guarantor |
| MS Shelby, LLC | Guarantor |
| MS Singing, LLC | Guarantor |
| NF Brynwood, LLC | Guarantor |
| NF Chipola, LLC | Borrower |
| NF Escambia, LLC | Borrower |
| NF Glen Cove, LLC | Guarantor |
| NF Manor, LLC | Guarantor |
| NF Nine Mile, LLC | Borrower |
| NF Panama, LLC | Borrower |
| NF Pensacola Manor, LLC | Borrower |

| Debtor Name | Type of Loan Party |
|---|---|
| NF River Chase, LLC | Guarantor |
| NF Suwannee, LLC | Borrower |
| NF Windsor, LLC | Guarantor |
| Pensacola Administrative Holdings, LLC | Guarantor |
| Pensacola Administrative Services, LLC | Guarantor |
| SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC | Guarantor |
| SF Berkshire, LLC | Guarantor |
| SF Boynton, LLC | Guarantor |
| SF Brevard, LLC | Borrower |
| SF Carnegie, LLC | Borrower |
| SF Fountainhead, LLC | Guarantor |
| SF Glen Oaks, LLC | Guarantor |
| SF Kissimmee, LLC | Guarantor |
| SF Lake Placid ALF, LLC | Borrower |
| SF Lake Placid, LLC | Guarantor |
| SF Oakbrook, LLC | Guarantor |
| SF Royal Manor, LLC | Guarantor |
| SF Salerno, LLC | Guarantor |
| SF Tampa, LLC | Guarantor |

**ANNEX C**
**TO TERM SHEET**

## CERTAIN DEFINITIONS

"Affiliate" has the meaning set forth in Bankruptcy Code section 101(2).

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any of the Loan Parties or their Subsidiaries is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any of the Loan Parties or their Subsidiaries is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"CHAMPVA" means, collectively, the Civilian Health and Medical Program of the Department of Veterans Affairs, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"CMS" means The Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, and any Governmental Authority successor thereto.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Government Reimbursement Program" means (a) Medicare, (b) Medicaid, (c) the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902 et seq., (d) TRICARE, (e) CHAMPVA, or (f) if applicable within the context of this Agreement, any agent, administrator, administrative contractor, intermediary or carrier for any of the foregoing.

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank), including CMS and any Medicare or Medicaid administrative contractors, intermediaries or carriers.

"Health Care Facility" means each facility from which any of Loan Parties or their Subsidiaries provides or furnishes goods or Medical Services, including, without limitation, any skilled nursing facility, assisted living facility, independent living facility or similar facility.

"Health Care Laws" means, collectively, any and all federal, state or local laws, rules, regulations and orders relating to any of the following: (a) fraud and abuse (including the following statutes, as amended, modified or supplemented from time to time and any successor statutes thereto and regulations promulgated from time to time thereunder:  the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn and § 1395(q)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the federal health care program exclusion provisions (42 U.S.C. § 1320a-7), the Civil Monetary Penalties Act (42 U.S.C. § 1320a-7a), and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173)); (b) any Government Reimbursement Program; (c) the licensure or regulation of healthcare providers, suppliers,

professionals, facilities or payors (including all statutes and regulations administered by the FDA); (d) the operation of any Health Care Facilities or the provision of, or payment for, Medical Services, items or supplies; (e) quality, safety certification and accreditation standards and requirements; (f) the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (g) HIPAA and Other Privacy Laws; (h) the practice of medicine and other health care professions or the organization of medical or professional entities; (i) fee-splitting prohibitions; (j) requirements for maintaining federal, state and local tax-exempt status of any of Loan Parties or their Subsidiaries; (k) charitable trusts or charitable solicitation laws; (l) health planning or rate-setting laws, including laws regarding certificates of need and certificates of exemption; and (m) any and all other applicable federal, state or local health care laws, rules, codes, regulations, manuals, orders, ordinances, professional or ethical rules, administrative guidance and requirements, as the same may be amended, modified or supplemented from time to time.

"Health Care Permits" means any and all permits, licenses, authorizations, certificates, certificates of need and accreditations of third-party accreditation agencies (such as The Joint Commission) that are (a) necessary to enable any Loan Party to operate any Health Care Facility or provide Medical Services, participate in and receive payment under any Government Reimbursement Program or other Third-Party Payor Arrangement, as applicable, or otherwise continue to conduct its business as it is conducted on the Closing Date, or (b) required under any Health Care Law.

"Health Care Proceeding" means any investigations, probes, audits, hearings, litigation or proceedings (in each case, whether civil, criminal, administrative or investigative) concerning any alleged or actual non-compliance by any Loan Party with any Health Care Laws or the requirements of any Health Care Permit or Third-Party Payor Arrangement (including any investigations, probes, audits or procedures initiated by a Fiscal Intermediary/Medicare Administrator Contractor, a Medicaid Integrity Contractor, a Recovery Audit Contractor, a Program Safeguard Contractor, a Zone Program Integrity Contractor, an Attorney General, the Office of Inspector General, the Department of Justice or any similar governmental agencies or contractors for such agencies).

"HIPAA and Other Privacy Laws" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time (including the provisions of the Health Information Technology for Economic and Clinical Health Act contained in the American Recovery and Reinvestment Act of 2009), and any successor statute thereto, any and all rules or regulations promulgated from time to time thereunder and any other applicable federal, state or local laws and regulations regulating, governing or relating to the privacy and/or security of patient protected health or personally identifiable information.

"Government Account Debtor" means the United States government or a political subdivision thereof, or any state, county or municipality or department, agency or instrumentality thereof (including privately administered "Managed Medicaid" programs), that is responsible for payment of an Account under any Government Reimbursement Program, or any agent, administrator, intermediary or carrier for the foregoing.

"Government Reimbursement Program" means (a) Medicare, (b) Medicaid, (c) the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902 et seq., (d) TRICARE, (e) CHAMPVA, or (f) if applicable within the context of this Agreement, any agent, administrator, administrative contractor, intermediary or carrier for any of the foregoing.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases (as defined in the Prepetition Credit Agreement), (d) all obligations or liabilities of others secured by a lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and, for the avoidance of doubt, other than royalty payments payable in the ordinary

course of business in respect of non-exclusive licenses), (f) all monetary obligations of such Person owing under Hedge Agreements (as defined in the Prepetition Credit Agreement) (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Disqualified Equity Interests (as defined in the Prepetition Credit Agreement) of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"Margin Stock" as defined in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" shall mean a material adverse effect on (i) the operations, business, assets, properties or financial condition of the Loan Parties taken as a whole, (ii) the ability of the Loan Parties to perform payment or other material obligations under any Interim DIP Document, (iii) the legality, validity or enforceability of this Term Sheet or any other Interim DIP Document, (iv) the rights and remedies of the DIP Agent and the DIP Lenders under any Interim DIP Document, or (v) the validity, perfection or priority of a lien in favor of DIP Lenders on any of the DIP Collateral; provided, however that "Material Adverse Effect" shall expressly exclude any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases, the MOTA, or such other changes during the Chapter 11 Cases that occur in a manner consistent with the RSA.

"Medicaid" means, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, or requirements pertaining to such program, including all state statutes and plans for medical assistance enacted in connection with such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Medical Services" means medical and health care items, services or supplies provided to a patient, including without limitation physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home health care services, residential and out-patient behavioral healthcare services, and medicine or health care equipment provided by any of Loan Parties or their Subsidiaries to a patient for a valid and proper medical or health purpose.

"Medicare" means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, or requirements pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Paid in Full" means, in respect of the DIP Facility, (i) all of the DIP Facility Obligations, pursuant to the DIP Term Sheet and this Interim DIP Order, have been indefeasibly paid in full in cash (other than contingent indemnification obligations as to which no claim has been asserted) unless the DIP Lenders have agreed to such other treatment under the RSA or othwerise, including, for the avoidance of doubt, satisfaction of all of the DIP Facility Obligations upon confirmation of a Plan, and (ii) all commitments to extend credit under the DIP Facility are terminated.

