## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Gulf Coast Health Care, LLC, *et al.*,[1] | ) | Case No. 21-11336 (KBO) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Related to Docket No. 14** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE
CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion")[2] of Gulf Coast Health Care, LLC ("Gulf Coast") and

its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned

chapter 11 cases (the "Chapter 11 Cases") for entry of an interim order (this "Interim Order") and

a final order ("Final Order"), under sections 105, 361, 362, 363, 364, 503, 506, and 507 of title 11

of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware

(the "Local Rules"), seeking, *inter alia*:

---

[1] The last four digits of Gulf Coast Health Care, LLC's federal tax identification number are 9281. There are 62 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/GulfCoastHealthCare. The location of Gulf Coast Health Care, LLC's corporate headquarters and the Debtors' service address is 40 South Palafox Place, Suite 400, Pensacola, FL 32502.

[2] Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the Motion or the DIP Term Sheet (as defined herein).

(i)        authorizing the Debtors to obtain postpetition financing on a secured superpriority basis, consisting of a new money term loan facility (the "<u>DIP Facility</u>," and the loans issued thereunder, the "<u>DIP Loans</u>") in an aggregate principal amount of up to $25,000,000 pursuant to the terms and conditions set forth in this Interim Order and that certain term sheet annexed hereto as **<u>Exhibit 1</u>** (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Term Sheet</u>"), executed by those certain Debtors identified as borrowers in the DIP Term Sheet (the "<u>DIP Borrowers</u>") and those certain Debtors identified as guarantors in the DIP Term Sheet (the "<u>DIP Guarantors</u>" and, together with the DIP Borrowers, the "<u>DIP Loan Parties</u>"), OHI Asset Funding (DE), LLC, as the administrative agent and collateral agent for the DIP Facility (the "<u>DIP Agent</u>"), each of the DIP Lenders (the "<u>DIP Lenders</u>" and, together with the DIP Agent, the "<u>DIP Secured Parties</u>"), and certain of the Prepetition Secured Parties (as defined below).

(ii)       authorizing the Debtors to enter into the DIP Term Sheet and, subject to final order, the DIP Note (as defined in the DIP Term Sheet) and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP Term Sheet and the DIP Note, the "<u>DIP Loan Documents</u>");

(iii)      authorizing the DIP Borrowers to incur, and for the DIP Guarantors to guarantee on an unconditional joint and several basis, obligations for principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts, as and when due

and payable under and in accordance with this Interim Order, the DIP Term Sheet, and the DIP Loan Documents (collectively, the "DIP Facility Obligations");

(iv)    authorizing the DIP Loan Parties to perform such other and further acts as may be necessary or desirable in connection with this Interim Order, the DIP Term Sheet, the DIP Loan Documents, and the transactions contemplated hereby and thereby;

(v)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the DIP Loan Parties to incur, the DIP Liens (as defined below), as applicable, in all DIP Collateral (as defined below) having the priority described in this Interim Order;

(vi)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the DIP Loan Parties to incur, allowed superpriority administrative expense claims against each of the DIP Loan Parties, on a joint and several basis, in respect of all DIP Facility Obligations, in each case, in accordance with the terms of this Interim Order;

(vii)    authorizing the DIP Loan Parties' use of Prepetition Collateral (as defined below), including Cash Collateral (as defined below), as well as the proceeds of the DIP Facility and New Ark Funding and the New Ark Operating Advance (each as defined in the DIP Term Sheet and, collectively, the "New Ark Financing"), subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents;

(viii)    providing adequate protection, to the Prepetition Secured Parties (as defined below) and the Prepetition HUD Lender (as defined below) on account of any Diminution in Value (as defined below) of the Prepetition Secured Parties' or Prepetition HUD Lender's interest in the Prepetition Collateral or Prepetition HUD Lender Collateral (as defined below), as applicable;

(ix)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate, including the right to exercise

3

remedies following an Event of Default and expiration of any applicable notice period, the terms and provisions of this Interim Order and the DIP Loan Documents, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(x)     upon entry of a Final Order providing for such relief and as set forth in paragraphs 24 and 26 herein, authorizing the Debtors to waive as to the DIP Lenders and Prepetition Secured Parties (a) certain of their rights to surcharge the DIP Collateral, Omega Landlord Collateral or any Prepetition Working Capital Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)     upon entry of a Final Order providing for such relief, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral, for the benefit of any party other than the DIP Secured Parties, and (b) the Prepetition Working Capital Collateral, for the benefit of any party other than the Prepetition Working Capital Secured Parties, subject to the Carve-Out (as defined below); and

(xii)     scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the DIP Term Sheet, the proposed Interim Order, the *Declaration of M. Benjamin Jones in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Declaration") and the *Declaration of M. Benjamin Jones in Support of Chapter*

*11 Petitions and First Day Pleadings* (the "First Day Declaration" and together with the DIP Declaration, the "Jones Declarations"), the pleadings filed with the Court, the evidence submitted and arguments proffered or adduced at the hearing held before the Court on October 15, 2021 (the "Interim Hearing"), and upon the record of these Chapter 11 Cases; and adequate notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001 and 9014 and all applicable Local Rules; and it appearing that no other or further notice need be provided; and all objections, responses and reservations of rights with respect to the entry of the Interim Order, if any, to the relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors, represents a sound exercise of the Debtors' business judgment, and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A.    **Petition Date**. On October 14, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (this "Court") commencing these Chapter 11 Cases.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

On October 15, 2021, this Court entered an order approving the joint administration of the Chapter 11 Cases for procedural purposes only.

B.      **Debtors-in-Possession**.  The Debtors continue in possession of and to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of these Chapter 11 Cases.

C.      **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases (together with any statutory committee that may appointed or formed in the Chapter 11 Cases or any such successor cases (collectively, the "Successor Cases"), the "Official Committee").

D.      **Jurisdiction and Venue**.  The Court has jurisdiction over the Debtors, property of the Debtors' estates, the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for these Chapter 11 Cases and the proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and Local Rule 9013-1.

E.      **Debtors' Stipulations**.  Subject to the limitations thereon contained in paragraph 23 hereof, the DIP Loan Parties, on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(i)     Prepetition Credit Agreement.    Gulf Coast and certain of its affiliates designated therein, as borrowers (such borrowers, collectively, the "Prepetition Borrowers"), certain other parties designated as guarantors thereto (such guarantors collectively, the "Prepetition Guarantors" and, together with the Prepetition Borrowers, the "Prepetition Loan Obligors"), the lenders from time to time party thereto (the "Prepetition Lenders"), and Wells Fargo Bank, N.A. ("Wells Fargo") as administrative agent for the Prepetition Lenders, entered into a credit agreement, dated as of July 6, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Secured Parties, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition Loan Documents").   On November 2, 2020, Wells Fargo and New Ark Capital, LLC ("New Ark") executed that certain Loan, Commitment and Agency Assignment Agreement dated as of the date thereof, through which Wells Fargo assigned its interests, liens and obligations provided by or under the Prepetition Credit Agreement to New Ark (in such capacity, the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Working Capital Secured Parties").   As of the Petition Date, the Prepetition Loan Obligors were justly and lawfully indebted and liable to the Prepetition Working Capital Secured Parties, without defense, counterclaim or offset of any kind, with respect to $14,343,316.85 in principal amount of loans outstanding, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition Loan Documents), charges, indemnities and

all other Obligations (as defined in the Prepetition Credit Agreement) incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date) as provided in the Prepetition Loan Documents (collectively, the "<u>Prepetition Working Capital Debt</u>"), which Prepetition Working Capital Debt has been guaranteed on a joint and several basis by the Prepetition Guarantors.  The Prepetition Working Capital Debt is secured by first priority security interests in and liens on certain of the Prepetition Loan Obligors' assets as set forth in the Prepetition Loan Documents (such collateral, the "<u>Prepetition Working Capital Collateral</u>" and such liens on and security interests in the Prepetition Working Capital Collateral, the "<u>Prepetition Working Capital Liens</u>").

(ii)     Debtor Gulf Coast Master Tenant I, LLC (the "<u>GC Master Tenant I</u>") entered into that certain *Second Consolidated Amended and Restated Master Lease Agreement*, dated July 1, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Omega Master Lease Agreement</u>" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Landlords (as defined therein) (the "<u>Omega Landlords</u>" and, together with the Prepetition Working Capital Secured Parties, the "<u>Prepetition Secured Parties</u>"), including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "<u>Omega Master Lease Documents</u>").  GC Master Tenant I has subleased the facilities leased to GC Master Tenant I under the Omega Master Lease Agreement to certain operators set forth therein (the "<u>Existing Operators</u>").  Certain of the Debtors, the Existing Operators and other parties have entered into that certain Guaranty of Obligations, dated July 1, 2013 in respect of the Omega Master Lease Agreement (each an "<u>Omega Master</u>

Lease Guarantor", and collectively with GC Master Tenant I and the Existing Operators, the "Omega Master Lease Obligors," and together with the Prepetition Loan Obligors, the "Prepetition Obligors").  As of the Petition Date, the Omega Master Lease Obligors were justly and lawfully indebted and liable to the Omega Landlords, without defense, counterclaim or offset of any kind, with respect to $237,711,978 in principal amount of unpaid Rent (as defined in the Omega Master Lease Agreement), plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Omega Master Lease Documents), charges, indemnities and all other obligations arising under the Omega Master Lease Documents incurred in connection therewith (whether arising before, on, or after the Petition Date) as provided in the Omega Master Lease Documents (collectively, the "Omega Master Lease Obligations" and, together with the Prepetition Working Capital Obligations, the "Prepetition Secured Obligations"), which Omega Master Lease Obligations have been guaranteed on a joint and several basis by the Omega Master Lease Guarantors.  The Omega Master Lease Obligations are secured by second priority security interests in and liens on property constituting Prepetition Working Capital Collateral and a first priority security interest in and liens on any other property as set forth in the Omega Master Lease Documents (the "Omega Landlord Collateral," and together with the Prepetition Working Capital Collateral, the "Prepetition Collateral," and such liens on and security interests in the Omega Landlord Collateral, the "Omega Landlord Liens," and together with the Prepetition Working Capital Liens, the "Prepetition Liens").

(iii)    Prepetition Secured Obligations.  The Prepetition Secured Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective

terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Secured Obligations owing to, or any transfers made to any or all of the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other legal or equitable challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(iv)    <u>Prepetition Liens</u>.  The Prepetition Liens granted to the Prepetition Secured Parties respectively constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral were granted to, or for the benefit of, the applicable Prepetition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity or regulation by any person or entity, including in any Successor Cases.

(v)    <u>No Challenges/Claims</u>.  No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, no facts or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist and no portion of the Prepetition Liens or Prepetition Secured Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity.  The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the

Bankruptcy Code), objections, challenges, causes of action, and/or choses in action or basis for any equitable relief against any of the Prepetition Secured Parties or DIP Lenders or any of their respective predecessors, affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition Loan Documents, the Omega Master Lease Documents, the Prepetition Secured Obligations, the Prepetition Liens, DIP Loan Documents, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other Claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable non-bankruptcy law equivalents. The Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(vi)    <u>Indemnity</u>.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility, the New Ark Financing and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), the DIP Superpriority Claims (as defined below), the 507(b) Claims (as defined below) and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors, joint and severally, in respect of any Claim or liability incurred in respect thereof or in any way related thereto, provided that no such party will be indemnified for any loss, cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to

have resulted primarily from any such party's gross negligence or willful misconduct. No exception or defense exists in contract, law, or equity as to any obligation set forth in this paragraph, in the Prepetition Loan Documents, the Omega Master Lease Documents, or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the Prepetition Secured Parties, the DIP Agent, or the DIP Lenders, as the case may be.