"Permitted Indebtedness" means:  (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Term Sheet and the

other Documentation; (c) Indebtedness arising under the New Ark Funding, (d) obligations under the Prepetition Credit Agreement; (e) deferred taxes and other expenses incurred in the ordinary course of business; (f) any Indebtedness existing on the Petition Date; (g) administrative expenses of Loan Parties; (h) endorsement of instruments or other payment items for deposit; (i) Indebtedness incurred in the ordinary course of business under performance, surety, statutory, or appeal bonds; (j) Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any of the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year; (k) Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business, and (l) any other unsecured Indebtedness incurred by any of the Loan Parties in an aggregate outstanding amount not to exceed $25,000 at any one time.

"Permitted Lien" means; (a) liens in favor of the DIP Agent as contemplated by the Term Sheet, (b) liens provided to the Prepetition Agent and Prepetition Lenders pursuant to the Prepetition Credit Agreement and related documents, (c) liens provided to New Ark pursuant to the New Ark Funding and related documents, (d) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code; (e) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding liens under ERISA); (f) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (g) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (h) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (i) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (i) liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code); (j) to the extent constituting liens, liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements; (k) any adequate protection liens permitted under the DIP Orders; (l) liens arising in favor of utility providers in any adequate assurance deposits arising under an order approved by the Bankruptcy Court; (m) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the ordinary course of business; and (n) other liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $25,000.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other equity interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other equity interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person

resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by The Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC").

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any member of the Loan Parties or their Subsidiaries.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the equity interests having ordinary voting power to elect a majority of the board of directors (or other governing body) of such corporation, partnership, limited liability company, or other entity.

"Third-Party Payor" means (i) a commercial medical insurance company, health maintenance organization, professional provider organization or other third-party payor that reimburses providers for Medical Services provided to individual patients, (ii) a nonprofit medical insurance company (such as the Blue Cross, Blue Shield entities), and (iii) a Government Account Debtor making payments under a Government Reimbursement Program.

"Third-Party Payor Arrangement" shall mean a written agreement or arrangement with a Third-Party Payor pursuant to which the Third-Party Payor pays all or a portion of the charges of any Loan Party or its Subsidiaries for providing Medical Services.

"TRICARE" means, collectively, the program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Department of Defense, Health and Human Services and Transportation, and all laws, rules, regulations, orders or requirements pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

**ANNEX D**
**TO TERM SHEET**

## REPRESENTATIONS AND WARRANTIES

Each of the Loan Parties represents as follows:

1. **Due Organization**.  Each of the Loan Parties are duly formed and/or organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdiction) under the laws of their jurisdictions of incorporation or formation;

2. **Due Authorization**.

   a.  Upon entry of the Interim DIP Order, the execution and delivery of this Term Sheet and the other Documentation and the performance by each Loan Party of such Loan Party's obligations under the Documentation (i) are within its corporate or limited liability company (or equivalent) powers, (ii) have been duly authorized by all necessary corporate or limited liability company (or equivalent) action of such Loan Party, (iii) have received all necessary bankruptcy, insolvency or governmental approvals, (iv) do not and will not contravene or conflict with any provisions of such Loan Party's corporate charter or by-laws (or equivalent organizational documents, and (v) do not and will not materially contravene or materially conflict with any provisions of applicable material law or of any material agreements binding upon or applicable to such Loan Party or any of its Subsidiaries or any of their properties;

   b.  The Chapter 11 Cases of each Loan Party have been duly authorized by all corporate or limited liability company (or equivalent) action of such Loan Party;

3. **Binding Obligations**.  Upon entry of the Interim DIP Order, this Term Sheet and the other Documentation, constitute the legal, valid and binding obligation, enforceable against the Loan Parties in accordance with its respective terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, including the entry of the Interim DIP Order and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

4. **Title to Assets**.  Other than as a result of the Chapter 11 Cases and subject to any necessary orders or authorization of the Bankruptcy Court, the Loan Parties have good and marketable title to, or valid leasehold interests in, all of its material property and assets; none of the properties and assets of the Loan Parties are subject to any liens other than Permitted Liens;

5. **Disclosure**. No written statement furnished by or on behalf of the Loan Parties or their subsidiaries to the DIP Lenders in accordance with the terms of this Term Sheet and the Documentation (other than any projections, the DIP Budget, estimates and information of a general economic nature or general industry nature), when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of all of the circumstances under which they were made;

6. **Perfected Liens**.  Upon entry of the Interim DIP Order, the liens granted to the DIP Lenders in accordance with the Term Sheet, the Documentation and the Interim DIP Order will at all times be fully perfected liens in and to the DIP Collateral described therein, subject, as to priority, only to liens permitted to have such priority under the Interim DIP Order;

7. **No Litigation**.  Except for proceedings in the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Loan Parties, threatened in writing against any Loan Party before any governmental authority or before any arbitrator or panel of arbitrators

that challenges the rights or powers of the Loan Parties to enter into or perform any of their obligations under the Interim DIP Documents to which it is a party, or the validity or enforceability of any Interim DIP Document or any action taken thereunder;

8.  **Compliance with Laws**.  No Loan Party (a) is in material violation of any applicable laws, rules, regulations, executive orders, or codes, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, are material;

9.  **Investment Company Act**.  None of the Loan Parties is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940;

10.  **Material Adverse Effect**. Since the Petition Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect;

11.  **Payment of Taxes**.  The Loan Parties have filed (or obtained extensions to file) all federal, state and other tax returns and reports required to be filed, and have paid all federal, state and other taxes, assessments, fees and other governmental charges levied or imposed by a governmental authority upon them or their properties, income or assets otherwise due and payable other than those (i) not yet delinquent or are being contested in good faith by appropriate proceedings, (ii) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this DIP Term Sheet, or (iii) taxes allocable to the facilities operated by the Debtors for which the Debtors have agreed to pay under any master lease pertaining to such facilities or any sub-leases related thereto, including, without limitation, under the Lease or the Blue Mountain Master Leases (as defined in the First Day Declaration);

12.  **Use of Proceeds**. The proceeds of the DIP Facility received by the Borrowers have been used in accordance with the Affirmative Covenant identified in item 13 [Use of Proceeds] of **Annex E**.

13.  **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**.  None of the Loan Parties or any of their Subsidiaries is in violation of any Sanctions. None of Loan Parties or any of their Subsidiaries nor, to the knowledge of any Loan Party, any director, officer, employee, or agent of Loan Parties or any of their Subsidiaries (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and any of their Subsidiaries has, to the extent applicable to their business activities, implemented and maintains in effect policies and procedures designed to ensure compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties and their Subsidiaries, and to the knowledge of each Loan Party, each director, officer, employee, and agent of each of the Loan Parties and their Subsidiaries, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any funding hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person'

14.  **Margin Stock**.  None of the Loan Parties or any of their Subsidiaries owns any Margin Stock or is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the loans made to Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors. None of the Loan Parties or any of their Subsidiaries expects to acquire any Margin Stock.

15. **MOTA**. The Loan Parties are not aware of any events or circumstances that would make the representation and warranties contained in Section 11(j) and 11(l) of the MOTA not true and correct in all respects as and when such representations and warranties are required to be made in accordance with the MOTA.