(vii)    Sale and Credit Bidding. The Debtors and the Prepetition Obligors admit, stipulate, acknowledge, and agree that any of the DIP Lenders, the DIP Agent, or the Prepetition Secured Parties, shall have the right to credit bid the entirety of (or any portion of) the Prepetition Secured Obligations and/or the DIP Facility Obligations, as applicable, secured by their respective Prepetition Liens.

(viii)    Cash Collateral. All of the DIP Loan Parties' cash, whether existing as of the Petition Date or thereafter, wherever located, constitutes or will constitute "cash collateral" of the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"); *provided* that, notwithstanding anything in this Interim Order to the contrary, the DIP Secured Parties' interest in any Cash Collateral held in, or traceable to, the accounts established for the Prepetition Loan Account (as defined below) and the New Ark Reserve Account (as defined in the DIP Term Sheet), and any proceeds thereof, shall be junior to the Prepetition Working Capital Liens, the Prepetition Working Capital Debt, the Working Capital Adequate Protection Liens (as defined below), and the Working Capital 507(b) Claims (as defined below); *provided further* that, notwithstanding anything in this Interim Order to the contrary, the DIP Secured Parties' interest in any Cash Collateral of the Prepetition HUD Obligors (as defined below) shall be junior to the Prepetition HUD Lender Liens (as defined below).

F.    **Findings Regarding Corporate Authority**.  Subject to entry of this Interim Order, each of the DIP Loan Parties has all requisite power and authority to execute and deliver the DIP Term Sheet to which it is a party and to perform its obligations thereunder.

G.    **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i)    <u>Good Cause</u>.  Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP Facility, the New Ark Financing, and the DIP Loan Documents and to use Cash Collateral as set forth herein and consistent with the (i) Approved DIP Budget (as defined below), subject to Permitted Variances (as defined in the DIP Term Sheet) and Permitted Carrybacks/Carryforwards (as defined in the DIP Term Sheet), and (ii) the New Ark Budget Permitted Variances and Permitted Carrybacks/Carryforwards.

(ii)    <u>Immediate Need for Postpetition Financing and Use of Cash Collateral</u>.  The Debtors' need to use the Prepetition Collateral (including Cash Collateral) and to obtain credit pursuant to the DIP Facility as provided for herein is immediate and critical to avoid serious and irreparable harm to the Debtors, their estates, their creditors, and other parties in interest.  The Debtors have an immediate need to obtain the DIP Loans, the New Ark Financing, and other financial accommodations and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things: (i) permit the orderly continuation of the operation of their businesses (ii) maintain the health, safety, and well-being of their residents, (iii) maintain, amend, renew, or modify insurance policies in the ordinary course of business; (iv) maintain business relationships with customers, vendors, and suppliers, including purchasing necessary materials and services to maintain compliance with all applicable regulatory and safety requirements; (v) make payroll; (vi) satisfy other working capital, capital improvement, and

operational needs; (vii) pay professional fees, expenses, and obligations; (viii) pay costs, fees, and expenses associated with or payable under the DIP Facility, subject to the terms of this Interim Order and the DIP Loan Documents; and (ix) make adequate protection payments as set forth herein. The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of this Interim Order. The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Loan Documents, and other financial accommodations provided under the DIP Loan Documents are necessary and vital to preserve and maintain the value of the Debtors' assets. The terms of the proposed DIP Facility and the New Ark Financing, pursuant to the DIP Loan Documents, and this Interim Order are fair and reasonable, reflect each Debtor's exercise of its prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

(iii)    No Credit Available on More Favorable Terms. The Debtors have been unable to obtain financing and other financial accommodations from sources other than (i) the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Loan Documents and (ii) New Ark on terms more favorable than those provided under the New Ark Financing set forth in the DIP Term Sheet and this Interim Order. The Debtors have been unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors also have been unable to obtain adequate credit for money borrowed (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code or (b) secured only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien. Postpetition financing is not otherwise available without granting the (i) the DIP Agent, for the benefit of the respective DIP Secured

14

Parties: (1) the DIP Liens on all DIP Collateral, as set forth herein, (2) the DIP Superpriority Claims, and (3) the other protections set forth in this Interim Order and (ii) New Ark, (1) Adequate Protection Liens (as defined below) on all DIP Collateral, (2) 507(b) Claims, and (3) the other protections set forth in this Interim Order.  After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility and New Ark Financing represent the best financing available to them at this time, and are in the best interests of all of their stakeholders.

(iv)     Use of Proceeds of the DIP Facility and Cash Collateral.  As a condition to entry into the DIP Facility, the extension of credit and other financial accommodations made under the DIP Facility and the consent to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), each of the DIP Secured Parties requires, and the Debtors have agreed, that Cash Collateral, the proceeds of the DIP Facility, and all other cash or funds of the Debtors, shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Loan Documents, and only for the expenditures set forth in and consistent with the Approved DIP Budget (as defined below) (subject to Permitted Variances), and for no other purpose.

(v)     Use of Proceeds of the New Ark Financing and Cash Collateral.  As a condition to obtaining the New Ark Financing, the extension of credit and other financial accommodations made under the New Ark Funding Documentation (as defined in the DIP Term Sheet), and the consent to use Cash Collateral, New Ark requires, and the Debtors have agreed, that Cash Collateral and the proceeds of the New Ark Financing shall be used solely in accordance with the terms and conditions of this Interim Order and the New Ark Funding Documentation, and only for the expenditures set forth in and consistent with the Approved New Ark Budget (as

defined below) (subject to Permitted Variances and Permitted Carrybacks/Carryforwards), and for no other purpose.

(vi)    <u>Adequate Protection</u>.  The Debtors have agreed, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to provide the Prepetition Secured Parties and the Prepetition HUD Lender adequate protection, as and to the extent set forth in this Interim Order, against the risk of any diminution in the value of their respective interests in the Prepetition Collateral which is as a result of, or arises from, or is attributable to, the imposition of the automatic stay, or the use, sale or lease of such Prepetition Collateral, or the grant of a lien under section 364 of the Bankruptcy Code and applicable case law interpreting the same (any such diminution, "<u>Diminution in Value</u>").  Based on the DIP Motion, the declarations, or other evidence filed in support of the DIP Motion, and the record presented to the Court in connection with the Interim Hearing, the terms of the adequate protection arrangements and of the use of Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral).

(vii)    <u>Consent</u>.  The Prepetition Secured Parties have consented to the Debtors' use of Prepetition Collateral (including Cash Collateral), the New Ark Financing, and the DIP Loan Parties' entry into the DIP Facility, the DIP Loan Documents and the New Ark Funding Documentation, in each case, solely in accordance with and subject to the terms and conditions of this Interim Order, the DIP Loan Documents, and the New Ark Funding Documentation.

(viii)    <u>Limitation on Charging Expenses Against Collateral</u>.  upon entry of a Final Order providing for such relief and as set forth in paragraph 24 herein, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may

result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or any Prepetition Collateral (in each case, including Cash Collateral) as to the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Secured Parties with respect to DIP Collateral or the Prepetition Secured Parties with respect to the Prepetition Collateral, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, respectively, and nothing contained in this Interim Order or the DIP Loan Documents shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claims against the DIP Collateral or the Prepetition Collateral, respectively, under section 506(c) of the Bankruptcy Code or otherwise.

(ix)     No Marshaling.  upon entry of a Final Order providing for such relief, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations.  Further, upon entry of a Final Order providing for such relief, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Collateral.

(x)     Business Judgment and Good Faith Pursuant to Section 364(e).  Based on the DIP Motion, the Jones Declarations, and the record presented to the Court at the Interim Hearing, (i) the extension of credit and other financial accommodations made under the DIP Facility, (ii) the terms of the DIP Loan Documents, (iii) the fees and other amounts paid and to be paid thereunder, (iv) the extension of credit and other financial accommodations made under the

New Ark Financing, (v) the terms of the New Ark Financing, (vi) terms of adequate protection granted to the Prepetition Secured Parties and the Prepetition HUD Lender, (vii) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral), and (viii) the Cash Collateral arrangements described therein and herein, in each case, pursuant to this Interim Order and the DIP Loan Documents, (a) are fair, reasonable, and the best available to the Debtors under the circumstances; (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; (c) are supported by reasonably equivalent value and fair consideration; and (d) represent the best financing available.  The DIP Facility, the New Ark Financing, and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties.  The use of Prepetition Collateral (including Cash Collateral) and the credit to be extended under the DIP Facility and the New Ark Financing shall be deemed to have been so allowed, advanced, made, used, and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Secured Parties are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

(xi)     <u>Good Faith of DIP Secured Parties</u>.   The DIP Facility, the adequate protection granted to the Prepetition Secured Parties, and the use of Prepetition Collateral (including Cash Collateral) hereunder have been negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and their respective advisors, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility and the DIP Loan Documents, including, without limitation, all loans and other financial accommodations made to and guarantees issued by the Debtors pursuant to the DIP Loan

Documents and any DIP Facility Obligations shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the claims, security interests and liens, and other rights, benefits, and protections granted to the DIP Secured Parties (and the successors and assigns thereof) pursuant to this Interim Order and the DIP Loan Documents shall each be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed or modified on appeal; provided, however, that the DIP Secured Parties shall not be entitled to protection under section 364(e) of the Bankruptcy Code with respect to any funds advanced by the DIP Secured Parties under the DIP Loan Documents after entry of an order staying this Interim Order or any provision of this Interim Order authorizing the Debtors to borrow funds under the DIP Loan Documents..

(xii)    Good Faith of Prepetition Secured Parties.  The Prepetition Secured Parties have acted in good faith regarding the DIP Facility and the New Ark Financing and the Debtors' continued use of Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of any adequate protection obligations and the granting of adequate protection liens), in accordance with the terms hereof.

(xiii)    Initial DIP Budget.  The Debtors have prepared and delivered to the DIP Secured Parties the initial itemized cash flow forecast set forth on **Exhibit 2** attached hereto (the "Initial DIP Budget"), which is acceptable to the Required Lenders (as defined in the DIP Term Sheet and hereinafter referred to as the "Required DIP Lenders"), setting forth all line-item and cumulative cash receipts and operating disbursements on a weekly basis for the period beginning

as of the week including the Closing Date (as defined in the DIP Term Sheet) through and including the end of the thirteenth calendar week following such week.  The DIP Secured Parties are relying upon the Debtors' agreement to comply with the Initial DIP Budget (as may be updated by the Debtors and approved by the Required DIP Lenders from time to time pursuant to and in accordance with the terms hereof and of the DIP Term Sheet, the "Approved DIP Budget"), in determining to enter into the postpetition financing arrangements provided for in this Interim Order and to allow the Debtors to use DIP Collateral (including Cash Collateral) subject to the terms of this Interim Order, respectively.  Notwithstanding the foregoing, in no circumstances shall an Approved DIP Budget include budgeted fees and expenses for persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals"), the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals"), or, if a patient care ombudsman (the "PCO") is appointed by order of the Court, by the PCO pursuant to section 327, 328, or 333 of the Bankruptcy Code (together with the PCO, the "PCO Professionals" and, together with the Debtor Professionals and the Committee Professionals, the "Professional Persons") .