16. **Health Care Matters**.

   a. <u>Compliance with Health Care Laws; Health Care Permits; Third-Party Payors</u>.  Each of the Loan Parties and their Subsidiaries is in compliance in material respects with all Health Care Laws and requirements of Third-Party Payor Arrangements applicable to it and its assets, business or operations. Each of Loan Parties and their Subsidiaries (i) holds in full force and effect (without default, violation or noncompliance) all Health Care Permits necessary for it to own, lease, sublease or operate its assets and Health Care Facilities or to conduct its business and operations as presently conducted (including to obtain reimbursement under all Third-Party Payor Arrangements in which it participates), and (ii) has obtained and maintains accreditation from all generally recognized accreditation agencies material to the operations of the Loan Parties and their Subsidiaries. To Loan Parties' knowledge after due inquiry, no circumstance exists or event has occurred which could reasonably be expected to result in the suspension, revocation, termination, restriction, limitation, modification or non-renewal of any material Health Care Permit. The Health Care Facilities operated by any of Loan Parties or their Subsidiaries and the Medical Services provided at such Health Care Facilities are qualified for participation in the Government Reimbursement Programs, and each of Loan Parties and their Subsidiaries is entitled to reimbursement under the Government Reimbursement Programs for services rendered at such Health Care Facilities to qualified beneficiaries. All Persons providing professional health care services for or on behalf of any of the Loan Parties or their Subsidiaries (either as an employee or independent contractor) are appropriately licensed in every jurisdiction in which they hold themselves out as professional health care providers.

   b. <u>Cost Reports; Overpayments; Civil Money Penalties</u>.  Each of Loan Parties and their Subsidiaries has timely filed or caused to be timely filed all cost reports and other reports of every kind whatsoever required by any Government Reimbursement Program to have been filed or made with respect to the operations of any of the Loan Parties or their Subsidiaries. There are no claims, actions or appeals pending before CMS, any administrative contractor, intermediary or carrier or any other Governmental Authority with respect to any Government Reimbursement Programs cost reports or claims filed by any of the Loan Parties or their Subsidiaries, or any disallowance by any Governmental Authority in connection with any audit of such cost reports. None of the Loan Parties or their Subsidiaries (i) to Loan Parties' knowledge, after due inquiry, has retained an overpayment received from, or failed to refund any amount due to any Government Reimbursement Program or other Third-Party Payor in violation of any Health Care Law or Third-Party Payor Arrangement, (ii) has received written notice of, or has knowledge of, any overpayment or refunds due to any Third-Party Payor or (iii) has been subject to civil money penalties during the period beginning three (3) years prior to the date hereof, except for civil money penalties imposed following a survey of a Health Care Facility as a result of noncompliance with requirements for participation in Medicare and/or Medicaid so long as the aggregate amount of all such civil money penalties outstanding at any one time does not exceed $250,000.

   c. <u>Material Statements</u>.  None of the Loan Parties or their Subsidiaries, nor any officer, employee or agent of any of the Loan Parties or their Subsidiaries, has made an untrue statement of a material fact or fraudulent statement to any Governmental Authority, failed to disclose a material fact that must be disclosed to any Governmental Authority, or committed an act, made a statement or failed to make a statement that, at the time such statement, disclosure or failure to disclose occurred, would constitute a material violation of any Health Care Law.

WEIL:\98150122\31\66205.0003

d.  Exclusion.  None of the Loan Parties or their Subsidiaries, nor any owner, officer, director, partner, agent or managing employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any of the Loan Parties or their Subsidiaries , has (i) been excluded from any Third-Party Payor Arrangement or had a civil monetary penalty assessed pursuant to 42 U.S.C. § 1320a-7; (ii) been convicted (as that term is defined in 42 C.F.R. § 1001.2) of or investigated for any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347 or 1518, including any of the following categories of offenses: (A) criminal offenses relating to the delivery of an item or service under any federal health care program (as that term is defined in 42 U.S.C. § 1320a-7b) or healthcare benefit program (as that term is defined in 18 U.S.C. § 24b), (B) criminal offenses under federal or state law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service, (C) criminal offenses under laws relating to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickbacks, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state or local governmental agency, (D) laws relating to the interference with or obstruction of any investigations into any criminal offenses described in this clause (d), or (E) criminal offenses under laws relating to the unlawful manufacturing, distribution, prescription or dispensing of a controlled substance; or (iii) been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.

e.  HIPAA and Other Privacy Laws.  Each of the Loan Parties and their Subsidiaries is in compliance in all material respects with HIPAA and Other Privacy Laws. Further, in each contractual arrangement that is subject to HIPAA or Other Privacy Laws, each of the Loan Parties and their Subsidiaries has: (i) entered into a written business associate agreement (as such term is defined under the regulations implementing HIPAA) that substantially meets the requirements of HIPAA; (ii) at all times complied in all material respects with such business associate agreements in respect of the applicable privacy or security standards; and (iii) to its knowledge after due inquiry, at no time experienced or had a material unauthorized use or disclosure of Protected Health Information (as such term is defined in the regulations implementing HIPAA) or privacy or security breach or other privacy or security incident within the meaning of HIPAA.

f.  Proceedings. There is no pending (or, to the knowledge of any Loan Party, threatened) Health Care Proceeding commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator against or affecting any of the Loan Parties or their Subsidiaries. To Loan Parties' knowledge after due inquiry, there are no facts, circumstances or conditions that would reasonably be expected to form the basis for any such Health Care Proceeding against or affecting any of the Loan Parties or their Subsidiaries.

g.  Corporate Integrity Agreement. None of the Loan Parties or their Subsidiaries, nor any owner, officer, director, partner, agent or managing employee of any of Loan Parties or any of their Subsidiaries, is a party to or bound by any individual integrity agreement, corporate integrity agreement, corporate compliance agreement, deferred prosecution agreement, or other formal or informal agreement with any Governmental Authority concerning compliance with Health Care Laws, any Government Reimbursement Programs or the requirements of any Health Care Permit.

17. **Loan Party Information.** The exact legal name of each Loan Party, as such name appears in its respective certificate of formation or any other organizational document, is set forth below. Each Loan Party is (i) the type of entity disclosed next to its name as set forth below and (ii) a registered organization except to the extent disclosed below. Also set forth below is the organizational identification number, if any, of each Loan Party that is a registered organization, and the jurisdiction of formation of each Loan Party.