(xiv)    Initial New Ark Budget.  The Debtors have prepared and delivered to New Ark the initial itemized cash flow forecast set forth on **Exhibit 3** attached hereto (the "Initial New Ark Budget"), which is acceptable to New Ark, setting forth all line-item and cumulative professional and other fees and expenses on a weekly basis for the period beginning as of the week including the Petition Date through and including the end of the thirteenth calendar week following such week.  New Ark is relying upon the Debtors' agreement to comply with the Initial New Ark Budget (as may be updated by the Debtors and approved by New Ark from time to time pursuant to and in accordance with the terms hereof and of the DIP Term Sheet, the "Approved New Ark

20

Budget"), in determining to enter into the postpetition financing arrangements provided for in this Interim Order and the DIP Term Sheet and to allow the Debtors to use Prepetition Collateral (including Cash Collateral) subject to the terms of this Interim Order, respectively.  Any amounts budgeted for fees and expenses of Professional Persons remain subject to allowance and payment thereof in accordance with the Local Rules, the Bankruptcy Rules and the Bankruptcy Code, and New Ark reserves the right to object to any Professional Persons' fees and expenses notwithstanding its inclusion in the New Ark Budget.

(xv)    Notice.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (a) the U.S. Trustee for the District of Delaware; (b) the holders of the 40 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to New Ark and the Prepetition Lenders; (d) counsel to the Omega Landlords; (e) the BM Eagle Landlords (as defined in the First Day Declaration); (f) counsel to the Prepetition HUD Lender, (g) the United States Department of Housing and Urban Development, (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for states in which the Debtors conduct business; (l) counsel to Barrow Street Capital LLC and its affiliates; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Under the circumstances, such notice of the Interim Hearing and the relief requested in the DIP Motion constitutes due, sufficient, and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c), and Local Rules 2002-1 and 4001-1.

(xvi)   <u>Relief Essential; Necessity of Immediate Entry</u>.   The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).   Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.   The Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and properties.

**NOW THEREFORE,** based upon the foregoing findings and conclusions, the DIP Motion, the Jones Declarations, and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.   **<u>DIP Motion Approved</u>.**   The DIP Motion is granted on an interim basis, and the Interim Financing (as defined below) is authorized and approved, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Term Sheet.   Any objections or other statements to any of the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights inconsistent with this Interim Order, are hereby overruled; provided that the rights of all parties in interest to object to the entry of a Final Order on the DIP Motion are fully reserved.

2.   **<u>Authorization of DIP Facility and New Ark Financing</u>.**

(a)   <u>DIP Facility</u>.

(1)   Subject to the terms and conditions of this Interim Order, each of the DIP Loan Parties is hereby authorized to execute, enter into, guarantee (as applicable), and perform all obligations under the DIP Facility and the DIP Term Sheet to which it is party. The DIP Term Sheet and this Interim Order govern the financial and credit accommodations to be provided to the DIP Loan Parties by the DIP Lenders in connection with the DIP Facility.

(2)    From the entry of this Interim Order through the entry of the Final Order, the DIP Borrowers are authorized to incur, and the DIP Guarantors are hereby authorized to unconditionally guarantee, on a joint and several basis, all of the DIP Loan Parties' DIP Facility Obligations on account of such incurrence under the DIP Facility, up to aggregate principal amount of $25,000,000 in new money DIP Loans on an interim basis, together with applicable interest, protective advances, fees, and other charges payable in connection with the DIP Facility; *provided*, that prior to entry of the Final Order, then such amount shall be reduced to $15,750,000 until the Final Order is entered (the "Interim Financing"), as applicable, in each case, subject to the terms and conditions set forth in this Interim Order and the DIP Term Sheet.

(3)    Without limiting the foregoing, and without the need for further approval of this Court, each DIP Loan Party is authorized to perform all acts to make, execute, and deliver all instruments and documents and to pay all fees or expenses that are authorized by the DIP Term Sheet and this Interim Order.

(4)    No DIP Secured Party shall have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and each DIP Secured Party may rely upon each DIP Loan Party's representations that the amount of the DIP Facility requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Term Sheet, and Bankruptcy Rule 4001(c)(2).

(b)    New Ark Financing.

(1)    Subject to the terms and conditions of this Interim Order, each of the DIP Loan Parties is hereby authorized to execute, enter into, and perform all obligations under the New Ark Financing and the DIP Term Sheet to which it is party. The DIP Term Sheet and this Interim Order govern the financial and credit accommodations to be provided to the DIP Loan Parties by New Ark in connection with the New Ark Financing.

(2)    Without the need for further approval of this Court, each DIP Loan Party is authorized to perform all acts to make, execute, and deliver all instruments and documents and to pay all fees or expenses that are authorized by this Interim Order, the New Ark Financing, and the DIP Term Sheet.

(3)    New Ark shall not have any obligation or responsibility to monitor any Debtor's use of the New Ark Financing, and New Ark may rely upon each DIP Loan Party's representations that the amount of the New Ark Financing requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Term Sheet, and Bankruptcy Rule 4001(c)(2).

3.    **DIP Facility and New Ark Financing Obligations.**  Upon entry of this Interim Order and execution and delivery of the DIP Term Sheet, the DIP Term Sheet shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and

shall be fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, and their creditors and other parties in interest, in each case, in accordance with the terms thereof and this Interim Order. Upon execution and delivery of the DIP Loan Documents, the Debtors shall file the same with the Court within three (3) business days of their execution, and the DIP Facility Obligations will include all postpetition loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by any of the DIP Loan Parties to any of the DIP Agent or DIP Lenders, in each case, under, or secured by, and in accordance with, the DIP Loan Documents or this Interim Order, including all principal, interest, costs, fees, expenses, and other amounts under the DIP Loan Documents (including this Interim Order), but in all cases, subject to the Restructuring Support Agreement (as defined below). The DIP Loan Parties shall be jointly and severally liable for the DIP Facility Obligations. Subject to paragraph 18 of this Interim Order and after the expiration of the Remedies Notice Period (as defined below), but in all cases subject to the Restructuring Support Agreement, the DIP Facility Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease during the continuation of a DIP Termination Event (as defined below) or a New Ark Termination Event (each as defined below) or the occurrence and continuance of any event or condition set forth in paragraph 18 of this Interim Order. No obligation, payment, transfer, or grant of security under the DIP Term Sheet or this Interim Order to the DIP Secured Parties or New Ark shall be stayed, restrained, voidable, or

recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 362, 502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, counterclaim, offset, or any other challenge under the Bankruptcy Code or any applicable law unless in accordance with paragraph 18 of this Interim Order.

4. **No Obligation to Extend Credit.** The DIP Secured Parties and New Ark shall have no obligation to make any loan or advance under the applicable DIP Term Sheet unless all of the conditions precedent to the making of such extension of credit by the applicable DIP Secured Parties or New Ark, as applicable, under the DIP Term Sheet and this Interim Order have been satisfied in full or waived in accordance with the terms of the DIP Term Sheet.

5. **DIP Liens.**

(a) As security for the DIP Facility Obligations, effective immediately upon the date of this Interim Order and execution of the DIP Term Sheet, as set forth more fully in this Interim Order, the DIP Agent, for the benefit of the DIP Secured Parties, is hereby granted (without the necessity of the execution by the DIP Loan Parties or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instruments or otherwise by the DIP Agent or the DIP Lenders) valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (as applicable, the "Priming DIP Liens" or the "Senior DIP Liens," and collectively, the "DIP Liens") in the DIP Collateral (as defined below), as collateral security for the prompt and complete performance and payment when

due (whether at the stated maturity, by acceleration or otherwise) of all DIP Facility Obligations,

which DIP Liens shall have the following relative rank and priority:

(1)    *Priming DIP Liens*.  Pursuant to section 364(d) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected, senior priming security interest in and lien upon all of the DIP Loan Parties' right, title, and interest in, to, and under any tangible and intangible, real and personal prepetition and postpetition property of each DIP Loan Party, whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, to the extent such property is subject to the Prepetition Liens securing the Prepetition Secured Obligations (collectively, the "DIP Priming Collateral"), subject and subordinate only to (a) the Prepetition Working Capital Liens solely with respect to the Prepetition Working Capital Collateral, (b) any valid, binding, enforceable, non-avoidable, and properly perfected liens and security interests (the "Prepetition HUD Lender Liens") in favor of Housing & Healthcare Finance, LLC (the "Prepetition HUD Lender") securing the obligations owed to the Prepetition HUD Lender solely with respect to property of each of Gulf Coast Master Tenant II, LLC, MS Singing, LLC, and MS Lakeside, LLC (collectively, the "Prepetition HUD Obligors") (collectively, the "Prepetition HUD Lender Collateral") and (c) applicable Permitted Liens (as defined in the DIP Term Sheet);

(2)    *Senior DIP Liens*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected first priority senior security interest in and lien upon all of the DIP Loan Parties' right, title, and interest in, to, and under (w) the DIP Proceeds Account and any account that only holds the proceeds of any DIP Loans, (x) to the extent a Final Order is entered providing for such relief, Avoidance Actions Proceeds (as defined below) and solely to the extent set forth below, (y) Stimulus Proceeds (as defined in the DIP Term Sheet), and (z) any other tangible and intangible, real (including leaseholds) and personal prepetition and postpetition property of each DIP Loan Party (excluding assets that qualify as Prepetition Working Capital Collateral or Prepetition HUD Lender Collateral (as defined below)) (collectively, the "Unencumbered Property"), whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (all of the foregoing, collectively, the "DIP Priority Collateral," and, together with the DIP Priming Collateral, the "DIP Collateral"); *provided,* that, to the extent a Final Order is entered providing for such relief, the DIP Priority Collateral shall include the proceeds of causes of action under section 502(d), 544, 545, 547, 548, 550, 551 or 553 of the Bankruptcy Code, whether pursuant to federal law or applicable state law, of the DIP Loan Parties or their estates (such causes of action, collectively, the "Avoidance Actions" and the proceeds therefrom, the "Avoidance Actions Proceeds").

(b)    For the avoidance of doubt, the term "DIP Collateral" shall include all assets

and properties of each of the DIP Loan Parties of any kind or nature whatsoever, whether tangible

or intangible, real, personal or mixed, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties, whether prior to or after the Petition Date, whether owned or consigned by or to, or leased from or to, the DIP Loan Parties, and wherever located, including, without limitation, each of the DIP Loan Parties' rights, title and interests in (i) all Prepetition Collateral, (ii) all Prepetition HUD Collateral, and (iii) all proceeds, products, offspring, and profits of each of the foregoing and all accessions to, substitutions, and replacements for, each of the foregoing, including any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to any DIP Loan Party from time to time with respect to any of the foregoing.

(c)        Except as expressly provided in this Order, the DIP Liens (i) shall not be made subject or subordinate to or *pari passu* with (A) lien that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, or (B) any intercompany or affiliate lien, and (ii) shall not be subject to sections 506(c) (to the extent a Final Order is entered providing for such relief), 510, 549, 550, or 551 of the Bankruptcy Code.

(d)        To the extent a Final Order is entered providing for such relief, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent, or the payment of any fees or obligations to, any governmental entity or non-governmental entity in order for the DIP Loan Parties to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest in any property or the proceeds thereof, is and shall hereby be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens or Adequate Protection Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any DIP Loan

27

Parties, in favor of the DIP Secured Parties or the Prepetition Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order; provided that, with respect to the Prepetition HUD Lender Collateral, the foregoing shall not apply to any consent rights that the Prepetition HUD Lender or the United States Department of Housing and Urban Development may have under the loan documents giving rise to the Prepetition HUD Lender's interest in the Prepetition HUD Lender Collateral and applicable law relating to the same.