| Legal Name | Entity Type | Organizational ID Number | Jurisdiction of Organization |
|---|---|---|---|
| AL Citronelle, LLC | Limited Liability Company | 4544017 | Delaware |
| AL Willow Tree, LLC | Limited Liability Company | 4544021 | Delaware |
| FL HUD Baybreeze, LLC | Limited Liability Company | 4543875 | Delaware |
| FL HUD Bayside, LLC | Limited Liability Company | 4543878 | Delaware |
| FL HUD Destin, LLC | Limited Liability Company | 4543876 | Delaware |
| FL HUD Margate, LLC | Limited Liability Company | 4543879 | Delaware |
| FL HUD Pensacola, LLC | Limited Liability Company | 4543877 | Delaware |
| FL HUD Rosewood, LLC | Limited Liability Company | 4544027 | Delaware |
| FL HUD Silvercrest, LLC | Limited Liability Company | 4543880 | Delaware |
| Florida Facilities, LLC | Limited Liability Company | 4525132 | Delaware |
| GCH Management Services, LLC | Limited Liability Company | 4554298 | Delaware |
| Gulf Coast Facilities, LLC | Limited Liability Company | 4525133 | Delaware |
| Gulf Coast Health Care, LLC | Limited Liability Company | 4522903 | Delaware |
| Gulf Coast Master Tenant Holdings, LLC | Limited Liability Company | 4554297 | Delaware |
| Gulf Coast Master Tenant I, LLC | Limited Liability Company | 4542028 | Delaware |
| Gulf Coast Master Tenant II, LLC | Limited Liability Company | 4542029 | Delaware |
| Gulf Coast Master Tenant III, LLC | Limited Liability Company | 3902710 | Delaware |
| HUD Facilities, LLC | Limited Liability Company | 4525131 | Delaware |
| MF Debary, LLC | Limited Liability Company | 4544039 | Delaware |
| MF Flagler, LLC | Limited Liability Company | 4544041 | Delaware |
| MF Halifax, LLC | Limited Liability Company | 4625418 | Delaware |
| MF Heritage, LLC | Limited Liability Company | 4544032 | Delaware |
| MF Lake Eustis, LLC | Limited Liability Company | 4544031 | Delaware |
| MF Longwood, LLC | Limited Liability Company | 4544033 | Delaware |
| MF Oakwood, LLC | Limited Liability Company | 4544028 | Delaware |
| MF Winter Park, LLC | Limited Liability Company | 4544036 | Delaware |
| MS Greenbough, LLC | Limited Liability Company | 4544006 | Delaware |
| MS HUD Boyington, LLC | Limited Liability Company | 4543884 | Delaware |
| MS HUD Dixie, LLC | Limited Liability Company | 4543881 | Delaware |
| MS HUD Ocean Springs, LLC | Limited Liability Company | 4543883 | Delaware |
| MS HUD Pine View, LLC | Limited Liability Company | 4543882 | Delaware |
| MS Lakeside, LLC | Limited Liability Company | 4544010 | Delaware |
| MS Shelby, LLC | Limited Liability Company | 4544007 | Delaware |
| MS Singing, LLC | Limited Liability Company | 4544008 | Delaware |
| NF Brynwood, LLC | Limited Liability Company | 4543999 | Delaware |
| NF Chipola, LLC | Limited Liability Company | 4544016 | Delaware |
| NF Escambia, LLC | Limited Liability Company | 5586593 | Delaware |
| NF Glen Cove, LLC | Limited Liability Company | 4544001 | Delaware |
| NF Manor, LLC | Limited Liability Company | 4543684 | Delaware |
| NF Nine Mile, LLC | Limited Liability Company | 6324810 | Delaware |
| NF Panama, LLC | Limited Liability Company | 4544003 | Delaware |
| NF Pensacola Manor, LLC | Limited Liability Company | 5376207 | Delaware |
| NF River Chase, LLC | Limited Liability Company | 4544013 | Delaware |
| NF Suwannee, LLC | Limited Liability Company | 4544004 | Delaware |
| NF Windsor, LLC | Limited Liability Company | 4544012 | Delaware |
| Pensacola Administrative Holdings, LLC | Limited Liability Company | 4587598 | Delaware |
| Pensacola Administrative Services, LLC | Limited Liability Company | 4522905 | Delaware |
| SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC | Limited Liability Company | 7091668 | Delaware |

WEIL:\98150122\31\66205.0003

| Legal Name | Entity Type | Organizational ID Number | Jurisdiction of Organization |
|---|---|---|---|
| SF Berkshire, LLC | Limited Liability Company | 4544060 | Delaware |
| SF Boynton, LLC | Limited Liability Company | 4544051 | Delaware |
| SF Brevard, LLC | Limited Liability Company | 5586592 | Delaware |
| SF Carnegie, LLC | Limited Liability Company | 4544057 | Delaware |
| SF Fountainhead, LLC | Limited Liability Company | 4544025 | Delaware |
| SF Glen Oaks, LLC | Limited Liability Company | 4544055 | Delaware |
| SF Kissimmee, LLC | Limited Liability Company | 4544048 | Delaware |
| SF Lake Placid ALF, LLC | Limited Liability Company | 5374667 | Delaware |
| SF Lake Placid, LLC | Limited Liability Company | 4544022 | Delaware |
| SF Oakbrook, LLC | Limited Liability Company | 4544046 | Delaware |
| SF Royal Manor, LLC | Limited Liability Company | 4544054 | Delaware |
| SF Salerno, LLC | Limited Liability Company | 4544045 | Delaware |
| SF Tampa, LLC | Limited Liability Company | 4544043 | Delaware |
| Brevard Oaks Center, LLC | Limited Liability Company | L14000169683 | Florida |

WEIL:\98150122\31\66205.0003

**ANNEX E**
**TO TERM SHEET**

### CERTAIN AFFIRMATIVE COVENANTS

The Loan Parties agree that until the DIP Facility is Paid in Full:

1.  **Inspection**.  Upon reasonable request of the DIP Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the DIP Agent to audit, review, make extracts from or copy, at the Loan Parties' expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Loan Parties will permit the DIP Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any DIP Collateral or any other property of the Loan Parties at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the DIP Agent (or any agent or representative thereof) that is prohibited by applicable law, subject to confidentiality restrictions or is subject to attorney-client or similar privilege or constitutes attorney work product.

2.  **Compliance with Laws**.  (i) The Loan Parties will comply, in all materials respects, with all requirements of applicable law, except as executed by, or otherwise prohibited by, the provisions of the Bankruptcy Code or as a result of the Chapter 11 Cases and (ii) the Loan Parties will obtain, maintain in effect and comply, in all materials respects, with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the DIP Budget or the Interim DIP Order.

3.  **Taxes**.  The Loan Parties will pay or discharge, when due, (i) all material taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Loan Parties (including, without limitation, the DIP Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (a) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Loan Parties, (b) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this DIP Term Sheet, or (c) taxes allocable to the facilities operated by the Debtors for which the Debtors have agreed to pay under any master lease pertaining to such facilities or any sub-leases related thereto, including, without limitation, under the Lease or the Blue Mountain Master Leases and (ii) all federal, state and local taxes required to be withheld by it.

4.  **Maintenance of Properties**.  Each the Loan Parties will keep and maintain the DIP Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the DIP Budget or the Interim DIP Order,.

5.  **Insurance**.  The Loan Parties will maintain insurance with respect to the DIP Collateral, covering liabilities, losses or damages as are customarily are insured against by other Persons engaged in same or similar businesses and similarly situated and located.  All such policies of insurance shall be with financially sound and reputable insurance companies (including self-funded insurance programs and captive insurers) acceptable to Agent and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to DIP Agent.  All property insurance policies covering the Collateral are to be made payable to Agent for the benefit of DIP Agent and the DIP Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully

protect the Lenders' interest in the Collateral and to any payments to be made under such policies. If any Loan Party or any Subsidiary of any Loan Party fails to maintain such insurance, DIP Agent may arrange for such insurance, but at Borrowers' expense and without any responsibility on DIP Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, DIP Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the DIP Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

6. **Existence**. Each of the Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to, at all times preserve and keep in full force and effect such Person's valid existence and good standing in its jurisdiction of organization and, except as could not reasonably be expected to result in a Material Adverse Effect, good standing with respect to all other jurisdictions in which it is qualified to do business and any rights, franchises, permits, licenses, accreditations, authorizations, or other approvals material to their businesses.

7. **Cooperation with DIP Agent Financial Advisors**. The Loan Parties shall at all times provide reasonable access for, and reasonable cooperation with, any financial advisors to the DIP Agent.

8. **Milestones**. The Loan Parties shall take all actions necessary to cause each of the following to occur (the "Milestones"):

    a. no later than three (3) business days after the Petition Date, the Interim DIP Order approving the Term Sheet shall be entered by the Bankruptcy Court;

    b. on or before the entry of the Final DIP Order by the Bankruptcy Court, the Loan Parties, the DIP Agent and the DIP Lenders shall have executed (i) the DIP Note, consistent with the Documentation Principles, and (ii) any other Documentation reasonably requested by the DIP Agent at least two (2) business days prior to the Final Hearing;

    c. no later than thirty-five (35) days after the Petition Date, the Final Order approving the DIP Facility shall be entered by the Bankruptcy Court;

    d. no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered an order authorizing the Debtors' assumption of the RSA;

    e. no later than 90 days after the Petition Date (*provided that* the deadline may be extended by the Loan Parties by up to an additional thirty (30) days solely to comply with licensing requirements), (i) the Bankruptcy Court shall have entered an order rejecting the Blue Mountain Master Leases, and (ii) the Loan Parties shall have transitioned the properties subject to the Blue Mountain Master Leases;

    f. the Bankruptcy Court shall have entered the MOTA Order within thirty-five (35) days after the Petition Date; *provided that* the deadline to obtain entry of the MOTA Order may be extended by the Borrowers until the earlier of (i) an additional fifteen (15) days or (ii) December 1, 2021 if the Loan Parties are diligently pursuing the MOTA Order and the Loan Parties' failure to obtain the MOTA Order within the first thirty-five (35) Days after the Petition Date is primarily attributable to the Omega Entities (as defined in the RSA) or the New Operator(s); and

    g. No later than the first day of the first month following entry of the MOTA Order, the MOTA(s) shall have been consummated and gone into effect;

h.  No later than fifty (50) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement, solicitation procedures for the Plan (as defined in the RSA, and a deadline or bar date for filing of all prepetition claims;

i.  No later than 100 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order (as defined in the RSA); and

j.  No later than 30 calendar days after the date that the Court entered the Confirmation Order, the Plan shall have been consummated.