6.    **DIP Superpriority Claims.**    Effective immediately upon entry of this Interim Order, the DIP Agent (on behalf of the DIP Secured Parties) is hereby granted, pursuant to section 364(c)(1) and 503(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the DIP Loan Parties' Chapter 11 Cases and any Successor Cases thereof on account of the DIP Facility Obligations, with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 328, 330, 331, 364(c)(1), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114, or any other provisions of the Bankruptcy Code and any other claims against the DIP Loan Parties (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall have recourse against each of the DIP Loan Parties, on a joint and several basis.  Notwithstanding anything contained herein or in any of the DIP Term Sheet to the contrary, the DIP Superpriority Claims shall, at all times be (x) in respect of any DIP Priming Collateral or proceeds or products thereof, (i) junior in right of payment to Prepetition Working Capital Liens, Prepetition HUD Lender Liens, and Permitted Liens, as applicable, and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases and (y) in respect of any DIP

Priority Collateral or proceeds or products thereof, senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases.

       7.      **Use of Proceeds of the DIP Facility and Cash Collateral.**

      (a)      The use of Prepetition Collateral and Prepetition HUD Lender Collateral (in each case, including Cash Collateral) is authorized and approved, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Term Sheet. From and after the date of entry of this Interim Order, so long as no DIP Termination Event has occurred and is continuing and, with respect to clause (x), no New Ark Termination Event has occurred and is continuing, the DIP Loan Parties shall be (x) authorized to use Prepetition Collateral and Prepetition HUD Lender Collateral (in each case, including Cash Collateral), and (y) permitted to draw upon the Interim Financing and the proceeds thereof, subject, in each case, to the terms and conditions of this Interim Order and the DIP Term Sheet, and in accordance with (1) the Approved DIP Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards) and (2) the Approved New Ark Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards), including, without limitation: (i) to pay amounts due to DIP Secured Parties under the DIP Term Sheet incurred by the DIP Secured Parties; (ii) the payment of any adequate protection payments approved by the Court; (iii) to fund the Carve-Out from of the New Ark Funding as set forth herein; (iv) to provide working capital and for other general corporate purposes of the DIP Loan Parties; and (v) to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Court, including in the "first day" or "second day" orders or as required under the Bankruptcy Code. For the avoidance of doubt, none of the DIP Loan Parties will use any DIP Loans, the proceeds of the DIP Facility or DIP Collateral (including Cash

Collateral) in a manner or for a purpose other than those consistent with the Approved DIP Budget, the New Ark Budget, the DIP Loan Documents, and this Interim Order unless otherwise ordered by the Court.  Except as expressly permitted in this Interim Order, the DIP Term Sheet, or the Approved DIP Budget, nothing in this Interim Order shall otherwise authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any DIP Collateral (including Cash Collateral) or other proceeds resulting therefrom.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents.

(b)     All proceeds (x) received by the Debtors after the Petition Date, (y) consisting of accounts receivable generated by the Debtors prior to the Petition Date, and (z) constituting Prepetition Working Capital Collateral (such proceeds satisfying the conditions set forth in (x), (y), and (z), the "Prepetition Receivables") shall be (i) first, deposited into a segregated deposit account (the "Prepetition Loan Account") until the amount held in such Prepetition Loan Account is equal to the sum of (a) the Prepetition Working Capital Debt, plus (b) to the extent the value of the Prepetition Working Capital Collateral exceeds the Prepetition Working Capital Debt, postpetition interest and attorneys' fees payable to the Prepetition Working Capital Secured Parties in accordance with this Interim Order and (ii) to the extent any Prepetition Receivables remain after funding the Prepetition Loan Account in accordance with clause (i) above, retained by the Debtors to be used in accordance with the terms of this Interim Order.

8.     **Disposition of DIP Collateral.**  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, Prepetition Collateral, or Prepetition HUD Lender Collateral (in each case, including Cash Collateral) (and, in each case,

the Debtors shall not enter into any binding agreement to do so) other than in accordance with the DIP Loan Documents or otherwise in the ordinary course of business without the prior written consent of the Required DIP Lenders and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders.

9.      **Adequate Protection.**   The Prepetition Secured Parties and Prepetition HUD Lender are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral and Prepetition HUD Lender Collateral (in each case, including the Cash Collateral), as applicable, (x) with respect to the Prepetition Secured Parties, to the extent of any Diminution in Value of such Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, if any, and (y) with respect to the Prepetition HUD Lender, to the extent of any Diminution in Value of the Prepetition HUD Lender's interests in the Prepetition HUD Lender Collateral (including Cash Collateral) from and after the Petition Date, if any (such claims set forth in clauses (x) and (y), the "Adequate Protection Claims").  In consideration of the foregoing, the Prepetition Secured Parties and Prepetition HUD Lender, as applicable, are hereby granted the following adequate protection:

(a)      Prepetition HUD Lender's Adequate Protection Liens.   The Prepetition HUD Lender is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the aggregate amount of its Adequate Protection Claims (such claims, the "HUD Lender Adequate Protection Claims"), valid, perfected replacement security interests in and liens upon all DIP Collateral of the Prepetition HUD Obligors

(the "HUD Lender Adequate Protection Liens"); *provided* that the HUD Lender Adequate Protection Liens shall be junior to the Prepetition HUD Lender Liens.

(b)    Prepetition Working Capital Secured Parties' Adequate Protection Liens. The Prepetition Agent (for itself and for the benefit of the other Prepetition Lenders) is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the aggregate amount of its Adequate Protection Claims (such claims, the "Working Capital Adequate Protection Claims"), valid, perfected replacement security interests in and liens upon all accounts receivable generated by the Debtors from the Petition Date onwards (the "Postpetition Accounts Receivable") and the proceeds thereof (the "Working Capital Adequate Protection Liens"); *provided* that the Working Capital Adequate Protection Liens shall be junior to the Prepetition Working Capital Liens and the Carve-Out.

(c)    Omega Landlords' Adequate Protection Liens.  The Omega Landlords are each hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the aggregate amount of their respective Adequate Protection Claims (such claims, the "Omega Landlord Adequate Protection Claims"), valid, perfected replacement security interests in and liens upon all of the DIP Collateral (the "Omega Landlord Adequate Protection Liens" and, together with the HUD Lender Adequate Protection Liens, and the Working Capital Adequate Protection Liens, the "Adequate Protection Liens"); *provided* that, the Omega Landlord Adequate Protection Liens shall be junior to the Prepetition HUD Lender Liens, the HUD Lender Adequate Protection Liens, the DIP Liens, Prepetition Working Capital Liens, the Working Capital Adequate Protection Liens, and the Carve-Out.

(d)    <u>Prepetition HUD Lender's 507(b) Claim</u>.  The Prepetition HUD Lender is hereby granted allowed superpriority administrative expense claims against the Prepetition HUD Obligors as provided for in section 507(b) of the Bankruptcy Code in the aggregate amount of the applicable HUD Lender Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>HUD Lender 507(b) Claims</u>").  The HUD Lender 507(b) Claims shall be senior to any and all other administrative expense claims or other claims against the Prepetition HUD Obligors or their estates, in the Chapter 11 Cases and any Successor Cases.

(e)    <u>Prepetition Working Capital Secured Parties' 507(b) Claim</u>.    The Prepetition Agent (for itself and for the benefit of the other Prepetition Lenders) is hereby granted allowed superpriority administrative expense claims as provided for in section 507(b) of the Bankruptcy Code in the aggregate amount of the applicable Working Capital Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "<u>Working Capital 507(b) Claims</u>")  The Working Capital 507(b) Claims shall be (x) in respect of any DIP Collateral of the Prepetition HUD Obligors (other than DIP Priority Collateral) or proceeds or products thereof, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, the HUD Lender 507(b) Claims, the DIP Superpriority Claims, the Omega Landlord 507(b) Claims, and the Carve-Out and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, (y) in respect of any DIP Collateral that is subject to first priority Prepetition Working Capital Liens or first priority Working Capital Adequate

Protection Liens senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, and (z) in respect of any other DIP Collateral, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, the DIP Superpriority Claims, the Omega Landlord 507(b) Claims, and the Carve-Out, and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases.

(f)   Omega Landlord 507(b) Claim.  The Omega Landlords are hereby granted allowed superpriority administrative expense claims as provided for in section 507(b) of the Bankruptcy Code in the aggregate amount of the applicable Omega Landlord Adequate Protection Claims with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "Omega Landlord 507(b) Claims" and, together with the HUD Lender 507(b) Claims and the Working Capital 507(b) Claims, the "507(b) Claims").  The Omega Landlord 507(b) Claims shall be (x) in respect of any DIP Collateral of the Prepetition HUD Obligors (other than DIP Priority Collateral) or proceeds or products thereof, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, the HUD Lender 507(b) Claims, and the DIP Superpriority Claims and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases, (y) in respect of any DIP Collateral that is subject to first priority Prepetition Working Capital Liens or first priority Working Capital Adequate Protection Liens, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, the Prepetition Working Capital 507(b) Claims, and the DIP Superpriority Claims and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the

34

Chapter 11 Cases and any Successor Cases, and (z) in respect of any other DIP Collateral, (i) junior in right of payment to claims secured by Liens on such DIP Collateral, and the DIP Superpriority Claims, and (ii) senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases and any Successor Cases.

(g)    <u>Postpetition Interest on the Prepetition Working Capital Debt</u>.    The Prepetition Agent (for the benefit of the other Prepetition Lenders) is hereby entitled to cash payment of interest on the Prepetition Working Capital Debt at the non-default rate provided for under the Prepetition Credit Agreement (subject to recharacterization as repayments of principal to the extent the value of the Prepetition Working Capital Collateral does not exceed the Prepetition Working Capital Debt and any amounts paid postpetition to the Prepetition Agent on account of the Prepetition Credit Agreement).

(h)    <u>Postpetition Attorneys' Fees</u>.

(1)    The Prepetition Agent (for the benefit of the other Prepetition Lenders) is hereby entitled to cash reimbursement of actual, reasonable, and documented fees and expenses and other disbursements of the Prepetition Lenders incurred in connection with the Chapter 11 Cases (the "<u>Working Capital Fees and Expenses</u>") (subject to recharacterization as repayments of principal to the extent the value of the Prepetition Working Capital Collateral does not exceed the Prepetition Working Capital Debt and any amounts paid postpetition to the Prepetition Agent on account of the Prepetition Credit Agreement). Subject to the review procedures set forth in this paragraph, Working Capital Fees and Expenses invoices may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and shall be provided to counsel to the Debtors, counsel to any Official Committee (if appointed), and the U.S. Trustee (the "<u>Fee Notice Parties</u>"). The rights of the Fee Notice Parties to seek additional information regarding the Working Capital Fees and Expenses remain fully reserved. If no objection to payment of the requested fees and expenses is made, in writing by any of the Fee Notice Parties within ten (10) business days after delivery of such invoices (the "<u>Fee Objection Period</u>"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors and, in any case, within five (5) business days following the expiration of the Fee Objection Period. If an objection is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the

requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors and, in any case, within five (5) business days of the expiration of the Fee Objection Period.