9.  **Financial Reporting**.  The Loan Parties shall deliver (which delivery may be made by electronic communication (including email)) to the DIP Agent each of the reports and other items set forth on Exhibit A attached hereto no later than the times specified therein (or such later time as the Required Lenders may agree).  Upon reasonable request by the DIP Agent, the Loan Parties shall make their senior management and advisors available at reasonable times and upon reasonable notice to the DIP Agent and DIP Lenders to discuss the financial position, cash flows, variances, operations, sale process and general case status of the Loan Parties.

10.  **Transfer Assistance Obligations**.  The Loan Parties shall promptly satisfy the Transfer Assistance Obligations.

11.  **Operations**.  The Loan Parties shall:

a.  prior to effectiveness of the MOTA, maintain (i) operation of the business at the Leased Property, and (ii) billing and collections procedures and practices, in each case, in the ordinary course of business and consistent with historical practices; and

b.  at all times following effectiveness of the MOTA, comply with and perform their respective obligations under and in accordance with the MOTA.

12.  **Bankruptcy Pleadings**.  The Loan Parties shall cooperate in good faith with the DIP Lenders to address the DIP Lenders' comments with respect to any material pleadings, motions, applications, financial information or other material documents filed on behalf of any Debtor in the Chapter 11 Cases.  Any such material pleadings, motions, applications, financial information or other material documents shall (i) be consistent with the DIP Facility, including, without limitation, the DIP Budget, and (ii) in the case of the Debtors' "first-day" and "second-day" motions, be reasonably acceptable to the DIP Lenders.

13.  **Use of Proceeds**.  The proceeds of the DIP Facility will be used to fund the operational, employee, wind-down and other costs of the Loan Parties, including, without limitation, payments authorized to be made under "first day" or "second day" orders, post-MOTA transition and employee costs, and costs associated with providing shared services to New Operator or plan administrator post-transition, and, in each case, consistent with, subject to, and within the limitations contained in the DIP Budget (including Permitted Variances and Permitted Carrybacks/Carryforwards). Except as expressly set forth in the DIP Budget, proceeds of the DIP Facility will not be used to pay the costs and expenses (including professional fees) of administering the Chapter 11 Cases.

14.  **Compliance with Health Care Laws**. Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to:

a.  comply in all material respects with all applicable Health Care Laws.

b.  (i) obtain, maintain and preserve, and take all necessary action to timely renew, all material Health Care Permits (including, as applicable, Health Care Permits necessary for it to be eligible to receive

payment and compensation from and to participate in any Third-Party Payor Arrangements) which are necessary or useful in the proper conduct of its business; (ii) be and remain in material compliance with all requirements for participation in, and for licensure required to provide the goods or services that are reimbursable under, all Third-Party Payor Arrangements; (iii) cause all Persons providing professional health care services for or on behalf of any of Loan Parties or their Subsidiaries (either as an employee or independent contractor) to comply with all applicable Health Care Laws in the performance of their duties, and to maintain in full force and effect all professional licenses and other Health Care Permits required to perform such duties; and (iv) keep and maintain all records required to be maintained by any Governmental Authority or otherwise under any Health Care Law.

c.  Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to, maintain a corporate and health care regulatory compliance program ("RCP") which addresses the requirements of Health Care Laws, including HIPAA and Other Privacy Laws, and includes at least the following components: (i) standards of conduct and procedures that describe compliance policies regarding laws with an emphasis on prevention of fraud and abuse; (ii) a specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including fraud and abuse laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including publicizing a reporting system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies including discipline of individuals responsible for the failure to detect violations of the RCP; and (vi) mechanisms to immediately respond to detected violations of the RCP. Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to, modify such RCPs from time to time, as may be necessary to ensure continuing compliance with all applicable Health Care Laws. Upon request, the DIP Agent (and/or its consultants) shall be permitted to review such RCPs.

d.  Provide to DIP Agent upon request, an accurate, complete and current list of all Third-Party Payor Arrangements with respect to the business of any of the Loan Parties.

15.  **Blue Mountain Master Leases**. The Loan Parties shall use commercially reasonable efforts to cause the rejection of the Blue Mountain Master Leases to be effective *nunc pro tunc* to the Petition Date.

Exhibit A to Annex E

Deliver (which delivery may be made by electronic communication (including email)) to the DIP Agent (for distribution by the DIP Agent to the DIP Lenders), each of the financial statements, reports, or other items set forth below at the following times in form reasonably satisfactory to the Required Lenders:

| | |
|---|---|
| on the Budget Testing Start Date and every Thursday of every other week ending thereafter: | (a)    a certificate which shall include such detail as is reasonably satisfactory to the Required Lenders (i) certifying that the Loan Parties are in compliance with the DIP Budget (including Permitted Variances and Permitted Carrybacks/Carryforwards) and (ii) certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and attaching thereto a report identifying any variances and/or any use of any Permitted Carrybacks/Carryforwards.

(b)    a revised proposed budget (it being understood that upon written approval of such proposed budget by the Required Lenders (and not before such written approval), in their sole discretion, such proposed budget shall become the DIP Budget) and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the Agent and DIP Lenders. |
| three (3) business days prior to any such filing or, where it is not practically possible to do so within such time, as soon as possible and in any event not less than one (1) business day prior to such filing: | (c)    copies of all material pleadings, motions, applications, financial information or other material documents filed on behalf of any Debtor in the Chapter 11 Cases. |
| promptly, but in any event within five (5) business days after Loan Parties have knowledge of any event or condition that constitutes a default or an Event of Default: | (d)    notice of such event or condition and a statement of the curative action that Loan Parties propose to take with respect thereto. |
| as soon as available, but in any event within 30 days after the end of each month during each of Parent's fiscal years | (e)    an unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of shareholder's equity of Parent and its Subsidiaries during such period and compared to the prior period and plan, together with a corresponding discussion and analysis of results from management, and

(f)    an unaudited combined and combining income statement of Borrowers containing facility level detail during such period and compared to the prior period and plan, and

(g)    a Compliance Certificate (as defined in the Prepetition Credit Agreement) along with,

   (i) the underlying calculations, including the calculations to arrive at Consolidated EBITDA (as defined in the Prepetition Credit |