(2)     Notwithstanding anything to the contrary herein, the Debtors shall not pay, as adequate protection or otherwise, any fees or expenses incurred postpetition by any of the Omega Landlords, HUD Lender, the DIP Agent, or the DIP Lenders, each of which shall be responsible for paying its own fees and expenses.

(i)     <u>Reservation of Rights</u>.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and the Prepetition HUD Lender; *provided* that any of the Prepetition Agent, acting on its own behalf or at the direction of the Prepetition Lenders, or the Prepetition HUD Lender may request further or different adequate protection, and the Debtors, the DIP Secured Parties, or any other party in interest may contest any such request; *provided further*, *however*, that the Prepetition Agent shall not request any relief that modifies, impairs, diminishes, or is inconsistent with the relief and protections granted to the DIP Lenders hereunder.

10.     **<u>Approved Budgets.</u>**

(a)     *Approved DIP Budget*.  All borrowings under the DIP Facility, and the use of Cash Collateral (other than Cash Collateral consisting of Prepetition Working Capital Collateral), shall at all times comply with the Approved DIP Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards) and the DIP Term Sheet.  On the first Thursday of each weekly period after the Budget Testing Start Date (as defined in the DIP Term Sheet), the Debtors shall deliver updates to the Initial DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), covering the 13-week period that commences with the beginning of the week immediately following the week in which the supplemental budget is

36

required to be delivered, consistent with the form and level of detail set forth in the Initial DIP Budget (each such supplemental budget, an "Updated DIP Budget") and the Updated DIP Budget will replace the Initial DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), unless the Required Lenders otherwise object within 2 business days of the receipt thereof to the substance of such Updated DIP Budget on the basis of such Updated DIP Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the DIP Loan Documents, or being based on information that is incorrect in any material respect, in which case the Updated DIP Budget will be as agreed reasonably and in good faith by the Required Lenders and the Debtors; provided that, in the event of an objection to the Updated DIP Budget in accordance with this paragraph, the then-current Approved DIP Budget shall remain in effect, effective as of the beginning of the week immediately following the week in which it was delivered.  Each Approved DIP Budget shall be filed with the Court.

(b)     *Approved New Ark Budget*.  The use of Cash Collateral consisting of Prepetition Working Capital Collateral, shall at all times comply with the Approved New Ark Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards) and the DIP Term Sheet.  On the first Thursday of each weekly period after the Budget Testing Start Date (as defined in the DIP Term Sheet), the Debtors shall deliver updates to the Initial New Ark Budget (or the previously supplemented Approved New Ark Budget, as the case may be), covering the 13-week period that commences with the beginning of the week immediately following the week in which the supplemental budget is required to be delivered, consistent with the form and level of detail set forth in the Initial New Ark Budget (each such supplemental budget, an "Updated New Ark Budget") and the Updated New Ark Budget will replace the Initial New Ark Budget (or the previously supplemented Approved New Ark Budget, as the case may be), unless New Ark

otherwise objects within 2 business days of the receipt thereof to the substance of such Updated New Ark Budget on the basis of such Updated New Ark Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the DIP Term Sheet or being based on information that is incorrect in any material respect, in which case the Updated New Ark Budget will be as agreed reasonably and in good faith by New Ark and the Debtors; provided that, in the event of an objection to the Updated DIP Budget in accordance with this paragraph, the then-current Approved New Ark Budget shall remain in effect, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that the aggregate disbursements to be made under the Approved New Ark Budget from and after the Petition Date shall not exceed $8,000,000.  Each Approved New Ark Budget shall be filed with the Court.

11.    **Modification of Automatic Stay.**  Subject to paragraph 18 hereof, the automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may reasonably request, to assure the perfection and priority of the DIP Liens and the DIP Superpriority Claims; (b) the DIP Loan Parties to incur all liabilities and obligations, including all the DIP Facility Obligations, to the DIP Secured Parties as contemplated under this Interim Order and the DIP Loan Documents, and to perform under the DIP Loan Documents any and all other instruments, certificates, agreements, and documents that may be reasonably required, necessary, or prudent for the performance by the applicable DIP Loan Parties under the DIP Loan Documents and any transactions contemplated therein or in this Interim Order in each case in accordance therewith or herewith; (c) the DIP Loan Parties to take all appropriate actions to grant the Adequate Protection Liens and the 507(b) Claims set forth herein,

and to take all appropriate actions (including such actions as the Prepetition Secured Parties may reasonably request) to ensure that the Adequate Protection Liens granted hereunder are perfected and maintain the priority set forth herein; (d) the DIP Loan Parties to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order; (e) the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order; (f) subject to paragraph 18 hereof, the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any DIP Termination Event (as defined below), all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein in accordance therewith; and (g) subject to paragraph 18 hereof, the implementation and exercise of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents, in each case, in accordance herewith and therewith, without further notice, motion or application to, or order of this Court.

12.    **Perfection of DIP Liens and Adequate Protection Liens.**  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of execution, filing, or recording any financing statement, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Secured Parties, the Prepetition Secured Parties, and the Prepetition HUD Lender to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent, the Prepetition Agent, and the Prepetition HUD Lender, without any further consent of any party, are

authorized to execute, file, or record, as the case may be (and the DIP Agent, Prepetition Agent, and Prepetition HUD Lender may reasonably request the execution, filing, or recording), as each, in its reasonable discretion deems necessary, such financing statements, notices of lien, and other similar documents to enable the DIP Agent, the Prepetition Agent, and the Prepetition HUD Lender to further validate, perfect, preserve, and enforce the applicable DIP Liens or other liens and security interests granted hereunder, perfect in accordance with applicable law or to otherwise evidence the applicable DIP Liens and/or the applicable Adequate Protection Liens, as applicable, and all such financing statements, notices, and other documents shall be deemed to have been filed or recorded as of the date of entry of the Interim Order; *provided* that no such filing or recordation shall be necessary or required in order to create, perfect, preserve, or enforce the DIP Liens and/or the Adequate Protection Liens.  The Debtors are authorized to execute and deliver promptly upon reasonable request and in accordance with the DIP Term Sheet to the DIP Agent and the Prepetition Agent all such financing statements, notices, and other security documents as the DIP Agent and the Prepetition Agent may reasonably request.  The DIP Agent, the Prepetition Agent, and the Prepetition HUD Lender, each in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments. To the extent that the Prepetition Agent is a secured party under any account control agreement, listed as an additional insured, loss payee under any of the Debtors' insurance policies, or is the secured party under any loan document, financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction to validate, attach, perfect, or prioritize liens (any such instrument or document, a "Security Document"), the DIP Agent shall also be deemed to be the secured party under each such Security

Document, and shall have all the rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Order and/or the Final Order, as applicable, and the other DIP Loan Documents. The Prepetition Agent shall serve as agent for the DIP Agent solely for the purposes of perfecting its security interests in and liens on all DIP Collateral that is of a type such that perfection of a security interest therein (but for the entry of this Interim Order) may be accomplished only by possession or control by a secured party to the extent such Prepetition Agent possesses or controls any such DIP Collateral.

13.    **Proceeds of Subsequent Financing.**  Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the indefeasible payment in full in cash of all of the DIP Facility Obligations, Omega Master Lease Obligations, and the Prepetition Working Capital Debt, in each case, other than contingent indemnification obligations as to which no claim has been asserted, the termination of the DIP Secured Parties' obligations to extend credit under the DIP Facility and this Interim Order (including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates), and the satisfaction of the DIP Superpriority Claims and the Adequate Protection Claims, either the DIP Loan Parties, the DIP Loan Parties' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in any of the DIP Loan Parties' Chapter 11 Cases or any Successor Cases thereof, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code then, unless otherwise agreed by the requisite DIP Lenders in their sole discretion: (i) all of the cash proceeds derived from such credit or debt and all DIP Collateral shall immediately be turned over to the DIP Agent for further distribution to the applicable DIP Secured Parties on account of their applicable DIP Facility Obligations pursuant to the applicable DIP Loan

Documents; and (ii) after indefeasible payment in full of all DIP Facility Obligations in cash (other than contingent indemnification obligations as to which no claim has been asserted), all the cash proceeds derived from DIP Collateral shall immediately be turned over to the Prepetition Agent, for further distribution to the applicable Prepetition Secured Parties pursuant to the terms of this Order and/or the applicable Prepetition Loan Documents.

14.    **Covenants**.  The DIP Loan Parties shall comply with the covenants set forth in the DIP Loan Documents in accordance with the terms thereof.

15.    **Milestones.**  It is a condition to the DIP Facility and the use of Cash Collateral that the Debtors shall comply with those certain case milestones set forth in the DIP Term Sheet (the "Milestones").  The failure to comply with any Milestone shall constitute an "Event of Default" in accordance with the terms of the DIP Note.

16.    **Maintenance of DIP Collateral.**  Until all DIP Facility Obligations are indefeasibly paid in full (other than contingent indemnification obligations as to which no claim has been asserted) and the DIP Secured Parties' obligation to extend credit under the DIP Facility has terminated, the Debtors shall continue to maintain all property, operational, and other insurance as required in the DIP Loan Documents.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the DIP Loan Parties that in any way relates to the DIP Collateral, and the DIP Agent shall distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment in full of the DIP Facility Obligations (other than

contingent indemnification obligations as to which no claim has been asserted), and <u>second</u>, to the payment of the Prepetition Working Capital Debt.

17.     **Termination Events.**

(a)     The (i) occurrence and continuance of any "Event of Default" under and as defined in the DIP Term Sheet, (ii) consent of the Debtors to the standing of any party, including an Official Committee to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenge (as defined below), or (iii) commencement of a Challenge Proceeding (as defined below) by any party, including the Debtors or an Official Committee, shall each constitute a "DIP Termination Event" under this Interim Order (each a "<u>DIP Termination Event</u>," and the date upon which such DIP Termination Event occurs, the "<u>DIP Termination Date</u>"), unless waived in writing by the DIP Agent in its sole discretion.

(b)     The occurrence and continuance of any "New Ark Event of Default" under and as defined in the DIP Term Sheet shall each constitute a "<u>New Ark Termination Event</u>" under this Interim Order (and the date upon which New Ark provides written notice to the Debtors of such New Ark Termination Event, the "<u>New Ark Termination Date</u>"), unless waived in writing by the Prepetition Agent in its sole discretion.

18.     **Exercise of Remedies.**

(a)     <u>Remedies of the DIP Agent</u>.  Immediately upon the occurrence and during the continuation of a DIP Termination Event, any automatic stay, whether arising under section 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order, including clause (c) of this paragraph, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent to, upon the delivery of written notice (which may include electronic mail) to the Remedies Notice Parties (as defined below): (i) declare

all DIP Facility Obligations owing under the DIP Facility to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend credit to the DIP Loan Parties under the DIP Facility (to the extent any such commitment remains); (iii) terminate the DIP Facility and the DIP Loan Documents as to any future liability or obligation thereunder, but without affecting the DIP Liens or the DIP Facility Obligations; (iv) charge interest at the default rate under the DIP Facility; (v) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the DIP Loan Documents to use any Cash Collateral of the DIP Secured Parties (other than proceeds of prepetition accounts receivable that are subject to the Prepetition Working Capital Liens); (vi) freeze monies or balances in the DIP Proceeds Account; (vii) otherwise enforce any and all rights against the DIP Collateral in the possession of the DIP Agent; and (viii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents, or applicable law; *provided* that prior to the exercise of any right in clauses (v) through (viii) of this paragraph, the DIP Agent shall be required to provide five (5) business days' written notice (by electronic mail or other electronic means) to counsel to the Debtors, counsel to the Prepetition Agent, counsel to any Official Committee (if appointed), and the U.S. Trustee (the "Remedies Notice Parties") of the DIP Agent's intent to exercise its rights and remedies (the "DIP Remedies Notice Period"); *provided*, *further*, that the DIP Lenders shall not be obligated to make any loans or advances under the DIP Facility during any Remedies Notice Period; *provided further* that, for the avoidance of doubt, the Debtors may continue to use any Cash Collateral prior to the expiration of the Remedies Notice Period so long as such Cash Collateral is used in accordance with the Approved DIP Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards).