42

| | |
|---|---|
| | Agreement), EBITDA (as defined in the Prepetition Credit Agreement), the Consolidated Fixed Charge Coverage Ratio EBITDA (as defined in the Prepetition Credit Agreement), the Fixed Charge Coverage Ratio EBITDA (as defined in the Prepetition Credit Agreement), and the Cash Velocity Ratio EBITDA (as defined in the Prepetition Credit Agreement);<br><br>(ii) to the extent applicable, a schedule regarding the outstanding balance (and remaining monthly payments) owing under any PL/GL settlement, any longterm payment agreement or tax settlement with any Governmental Authority or other long-term payment agreement, together with evidence of payment by Borrowers of all amounts owing thereunder for the most recently concluded month, and<br><br>(iii) a statistical report, including census, statistics, and such other information (including information relating to payor mix, skilled mix, quality mix, and average length of stay) as may be reasonably requested by Agent, and<br><br>(h)    unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of shareholder's equity the Master Tenant Affiliates (as defined in the Prepetition Credit Agreement) during such period and compared to the prior period and plan, together with a corresponding discussion and analysis of results from management. |
| Promptly after the commencement thereof, but in any event within 5 Business Days after the service of process with respect thereto on Parent or any Borrower, | (i)    notice of all actions, suits, or proceedings brought by or against any of Borrowers, their Subsidiaries or the other Loan Parties before any Governmental Authority which reasonably could be expected to result in a Material Adverse Effect including, without limitation, an condemnation proceeding involving any Health Care Facility. |
| | |
| Promptly after the commencement or occurrence thereof, but in event within 10 Business Days thereafter, any of the following: | (j)    [reserved].<br><br>(k)    notice that any of Borrowers, their Subsidiaries or the other Loan Parties, or any owner, officer, manager, managing employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in Borrowers, their Subsidiaries or the other Loan Parties: (A) is subject to any Health Care Proceeding or other investigations or audits (including cost reports or similar audits regarding the valuation of receivables payments) conducted by any federal, state or county Governmental Authority or its agents or designees, except in accordance with applicable settlement or appeals procedures that are timely and diligently pursued with respect to which the amount at issue (for any single investigation or audit) does not |

43

exceed $250,000, (B) has had a civil monetary penalty assessed pursuant to 42 U.S.C. § 1320a-7a or is the subject of a proceeding seeking to assess such penalty; (C) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b) or is the subject of a proceeding seeking to assess such penalty; (D) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; or (E) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or in any qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.;

(l)     notice of (A) any material reduction to any rate for reimbursement under any Third Party Payor Arrangement, or (B) any changes in any Health Care Law (including the adoption of a new Health Care Law) that could, in the aggregate, have a Material Adverse Effect;

(m)     notice of (A) any claim to recover any alleged overpayments with respect to any Accounts (as defined in the Prepetition Credit Agreement) in excess of $250,000, (B) any material modification to the billing systems or practices of Borrowers, their Subsidiaries or the other Loan Parties as in effect as of the Petition Date, (C) any validation review, program integrity review or any material reimbursement audits related to Borrowers, their Subsidiaries or the other Loan Parties in connection with any Third Party Payor Arrangement, or (D) the disclosure by any Borrower to the Office of the Inspector General of the United States Department of Health and Human Services, or any Third Party Payor program (including to any intermediary, carrier or contractor of such program), of an actual or potential overpayment involving the submission of claims in an amount greater than $250,000;

(n)     the pending imposition of any material fine or penalty by any Governmental Authority under any Health Care Law against Borrowers, their Subsidiaries or the other Loan Parties;

(o)     any pending revocation, suspension, termination, probation, restriction, limitation, denial, or non-renewal with respect to any Health Care Permit or Third Party Payor Arrangement, except for any such non-renewal at the election of Borrowers, their Subsidiaries or the other Loan Parties as would not, in the aggregate, have a Material Adverse Effect; provided that, for the avoidance of doubt, the inclusion by a Governmental Authority or Third Party Payor of language in a notice letter advising Borrowers, their Subsidiaries or the other Loan Parties that failure to comply with the terms of such letter could result in such Governmental Authority or Third Party Payor taking steps to revoke, suspend, terminate, impose probation, restrict, limit, deny or not renew such Person's Health Care Permit or Third Party Payor Arrangement shall not automatically be deemed a "pending" action for purposes of this clause (5);

44

<table>
<tr><td></td><td>(p)    any non-routine and material inspection of any facility of Borrowers, their Subsidiaries or the other Loan Parties by any Governmental Authority;</td></tr>
</table>

|  | (p)    any non-routine and material inspection of any facility of Borrowers, their Subsidiaries or the other Loan Parties by any Governmental Authority; |
|---|---|
|  | (q)    notice of the occurrence of any reportable event as defined in any corporate integrity agreement, corporate compliance agreement or deferred prosecution agreement pursuant to which any of the Borrowers, their Subsidiaries or the other Loan Parties has to make a submission to any Governmental Authority or other Person under the terms of such agreement; |
|  | (r)    any threatened or actual ban on admissions by from any Governmental Authority to all or any substantial portion of any Health Care Facility; |
|  | (s)    upon request, copies of material Health Care Permits required in connection with the operation of Borrower's business; |
|  | (t)    copies of (a) any surveys (i) that are conducted following an "immediate jeopardy" complaint or (ii) with respect to which one or more condition-level deficiencies are found, (b) all plans of correction submitted with respect to such surveys described in clause (a), and (c) upon request, copies of any other surveys and plans of correction related thereto; |
|  | (u)    notice of the occurrence of any New Ark Event of Default; |
|  | (v)    notices and copies of any subpoenas from the Office of the Inspector General or other Governmental Authority; |
|  | (w)    notice of any material default under any Lease of a Health Care Facility, notice from the landlord of any Health Care Facility that such landlord is exercising its termination rights under the Lease applicable thereto or has elected not to renew the Lease applicable thereto, or notice given by any of the Borrowers, their Subsidiaries or the other Loan Parties to such landlord that such Borrower, Subsidiary or other Loan Party is not electing to renew (or is otherwise terminating) the Lease applicable thereto; |
|  | (x)    notice of any changes in any director of reimbursement or similar senior executive with respect to the billing and collections personnel of any of the Borrowers, their Subsidiaries or the other Loan Parties; and |
|  | (y)    notice of any comprehensive system changes updating the charge master with new billing rates that would affect the Expected Net Value (as defined in the Prepetition Credit Agreement) of Eligible Accounts (as defined in the Prepetition Credit Agreement) of any Borrower. |
| Monthly (no later than the fifteenth day of each month) | (z)    an executed Borrowing Base Certificate (as defined in the Prepetition Credit Agreement) |

45

| | |
|---|---|
| | (aa)     a detailed aging, by total, of Borrowers' Accounts, together with a reconciliation (if applicable) and supporting documentation for any reconciling items noted (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), in a format consistent with past practices,<br><br>(bb)     a monthly Account roll-forward, in a format consistent with past practices, tied to the beginning and ending account receivable balances of Borrowers' general ledger,<br><br>(cc)     any action, suit, proceeding, dispute, set-off, deduction, defense or counterclaim that is asserted by any obligor in an amount in excess of $250,000, and<br><br>(dd)     a reconciliation of Accounts and trade accounts payable Borrowers' general ledger accounts to its monthly financial statements including any book reserves related to each category. |
| Promptly upon the reasonable request of the Required Lenders: | (ee)     any other information relating to the business, financial, legal or corporate affairs of the Loan Parties. |

46

**ANNEX F**
**TO TERM SHEET**

**CERTAIN NEGATIVE COVENANTS**

Until the DIP Facility is Paid in Full, the Loan Parties shall not, without the consent of the Required Lenders:

1. **Restrictions on Fundamental Changes**.  Directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or equity interests of, or otherwise combine with or acquire, any Person, other than, in each case, any such action approved by an order of the Bankruptcy Court in form and substance satisfactory to the Required Lenders.

2. **Permitted Indebtedness**.  Create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Interim DIP Order, Permitted Indebtedness.

3. **Permitted Liens**.  Create, incur, assume or permit to exist any lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Liens.

4. **Permitted Restricted Payments**.  Make any Restricted Payment, except (x) dividends and distributions by Subsidiaries of the Loan Parties paid to the Loan Parties or other wholly-owned Subsidiaries of the Loan Parties and (y) the Prepetition Loan Paydown.