(b)     Remedies of the Prepetition Agent. Immediately upon the occurrence and during the continuation of a New Ark Termination Event, any automatic stay, whether arising

under section 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim

Order, including clause (c) of this paragraph, is hereby modified, without further notice to, hearing

of, or order from this Court, to the extent necessary to permit the Prepetition Agent to, upon the

delivery of written notice (which may include electronic mail) to the Remedies Notice Parties:

(i) [reserved]; (ii) terminate, reduce, or restrict any commitment to extend credit to the DIP Loan

Parties under the New Ark Financing (to the extent any such commitment remains); (iii) terminate

the New Ark Funding Documentation as to any future liability or obligation thereunder; (iv)

[reserved]; (v) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the

New Ark Funding Documentation to use any Cash Collateral of the Prepetition Working Capital

Secured Parties; (vi) freeze monies or balances in the Prepetition Loan Account; (vii) [reserved];

and (viii) take any other actions or exercise any other rights or remedies permitted under this

Interim Order, the New Ark Funding Documentation, or applicable law; *provided* that prior to the

exercise of any right in clauses (v) through (viii) of this paragraph, the Prepetition Agent shall be

required to provide five (5) business days' written notice (by electronic mail or other electronic

means) to the Remedies Notice Parties of the Prepetition Agent's intent to exercise its rights and

remedies (the "New Ark Remedies Notice Period" and, together with the DIP Remedies Notice

Period, each, a "Remedies Notice Period"); *provided further* that, for the avoidance of doubt, the

Debtors may continue to use any Cash Collateral prior to the expiration of the New Ark Remedies

Notice Period so long as such Cash Collateral is used in accordance with the Approved New Ark

Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards).

(c)    During the applicable Remedies Notice Period, the Debtors, the Official

Committee or any other party in interest may seek an emergency hearing before the Court.  Unless

during such Remedies Notice Period the Court enters an order to the contrary, the DIP Agent or

Prepetition Agent, as applicable, shall be deemed to have received relief from the automatic stay to exercise all rights and remedies available against the DIP Collateral (subject to the rights of the Prepetition Lenders in the Prepetition Working Capital Collateral and the Prepetition HUD Lender in the Prepetition HUD Lender Collateral) or Prepetition Working Capital Collateral, as applicable, permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code or otherwise (in each case, subject to paragraph 18(d) hereof). To the extent a Final Order is entered providing for such relief and in furtherance of the foregoing, upon the occurrence and during the continuation of a DIP Termination Event or New Ark Termination Event, as applicable, and the expiration of the applicable Remedies Notice Period without entry of a Court order to the contrary, the DIP Agent and any liquidator or other professional acting at the DIP Agent's direction (or Prepetition Agent and any liquidator or other professional acting at the Prepetition Agent's direction) shall (A) have the right to use, license or sub-license (without payment of royalty or other compensation) any or all intellectual property of the Debtors, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any DIP Collateral or Prepetition Working Capital Collateral, as applicable, and (B) have the right to access, and a rent free right to use, any and all owned or leased locations (including, without limitation, manufacturing facilities, warehouse locations, distribution centers and offices) for the purpose of arranging for and effecting the sale or disposition of DIP Collateral or Prepetition Working Capital Collateral, as applicable, including the production, completion, packaging and other preparation of such DIP Collateral or Prepetition Working Capital Collateral, as applicable,

for sale or disposition (it being understood and agreed that the DIP Agent and its representatives (and persons employed on their behalf) or Prepetition Agent and its representatives (and persons employed on their behalf), as applicable, may continue to operate, service, maintain, process and sell the DIP Collateral (subject to the rights of the Prepetition Lenders in the Prepetition Working Capital Collateral) or Prepetition Working Capital Collateral, as applicable, as well as to engage in bulk sales of such DIP Collateral or Prepetition Working Capital Collateral, as applicable.

(d)     The Debtors (i) shall reasonably cooperate with the DIP Agent or Prepetition Agent, as applicable, in its exercise of rights and remedies, whether against DIP Collateral (subject to the rights of the Prepetition Lenders in the Prepetition Working Capital Collateral and the Prepetition HUD Lender in the Prepetition HUD Lender Collateral) or Prepetition Working Capital Collateral, as applicable, or otherwise, (ii) waive any right to seek relief under section 105 of the Bankruptcy Code, and (iii) unless the Court orders otherwise, may not contest or challenge the exercise of any such rights or remedies other than to dispute whether a DIP Termination Event or New Ark Termination Event, as applicable, has in fact occurred.

(e)     So long as there are any DIP Facility Obligations outstanding or any DIP Lenders have any outstanding DIP Commitment (as defined in the DIP Term Sheet), in each case with respect to DIP Collateral that is secured by DIP Liens that in accordance with this Interim Order are senior to any liens held by Prepetition Secured Parties, then with respect to such DIP Collateral, such Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral, including in connection with the Adequate Protection Liens except to the extent required by an order of this Court; (ii) be deemed to have consented to any

transfer, disposition or sale of, or release of liens on, such DIP Collateral or proceeds thereof (until payment in full in cash of all DIP Facility Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitments), to the extent such transfer, disposition, sale, or release is authorized under the applicable DIP Loan Documents; and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iii), any of the applicable DIP Secured Parties have filed financing statements or other documents in respect of the liens granted pursuant to this Interim Order or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or securities interests as of the Petition Date.

19.    **Indemnification.**  The DIP Loan Parties shall jointly and severally indemnify and hold harmless the DIP Agent, each DIP Secured Party, and New Ark and each of their respective directors, officers, employees, agents, attorneys, accountants, advisors, controlling persons, equity holders, partners, members, and other representatives and each of their respective successors and permitted assigns (each, an "Indemnified Party") against, and to hold each Indemnified Party harmless from, any and all losses, claims, damages, liabilities, and reasonable, documented and invoiced out-of- pocket fees and expenses (including, without limitation, fees and disbursements of counsel but limited, in the case of counsel, to the extent set forth in the DIP Term Sheet) that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of, or in any way in connection with, or as a result of: (i) the execution or delivery of the DIP Term Sheet or DIP Note, any other DIP Loan Document, the performance by the parties thereto of their respective obligations thereunder and the other transactions contemplated thereby; (ii) the use of the proceeds of the DIP Loans or the New Ark Financing; (iii) the enforcement or protection of its

rights in connection with the DIP Term Sheet, the DIP Note, and any other DIP Loan Document; (iv) the negotiation of and consent to this Interim Order; or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnified Party is a party thereto and regardless of whether such matter is initiated by a third party or the Debtors or any of their subsidiaries or affiliates or creditors; *provided* that the foregoing indemnity shall not apply to any claims arising (i) prior to the Petition Date or (ii) out of, or in any way in connection with, or as a result of provisions of the Prepetition Loan Documents or Omega Master Lease Documents (for the avoidance of doubt, nothing in this Interim Order alters, amends, expands or minimizes any indemnification under the Prepetition Loan Documents or Omega Master Lease Documents, subject to applicable law); *provided further* that no Indemnitee will be indemnified for any loss, claim, damage, liability, cost, or other expense to the extent such loss, claim, damage, liability, cost, or expense that (i) is determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith, or willful misconduct of such Indemnitee or (B) a material breach of the obligations of such Indemnitee under the DIP Loan Documents or (ii) relates to any proceeding between or among Indemnitees other than claims arising out of any act or omission on the part of the DIP Loan Parties in accordance with this paragraph 19.

20.    **Proofs of Claim.**  The DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successors Cases for any claim allowed herein or therein in respect of the Prepetition Working Capital Debt or the Omega Master Lease Documents.  Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases shall not apply to the DIP Secured Parties or the Prepetition Secured Parties; *provided* that, notwithstanding any

order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor

Cases to the contrary, the DIP Agent, on behalf of the DIP Secured Parties, and the Prepetition

Agent, on behalf of the Prepetition Secured Parties, may (but are not required) in their discretion

file (and amend and/or supplement) in the Debtors' lead chapter 11 case *In re Gulf Coast Health

Care, LLC, et al.,* Case No. 21-11336 (KBO), or any Successor Cases, a single, master proof of

claim on behalf of the Prepetition Working Capital Secured Parties or the Omega Landlords, as

applicable, for any claim allowed herein or their claims arising under the applicable Prepetition

Loan Documents or the Omega Master Lease Documents, and any such proof of claim may (but

is not required to) be filed as one consolidated proof of claim against all of the Debtors (each, a

"Master Proof of Claim"), rather than as separate proofs of claim against each Debtor.  Any proof

of claim filed by the DIP Secured Parties or any of the Prepetition Secured Parties shall be deemed

to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such

persons.   The provisions set forth in this paragraph are intended solely for the purpose of

administrative convenience and shall not affect the substantive rights of any party-in-interest or

their respective successors-in-interest. The Master Proofs of Claim shall not be required to attach

any instruments, agreements or other documents evidencing the obligations owing by each of the

Debtors to the Prepetition Secured Parties, which instruments, agreements or other documents will

be provided upon written request to counsel to each Prepetition Secured Party.

21.     **Carve-Out.**

(a)     Subject to the terms, conditions and limitations contained in this

Paragraph 21, but only to the extent and subject to the express exclusions set forth herein, the

Prepetition Liens, the Adequate Protection Liens and the 507(b) Claims, and any other liens or

claims granted under this Interim Order, are all subordinate (except as otherwise provided herein) to the following (collectively, the "Carve-Out"):

(1)     allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for statutory fees payable to the U.S. Trustee, together with the statutory rate of interest, and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court (collectively, the "Statutory Fees"), which shall not be subject to any budget;

(2)     all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;

(3)     to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees (other than any "success," "restructuring," "transaction" or similar fees), disbursements, costs, and expenses ("Allowed Professional Fees") incurred by Professional Persons, at any time on or before the second (2nd) business day following delivery of the Carve-Out Trigger Notice (as defined below) by New Ark, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, but in all cases, with respect to this clause (3), subject to the amounts set forth for such Professional Persons in the Approved New Ark Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards); and

(4)     Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $250,000 incurred after the second (2nd) business day following deliver of a Carve-Out Trigger Notice by New Ark to the extent allowed at any time, whether by final order, procedural order, or otherwise (the amounts set forth in this clause (4) being the "Carve-Out Trigger Notice Cap").

For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by New Ark to the Debtors and their counsel, with a copy to the DIP Agent and their counsel, the U.S. Trustee, and counsel to the Official Committee, if any, which notice may be delivered following the occurrence and during the continuation of New Ark Funding Termination Event (as defined in the DIP Term Sheet) stating that the Carve-Out Trigger Notice Cap has been invoked.