5. **Guarantees of Obligations**.  Assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Loan Parties or any of their Subsidiaries), except the endorsement of negotiable instruments by Loan Parties and their Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

6. **Permitted Asset Sales**.  Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (i) the sales or dispositions of assets in the ordinary course of business, (ii) the sale or disposition of obsolete equipment, (iii) the sale of other property on terms acceptable to the Required Lenders, and (iv) the transfer, sale or disposition of assets approved by an order of the Bankruptcy Court in form and substance satisfactory to the Required Lenders.

7. **Modifications to Material Documents; Payments of Obligations**.  Consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to (i) the Interim DIP Order or (ii) the New Ark Funding or the Prepetition Obligations except, in the case of this clause (ii), where such amendment, supplement or other modification is not materially adverse to the interests of the DIP Lenders.  Except for (A) payments authorized to be made under "first day" or "second day" orders entered by the Bankruptcy Court and identified in the DIP Budget, subject to Permitted Variances and Permitted Carrybacks/Carryforwards, and (B) payments permitted by the Interim DIP Order and the DIP Budget, subject to Permitted Variances and Permitted Carrybacks/Carryforwards, no Loan Party shall make any payment in respect of, or repurchase, redeem, retire or defease any, Indebtedness arising prior to the Petition Date.

8. **Permitted Investments**.  Make any investment in, or make loans or advances of money to, any Person (other than another Loan Party), through the direct or indirect lending of money, holding of securities or otherwise.

9. **Change in Fiscal Year**.  Change their fiscal year.

47

10. **Affiliate Transactions**.  Make any other payments of prepetition claims to Affiliates (other than payments to New Ark and the Prepetition Lenders made in accordance with the New Ark Funding Documentation) nor shall the Loan Parties make any other payments of postpetition claims to Affiliates other than as set forth in the Budgets.

11. **Financial Covenant**.  As of the last day of each Reporting Period commencing with the Budget Testing Start Date, permit the aggregate amount of operating cash disbursements payable to Persons other than the DIP Lenders made by the Debtors to exceed 110% of the aggregate amount of operating cash disbursements for such Reporting Period as set forth in the Approved DIP Budget (such variance that does not breach this covenant, a "Permitted Variance").  Notwithstanding the foregoing, the Borrower may (a) carry-forward any disbursement amounts that are available and unused during a prior Reporting Period to any of the following subsequent Reporting Periods (a "Permitted Carryforward") and (b) may carry-backwards up to 50% of any amounts available to be used in up to two subsequent Reporting Periods to be used in the Reporting Period then in effect (a "Permitted Carryback" and, together with Permitted Carryforwards, "Permitted Carrybacks/Carryforwards") (which Permitted Carrybacks will not be available in any subsequent Reporting Periods).

**ANNEX G**
**TO TERM SHEET**

The events of default under the New Ark Funding (each, a "**New Ark Event of Default**," and collectively, the "**New Ark Events of Default**") shall be limited to:

1. failure to make any payment to the New Ark or the Prepetition Lenders when due;

2. failure to repay the New Ark Operating Advance to the Prepetition Loan Account by no later than December 3, 2021.

3. any breach or failure to comply with the terms of the Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, as applicable, to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from New Ark;

4. failure to comply with the Milestones;

5. prior to entry of the MOTA Order, the occurrence of an Event of Default under the DIP Facility that results in any limitation, suspension or termination of funding thereunder;

6. any Loan Party filing of a motion to convert any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the commencement by any of the Debtors of any winding up or liquidation proceeding (other than the Chapter 11 Cases) under any other applicable law;

7. the appointment of a receiver, receiver and manager, interim receiver, or similar official over any substantial portion of the Prepetition Lenders' collateral;

8. the dismissal of the Chapter 11 Cases;

9. the appointment in the Chapter 11 Cases of a chapter 11 trustee or an examiner with expanded powers;

10. any Loan Party shall (A) contest or dispute the validity or enforceability of any New Ark Funding Documentation or any obligation owed under any New Ark Funding Documentation in writing or deny in writing that it has any liability thereunder, (B) contest or dispute the validity or perfection of the Prepetition Credit Agreement, or the liens and security interests securing the claims under the Prepetition Credit Agreement in writing or (C) pursue, negotiate, solicit interest in, or agree to any sale or liquidation of the Debtors' assets or any restructuring, reorganization, refinancing, or other transaction other than on the terms provided for in the RSA;

11. the grant of any super priority administrative expense claim or any lien or charge which is pari passu with or senior to those of New Ark and the Prepetition Lenders (other than as permitted by this Term Sheet and/or the New Ark Funding Documentation);

12. cessation of liens or adequate protection claims granted with respect to the New Ark Funding to be valid, perfected and enforceable in all respects with the priority described herein;

13. the entry of the Final DIP Order shall not have occurred within thirty-five (35) days after entry of the Interim DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any substantive modification or amendment, without the prior written consent of New Ark; and

14. the incurrence by any Loan Party of postpetition administrative or priority expenses individually or in the aggregate in excess of $500,000, the payment for which is not permitted under the Budgets (subject to Permitted Variances and Permitted Carrybacks/Carryforwards).