(b)     During the time period commencing on the Petition Date and continuing until the second (2nd) business day following delivery of the Carve-Out Trigger Notice, those amounts set forth in the Approved New Ark Budget (subject to Permitted Variances and Permitted

Carrybacks/Carryforwards) for the satisfaction of the amounts included in the Carve-Out shall be transferred from the Prepetition Loan Account to the New Ark Reserve Account, on a weekly basis, pending approval of the Court (if required) to disburse such funds to the respective beneficiaries thereof (not to exceed the aggregate amounts allocated for each such beneficiary under the New Ark Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards)).

(c)     Following the delivery of the Carve-Out Trigger Notice, the Prepetition Agent shall promptly transfer to the New Ark Reserve Account an amount equal to the sum of (i) the Carve-Out Trigger Notice Cap, plus (ii) the amounts reserved under clause (2) of the definition of Carve-Out, plus (iii) an estimate of amounts necessary to fund the remaining amounts to be paid or payable under clause (1) of the definition of Carve-Out.

(d)     To the extent that (a) any amounts held in the New Ark Reserve Account are not allowed by the Bankruptcy Court to be disbursed to a beneficiary of the Carve-Out or (b) such amounts relate to any period during which such beneficiary of the Carve-Out is no longer employed as a Professional Person, such funds shall revert to New Ark for application against the Prepetition Working Capital Debt, if any.

(e)     Nothing herein, including the inclusion of line items in the Approved New Ark Budget for Professional Persons, shall be construed as consent to the allowance of any particular professional fees or expense of the Debtors, of the Official Committee, or of any other person or shall affect the right of the DIP Agent, the Prepetition Agent, the U.S. Trustee, or any other party in interest to object to the allowance and payment of such fees and expenses. The Prepetition Working Capital Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection

52

with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Working Capital Secured Parties in any way to pay compensation to or to reimburse expenses of any Professional Persons, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     Notwithstanding anything to the contrary contained in this Interim Order, the DIP Liens on DIP Priority Collateral shall not be subject to the Carve-Out.

22.    **Limitations on the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, the Carve-Out, and Other Funds.**  Notwithstanding anything contained in the DIP Loan Documents, this Interim Order, or any other order of the Court to the contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, any Official Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral, or Cash Collateral, so long as a DIP Termination Event has occurred and is continuing; or (b) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, against any of the Prepetition Secured Parties

and DIP Lenders, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) (collectively, the "Subject Parties") with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to this Interim Order, the DIP Facility, the DIP Loan Documents, the DIP Facility Obligations, the Prepetition Liens, the Prepetition Working Capital Debt, or the Prepetition Loan Documents or the transactions contemplated therein or thereby, including, without limitation, (A) any Avoidance Actions, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Facility Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Prepetition Loan Documents, the Prepetition Liens, the Adequate Protection Liens, the Adequate Protection Claims, or the Prepetition Working Capital Debt, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Facility Obligations, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the Prepetition Collateral, the Prepetition Working Capital Debt, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any of the DIP Secured Parties hereunder or under any of the DIP Loan Documents or the Prepetition Secured Parties under any of the Prepetition Loan Documents or the Omega Master Lease Documents, as applicable (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay

any of the DIP Secured Parties, or the Prepetition Secured Parties' assertions, enforcements, realizations, or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents or Prepetition Loan Documents and this Interim Order and/or the Final Order (as applicable)); *provided*, that (i) no more than $50,000 may be used for allowed fees and expenses incurred solely by any Official Committee (if appointed) in investigating, but not objecting to, challenging, litigating, opposing, prosecuting, or seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the Prepetition Liens, the Prepetition Working Capital Debt, the Prepetition Loan Documents, the Omega Master Lease Obligations, the Omega Master Lease Documents, the Adequate Protection Liens, or the Adequate Protection Claims prior to the Challenge Deadline (as defined below) and (ii) no DIP Collateral (including Cash Collateral) or any proceeds thereof shall be used to investigate, object to, challenge, litigate, oppose, or prosecute any cause of action against the DIP Secured Parties (in their capacity as such), including seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the DIP Liens, the DIP Superpriority Claims, the DIP Loans, or the DIP Loan Documents.  Except to the extent expressly permitted by the terms of the DIP Loan Documents and this Interim Order or any further order of the Court, none of the Debtors, any Official Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity may use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of the Required DIP Lenders.

23.    **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims.**

(a)    Subject to the challenge rights described in this paragraph 23, each of the stipulations, admissions, and agreements contained in this Interim Order, including, without

limitation, in clauses (i) through (viii) of paragraph E of this Interim Order (collectively, the "Stipulations"), shall be binding upon the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases or any Successor Cases) in all circumstances and for all purposes. The Stipulations shall be binding upon all parties in interest (including without limitation, (x) the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases or any Successor Cases), and (y) any Official Committee, if appointed) and any other person or entity acting or seeking to act on behalf of the DIP Loan Parties' estates, in all circumstances and for all purposes, unless  an Official Committee, if any, or a party in interest (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the Challenge Deadline (as defined below)) with respect to the Stipulations and a challenge has been filed with the Court (each, a "Challenge Proceeding") by the Challenge Deadline, objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Working Capital Debt, the Omega Master Lease Obligations, the Prepetition Liens, or the Prepetition Loan Documents, the Omega Master Lease Documents, or otherwise asserting or prosecuting any Avoidance Action or any other claim, counterclaim, cause of action, objection, contest, defense or other challenge (a "Challenge") against any of the Subject Parties arising under, in connection with or related to the Debtors, the Prepetition Working Capital Debt, the Prepetition Liens, the Prepetition Loan Documents, or the DIP Loan Documents, and there is entered a final non-appealable order in favor of the objector, movant or plaintiff in any such timely filed Challenge Proceeding; *provided* that (i) as to the Debtors (but not their estates), any and all such challenges are hereby irrevocably waived and relinquished as of the Petition Date, (ii) any pleadings filed in

56

any Challenge Proceeding shall set forth with the requisite specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Deadline shall be deemed forever, waived, released and barred), and (iii) such Challenge Proceeding may be pursued by the Official Committee or any other party in interest that timely commenced a Challenge Proceeding pursuant to the terms of this Interim Order.

(b)     If no such Challenge Proceeding is timely filed with the Court prior to the Challenge Deadline, then, without further notice to any person or entity or order of the Court, (i) the Stipulations shall be binding on all parties in interest (including, without limitation, any Official Committee, if appointed, the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases or any Successor Cases) and the Debtors; (ii) the Prepetition Working Capital Debt and Omega Master Lease Obligations shall constitute allowed claims and shall not be subject to any defense, claim, counterclaim, recharacterization, subordination, disgorgement, offset, avoidance, for all purposes in these Chapter 11 Cases and any Successor Cases; (iii) the Prepetition Loan Documents and Omega Master Lease Documents shall be deemed to have been valid, as of the Petition Date, and enforceable against each of the DIP Loan Parties in the Chapter 11 Cases and any Successor Cases, and the Prepetition Obligors; (iv) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance, or other defense; and (v) the Prepetition Working Capital Debt, the Omega Master Lease Obligations, the Prepetition Liens, the Omega Master Lease Documents, and the Prepetition Loan Documents shall not be subject to any other or further claim or Challenge by any Official Committee (if appointed), any non-statutory committees appointed or formed in these Chapter 11 Cases or any Successor

Cases or any other party in interest, whether acting or seeking to act on behalf of the Debtors' estates or otherwise.

(c)     If any such Challenge Proceeding is timely filed prior to the Challenge Deadline, the Stipulations shall nonetheless remain binding and preclusive (as provided in paragraph 23(b) hereof) on any Official Committee (if appointed) and on any other person or entity, the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases or any Successor Cases), and the Debtors, except to the extent that such Stipulations were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

(d)     The "Challenge Deadline" shall mean the date that is (A) the later of (i) 75 calendar days after entry of this Interim Order if no Official Committee has been formed by such date, or (ii) 60 days after formation of an Official Committee (if appointed), (B) with respect to any Subject Party, such later date that such Subject Party has agreed to in writing, prior to the expiration of the deadline to commence a Challenge, or (C) any such later date as has been ordered by the Court for cause upon a motion filed and served prior to the expiration of the deadline to commence a Challenge, on (i) with respect to the Prepetition Credit Agreement, the Prepetition Agent and (ii) with respect to the Omega Master Lease Obligations, the Omega Landlords; *provided*, that the filing of a motion pursuant to subsection (C), *supra*, shall toll the Challenge Period only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by the Court; *provided further*, if a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date

that is twenty (20) calendar days after the date on which such trustee is appointed or elected. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Official Committee (if appointed) or any non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Loan Documents, the Prepetition Working Capital Debt, the Omega Master Lease Documents, the Omega Master Lease Obligations, or the Prepetition Liens, and all rights to object to such standing are expressly reserved.

24.     **Limitations on Charging Expenses.**   To the extent a Final Order is entered providing for such relief, and except to the extent of the Carve-Out and paragraph 22, and except as otherwise provided under an Approved DIP Budget or an Approved New Ark Budget, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured Parties (as the case may be) upon the DIP Collateral or Prepetition Collateral (as the case may be), shall be charged against or recovered from (a) the DIP Secured Parties or the DIP Collateral (including in respect of the Adequate Protection Liens), or any of the DIP Facility Obligations, or (b) the Prepetition Secured Parties or the Prepetition Collateral, in each case, pursuant to sections 105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust enrichment) or any similar principle of law, without the prior express written consent of the Required DIP Lenders or the Prepetition Agent, each in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any

such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

25. **No Marshaling.**  To the extent a Final Order is entered providing for such relief, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, the Prepetition Collateral, the Prepetition Working Capital Debt, or the Omega Master Lease Obligations, as applicable, and all proceeds shall be received and applied in accordance with this Interim Order, the DIP Term Sheet, the Prepetition Loan Documents, and the Omega Master Lease Documents, as applicable.

26. **Equities of the Case**.  Further, to the extent a Final Order is entered providing for such relief, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to any of the Prepetition Secured Parties or Prepetition Collateral.

27. **Joint and Several Liability.**  Nothing in this Interim Order shall be construed to constitute or authorize a substantive consolidation of any of the Debtors' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Interim Order.

28. **Right to Credit Bid**.

(a)     The DIP Agent or its designee (at the written direction of the Required DIP Lenders), on behalf of the DIP Secured Parties, unless the Court for cause orders otherwise, shall have the right to credit bid on the DIP Collateral, in accordance with the DIP Loan Documents, up to the full amount of the DIP Facility Obligations, subject to the Prepetition Secured Parties' and Prepetition HUD Lender's respective interests in the DIP Collateral, in connection with any sale or other disposition of all or any portion of the DIP Collateral, as provided for in section 363(k) of

the Bankruptcy Code, without the need for further Court order authorizing the same, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.

(b)      To the extent a Final Order is entered providing for such relief, the Prepetition Agent or its designee (at the written direction of the required Prepetition Lenders), on behalf of the Prepetition Working Capital Secured Parties, unless the Court for cause orders otherwise, shall have the right to credit bid on the Prepetition Working Capital Collateral, in accordance with the Prepetition Loan Documents, up to the full amount of the Prepetition Working Capital Debt in connection with any sale or other disposition of all or any portion of the Prepetition Working Capital Collateral, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of Prepetition Working Capital Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.

29.      **Rights Preserved.**  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or

implicitly: (a) the rights of the DIP Secured Parties or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents, the Prepetition Loan Documents, or the Omega Master Lease Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the DIP Loan Parties', or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order.