WEIL:\98150122\31\66205.0003

## **Exhibit 2**

Initial DIP Budget

Gulf Coast Health Care, LLC, et al.
**Omega DIP Lender DIP Budget**

*Subject to Further Revision*

| ($ in thousands) | Week 1 14-Oct-21 15-Oct-21 | Week 2 16-Oct-21 22-Oct-21 | Week 3 23-Oct-21 29-Oct-21 | Week 4 30-Oct-21 5-Nov-21 | Week 5 6-Nov-21 12-Nov-21 | Week 6 13-Nov-21 19-Nov-21 | Week 7 20-Nov-21 26-Nov-21 | Week 8 27-Nov-21 3-Dec-21 | Week 9 4-Dec-21 10-Dec-21 | Week 10 11-Dec-21 17-Dec-21 | Week 11 18-Dec-21 24-Dec-21 | Week 12 25-Dec-21 31-Dec-21 | Week 13 1-Jan-22 7-Jan-22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1 Receipts** | 109.1 | 388.2 | 564.2 | 390.3 | 4,635.2 | 3,968.8 | 5,424.6 | 5,345.2 | 2,141.0 | 2,309.1 | 2,620.7 | 5,170.4 | 508.2 | **33,575.0** |
| 2 Employee Costs | (337.1) | (2,337.5) | (3,332.0) | (3,174.1) | (3,545.8) | (2,112.0) | (3,097.0) | (2,102.0) | (3,310.8) | (2,102.0) | (681.4) | (429.4) | (296.4) | **(26,857.4)** |
| 3 Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4 Halcyon (therapy) | (184.3) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (43.0) | (43.0) | (43.0) | (43.0) | (43.0) | **(3,409.3)** |
| 5 Food | (185.0) | (150.0) | (185.0) | (150.0) | (150.0) | (150.0) | (150.0) | (185.0) | (15.0) | (15.0) | (18.5) | (15.0) | (15.0) | **(1,387.0)** |
| 6 Agency | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (1,028.8) | (548.8) | (548.8) | (548.8) | (7.5) | **(5,682.5)** |
| 7 Provider Fee | - | (1,185.0) | - | - | - | (1,185.0) | - | - | - | - | - | (1,185.0) | - | **(3,555.0)** |
| 8 Pharmacy | (737.8) | - | - | (737.8) | - | - | - | (669.9) | - | - | - | (56.0) | - | **(2,201.5)** |
| 9 Medical Supplies | (150.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (41.5) | (17.5) | (17.5) | (17.5) | (41.5) | **(1,510.5)** |
| 10 Laboratory & X-ray | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | **(425.0)** |
| 11 Utilities | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (15.6) | (15.6) | (15.6) | (15.6) | (15.6) | **(1,166.0)** |
| 12 Shared Service Fees[1] | - | (400.6) | (426.4) | (345.0) | (345.0) | (345.0) | (390.6) | - | - | - | - | - | - | **(2,252.7)** |
| 13 Misc. & Local Vendors | (550.7) | (500.0) | (234.3) | (247.8) | (254.6) | (353.6) | (234.3) | (213.5) | (48.1) | (34.0) | (22.5) | (27.0) | (152.5) | **(2,872.8)** |
| **14 Total Disbursements b/f Rx Disbursements** | **(2,705.9)** | **(5,739.2)** | **(5,343.8)** | **(5,820.7)** | **(5,461.4)** | **(5,311.6)** | **(5,038.0)** | **(4,336.4)** | **(4,507.8)** | **(2,784.3)** | **(1,348.7)** | **(2,345.7)** | **(576.4)** | **(51,319.7)** |
| 15 Process Costs[2] | - | - | (300.2) | - | - | - | - | - | - | - | - | - | - | **(300.2)** |
| 16 Professional Fees[3,4] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 17 Financing Costs | (250.0) | - | - | (153.4) | - | - | - | (226.9) | - | - | - | - | (275.8) | **(906.0)** |
| **18 Total Disbursements** | **(2,955.9)** | **(5,739.2)** | **(5,643.9)** | **(5,974.0)** | **(5,461.4)** | **(5,311.6)** | **(5,038.0)** | **(4,563.2)** | **(4,507.8)** | **(2,784.3)** | **(1,348.7)** | **(2,345.7)** | **(852.2)** | **(52,525.9)** |
| **19 Net Cash Flow before Financing** | **(2,846.8)** | **(5,351.0)** | **(5,079.8)** | **(5,583.8)** | **(826.2)** | **(1,342.7)** | **386.7** | **782.0** | **(2,366.8)** | **(475.3)** | **1,272.0** | **2,824.7** | **(344.0)** | **(18,951.0)** |
| 20 New Ark Capital, LLC Cash Collateral Use / (Repayment) | - | - | 4,500.0 | 1,600.0 | 200.0 | 400.0 | 300.0 | (7,000.0) | - | - | - | - | - | - |
| 21 DIP Draw | 6,000.0 | 4,500.0 | 750.0 | 4,000.0 | 500.0 | 1,000.0 | 750.0 | 7,000.0 | 500.0 | - | - | - | - | 25,000.0 |
| **22 Net Cash Flow** | **3,153.2** | **(851.0)** | **170.2** | **16.2** | **(126.2)** | **57.3** | **1,436.7** | **782.0** | **(1,866.8)** | **(475.3)** | **1,272.0** | **2,824.7** | **(344.0)** | **6,049.0** |
| **23 Book Cash Roll-Forward** | | | | | | | | | | | | | | |
| 24 Beginning Book Cash Balance | - | 3,153.2 | 2,302.2 | 2,472.4 | 2,488.7 | 2,362.5 | 2,419.8 | 3,856.4 | 4,638.4 | 2,771.7 | 2,296.4 | 3,568.4 | 6,393.1 | - |
| 25 Cash Generated / (Needed) | 3,153.2 | (851.0) | 170.2 | 16.2 | (126.2) | 57.3 | 1,436.7 | 782.0 | (1,866.8) | (475.3) | 1,272.0 | 2,824.7 | (344.0) | 6,049.0 |
| **26 Ending Book Cash Balance** | **3,153.2** | **2,302.2** | **2,472.4** | **2,488.7** | **2,362.5** | **2,419.8** | **3,856.4** | **4,638.4** | **2,771.7** | **2,296.4** | **3,568.4** | **6,393.1** | **6,049.0** | **6,049.0** |

Notes:
1. Shared Service Costs post-transition to be determined as negotiated between Health Care Navigator, Omega and the New operator(s).
2. Process costs include adequate assurance utility deposit.
3. Post-petition professional fees have been shown as paid to escrow in the week incurred.
4. Professional fees include debtor legal counsel and financial advisor fees, independent manager fees, New Ark legal counsel fees, Unsecured Creditor Committee fees, US Trustee fees, and patient care ombudsman fees.

## **Exhibit 3**

Initial New Ark Budget

*Subject to Further Revision*

**Gulf Coast Health Care, LLC, et al.**
**New Ark Financing Cash Collateral Budget**

| ($ in thousands) | Week 1 14-Oct-21 15-Oct-21 | Week 2 16-Oct-21 22-Oct-21 | Week 3 23-Oct-21 29-Oct-21 | Week 4 30-Oct-21 5-Nov-21 | Week 5 6-Nov-21 12-Nov-21 | Week 6 13-Nov-21 19-Nov-21 | Week 7 20-Nov-21 26-Nov-21 | Week 8 27-Nov-21 3-Dec-21 | Week 9 4-Dec-21 10-Dec-21 | Week 10 11-Dec-21 17-Dec-21 | Week 11 18-Dec-21 24-Dec-21 | Week 12 25-Dec-21 31-Dec-21 | Week 13 1-Jan-22 7-Jan-22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 **Receipts** | **931.5** | **3,246.3** | **6,510.4** | **1,814.0** | **497.8** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **13,000.0** |
| 2 Debtor Professional Fees[1] | (388.3) | (345.1) | (345.1) | (336.8) | (366.8) | (336.8) | (336.8) | (236.8) | (236.8) | (266.8) | (261.8) | (236.8) | (436.8) | (4,131.2) |
| 3 UCC Professional Fees[1] | - | - | (37.5) | (37.5) | (37.5) | (37.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (237.5) |
| 4 Other Professional Fees[1,2] | (26.3) | (26.3) | (26.3) | (26.3) | (26.3) | (56.3) | (26.3) | (26.3) | (26.3) | (56.3) | (26.3) | (26.3) | (26.3) | (402.1) |
| 5 US Trustee Fees[1] | - | - | - | - | - | - | - | - | - | - | - | (250.0) | - | (250.0) |
| 6 **Total Disbursements** | **(414.6)** | **(371.4)** | **(408.9)** | **(400.6)** | **(430.6)** | **(430.6)** | **(375.6)** | **(275.6)** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **(5,020.8)** |
| 7 **Net Cash Flow before Financing** | **516.8** | **2,874.9** | **6,101.5** | **1,413.4** | **67.2** | **(430.6)** | **(375.6)** | **(275.6)** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **7,979.2** |
| 8 New Ark Capital, LLC (Proceeds to) / Repayment from Omega | - | - | (4,500.0) | (1,600.0) | (200.0) | (400.0) | (300.0) | 7,000.0 | - | - | - | - | - | - |
| 9 **Net Cash Flow** | **516.8** | **2,874.9** | **1,601.5** | **(186.6)** | **(132.8)** | **(830.6)** | **(675.6)** | **6,724.4** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **7,979.2** |
| 10 Book Cash Roll-Forward | | | | | | | | | | | | | | |
| 11 Beginning Book Cash Balance | 1,500.0 | 2,016.8 | 4,891.7 | 6,493.2 | 6,306.6 | 6,173.9 | 5,343.3 | 4,667.7 | 11,392.1 | 11,116.5 | 10,781.0 | 10,480.4 | 9,954.8 | 1,500.0 |
| 12 Cash Generated / (Needed) | 516.8 | 2,874.9 | 1,601.5 | (186.6) | (132.8) | (830.6) | (675.6) | 6,724.4 | (275.6) | (335.6) | (300.6) | (525.6) | (475.6) | 7,979.2 |
| 13 **Net Ending Cash Collateral Balance** | **2,016.8** | **4,891.7** | **6,493.2** | **6,306.6** | **6,173.9** | **5,343.3** | **4,667.7** | **11,392.1** | **11,116.5** | **10,781.0** | **10,480.4** | **9,954.8** | **9,479.2** | **9,479.2** |

Notes:
1. Post-petition professional and trustee fees have been shown as paid to escrow in the week incurred.
2. Other professional fees include New Ark legal counsel fees, and patient care ombudsman fees.