30.   **Intercreditor Provisions.**

(a)   Intercreditor and Subordination Agreement.  The Prepetition Agent (as successor-in-interest to Wells Fargo Bank, National Association) and OHI (as defined in the Intercreditor Agreement) are parties to that certain Subordination and Intercreditor Agreement, dated as of July 6, 2018 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement").  Pursuant to section 510 of the Bankruptcy Code, the Intercreditor Agreement, and the DIP Term Sheet, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents and Omega Master Lease Documents (i) shall remain in full force and effect, and (ii) shall continue to govern the

relative priorities, rights, and remedies of the Prepetition Secured Parties and OHI. Notwithstanding the foregoing, subject to the Restructuring Support Agreement, neither the Prepetition Agent nor the Prepetition Lenders shall be permitted to interfere with the DIP Loan Parties' performance of their obligations under the DIP Loan Documents, including their Transfer Assistance Obligations (as defined in the DIP Term Sheet) and their obligations to enter into and perform under the MOTA (as defined in the DIP Term Sheet).

(b)     Intercreditor Covenants.

(1)     In consideration for New Ark's consent to the DIP Facility and other commitments under the DIP Loan Documents, including the New Ark Financing, upon entry of this Interim Order: each of the DIP Agent, on behalf of itself and the DIP Lenders, and the Omega Landlords covenants and agrees that it will not, individually, derivatively, or with any person or in any way, directly or indirectly, sue upon, file, or otherwise assert or interpose, or cause or assist others to sue upon, file, or otherwise assert or interpose, any claim, cause of action, or other right of recovery against New Ark, the Equity Sponsors, the Service Providers (as such terms are defined in the Restructuring Support Agreement) and their respective affiliates, assigns or successors and the respective members, managers, equity security holders, trusts, trustees, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (collectively, the "New Ark Related Parties"), whether arising at law or in equity (the "New Ark Related Party Claims"); provided, however, that the New Ark Related Party Claims do not include any claim of the DIP Agent or the DIP Lenders relating to or arising out of the breach by any New Ark Related Party of such party's obligations under the Restructuring Transaction Documents (as defined in the Restructuring Support Agreement). In the event that the DIP Agent or any of the DIP Lenders receive any proceeds of a New Ark Related Party Claim, such party shall immediately turn over such proceeds to New Ark; and

(2)     In consideration for providing the DIP Facility and other commitments under the DIP Loan Documents, upon entry of this Interim Order: each of New Ark, the Equity Sponsors, and the Service Providers (as such terms are defined in the Restructuring Support Agreement), covenants and agrees that it will not, individually, derivatively, or with any person or in any way, directly or indirectly, sue upon, file, or otherwise assert or interpose, or cause or assist others to sue upon, file, or otherwise assert or interpose, any claim, cause of action, or other right of recovery against the DIP Agent, the DIP Lenders, the Omega Landlords and their respective affiliates, assigns or successors and the respective members, managers, equity security holders, trusts, trustees, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (collectively, the "Omega Related Parties"), whether arising at law or in equity (the "Omega Related Party Claims"); provided, however, that the Omega Related Party Claims do not include any claim of New Ark, the Equity

Sponsors, and the Service Providers relating to or arising out of the breach by any Omega Related Party of such party's obligations under the Restructuring Transaction Documents (as defined in the Restructuring Support Agreement). In the event that a New Ark Related Party receives any proceeds of an Omega Related Party Claim, such party shall immediately turn over such proceeds to the DIP Agent.

31.    **No Waiver by Failure to Seek Relief.**  The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents, or the Omega Master Lease Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought.  No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties.

32.    **No Deemed Control.**  In determining to make, and in providing, any DIP Loans under the DIP Note, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, any Final Order or the DIP Loan Documents, no DIP Secured Party and no Prepetition Secured Party shall be deemed to be in control of any Debtor or its operations or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability

Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar state or federal statute) with respect to the operation or management of such Debtor.

33.    **Binding Effect of this Interim Order.**  Immediately upon entry of this Interim Order by the Court, this Interim Order shall inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and the Prepetition HUD Lender, and the provisions of this Interim Order (including all findings and conclusions of law herein) shall be valid and binding upon the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, the Prepetition HUD Lender any and all other creditors of the Debtors, any Official Committee (if appointed) or other committee appointed in the Chapter 11 Cases, any and all other parties in interest, and the respective successors and assigns of each of the foregoing, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Chapter 11 Cases or any Successor Cases, or upon dismissal of any of the Chapter 11 Cases; *provided* that (a) nothing in this paragraph shall confer final status on this Interim Order and (b) the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed for the estates of the Debtors.

34.    **Survival**.  The terms and provisions of this Interim Order, including, without limitation, (a) the Carve-Out and (b) all of the rights, privileges, benefits, and protections afforded herein and in the DIP Loan Documents (including the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Claims, and any other claims, liens, security interests, and other protections (as applicable)) granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Interim Order and the DIP Loan Documents (collectively, the "DIP Protections"), and any actions taken pursuant hereto or thereto, shall

survive, shall continue in full force and effect, shall remain binding on all parties in interest, and shall maintain their priorities, and shall not be modified, impaired, or discharged by (except to the extent consented to in writing by the applicable secured parties), entry of any order that may be entered (i) confirming any plan of reorganization in any of the Chapter 11 Cases, (ii) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (iii) dismissing any or all of the Chapter 11 Cases, or (iv) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases, in each case, until (x) in respect of the DIP Facility, all of the DIP Facility Obligations, pursuant to the DIP Term Sheet and this Interim Order, have been indefeasibly paid in full in cash (other than contingent indemnification obligations as to which no claim has been asserted) and all commitments to extend credit under the DIP Facility are terminated, and (y) in respect of the Prepetition Working Capital Debt, all of the Prepetition Working Capital Debt have been indefeasibly paid in full in cash (other than contingent indemnification obligations as to which no claim has been asserted). This Court shall retain jurisdiction, notwithstanding any such confirmation, conversion, or dismissal, for the purposes of enforcing such DIP Protections and the Prepetition Secured Parties' adequate protection.

35.    **Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.**  The DIP Secured Parties and New Ark have acted in good faith in connection with the DIP Facility, the DIP Loan Documents, the Interim Financing, and with this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Loan Documents to the extent provided therein.  If any or all of the provisions of this Interim Order are

hereafter reversed or modified on appeal, such reversal or modification shall not affect the validity, priority, or enforceability of the DIP Facility Obligations or the DIP Liens; provided, however, that the DIP Secured Parties shall not be entitled to protection under section 364(e) of the Bankruptcy Code with respect to any funds advanced by the DIP Secured Parties or made available by the Prepetition Secured Parties, as applicable, under the DIP Loan Documents after entry of an order staying this Interim Order or any provision of this Interim Order authorizing the Debtors to borrow funds under the DIP Loan Documents.. Notwithstanding any such reversal or modification of this Interim Order or certain provisions thereof on appeal, any DIP Facility Obligations, DIP Liens, or Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Secured Parties or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and the Prepetition Agent of the effective date of such reversal, modification, or stay shall be governed in all respects by the original provisions of this Interim Order.

36. **Limitation on Exercise of Rights and Remedies**. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, the rights and remedies of (i) the DIP Agent and the DIP Lenders upon an Event of Default and (ii) the Prepetition Agent and Prepetition Lenders upon a New Ark Event of Default, in each case, shall be limited by, and subject in all respects to, the Restructuring Support Agreement dated as of October 14, 2021 by and among, among others, the Debtors, the DIP Secured Parties, and the Prepetition Working Capital Secured Parties (the "Restructuring Support Agreement").

37. **Amendment of the DIP Loan Documents**. The DIP Loan Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto without notice or a hearing if the amendment, amendment and restatement, modification, or supplement is not material, and is: (i) in accordance with the DIP Documents; and (ii) not adverse

or prejudicial in any material respect to the rights of the Debtors, the estates, or third parties; *provided, however*, all amendments, modifications and waivers of the DIP Documents shall require the consent of the Required DIP Lenders, except in the case of amendments, modifications, or waivers requiring consent from all DIP Lenders, all affected DIP Lenders, or the DIP Agent (or the DIP Agent with the consent in writing of the Required DIP Lenders), including without limitation, certain consent rights in respect of commitments, economics, maturity and the release of collateral as set forth in the DIP Loan Documents.  Any material amendment, restatement, modification or supplement to the DIP Loan Documents may only be made pursuant to an order of this Court, upon notice and a hearing.  The Debtors shall file all amendments, restatements, modification and supplements of the DIP Loan Documents with the Court and serve the same on the U.S. Trustee and the Official Committee, if any.

38.   **Adequate Assurance Deposits**.  Notwithstanding anything to the contrary in this Interim Order, the interests of the DIP Secured Parties and the Prepetition Secured Parties in any adequate assurance deposit ordered by this Court for the benefit of the Debtors' utilities shall be subordinate to the interests of the Debtors' utilities in such adequate assurance deposit until such time as the adequate assurance deposit is returned to the Debtors.

39.   **Limitation of Liability.**  Nothing in this Interim Order, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties (in each case, in their capacities as such) of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates.  So long as the DIP Secured Parties comply with their obligations under the DIP Loan Documents and their

68

obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

40.    **Interim Order Controls.**  In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order, any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the DIP Loan Documents, the terms and provisions of this Interim Order shall govern and control.

41.    **Payments Held in Trust.**  Except as expressly permitted in this Interim Order or the DIP Loan Documents and other than with respect to the Prepetition Debt Collateral, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Facility Obligations under the DIP Loan Documents, and termination of the DIP Commitments in accordance with the DIP Term Sheet, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the applicable DIP Agent or DIP Lender, for application in accordance with the DIP Term Sheet and this Interim Order.

42.    **Interim Order Effective as of the Petition Date.**  This Interim Order shall take effect and shall be enforceable as of the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), and 7062 or any other

Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

43.     **Bankruptcy Rules.**  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

44.     **Necessary Action.**  The Debtors are authorized and directed to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim Order.

45.     **Headings.**  Section headings used herein are for convenience only and are not to affect the **construction** of or to be taken into consideration in interpreting this Interim Order.

46.     **Medicare/Medicaid.**  Nothing contained in this Interim Order, the DIP Loan Documents, or the New Ark Funding Documentation shall (a) restrain, limit or impact any action by the U.S. Department of Health and Human Services, the Centers for Medicare & Medicaid Services or Medicare Administrative Contractors to administer, regulate and enforce the Medicare program; (b) affect, modify or impair any governmental unit's recoupment or setoff rights, claims, or defenses, in each case, to the extent such rights, claims, or defenses are available under applicable law; (c) be construed to affect the exclusive jurisdiction of the U.S. Department of Health and Human Services to adjudicate and pay Medicare claims in the ordinary course; or (d) affect, modify or impair the rights of the Debtors or any other parties in interest with respect to the foregoing.

47.     **Final Hearing.**  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for November 12, 2021 at 10:00 a.m., prevailing Eastern Time, at the United States Bankruptcy Court for the District of Delaware.

48.     **Objections.**  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon: counsel for each of the Debtors, the DIP Agent, the DIP Lenders, and any other party that has filed a request for notices with this Court, to allow actual receipt by the foregoing **no later than November 5, 2021, at 4:00 p.m., prevailing Eastern Time**.  Any objections by creditors or any other party in interest to the DIP Motion or any of the provisions of this Interim Order shall be deemed waived unless filed and received in accordance with the foregoing on or before such date.

49.     **Retention of Jurisdiction.**  The Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Interim Order.

###

Dated: October 18th, 2021
Wilmington, Delaware

KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE