## **Exhibit 1**

DIP Term Sheet

**CONFIDENTIAL**
**SUBJECT TO FRE 408 AND SIMILAR RULES**

**GULF COAST HEALTH CARE, LLC AND CERTAIN AFFILIATES AND SUBSIDIARIES THEREOF**

**SUMMARY OF TERMS AND CONDITIONS**

**UP TO $25 MILLION SECURED DEBTOR-IN-POSSESSION CREDIT FACILITY**

**October 16, 2021**

This Summary of Terms and Conditions (the "**Term Sheet**") outlines the material terms and conditions of a debtor-in-possession credit facility that may be provided by the DIP Lenders (as defined below), and would be funded pursuant to the conditions precedent set forth under "Conditions to Effectiveness" below.

Reference is made to that certain Second Consolidated Amended and Restated Master Lease Agreement, by and among, the entities listed on Schedule A thereto (collectively "**Landlord**"), and GULF COAST MASTER TENANT I, LLC, a Delaware limited liability company ("**Tenant**"), dated as of July 1, 2013, as amended by that certain First Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of October 2, 2013, that certain Second Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of October 1, 2014, that certain Third Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of September 29, 2015, that certain Fourth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of February 25, 2016, that certain Fifth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of May 26, 2017, that certain Sixth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of December 15, 2016, that certain Seventh Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of January 26, 2017, that certain Eighth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of June 8, 2017, that certain Ninth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated December 19, 2017, that certain Tenth Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated July 6, 2018, and that certain Eleventh Amendment to Second Consolidated Amended and Restated Master Lease Agreement, dated as of August 19, 2019, as may have been further amended (collectively, the "**Lease**").

Reference is made to that certain Credit Agreement, dated as of July 6, 2018, among GULF COAST HEALTH CARE, LLC, a Delaware limited liability company ("**Parent**"), FL HUD BAYBREEZE, LLC, a Delaware limited liability company, FL HUD BAYSIDE, LLC, a Delaware limited liability company, FL HUD DESTIN, LLC, a Delaware limited liability company, FL HUD MARGATE, LLC, a Delaware limited liability company, FL HUD PENSACOLA, LLC, a Delaware limited liability company, FL HUD ROSEWOOD, LLC, a Delaware limited liability company, FL HUD SILVERCREST, LLC, a Delaware limited liability company, MF LAKE EUSTIS, LLC, a Delaware limited liability company, MF WINTER PARK, LLC, a Delaware limited liability company, MS GREENBOUGH, LLC, a Delaware limited liability company, MS HUD BOYINGTON, LLC, a Delaware limited liability company, MS HUD DIXIE, LLC, a Delaware limited liability company, MS HUD OCEAN SPRINGS, LLC, a Delaware limited liability company, MS HUD PINE VIEW, LLC, a Delaware limited liability company, NF CHIPOLA, LLC, a Delaware limited liability company, NF ESCAMBIA, LLC, a Delaware limited liability company NF PANAMA, LLC, a Delaware limited liability company, NF PENSACOLA MANOR, LLC, a Delaware limited liability company, NF SUWANNEE, LLC, a Delaware limited liability company, SF CARNEGIE, LLC, a Delaware limited liability company, SF LAKE PLACID ALF, LLC, a Delaware limited liability company, BREVARD OAKS CENTER, LLC, a Florida limited liability company, SF BREVARD, LLC, a Delaware limited liability company, NF NINE MILE, LLC, a Delaware limited liability company (collectively, "**Prepetition Borrowers**"), the lenders from time to time party thereto

(the "**Prepetition Lenders**") and NEW ARK CAPITAL, LLC, as administrative agent for the Prepetition Lenders (the "**Prepetition Agent**" or "**New Ark**"), issuing bank and swingline lender, as such Credit Agreement has been modified and supplemented from time to time (the "**Prepetition Credit Agreement**").

Terms used herein but not defined herein shall have the meaning assigned to such terms on **Annex C** attached hereto or the DIP Orders, as applicable.

Subject to entry of the Interim DIP Order (as defined below), the undersigned parties agree as follows:

| | |
|---|---|
| **Borrowers:** | The Prepetition Borrowers, in each case as debtors and debtors-in-possession in cases under chapter 11 (including any cases filed by subsidiaries or controlled Affiliates of any Borrower that are jointly administered with the cases of the Borrowers, the "**Chapter 11 Cases**") or any other chapter of the United States Bankruptcy Code (as amended, the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| **Guarantors:** | The obligations of the Borrowers under the DIP Facility (the "**DIP Facility Obligations**") shall be guaranteed, jointly and severally, and secured as provided in and consistent with the priority set forth below under the heading "Security", by Parent, Tenant, and each of the "Guarantors" under and as defined in the Prepetition Credit Agreement and those additional entities set forth on **Annex B** hereto in each case as debtors and debtors-in-possession in the Chapter 11 Cases (the "**Guarantors**," and together with the Borrowers, the "**Loan Parties**"). Each Loan Party, in its capacity as a debtor and debtor-in-possession in the Chapter 11 Cases, is referred to herein as a "**Debtor**". |
| **DIP Agent:** | OHI Asset Funding (DE), LLC, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"). |
| **DIP Lenders:** | One or more funds managed by, or other entities affiliated with, the DIP Agent (such funds or entities, collectively, the "**DIP Lenders**"). |
| **DIP Facility:** | A secured debtor-in-possession term loan credit facility in an aggregate principal amount of up to $25 million (the "**DIP Facility**"), composed of new term loans made by, and other obligations owed to, the DIP Lenders on, and from time to time after, the Closing Date (such new loans and obligations, the "**DIP Loans**" and commitments with respect to such DIP Loans, the "**DIP Commitments**") to be funded as set forth below under the heading "Availability" with no more than one draw each week, provided that the DIP Agent shall receive at least three business days' notice of any draw request, unless otherwise agreed to by the DIP Agent. DIP Loans that are repaid or prepaid may not be reborrowed. |
| **Closing Date:** | As used herein, "**Closing Date**" shall mean the date on which each of the conditions specified under the heading "**Conditions to Effectiveness**" below shall have been satisfied (or waived by the DIP Agent and the Required Lenders). The Closing Date shall occur as promptly as is practical after the entry of the Interim DIP Order (as defined below) by the Bankruptcy Court. |

| | |
|---|---|
| **Maturity Date:** | All amounts outstanding under the DIP Facility shall be due and payable in full (subject to the RSA (as defined below), and the DIP Commitments thereunder shall terminate, on the Maturity Date. The "**Maturity Date**" shall be that date which is the earliest to occur of (a) the date that is 8 months after the Closing Date, (b) the date that is 35 days after the entry of the Interim DIP Order if the Final DIP Order (as defined below) has not been entered by the Bankruptcy Court prior to such date, (c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases, and (d) the date the DIP Agent, or the DIP Agent at the direction of the Required Lenders, provides written notice to the Borrowers of the existence of an Event of Default (subject to applicable notice and cure provisions, if any) by the Borrowers as specified in the Documentation. |
| **Cash Collateral:** | "**Cash Collateral**" has the meaning ascribed to it in section 363(a) of the Bankruptcy Code. |
| **Use of Proceeds:** | The Debtors will be permitted to use the proceeds of the DIP Facility to fund the operational, employee, wind-down and other costs of the Loan Parties, including, without limitation, payments authorized to be made under "first day" or "second day" orders, post-MOTA transition and employee costs, and costs associated with providing shared services to New Operator or plan administrator post-transition, and, in each case, consistent with, subject to, and within the limitations contained in, the budget depicting on a 13-week basis cash revenue, receipts, expenses and disbursements (the "**DIP Budget**"), taking into account Permitted Variances (as defined in Annex F) and Permitted Carrybacks/Carryforwards (as defined in Annex F). Except as expressly set forth in the DIP Budget, proceeds of the DIP Facility shall not be used to pay the costs and expenses (including professional fees) of administering the Chapter 11 Cases. Other costs and expenses (including professional fees) of administering the Chapter 11 Cases are scheduled to be funded from the Cash Collateral of the Prepetition Lenders on the terms outlined herein, and as specifically identified in a budget associated therewith (the "**New Ark Budget**" and, together with the DIP Budget, the "**Budgets**"). For the avoidance of doubt, the fees, costs and expenses detailed in the New Ark Budget shall not be revised in a manner that would shift the burden for such fees, costs and expenses to the DIP Budget and/or the DIP Lenders and (2)(x) payments on account of claims under section 503(b)(9) of the Bankruptcy Code and (y) payments on account of critical vendor claims shall be included in the DIP Budget and not the New Ark Budget. For the further avoidance of doubt, proceeds of the DIP Facility shall not be used to pay professionals, directors' fees, or U.S. Trustee fees. |
| **Budgets:** | The use of borrowings under the DIP Facility and the New Ark Funding shall be limited in accordance with each of the respective Budgets, subject to permitted variances (at a 10% level) determined on the basis of aggregate cash disbursements payable to Persons other than the DIP Lenders and tested every other week on a four-week rolling basis (each a "**Reporting Period**"), beginning testing with the fourth full calendar week after the Closing Date ("**Budget Testing Start Date**"), with |

| | |
|---|---|
| | Permitted Carrybacks/Carryforwards.  In addition, prior to the Budget Testing Start Date, subject to "Use of Proceeds" above, any disbursements approved by the Bankruptcy Court and of the type reflected in the Initial Budgets (as defined below) may be financed with DIP Facility proceeds. |
| | The initial Budgets covering the 13-week period commencing on the Petition Date (the "**Initial Budgets**") shall be the budgets attached as **Annex A** to this Term Sheet.  Thereafter, on the first Thursday of each weekly period after the Budget Testing Start Date, the Loan Parties shall provide the DIP Agent and New Ark with updated Budgets covering the subsequent 13-week period commencing on the first day of each Reporting Period, respectively.  The updated DIP Budget will replace the previously delivered DIP Budget, unless the Required Lenders otherwise object within 2 business days of the receipt thereof to the substance of such updated DIP Budget on the basis of such DIP Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the DIP Facility or being based on information that is incorrect in any material respect, in which case the updated DIP Budget will be as agreed reasonably and in good faith by the Required Lenders and the Borrowers. Subject to clause (1) of "Use of Proceeds" above, the updated New Ark Budget will replace the previously delivered New Ark Budget, unless New Ark otherwise objects within 2 business days of the receipt thereof to the substance of such updated New Ark Budget on the basis of such New Ark Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the New Ark Financing or being based on information that is incorrect in any material respect, in which case the updated New Ark Budget will be as agreed reasonably and in good faith by New Ark and the Borrowers; *provided further* that the aggregate disbursements to be made under the New Ark Budget from and after the Petition Date shall not exceed $8 million without written consent from New Ark in its sole discretion. Until such time as a replacement budget is in effect pursuant to the provisions above, the Budgets, for all purposes, shall be the prior Budgets in effect prior to delivery of the updated budgets. |
| **Availability:** | The DIP Loans shall be made for the purposes set forth above under the heading "Use of Proceeds" (1) in principal amounts in an aggregate amount of up to $15.75 million on or after the first business day following the entry of the Interim DIP Order and satisfaction of the conditions under the heading "Conditions to Effectiveness" (the "**Initial Draws**") and (2) in additional principal amounts in an aggregate amount of up to $25 million on or after the first business day following the entry of the Final DIP Order subject to, in each case of the foregoing clauses (1) and (2), (a) compliance with the terms and conditions set forth in the paragraphs below in this section with respect to the Pre-MOTA Funding Amount (as defined below), (b) no Default or Event of Default having occurred and be continuing as of the date of such draw, (c) accuracy of the Representations and Warranties (as defined below) in all material respects as of the date of such draw (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date or (ii) such representation |

and/or warranty is already qualified by materiality or material adverse effect or similar language, in which case such representation and warranty shall be true and correct in all respects, as of such date), (d) compliance with the Milestones as of the date of such draw and (e) the amount of such draw being limited to the amount required to comply with the DIP Budget (and any Permitted Variances or Permitted Carrybacks/Carryforwards with respect thereto) after giving effect to the minimum liquidity set forth therein, or except as otherwise determined by the Borrowers in consultation with the DIP Agent (each, a "**Delayed Draw**").

Subject to ongoing compliance with the DIP Budget (and any Permitted Variances or Permitted Carrybacks/Carryforwards with respect thereto) and the terms and conditions contained herein and in the Documentation (including conditions to a Delayed Draw above), the DIP Lenders and New Ark shall, collectively, make available to the Borrowers up to $24.5 million (the "**Pre-MOTA Funding Amount**") consisting of (x) up to $17.5 million of DIP Loans to be provided by the DIP Lenders and (y) up to $7 million in funding from the Prepetition Loan Account (as defined below) to be provided by New Ark (this clause (y), "**New Ark Operating Advance**"), in each case of the foregoing clauses (x) and (y), for expenses set forth in the DIP Budget for the period of time prior to the Operations Transfer Date (the "**Pre-MOTA Funding**"). The Pre-MOTA Funding shall be funded by the DIP Lenders and New Ark as follows (the "**Pre-MOTA Funding Waterfall**"):

*First*, on or prior to the end of the first full week after the Petition Date, by the DIP Lenders in amounts consistent with the DIP Budget (subject to any Permitted Variances or Permitted Carrybacks/Carryforwards),

*Second*, beginning with the first day of the second full week after the Petition Date, by New Ark until such time as that the ratio of (a) the funds provided by the DIP Lenders under the DIP Facility to (b) funds provided to the Debtors under the New Ark Operating Advance (such ratio, the "**Pre-MOTA Funding Ratio**"), is equal to 2.50:1.00,

*Third*, from and after the time on which the Pre-MOTA Funding Ratio is equal to 2.50:1.00, by the DIP Lenders and New Ark on a *pro rata* basis based on the remaining portion of their initial maximum funding amounts under this paragraph (*i.e.* New Ark shall concurrently fund $1.00 for each $2.50 funded by the DIP Lenders).

For the avoidance of doubt, and notwithstanding the foregoing, (i) the New Ark Operating Advance shall be funded solely through New Ark's consent to the Debtors' use of Cash Collateral of the Prepetition Lenders, (ii) to the extent that collections of prepetition receivables are insufficient for the New Ark Operating Advance to be utilized in accordance with the Pre-MOTA Funding Waterfall, the DIP Lenders may (but, for the avoidance of doubt, shall have no obligation to), in their sole discretion, advance additional funds such that the Pre-MOTA Funding Ratio is greater than 2.50:1.00 (and, if funded, such failure to adhere to the Pre-MOTA Funding Waterfall shall not constitute an

<table>
<tr>
<td></td>
<td>Event of Default under this DIP Term Sheet), and (iii) if at any time after the second full week after the Petition Date (x) the Pre-MOTA Funding Ratio is greater than 2.50:1.00 and (y) there are sufficient funds in the Prepetition Loan Account to be utilized under the New Ark Operating Advance to cause the Pre-MOTA Funding Ratio to equal 2.50:1.00, then the Debtors shall solely utilize the New Ark Operating Advance until such time as the Pre-MOTA Funding Ratio is equal to 2.50:1.00 at which time any subsequent funding shall be made in accordance with the "*Third*" paragraph of the Pre-MOTA Funding Waterfall.</td>
</tr>
<tr>
<td>**Security:**</td>
<td>The DIP Facility Obligations will be secured by the "**DIP Liens,**" which shall include a fully perfected (which shall be, in the case of Stimulus Proceeds (as defined below) for the avoidance of doubt, first priority) security interest pursuant to section 364(d) in all DIP Collateral and the proceeds thereof, subject and subordinate to only (x) to the extent encumbering the DIP Collateral, Liens provided to the Prepetition Agent and Prepetition Lenders pursuant to the Prepetition Credit Agreement and related documents, (y) to the extent encumbering the DIP Collateral, Liens provided to the Prepetition HUD Lender pursuant to the Prepetition HUD Documents and (z) other Permitted Liens.

"**DIP Collateral**" shall mean all of the Loan Parties' tangible and intangible assets, including, without limitation, any collateral granted in respect of the Prepetition Credit Agreement and the following, but in each case subject to certain customary exclusions to be agreed: Stimulus Proceeds, accounts receivable, equipment, inventory, contracts, fee owned real estate, real property leaseholds, investment property, insurance proceeds, deposit accounts, monies, equity interests of subsidiaries of each Debtor and the products and proceeds thereof, and, upon entry of the Final Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code; provided, however, that the DIP Collateral shall not include any funds maintained in the New Ark Reserve Account (as defined below).

"**Stimulus Proceeds**" means any rights or funds (whether a cash payment, or proceeds of any grant, loan or otherwise) available to or received by any Borrower with respect to the Leased Property or operations thereof under or pursuant to the COVID Aid, Relief and Economic Security (CARES) Act, the Paycheck Protection Program under the CARES Act, the U.S. Department of Health and Human Services Provider Relief Funds under the CARES Act, any replacement, supplement or modification of any of the foregoing, or any other federal, state or local program, act, order or legislation providing relief or stimulus funding related to the COVID/coronavirus pandemic of 2020/2021.

The DIP Agent, for the benefit of the DIP Lenders, shall also be granted an administrative expense claim having priority over all other administrative expense claims in the Debtors' Chapter 11 Cases, other than those granted as adequate protection to the Prepetition Agent, the Prepetition HUD Lender (solely with respect to the Prepetition HUD Obligors), and the Carve-Out (the "**Superpriority Claims**").</td>
</tr>
</table>

|  | The New Ark Funding shall provide funding for a customary carve-out, including amounts for professionals paid by the Debtors, U.S. Trustee fees, and any amounts for a chapter 7 trustee) as further set forth in the DIP Orders (as defined below) and the New Ark Budget. |
|---|---|
|  | Subject to entry of the Final DIP Order, the DIP Liens shall not be subject to marshalling or sections 551 or 552(b) of the Bankruptcy Code, nor shall the DIP Collateral be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
| **Interest Rate:** | During the term of the DIP Facility, the outstanding principal balance drawn under the DIP Facility shall bear interest for the period commencing on the Closing Date through the date such DIP Facility is Paid in Full at LIBOR (subject to a 1.00% LIBOR floor) plus 12.0% per annum, accruing monthly and payable in cash in arrears (but subject to the RSA). All per annum rates shall be calculated on the basis of a 360-day year (with respect to LIBOR Advances) or 365-day year (with respect to other obligations) and actual days elapsed. |
| **Default Rate** | 2.00% above the applicable interest rate, payable in cash on demand (but subject to the RSA) upon written notice from the Required Lenders while an Event of Default is continuing. |
| **Fees:** | $250,000 upfront fee, earned, due and payable upon entry of the Interim DIP Order. |
|  | 0.50% unused commitment fee, commencing upon entry of the Interim DIP Order and payable monthly in arrears based on the average daily balance of (a) prior to entry of the Final DIP Order, the undrawn DIP Commitments available to the Borrowers under the Interim DIP Order and (b) following entry of the Final DIP Order, the undrawn DIP Commitments. |
| **Amortization:** | None. |
| **Voluntary Prepayments:** | The DIP Facility may be voluntarily prepaid by the Borrowers, in whole or in part, without premium or penalty, at any time upon 2 business days' notice to the DIP Agent (subject to actual breakage costs with respect to LIBOR Advances, if any). |

| | |
|---|---|
| **Mandatory Prepayments:** | Mandatory repayments shall be limited to the events listed below and applied to borrowings under DIP Facility until Paid in Full (subject to certain exceptions and basket amounts to be negotiated):<br><br>Asset Sales: Prepayments in an amount equal to 100% of the net cash proceeds of the disposition of any property or assets outside the ordinary course of business of the Borrowers and their subsidiaries.<br><br>Insurance Proceeds: Prepayments in an amount equal to 100% of the net cash proceeds of insurance (other than business interruption insurance) paid on account of any loss or damage of any property or assets of any Borrower, other than net cash proceeds that are promptly applied to restoration of the Leased Properties.<br><br>Incurrence of Not-Permitted Indebtedness: Prepayments in an amount equal to 100% of the cash proceeds of any Indebtedness incurred in violation of covenants under the DIP Facility. |
| **Documentation:** | The documentation in respect of the DIP Facility (collectively, the "**Documentation**"), including, without limitation, the secured DIP promissory note (the "**DIP Note**") and all motions relating thereto, shall be in form and substance reasonably acceptable to the DIP Lenders and their counsel; *provided* that on the Closing Date, this Term Sheet shall govern the terms of the DIP Facility (including, for the avoidance of doubt, the affirmative covenants, negative covenants (including financial covenants) and events of default described herein).  The Documentation shall be consistent with the terms and conditions set forth in the Term Sheet (other than to the extent any additional representations and warranties or covenants are contained in ancillary documentation (including collateral agreements and/or guarantees), which such representations and warranties or covenants shall be reasonably acceptable to the DIP Agent and the Debtors) (the "**Documentation Principles**"); *provided that*, to the extent any of the Documentation reflects terms or conditions that are inconsistent with the Documentation Principles, any such terms and conditions shall be reasonably acceptable to New Ark.<br><br>The documentation in respect of the New Ark Funding shall consist of the RSA, this Term Sheet and the Interim and Final DIP Orders (in each case, including any exhibits or schedules attached thereto) (the "**New Ark Funding Documentation**"), each of which shall be in a form acceptable to New Ark in all respects. |
| **Transfer Assistance Obligations/MOTA:** | The Loan Parties shall provide cooperation as reasonably requested by the Landlord, including hosting site visits, with any efforts by the Landlord or any of its Affiliates to transfer ownership of all or any portion or portions of the property subject to the Lease (the "**Leased Property**") in one or more transactions ("**Transfer Assistance Obligations**").  Upon the DIP Agent's written direction, the applicable Loan Parties shall enter into one or more Management Operations Transfer Agreements, satisfactory to the Debtors, the DIP Agent and one or more new operators (collectively, the "**New Operator**"), and customary for similar transactions, and under which New Operator shall |

| | |
|---|---|
| | be responsible for funding all operating costs of and shall be entitled to all payments generated by the Leased Property on and after the date the New Operator assumes responsibility for operating the Leased Property (collectively, the "**MOTA**").  As soon as practicable after entering into the MOTA, the Debtors shall seek entry of an order, in form and substance satisfactory to the DIP Agent, of the Bankruptcy Court (1) approving their entry into the MOTA, (2) the assumption and assignment, free and clear of all liens, claims, and encumbrances to the extent permitted under applicable law, of the Medicare provider agreements applicable to the Leased Property to one or more of the Landlords' designees which assumption and assignment shall be without any additional consideration other than the consideration supporting the DIP Facility; <u>provided</u>, <u>however</u>, that all such liabilities arising under such assumption and assignment, to the extent such MOTA Order does not provide for the assumption and assignment, free and clear of all liens, claims, and encumbrances, shall be borne by the New Operator, (3) providing for the rejection and termination of the Lease *nunc pro tunc* to the Petition Date upon the license approval date under the MOTA, (4) allowance upon the rejection of the Lease of a rejection damages claim by Landlord in the amount of $35,904,343, as capped under section 502(b)(6) of the Bankruptcy Code, and (5) authorization for the Landlord, to the extent necessary, to transfer the Leased Property to one or more third parties (the "**MOTA Order**"). <br><br> Contemporaneously with the Operations Transfer Date, the Debtors shall repay the New Ark Operating Advance in full in cash by transfer of funds to the Prepetition Loan Account on the Operations Transfer Date. |
| **Representations and Warranties** | Limited to (a) prior to execution of the DIP Note, the representations and warranties set forth on **Annex D** hereto and (b) upon execution and delivery of the DIP Note, the representations and warranties contained in the DIP Note that correspond to the representations and warranties set forth on **Annex D** hereto (each, a "**Representation and Warranty**") |
| **Affirmative Covenants:** | Limited to (a) prior to execution of the DIP Note, the affirmative covenants set forth on **Annex E** hereto and (b) upon execution and delivery of the DIP Note, the affirmative covenants contained in the DIP Note that correspond to the affirmative covenants set forth on **Annex E** hereto (each, an "**Affirmative Covenant**"). |
| **Negative Covenants:** | Limited to (a) prior to execution of the DIP Note, the negative covenants set forth on **Annex F** hereto and (b) upon execution and delivery of the DIP Note, the negative covenants contained in the DIP Note that correspond to the negative covenants set forth on **Annex F** hereto (each, a "**Negative Covenant**"). |
| **Financial Covenant:** | Limited to item 12 [Financial Covenant] of the Negative Covenants (the "**Financial Covenant**"). |
| **Prepetition Secured Claims/Adequate Protection** | The Interim and Final DIP Orders shall provide for the segregation into an account acceptable to New Ark, in its sole discretion (the "**Prepetition Loan Account**"), of proceeds from prepetition accounts |

receivable in an amount equal to the claims under the Prepetition Credit Agreement, including for postpetition interest to the extent the value of the Prepetition Agent's prepetition collateral exceeds principal, accrued prepetition interest, and other claims accrued prepetition under the Prepetition Credit Agreement, which, for the avoidance of doubt, shall not include additional funding for any fees and expenses incurred after the Petition Date.

The Final DIP Order shall require, unless otherwise agreed to in writing by the Prepetition Agent, the ongoing repayment of an amount (the "**Prepetition Loan Paydown Amount**") equal to (i) claims under the Prepetition Credit Agreement, including for postpetition interest to the extent the value of the Prepetition Agent's prepetition collateral exceeds principal, accrued prepetition interest, and other claims accrued prepetition under the Prepetition Credit Agreement, but excluding reimbursement for any fees and expenses incurred after the Petition Date _less_ (ii) the projected amount necessary to fully fund the New Ark Reserve Account (which shall include amounts necessary to fully fund adequate protection payments for postpetition fees and expenses of the Prepetition Lenders in accordance with this DIP Term Sheet and the New Ark Budget), with such Prepetition Loan Paydown Amount to be paid from proceeds of prepetition accounts receivable of the Prepetition Agent in the Prepetition Loan Account (the "**Prepetition Loan Paydown**"); _provided further_ that the Prepetition Loan Paydown Amount shall exclude the New Ark Operating Advance unless and until such New Ark Operating Advance is repaid to the Prepetition Loan Account on the Operations Transfer Date in accordance with this DIP Term Sheet.

The Interim and Final DIP Orders shall provide as adequate protection for the Prepetition Agent and Prepetition Lenders the following: (i) current cash payment of interest on the obligations under the Prepetition Credit Agreement at the non-default rate provided for thereunder (subject to recharacterization as repayments of principal to the extent the value of the Prepetition Agents prepetition collateral does not exceed the amount of principal, accrued prepetition interest, other claims accrued under the Prepetition Credit Agreement, and any amounts paid postpetition to the Prepetition Agent on account of the Prepetition Credit Agreement), (ii) current cash reimbursement of actual, reasonable, and documented fees and expenses and other disbursements of the Prepetition Lenders, incurred in connection with the Chapter 11 Cases (subject to customary procedures for the payment of such amounts, which amounts shall be included in the New Ark Budget and paid from the Prepetition Loan Account), and (iii) replacement liens on accounts receivable generated postpetition and superpriority claims to the extent of diminution in the value of the Prepetition Agent's collateral (excluding diminutions caused by funds used to repay the Prepetition Agent and Prepetition Lenders), all as more specifically set forth in the Interim and Final Orders. In addition, New Ark shall receive copies of all reports and other information provided to the DIP Agent.

The Interim and Final Orders shall provide as adequate protection for the Landlord replacement liens and superpriority claims, in all cases junior to liens and claims of the DIP Agent and adequate protection liens and superpriority claims of the Prepetition Agent and Prepetition

<table>
<tr>
<td></td>
<td>Lenders, to the extent of diminution in the value of the Landlord's collateral.</td>
</tr>
<tr>
<td></td>
<td>Subject to entry of the Final DIP Order, the liens and claims of the Prepetition Lenders shall not be subject to marshalling or sections 551 or 552(b) of the Bankruptcy Code, nor shall the Prepetition Lenders' collateral be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise.</td>
</tr>
<tr>
<td></td>
<td>No secured creditors shall be entitled as adequate protection to payment of postpetition fees and expenses or any other amounts other than the Prepetition Loan Paydown and any postpetition interest and fees payable as adequate protection to the Prepetition Agent pursuant to the terms in this Term Sheet.</td>
</tr>
<tr>
<td><strong>New Ark Funding/Consent to Use of Cash Collateral and Intercreditor Provisions:</strong></td>
<td>During the time period commencing on the Petition Date and continuing until the occurrence of the New Ark Funding Termination Date, the Prepetition Lenders shall consent to the use of Cash Collateral of the Prepetition Lenders solely to the extent necessary to:

i.    provide funding for those amounts and during applicable period set forth in the New Ark Budget, subject to permitted variances thereto, which amounts shall be withdrawn from the Prepetition Loan Account and deposited into a segregated escrow account maintained therefor (the "**New Ark Reserve Account**"), on a weekly basis, to reserve for professional fees and other expenses set forth in the New Ark Budget pending approval of the Bankruptcy Court (if required) and disbursed by the Debtors to the respective beneficiaries thereof (not to exceed the amounts allocated for each such beneficiary under the New Ark Budget) (the "**New Ark Funding**"), all in accordance with and subject to the New Ark Funding Documentation. To the extent that any funds remain in the New Ark Reserve Account following the payment of all allowed claims set forth in the New Ark Budget, including, without limitation, (a) the allowed amount of any claim set forth in the New Ark Budget is less than the budgeted amounts, (b) any funds in the New Ark Reserve Account are not allowed by the Bankruptcy Court to be disbursed to a beneficiary of the New Ark Budget, or (c) such reserved funds relate to any period during which such beneficiary of the New Ark Budget is no longer employed by the Debtors, such excess funds shall revert to New Ark; and

ii.    provide the New Ark Operating Advance; *provided*, *however* that the Debtors shall (1) repay the New Ark Operating Advance in full and in cash to the Prepetition Loan Account on the Operations Transfer Date (and the DIP Budget shall reflect and provide for such repayment) and (2) if at any time (x) the New Ark Operating Advance exceeds $6,000,000 and (y) there is Excess Cash as determined on the last business day of each week, the Debtors shall make a payment to the Prepetition Loan Account on the first business day of the immediately succeeding week in an amount equal to the lesser of (a) the amount of such Excess Cash and (b) the amount by which the New Ark Operating Advance exceeds $6,000,000 (each, an</td>
</tr>
</table>

<table>
<tr>
<td></td>
<td>"<u>Excess Cash Payment</u>").  For purposes of this DIP Term Sheet, "<u>Excess Cash</u>" shall mean, as of any date of determination, the amount by which the projected unrestricted cash available to the Debtors for operations exceeds (i) projected cash disbursements to be made by the Debtors for the following week as reasonably determined by the Debtors' chief restructuring officer <i>plus</i> (ii) $2,500,000.  For the avoidance of doubt and subject to the final paragraph of "Availability", any amounts repaid to the Prepetition Loan Account prior to the Operations Transfer Date under clause (2) above remain available to the Debtors to be utilized up to the full amount of the New Ark Operating Advance in accordance with this DIP Term Sheet.</td>
</tr>
<tr>
<td></td>
<td>The "<b>New Ark Funding Termination Date</b>" shall be the date upon which New Ark provides written notice in accordance with the DIP Orders of the occurrence of one or more events of default set forth on <b>Annex G</b> hereto.</td>
</tr>
<tr>
<td></td>
<td>The New Ark Funding shall be secured by liens on all DIP Collateral and shall receive superpriority claims, in all cases junior to the liens and claims under the DIP Facility.</td>
</tr>
<tr>
<td></td>
<td>The Interim and Final DIP Orders (together, the "<b>DIP Orders</b>") shall provide, among other things, that (1) the DIP Agent shall have no control over New Ark Budget and its approval; (2) New Ark shall have no control over the DIP Budget and its approval (other than with respect to the repayment of the New Ark Operating Advance); (3) adequate protection as set forth above; (4) subject to the RSA, none of the Prepetition Agent or the Prepetition Lenders will interfere with the Loan Parties' performance of their obligations under the Documentation, including their Transfer Assistance Obligations and their obligations to enter into and perform under the MOTA and (5) subject to the RSA, none of the Prepetition Agent or the Prepetition Lenders shall oppose or otherwise interfere with any enforcement by the DIP Agent or DIP Lenders of rights and remedies under the Documentation, the Interim DIP Order or the Final DIP Order (the "<b>DIP Order Intercreditor Provisions</b>").</td>
</tr>
<tr>
<td><b>Conditions to Effectiveness:</b></td>
<td>The availability of the DIP Facility on the Closing Date shall be conditioned upon satisfaction (or waiver) of solely the following:

<ul>
<li>The Bankruptcy Court shall have entered an interim order in form and substance satisfactory to the DIP Agent and the Required Lenders in their sole discretion (the "<b>Interim DIP Order</b>"), which shall also be satisfactory to New Ark, authorizing the transactions contemplated by the DIP Facility and the New Ark Funding including, without limitation, authorizing the granting of superpriority claim status for the Superpriority Claims and granting of the liens and charges (which liens and charges shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected), authorizing the DIP Facility in a principal amount equal to $25 million (with $15.75 million available under the Interim DIP Order), granting the adequate protection liens and claims described above, approving the New Ark Funding and the</li>
</ul>
</td>
</tr>
</table>

| | |
|---|---|
| | establishment and use of the New Ark Reserve Account set forth herein, providing for the DIP Order Intercreditor Provisions, and subject to entry of the Final DIP Order, providing that the DIP Liens and the liens of the Prepetition Lenders shall not be subject to marshaling or sections 551 and 552(b) of the Bankruptcy Code and the DIP Collateral and the collateral of the Prepetition Lenders shall not be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise; <u>provided</u> that such Interim DIP Order shall not have been reversed, modified, amended or stayed (other than with the prior written consent of New Ark, the DIP Agent and the Required Lenders, which may be withheld in their sole discretion). |
| | • Completion (after giving effect to the Interim DIP Order) of all filings and recordings necessary to provide the DIP Agent, for the benefit of the DIP Lenders and the DIP Agent, with perfected liens, charges and security interests in the DIP Collateral and of the priority contemplated herein, <u>provided</u> <u>however</u>, that, subject to the DIP Agent's satisfaction with the perfection provisions of the Interim DIP Order, no filings or recordings shall be required in connection with any owned or leased real property, any foreign assets, any intellectual property assets, and any certificates of title to any vehicles. |
| | • Receipt by the DIP Agent of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations to the extent requested at least three business days prior to the Closing Date. |
| | • Receipt by the DIP Agent of satisfactory Budgets (with the DIP Agent and DIP Lenders agreeing that the Initial Budgets are satisfactory). |
| | • Accuracy of the Representations and Warranties in all material respects as of the Closing Date (unless (i) such representation or warranty, by its terms, expressly relates to another date, in which case such representation or warranty shall have been true and correct in all material respects on and as of such earlier date or (ii) such representation and/or warranty is already qualified by materiality or material adverse effect or similar language, in which case such representation and warranty shall be true and correct in all respects, as of such date), as certified by the Borrowers. |
| **Restructuring Support Agreement** | Prior to the Petition Date, the Loan Parties, DIP Agent, DIP Lenders, Landlord, Prepetition Agent, Prepetition Lenders, Equity Sponsors (as defined therein) and Service Providers (as defined therein) shall enter into a Restructuring Support Agreement (the "**RSA**") in a form acceptable to each party. |
| **Events of Default:** | The events of default under the DIP Facility (each, an "**Event of Default**," and collectively, the "**Events of Default**") shall be limited to: <br><br> • Failure to make any payment to the DIP Agent and DIP Lenders when due |

|  | - failure of any Representation and Warranty of any Loan Party to be true and correct in all material respects when made;<br><br>- any breach or failure to comply with (i) the Affirmative Covenants identified in items 7 [Cooperation with DIP Agent Financial Advisors], 8 [Milestones], 9 [Financial Reporting], and 13 [Use of Proceeds] of **Annex E** or (ii) any other Affirmative Covenant to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from the DIP Agent;<br><br>- any breach or failure to comply with the Negative Covenants;<br><br>- any other breach or failure to comply with the terms of Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, as applicable, to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from the DIP Agent;<br><br>- failure to comply with the Milestones;<br><br>- (x) failure to timely perform Transfer Assistance Obligations as reasonably requested by Landlord or New Operator or (y) the occurrence of a default (or equivalent concept) under the MOTA, in each case, that is not cured within three business days of the earlier to occur of the Borrowers' knowledge of such default (or equivalent) or written notice from the DIP Agent;<br><br>- prior to entry of the MOTA Order, the occurrence of a New Ark Event of Default that results in any limitation, suspension or termination of funding under the New Ark Funding;<br><br>- any Loan Party filing of a motion to convert any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the commencement by any of the Debtors of any winding up or liquidation proceeding (other than the Chapter 11 Cases) under any other applicable law;<br><br>- the appointment of a receiver, receiver and manager, interim receiver, or similar official over any substantial portion of the DIP Collateral;<br><br>- the dismissal of the Chapter 11 Cases;<br><br>- the appointment in the Chapter 11 Cases of a chapter 11 trustee or an examiner with expanded powers;<br><br>- any Loan Party shall (A) contest or dispute the validity or enforceability of any Documentation or any obligation owed under any Documentation in writing or deny in writing that it has any liability thereunder, (B) contest or dispute the validity or perfection of the DIP Loan, or the liens and security interests securing the DIP Loan in writing or (C) pursue, negotiate, solicit interest in, or agree to any sale or liquidation of the Debtors' assets or any restructuring, |
|---|---|

reorganization, refinancing, or other transaction other than on the terms provided for in the MOTA;

- the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code so as to allow a third party to exercise remedies against the DIP Collateral in excess of $250,000, including, for the avoidance of doubt, in connection with any monetary non-appealable judgment not otherwise stayed, bonded or satisfied within 60 days; provided that the foregoing shall not apply to any stay relief order or unstayed judgment solely seeking to recover from applicable insurance coverage, if any;

- the grant of any super priority administrative expense claim or any lien or charge which is pari passu with or senior to those of the DIP Agent and the DIP Lenders under the DIP Facility (other than as permitted by this Term Sheet and/or the DIP Facility);

- cessation of liens or superpriority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein; and

- the entry of the Final DIP Order shall not have occurred within thirty-five (35) days after entry of the Interim DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any substantive modification or amendment, without the prior written consent of the DIP Agent and Required Lenders.

- If any of the following shall occur:

    o any material Health Care Permit of a Loan Party shall be revoked, fail to be renewed, suspended or otherwise terminated,

    o any Loan Party shall fail to continue to be eligible for any reason to participate in any Government Reimbursement Program or to accept assignments or rights to reimbursement thereunder,

    o any Account Debtor shall terminate, revoke or fail to renew any Loan Party's right to participate in any material Third-Party Payor Arrangement that provides reimbursement for Medical Services,

    o any Loan Party shall enter into a settlement or other agreement with CMS or any other Governmental Authority without the DIP Agent's written consent not to be unreasonably withheld, conditioned, or delayed,

    o any Loan Party or any officer, director, partner, shareholder or managing employee of a Loan Party (i) shall have been found guilty of an act of fraud or (ii) shall have been indicted for or convicted of a felony crime that relates to any Medical Services or Third-Party Payor Arrangement.

|  | • The occurrence of any Health Care Proceeding that could reasonably be expected to have a material adverse impact on any Health Care Facility (a "<u>Health Care Proceeding Default</u>"), provided any such Health Care Proceeding Default shall not be an Event of Default hereunder if the same is resolved to the reasonable satisfaction of the DIP Agent within sixty (60) days following the commencement thereof (or such longer period as DIP Agent shall permit in writing); |
|  | • The discharge of the DIP Facility Obligations by entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases unless the DIP Facility Obligations have been Paid in Full on or before the effective date of such confirmed plan of reorganization; |
|  | • The Debtors proposal or support of any chapter 11 plan or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the DIP Facility Obligations being Paid in Full on or prior to the earlier to occur of the effective date of such chapter 11 plan or sale; |
|  | • The Debtors seek or consent to, directly or indirectly, any modification, stay, vacatur or amendment of the Interim DIP Order without the consent of the Required Lenders; |
|  | • The Debtors seek any order authorizing the use of Cash Collateral resulting from the DIP Collateral or the Prepetition Collateral that is inconsistent with the Interim DIP Order without the prior written consent of the DIP Agent (acting at the direction of the Required Lenders) or the Prepetition Agent, as applicable; |
|  | • The Debtors grant any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition Liens or the Adequate Protection Liens, except to the extent expressly provided in the Interim DIP Order or this DIP Term Sheet without the consent of the Prepetition Agent. |
|  | A "**Final DIP Order**" is an order in form and substance satisfactory to New Ark, the DIP Agent and the Required Lenders in their sole discretion authorizing the transactions contemplated by the DIP Facility including, without limitation, authorizing the granting of superpriority claim status and the liens and charges (which liens and charges shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected); authorizing the DIP Facility in a principal amount equal to the sum of the Initial Draw and all Delayed Draws; granting the adequate protection described above; providing for the DIP Order Intercreditor Provisions; approving the New Ark Funding and the establishment and use of the New Ark Reserve Account set forth herein, providing that the DIP Liens and the liens of the Prepetition Lenders shall not be subject to marshaling or sections 551 or 552(b) of the Bankruptcy Code and the DIP Collateral and the collateral of the Prepetition Lenders shall not be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
| **Remedies:** | Immediately upon the occurrence (subject to applicable notice and cure provisions) and during the continuation of an Event of Default (and |

without the need for any further relief from the automatic stay), unless such Event of Default has been waived by the DIP Agent and subject in all respects to the RSA:

(a) the DIP Agent may, or at the direction Required Lenders shall, declare (i) all DIP Facility Obligations owing under the Documentation to be immediately due and payable, and (ii) the termination of the DIP Facility and any other Documentation as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the Liens or the DIP Facility Obligations; and

(b) the DIP Agent may, or at the direction Required Lenders shall, declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (other than proceeds of prepetition accounts receivable that are subject to the Prepetition Agent's valid and perfected liens, which the DIP Agent shall not withhold consent therefrom) upon expiration of the five business day period referenced below, any of the foregoing declarations shall be made to the Debtors, and shall be referred to herein as a "**Termination Declaration**" and the date that is the earliest to occur of any such Termination Declaration and the Maturity Date being herein referred to as the "**Termination Declaration Date**."  For the avoidance of doubt, the Debtors may continue to use any Cash Collateral prior to the expiration of the five business day period referenced below so long as such Cash Collateral is used in accordance with the DIP Budget (subject to Permitted Variances and Permitted Carrybacks/Carryforwards).

Subject to the RSA, in addition to remedies described above and other customary remedies, five business days following the Termination Declaration Date, the DIP Agent shall have relief from the automatic stay in the Chapter 11 Cases and may setoff against deposits and financial assets of the Debtors and foreclose on all or any portion of the DIP Collateral (other than proceeds of prepetition accounts receivable that are subject to the Prepetition Agent's valid and perfected liens, which may only be foreclosed upon by the DIP Agent after repayment in full of any allowed the Prepetition Credit Agreement obligations). During such five business day notice period, the Debtors, the Office of the U.S. Trustee, and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred.  Unless during such period the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing, the automatic stay, as to the DIP Lenders and the DIP Agent, shall be automatically terminated at the end of such notice period and without further notice or order.

In addition, upon the occurrence and during the continuation of an Event of Default, the DIP Agent will have the right to utilize, at no cost or expense, any tradenames, trademarks, copyrights or other intellectual property to the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the DIP Collateral.

| **Required Lenders:** | The DIP Lenders holding more than 50% of the outstanding DIP Loans and unfunded DIP Commitments under the DIP Facility. |
| --- | --- |

| | |
|---|---|
| **Expenses:** | All parties will be responsible for their out-of-pocket expenses associated with due diligence, negotiation and preparation of the DIP. |
| **Indemnity:** | Customary for similar debtor-in-possession financings. |
| **Assignments; Participations:** | Customary for similar debtor-in-possession financings. |
| **Governing Law:** | New York and, to the extent applicable, the Bankruptcy Code |
| **DIP Lenders' counsel:** | Weil, Gotshal & Manges LLP; Morris, Nichols, Arsht & Tunnell LLP; Ferguson Braswell Fraser Kubasta PC |

[Signature Page(s) to Follow]

IN WITNESS WHEREOF, the parties hereto have executed and agree to be bound by the terms set forth in this Term Sheet or caused the same to be executed by their respective duly authorized officers.

BORROWERS:

Gulf Coast Health Care, LLC
Brevard Oaks Center, LLC
FL HUD Baybreeze, LLC
FL HUD Bayside, LLC
FL HUD Destin, LLC
FL HUD Margate, LLC
FL HUD Pensacola, LLC
FL HUD Rosewood, LLC
FL HUD Silvercrest, LLC
MF Lake Eustis, LLC
MF Winter Park, LLC
MS Greenbough, LLC
MS HUD Boyington, LLC
MS HUD Dixie, LLC
MS HUD Ocean Springs, LLC
MS HUD Pine View, LLC
NF Chipola, LLC
NF Escambia, LLC
NF Nine Mile, LLC
NF Panama, LLC
NF Pensacola Manor, LLC
NF Suwannee, LLC
SF Brevard, LLC
SF Carnegie, LLC
SF Lake Placid ALF, LLC


By: _____
Name: M. Benjamin Jones
Title:   Chief Restructuring Officer

GUARANTORS:

GCH Management Services, LLC
Pensacola Administrative Services, LLC
Pensacola Administrative Holdings, LLC
Gulf Coast Master Tenant Holdings, LLC
Gulf Coast Master Tenant I, LLC
Gulf Coast Master Tenant II, LLC
Gulf Coast Master Tenant III, LLC
Gulf Coast Facilities, LLC
HUD Facilities, LLC
Florida Facilities, LLC
AL Citronelle, LLC
AL Willow Tree, LLC
MF Debary, LLC
MF Flagler, LLC
MF Halifax, LLC
MF Heritage, LLC
MF Longwood, LLC
MF Oakwood, LLC
MS Shelby, LLC
NF Brynwood, LLC
NF Glen Cove, LLC
NF Manor, LLC
NF River Chase, LLC
NF Windsor, LLC
SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC
SF Berkshire, LLC
SF Boynton, LLC
SF Fountainhead, LLC
SF Glen Oaks, LLC
SF Kissimmee, LLC
SF Lake Placid, LLC
SF Oakbrook, LLC
SF Royal Manor, LLC
SF Salerno, LLC
SF Tampa, LLC


By:  _____
Name: M. Benjamin Jones
Title:   Chief Restructuring Officer

GUARANTORS:

MS Lakeside, LLC
MS Singing, LLC


By: _____

Name:  M. Benjamin Jones
Title:    Chief Restructuring Officer

DIP AGENT:

OHI Asset Funding (DE), LLC

By: _____
Name:        Daniel J. Booth
Title:        Chief Operating Officer

PREPETITION AGENT:

New Ark Capital, LLC

By: _____
Name: Steven Lebowitz
Title:  Vice President

ANNEX A
TO TERM SHEET

**INITIAL BUDGETS**

[Attached]

**Gulf Coast Health Care, LLC, et al.**
**Omega DIP Lender DIP Budget**

| ($ in thousands) | Week 1 14-Oct-21 15-Oct-21 | Week 2 16-Oct-21 22-Oct-21 | Week 3 23-Oct-21 29-Oct-21 | Week 4 30-Oct-21 5-Nov-21 | Week 5 6-Nov-21 12-Nov-21 | Week 6 13-Nov-21 19-Nov-21 | Week 7 20-Nov-21 26-Nov-21 | Week 8 27-Nov-21 3-Dec-21 | Week 9 4-Dec-21 10-Dec-21 | Week 10 11-Dec-21 17-Dec-21 | Week 11 18-Dec-21 24-Dec-21 | Week 12 25-Dec-21 31-Dec-21 | Week 13 1-Jan-22 7-Jan-22 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1 Receipts** | 109.1 | 388.2 | 564.2 | 390.3 | 4,635.2 | 3,968.8 | 5,424.6 | 5,345.2 | 2,141.0 | 2,309.1 | 2,620.7 | 5,170.4 | 508.2 | **33,575.0** |
| 2 Employee Costs | (337.1) | (2,337.5) | (3,332.0) | (3,174.1) | (3,545.8) | (2,112.0) | (3,097.0) | (2,102.0) | (3,310.8) | (2,102.0) | (681.4) | (429.4) | (296.4) | **(26,857.4)** |
| 3 Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4 Halcyon (therapy) | (184.3) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (430.0) | (43.0) | (43.0) | (43.0) | (43.0) | (43.0) | **(3,409.3)** |
| 5 Food | (185.0) | (150.0) | (185.0) | (150.0) | (150.0) | (150.0) | (150.0) | (185.0) | (15.0) | (15.0) | (18.5) | (15.0) | (15.0) | **(1,387.0)** |
| 6 Agency | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (375.0) | (1,028.8) | (548.8) | (548.8) | (548.8) | (7.5) | **(5,682.5)** |
| 7 Provider Fee | - | (1,185.0) | - | - | - | (1,185.0) | - | - | - | - | - | (1,185.0) | - | **(3,555.0)** |
| 8 Pharmacy | (737.8) | - | - | (737.8) | - | - | - | (669.9) | - | - | - | (56.0) | - | **(2,201.5)** |
| 9 Medical Supplies | (150.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (175.0) | (41.5) | (17.5) | (17.5) | (17.5) | (41.5) | **(1,510.5)** |
| 10 Laboratory & X-ray | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (50.0) | (5.0) | (5.0) | (5.0) | (5.0) | (5.0) | **(425.0)** |
| 11 Utilities | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (136.0) | (15.6) | (15.6) | (15.6) | (15.6) | (15.6) | **(1,166.0)** |
| 12 Shared Service Fees[1] | - | (400.6) | (426.4) | (345.0) | (345.0) | (345.0) | (390.6) | - | - | - | - | - | - | **(2,252.7)** |
| 13 Misc. & Local Vendors | (550.7) | (500.0) | (234.3) | (247.8) | (254.6) | (353.6) | (234.3) | (213.5) | (48.1) | (34.0) | (22.5) | (27.0) | (152.5) | **(2,872.8)** |
| **14 Total Disbursements b/f Rx Disbursements** | **(2,705.9)** | **(5,739.2)** | **(5,343.8)** | **(5,820.7)** | **(5,461.4)** | **(5,311.6)** | **(5,038.0)** | **(4,336.4)** | **(4,507.8)** | **(2,784.3)** | **(1,348.7)** | **(2,345.7)** | **(576.4)** | **(51,319.7)** |
| 15 Process Costs[2] | - | - | (300.2) | - | - | - | - | - | - | - | - | - | - | **(300.2)** |
| 16 Professional Fees[3][4] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 17 Financing Costs | (250.0) | - | - | (153.4) | - | - | - | (226.9) | - | - | - | - | (275.8) | **(906.0)** |
| **18 Total Disbursements** | **(2,955.9)** | **(5,739.2)** | **(5,643.9)** | **(5,974.0)** | **(5,461.4)** | **(5,311.6)** | **(5,038.0)** | **(4,563.2)** | **(4,507.8)** | **(2,784.3)** | **(1,348.7)** | **(2,345.7)** | **(852.2)** | **(52,525.9)** |
| **19 Net Cash Flow before Financing** | **(2,846.8)** | **(5,351.0)** | **(5,079.8)** | **(5,583.8)** | **(826.2)** | **(1,342.7)** | **386.7** | **782.0** | **(2,366.8)** | **(475.3)** | **1,272.0** | **2,824.7** | **(344.0)** | **(18,951.0)** |
| 20 New Ark Capital, LLC Cash Collateral Use / (Repayment) | - | - | 4,500.0 | 1,600.0 | 200.0 | 400.0 | 300.0 | (7,000.0) | - | - | - | - | - | - |
| 21 DIP Draw | 6,000.0 | 4,500.0 | 750.0 | 4,000.0 | 500.0 | 1,000.0 | 750.0 | 7,000.0 | 500.0 | - | - | - | - | 25,000.0 |
| **22 Net Cash Flow** | **3,153.2** | **(851.0)** | **170.2** | **16.2** | **(126.2)** | **57.3** | **1,436.7** | **782.0** | **(1,866.8)** | **(475.3)** | **1,272.0** | **2,824.7** | **(344.0)** | **6,049.0** |
| 23 Book Cash Roll-Forward | | | | | | | | | | | | | | |
| 24 Beginning Book Cash Balance | - | 3,153.2 | 2,302.2 | 2,472.4 | 2,488.7 | 2,362.5 | 2,419.8 | 3,856.4 | 4,638.4 | 2,771.7 | 2,296.4 | 3,568.4 | 6,393.1 | - |
| 25 Cash Generated / (Needed) | 3,153.2 | (851.0) | 170.2 | 16.2 | (126.2) | 57.3 | 1,436.7 | 782.0 | (1,866.8) | (475.3) | 1,272.0 | 2,824.7 | (344.0) | 6,049.0 |
| **26 Ending Book Cash Balance** | **3,153.2** | **2,302.2** | **2,472.4** | **2,488.7** | **2,362.5** | **2,419.8** | **3,856.4** | **4,638.4** | **2,771.7** | **2,296.4** | **3,568.4** | **6,393.1** | **6,049.0** | **6,049.0** |

Notes:
1. Shared Service Costs post-transition to be determined as negotiated between Health Care Navigator, Omega and the New operator(s).
2. Process costs include adequate assurance utility deposit.
3. Post-petition professional fees have been shown as paid to escrow in the week incurred.
4. Professional fees include debtor legal counsel and financial advisor fees, independent manager fees, New Ark legal counsel fees, Unsecured Creditor Committee fees, US Trustee fees, and patient care ombudsman fees.

**Gulf Coast Health Care, LLC, et al.**
**New Ark Financing Cash Collateral Budget**

| | | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13 Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 14-Oct-21 | 16-Oct-21 | 23-Oct-21 | 30-Oct-21 | 6-Nov-21 | 13-Nov-21 | 20-Nov-21 | 27-Nov-21 | 4-Dec-21 | 11-Dec-21 | 18-Dec-21 | 25-Dec-21 | 1-Jan-22 | Total |
| | ($ in thousands) | 15-Oct-21 | 22-Oct-21 | 29-Oct-21 | 5-Nov-21 | 12-Nov-21 | 19-Nov-21 | 26-Nov-21 | 3-Dec-21 | 10-Dec-21 | 17-Dec-21 | 24-Dec-21 | 31-Dec-21 | 7-Jan-22 | |
| 1 | **Receipts** | **931.5** | **3,246.3** | **6,510.4** | **1,814.0** | **497.8** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **13,000.0** |
| 2 | Debtor Professional Fees[1] | (388.3) | (345.1) | (345.1) | (336.8) | (366.8) | (336.8) | (336.8) | (236.8) | (236.8) | (266.8) | (261.8) | (236.8) | (436.8) | (4,131.2) |
| 3 | UCC Professional Fees[1] | - | - | (37.5) | (37.5) | (37.5) | (37.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (12.5) | (237.5) |
| 4 | Other Professional Fees[1][2] | (26.3) | (26.3) | (26.3) | (26.3) | (26.3) | (56.3) | (26.3) | (26.3) | (26.3) | (56.3) | (26.3) | (26.3) | (26.3) | (402.1) |
| 5 | US Trustee Fees[1] | - | - | - | - | - | - | - | - | - | - | - | (250.0) | - | (250.0) |
| 6 | **Total Disbursements** | **(414.6)** | **(371.4)** | **(408.9)** | **(400.6)** | **(430.6)** | **(430.6)** | **(375.6)** | **(275.6)** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **(5,020.8)** |
| 7 | **Net Cash Flow before Financing** | **516.8** | **2,874.9** | **6,101.5** | **1,413.4** | **67.2** | **(430.6)** | **(375.6)** | **(275.6)** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **7,979.2** |
| 8 | New Ark Capital, LLC (Proceeds to) / Repayment from Omega | - | - | (4,500.0) | (1,600.0) | (200.0) | (400.0) | (300.0) | 7,000.0 | - | - | - | - | - | - |
| 9 | **Net Cash Flow** | **516.8** | **2,874.9** | **1,601.5** | **(186.6)** | **(132.8)** | **(830.6)** | **(675.6)** | **6,724.4** | **(275.6)** | **(335.6)** | **(300.6)** | **(525.6)** | **(475.6)** | **7,979.2** |
| 10 | Book Cash Roll-Forward | | | | | | | | | | | | | | |
| 11 | Beginning Book Cash Balance | 1,500.0 | 2,016.8 | 4,891.7 | 6,493.2 | 6,306.6 | 6,173.9 | 5,343.3 | 4,667.7 | 11,392.1 | 11,116.5 | 10,781.0 | 10,480.4 | 9,954.8 | 1,500.0 |
| 12 | Cash Generated / (Needed) | 516.8 | 2,874.9 | 1,601.5 | (186.6) | (132.8) | (830.6) | (675.6) | 6,724.4 | (275.6) | (335.6) | (300.6) | (525.6) | (475.6) | 7,979.2 |
| 13 | **Net Ending Cash Collateral Balance** | **2,016.8** | **4,891.7** | **6,493.2** | **6,306.6** | **6,173.9** | **5,343.3** | **4,667.7** | **11,392.1** | **11,116.5** | **10,781.0** | **10,480.4** | **9,954.8** | **9,479.2** | **9,479.2** |

Notes:
1. Post-petition professional and trustee fees have been shown as paid to escrow in the week incurred.
2. Other professional fees include New Ark legal counsel fees, and patient care ombudsman fees.

ANNEX B
TO TERM SHEET

**DEBTORS**

| Debtor Name | Type of Loan Party |
|---|---|
| AL Citronelle, LLC | Guarantor |
| AL Willow Tree, LLC | Guarantor |
| Brevard Oaks Center, LLC | Borrower |
| FL HUD Baybreeze, LLC | Borrower |
| FL HUD Bayside, LLC | Borrower |
| FL HUD Destin, LLC | Borrower |
| FL HUD Margate, LLC | Borrower |
| FL HUD Pensacola, LLC | Borrower |
| FL HUD Rosewood, LLC | Borrower |
| FL HUD Silvercrest, LLC | Borrower |
| Florida Facilities, LLC | Guarantor |
| GCH Management Services, LLC | Guarantor |
| Gulf Coast Facilities, LLC | Guarantor |
| Gulf Coast Health Care, LLC | Guarantor |
| Gulf Coast Master Tenant Holdings, LLC | Guarantor |
| Gulf Coast Master Tenant I, LLC | Guarantor |
| Gulf Coast Master Tenant II, LLC | Guarantor |
| Gulf Coast Master Tenant III, LLC | Guarantor |
| HUD Facilities, LLC | Guarantor |
| MF Debary, LLC | Guarantor |
| MF Flagler, LLC | Guarantor |
| MF Halifax, LLC | Guarantor |
| MF Heritage, LLC | Guarantor |
| MF Lake Eustis, LLC | Borrower |
| MF Longwood, LLC | Guarantor |
| MF Oakwood, LLC | Guarantor |
| MF Winter Park, LLC | Borrower |
| MS Greenbough, LLC | Borrower |
| MS HUD Boyington, LLC | Borrower |
| MS HUD Dixie, LLC | Borrower |
| MS HUD Ocean Springs, LLC | Borrower |
| MS HUD Pine View, LLC | Borrower |
| MS Lakeside, LLC | Guarantor |
| MS Shelby, LLC | Guarantor |
| MS Singing, LLC | Guarantor |
| NF Brynwood, LLC | Guarantor |
| NF Chipola, LLC | Borrower |
| NF Escambia, LLC | Borrower |
| NF Glen Cove, LLC | Guarantor |
| NF Manor, LLC | Guarantor |
| NF Nine Mile, LLC | Borrower |
| NF Panama, LLC | Borrower |
| NF Pensacola Manor, LLC | Borrower |

| Debtor Name | Type of Loan Party |
|---|---|
| NF River Chase, LLC | Guarantor |
| NF Suwannee, LLC | Borrower |
| NF Windsor, LLC | Guarantor |
| Pensacola Administrative Holdings, LLC | Guarantor |
| Pensacola Administrative Services, LLC | Guarantor |
| SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC | Guarantor |
| SF Berkshire, LLC | Guarantor |
| SF Boynton, LLC | Guarantor |
| SF Brevard, LLC | Borrower |
| SF Carnegie, LLC | Borrower |
| SF Fountainhead, LLC | Guarantor |
| SF Glen Oaks, LLC | Guarantor |
| SF Kissimmee, LLC | Guarantor |
| SF Lake Placid ALF, LLC | Borrower |
| SF Lake Placid, LLC | Guarantor |
| SF Oakbrook, LLC | Guarantor |
| SF Royal Manor, LLC | Guarantor |
| SF Salerno, LLC | Guarantor |
| SF Tampa, LLC | Guarantor |

**ANNEX C**
**TO TERM SHEET**

### CERTAIN DEFINITIONS

"Affiliate" has the meaning set forth in Bankruptcy Code section 101(2).

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any of the Loan Parties or their Subsidiaries is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any of the Loan Parties or their Subsidiaries is located or is doing business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"CHAMPVA" means, collectively, the Civilian Health and Medical Program of the Department of Veterans Affairs, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"CMS" means The Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, and any Governmental Authority successor thereto.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Government Reimbursement Program" means (a) Medicare, (b) Medicaid, (c) the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902 et seq., (d) TRICARE, (e) CHAMPVA, or (f) if applicable within the context of this Agreement, any agent, administrator, administrative contractor, intermediary or carrier for any of the foregoing.

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank), including CMS and any Medicare or Medicaid administrative contractors, intermediaries or carriers.

"Health Care Facility" means each facility from which any of Loan Parties or their Subsidiaries provides or furnishes goods or Medical Services, including, without limitation, any skilled nursing facility, assisted living facility, independent living facility or similar facility.

"Health Care Laws" means, collectively, any and all federal, state or local laws, rules, regulations and orders relating to any of the following: (a) fraud and abuse (including the following statutes, as amended, modified or supplemented from time to time and any successor statutes thereto and regulations promulgated from time to time thereunder:  the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn and § 1395(q)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the federal health care program exclusion provisions (42 U.S.C. § 1320a-7), the Civil Monetary Penalties Act (42 U.S.C. § 1320a-7a), and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173)); (b) any Government Reimbursement Program; (c) the licensure or regulation of healthcare providers, suppliers,

professionals, facilities or payors (including all statutes and regulations administered by the FDA); (d) the operation of any Health Care Facilities or the provision of, or payment for, Medical Services, items or supplies; (e) quality, safety certification and accreditation standards and requirements; (f) the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (g) HIPAA and Other Privacy Laws; (h) the practice of medicine and other health care professions or the organization of medical or professional entities; (i) fee-splitting prohibitions; (j) requirements for maintaining federal, state and local tax-exempt status of any of Loan Parties or their Subsidiaries; (k) charitable trusts or charitable solicitation laws; (l) health planning or rate-setting laws, including laws regarding certificates of need and certificates of exemption; and (m) any and all other applicable federal, state or local health care laws, rules, codes, regulations, manuals, orders, ordinances, professional or ethical rules, administrative guidance and requirements, as the same may be amended, modified or supplemented from time to time.

"Health Care Permits" means any and all permits, licenses, authorizations, certificates, certificates of need and accreditations of third-party accreditation agencies (such as The Joint Commission) that are (a) necessary to enable any Loan Party to operate any Health Care Facility or provide Medical Services, participate in and receive payment under any Government Reimbursement Program or other Third-Party Payor Arrangement, as applicable, or otherwise continue to conduct its business as it is conducted on the Closing Date, or (b) required under any Health Care Law.

"Health Care Proceeding" means any investigations, probes, audits, hearings, litigation or proceedings (in each case, whether civil, criminal, administrative or investigative) concerning any alleged or actual non-compliance by any Loan Party with any Health Care Laws or the requirements of any Health Care Permit or Third-Party Payor Arrangement (including any investigations, probes, audits or procedures initiated by a Fiscal Intermediary/Medicare Administrator Contractor, a Medicaid Integrity Contractor, a Recovery Audit Contractor, a Program Safeguard Contractor, a Zone Program Integrity Contractor, an Attorney General, the Office of Inspector General, the Department of Justice or any similar governmental agencies or contractors for such agencies).

"HIPAA and Other Privacy Laws" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time (including the provisions of the Health Information Technology for Economic and Clinical Health Act contained in the American Recovery and Reinvestment Act of 2009), and any successor statute thereto, any and all rules or regulations promulgated from time to time thereunder and any other applicable federal, state or local laws and regulations regulating, governing or relating to the privacy and/or security of patient protected health or personally identifiable information.

"Government Account Debtor" means the United States government or a political subdivision thereof, or any state, county or municipality or department, agency or instrumentality thereof (including privately administered "Managed Medicaid" programs), that is responsible for payment of an Account under any Government Reimbursement Program, or any agent, administrator, intermediary or carrier for the foregoing.

"Government Reimbursement Program" means (a) Medicare, (b) Medicaid, (c) the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902 et seq., (d) TRICARE, (e) CHAMPVA, or (f) if applicable within the context of this Agreement, any agent, administrator, administrative contractor, intermediary or carrier for any of the foregoing.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases (as defined in the Prepetition Credit Agreement), (d) all obligations or liabilities of others secured by a lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and, for the avoidance of doubt, other than royalty payments payable in the ordinary

course of business in respect of non-exclusive licenses), (f) all monetary obligations of such Person owing under Hedge Agreements (as defined in the Prepetition Credit Agreement) (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Disqualified Equity Interests (as defined in the Prepetition Credit Agreement) of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"Margin Stock" as defined in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" shall mean a material adverse effect on (i) the operations, business, assets, properties or financial condition of the Loan Parties taken as a whole, (ii) the ability of the Loan Parties to perform payment or other material obligations under any Interim DIP Document, (iii) the legality, validity or enforceability of this Term Sheet or any other Interim DIP Document, (iv) the rights and remedies of the DIP Agent and the DIP Lenders under any Interim DIP Document, or (v) the validity, perfection or priority of a lien in favor of DIP Lenders on any of the DIP Collateral; provided, however that "Material Adverse Effect" shall expressly exclude any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases, the MOTA, or such other changes during the Chapter 11 Cases that occur in a manner consistent with the RSA.

"Medicaid" means, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, or requirements pertaining to such program, including all state statutes and plans for medical assistance enacted in connection with such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Medical Services" means medical and health care items, services or supplies provided to a patient, including without limitation physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home health care services, residential and out-patient behavioral healthcare services, and medicine or health care equipment provided by any of Loan Parties or their Subsidiaries to a patient for a valid and proper medical or health purpose.

"Medicare" means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, or requirements pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Paid in Full" means, in respect of the DIP Facility, (i) all of the DIP Facility Obligations, pursuant to the DIP Term Sheet and this Interim DIP Order, have been indefeasibly paid in full in cash (other than contingent indemnification obligations as to which no claim has been asserted) unless the DIP Lenders have agreed to such other treatment under the RSA or othwerise, including, for the avoidance of doubt, satisfaction of all of the DIP Facility Obligations upon confirmation of a Plan, and (ii) all commitments to extend credit under the DIP Facility are terminated.

"Permitted Indebtedness" means:  (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Term Sheet and the

other Documentation; (c) Indebtedness arising under the New Ark Funding, (d) obligations under the Prepetition Credit Agreement; (e) deferred taxes and other expenses incurred in the ordinary course of business; (f) any Indebtedness existing on the Petition Date; (g) administrative expenses of Loan Parties; (h) endorsement of instruments or other payment items for deposit; (i) Indebtedness incurred in the ordinary course of business under performance, surety, statutory, or appeal bonds; (j) Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any of the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year; (k) Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business, and (l) any other unsecured Indebtedness incurred by any of the Loan Parties in an aggregate outstanding amount not to exceed $25,000 at any one time.

"Permitted Lien" means; (a) liens in favor of the DIP Agent as contemplated by the Term Sheet, (b) liens provided to the Prepetition Agent and Prepetition Lenders pursuant to the Prepetition Credit Agreement and related documents, (c) liens provided to New Ark pursuant to the New Ark Funding and related documents, (d) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code; (e) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding liens under ERISA); (f) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (g) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (h) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (i) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (i) liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code); (j) to the extent constituting liens, liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements; (k) any adequate protection liens permitted under the DIP Orders; (l) liens arising in favor of utility providers in any adequate assurance deposits arising under an order approved by the Bankruptcy Court; (m) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the ordinary course of business; and (n) other liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $25,000.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other equity interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other equity interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person

resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by The Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC").

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any member of the Loan Parties or their Subsidiaries.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the equity interests having ordinary voting power to elect a majority of the board of directors (or other governing body) of such corporation, partnership, limited liability company, or other entity.

"Third-Party Payor" means (i) a commercial medical insurance company, health maintenance organization, professional provider organization or other third-party payor that reimburses providers for Medical Services provided to individual patients, (ii) a nonprofit medical insurance company (such as the Blue Cross, Blue Shield entities), and (iii) a Government Account Debtor making payments under a Government Reimbursement Program.

"Third-Party Payor Arrangement" shall mean a written agreement or arrangement with a Third-Party Payor pursuant to which the Third-Party Payor pays all or a portion of the charges of any Loan Party or its Subsidiaries for providing Medical Services.

"TRICARE" means, collectively, the program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Department of Defense, Health and Human Services and Transportation, and all laws, rules, regulations, orders or requirements pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

**ANNEX D**
**TO TERM SHEET**

### REPRESENTATIONS AND WARRANTIES

Each of the Loan Parties represents as follows:

1. **Due Organization**.  Each of the Loan Parties are duly formed and/or organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdiction) under the laws of their jurisdictions of incorporation or formation;

2. **Due Authorization**.

   a. Upon entry of the Interim DIP Order, the execution and delivery of this Term Sheet and the other Documentation and the performance by each Loan Party of such Loan Party's obligations under the Documentation (i) are within its corporate or limited liability company (or equivalent) powers, (ii) have been duly authorized by all necessary corporate or limited liability company (or equivalent) action of such Loan Party, (iii) have received all necessary bankruptcy, insolvency or governmental approvals, (iv) do not and will not contravene or conflict with any provisions of such Loan Party's corporate charter or by-laws (or equivalent organizational documents, and (v) do not and will not materially contravene or materially conflict with any provisions of applicable material law or of any material agreements binding upon or applicable to such Loan Party or any of its Subsidiaries or any of their properties;

   b. The Chapter 11 Cases of each Loan Party have been duly authorized by all corporate or limited liability company (or equivalent) action of such Loan Party;

3. **Binding Obligations**.  Upon entry of the Interim DIP Order, this Term Sheet and the other Documentation, constitute the legal, valid and binding obligation, enforceable against the Loan Parties in accordance with its respective terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, including the entry of the Interim DIP Order and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

4. **Title to Assets**.  Other than as a result of the Chapter 11 Cases and subject to any necessary orders or authorization of the Bankruptcy Court, the Loan Parties have good and marketable title to, or valid leasehold interests in, all of its material property and assets; none of the properties and assets of the Loan Parties are subject to any liens other than Permitted Liens;

5. **Disclosure**. No written statement furnished by or on behalf of the Loan Parties or their subsidiaries to the DIP Lenders in accordance with the terms of this Term Sheet and the Documentation (other than any projections, the DIP Budget, estimates and information of a general economic nature or general industry nature), when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of all of the circumstances under which they were made;

6. **Perfected Liens**.  Upon entry of the Interim DIP Order, the liens granted to the DIP Lenders in accordance with the Term Sheet, the Documentation and the Interim DIP Order will at all times be fully perfected liens in and to the DIP Collateral described therein, subject, as to priority, only to liens permitted to have such priority under the Interim DIP Order;

7. **No Litigation**.  Except for proceedings in the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Loan Parties, threatened in writing against any Loan Party before any governmental authority or before any arbitrator or panel of arbitrators

that challenges the rights or powers of the Loan Parties to enter into or perform any of their obligations under the Interim DIP Documents to which it is a party, or the validity or enforceability of any Interim DIP Document or any action taken thereunder;

8. **Compliance with Laws**. No Loan Party (a) is in material violation of any applicable laws, rules, regulations, executive orders, or codes, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, are material;

9. **Investment Company Act**. None of the Loan Parties is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940;

10. **Material Adverse Effect**. Since the Petition Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect;

11. **Payment of Taxes**. The Loan Parties have filed (or obtained extensions to file) all federal, state and other tax returns and reports required to be filed, and have paid all federal, state and other taxes, assessments, fees and other governmental charges levied or imposed by a governmental authority upon them or their properties, income or assets otherwise due and payable other than those (i) not yet delinquent or are being contested in good faith by appropriate proceedings, (ii) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this DIP Term Sheet, or (iii) taxes allocable to the facilities operated by the Debtors for which the Debtors have agreed to pay under any master lease pertaining to such facilities or any sub-leases related thereto, including, without limitation, under the Lease or the Blue Mountain Master Leases (as defined in the First Day Declaration);

12. **Use of Proceeds**. The proceeds of the DIP Facility received by the Borrowers have been used in accordance with the Affirmative Covenant identified in item 13 [Use of Proceeds] of **Annex E**.

13. **OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws**. None of the Loan Parties or any of their Subsidiaries is in violation of any Sanctions. None of Loan Parties or any of their Subsidiaries nor, to the knowledge of any Loan Party, any director, officer, employee, or agent of Loan Parties or any of their Subsidiaries (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and any of their Subsidiaries has, to the extent applicable to their business activities, implemented and maintains in effect policies and procedures designed to ensure compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties and their Subsidiaries, and to the knowledge of each Loan Party, each director, officer, employee, and agent of each of the Loan Parties and their Subsidiaries, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any funding hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person'

14. **Margin Stock**. None of the Loan Parties or any of their Subsidiaries owns any Margin Stock or is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the loans made to Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors. None of the Loan Parties or any of their Subsidiaries expects to acquire any Margin Stock.

33

15. **MOTA**. The Loan Parties are not aware of any events or circumstances that would make the representation and warranties contained in Section 11(j) and 11(l) of the MOTA not true and correct in all respects as and when such representations and warranties are required to be made in accordance with the MOTA.

16. **Health Care Matters**.

    a.   <u>Compliance with Health Care Laws; Health Care Permits; Third-Party Payors</u>.  Each of the Loan Parties and their Subsidiaries is in compliance in material respects with all Health Care Laws and requirements of Third-Party Payor Arrangements applicable to it and its assets, business or operations. Each of Loan Parties and their Subsidiaries (i) holds in full force and effect (without default, violation or noncompliance) all Health Care Permits necessary for it to own, lease, sublease or operate its assets and Health Care Facilities or to conduct its business and operations as presently conducted (including to obtain reimbursement under all Third-Party Payor Arrangements in which it participates), and (ii) has obtained and maintains accreditation from all generally recognized accreditation agencies material to the operations of the Loan Parties and their Subsidiaries. To Loan Parties' knowledge after due inquiry, no circumstance exists or event has occurred which could reasonably be expected to result in the suspension, revocation, termination, restriction, limitation, modification or non-renewal of any material Health Care Permit. The Health Care Facilities operated by any of Loan Parties or their Subsidiaries and the Medical Services provided at such Health Care Facilities are qualified for participation in the Government Reimbursement Programs, and each of Loan Parties and their Subsidiaries is entitled to reimbursement under the Government Reimbursement Programs for services rendered at such Health Care Facilities to qualified beneficiaries. All Persons providing professional health care services for or on behalf of any of the Loan Parties or their Subsidiaries (either as an employee or independent contractor) are appropriately licensed in every jurisdiction in which they hold themselves out as professional health care providers.

    b.   <u>Cost Reports; Overpayments; Civil Money Penalties</u>.  Each of Loan Parties and their Subsidiaries has timely filed or caused to be timely filed all cost reports and other reports of every kind whatsoever required by any Government Reimbursement Program to have been filed or made with respect to the operations of any of the Loan Parties or their Subsidiaries. There are no claims, actions or appeals pending before CMS, any administrative contractor, intermediary or carrier or any other Governmental Authority with respect to any Government Reimbursement Programs cost reports or claims filed by any of the Loan Parties or their Subsidiaries, or any disallowance by any Governmental Authority in connection with any audit of such cost reports. None of the Loan Parties or their Subsidiaries (i) to Loan Parties' knowledge, after due inquiry, has retained an overpayment received from, or failed to refund any amount due to any Government Reimbursement Program or other Third-Party Payor in violation of any Health Care Law or Third-Party Payor Arrangement, (ii) has received written notice of, or has knowledge of, any overpayment or refunds due to any Third-Party Payor or (iii) has been subject to civil money penalties during the period beginning three (3) years prior to the date hereof, except for civil money penalties imposed following a survey of a Health Care Facility as a result of noncompliance with requirements for participation in Medicare and/or Medicaid so long as the aggregate amount of all such civil money penalties outstanding at any one time does not exceed $250,000.

    c.   <u>Material Statements</u>.  None of the Loan Parties or their Subsidiaries, nor any officer, employee or agent of any of the Loan Parties or their Subsidiaries, has made an untrue statement of a material fact or fraudulent statement to any Governmental Authority, failed to disclose a material fact that must be disclosed to any Governmental Authority, or committed an act, made a statement or failed to make a statement that, at the time such statement, disclosure or failure to disclose occurred, would constitute a material violation of any Health Care Law.

34

d.   Exclusion.  None of the Loan Parties or their Subsidiaries, nor any owner, officer, director, partner, agent or managing employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any of the Loan Parties or their Subsidiaries , has (i) been excluded from any Third-Party Payor Arrangement or had a civil monetary penalty assessed pursuant to 42 U.S.C. § 1320a-7; (ii) been convicted (as that term is defined in 42 C.F.R. § 1001.2) of or investigated for any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347 or 1518, including any of the following categories of offenses: (A) criminal offenses relating to the delivery of an item or service under any federal health care program (as that term is defined in 42 U.S.C. § 1320a-7b) or healthcare benefit program (as that term is defined in 18 U.S.C. § 24b), (B) criminal offenses under federal or state law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service, (C) criminal offenses under laws relating to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickbacks, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state or local governmental agency, (D) laws relating to the interference with or obstruction of any investigations into any criminal offenses described in this clause (d), or (E) criminal offenses under laws relating to the unlawful manufacturing, distribution, prescription or dispensing of a controlled substance; or (iii) been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.

e.   HIPAA and Other Privacy Laws.  Each of the Loan Parties and their Subsidiaries is in compliance in all material respects with HIPAA and Other Privacy Laws. Further, in each contractual arrangement that is subject to HIPAA or Other Privacy Laws, each of the Loan Parties and their Subsidiaries has: (i) entered into a written business associate agreement (as such term is defined under the regulations implementing HIPAA) that substantially meets the requirements of HIPAA; (ii) at all times complied in all material respects with such business associate agreements in respect of the applicable privacy or security standards; and (iii) to its knowledge after due inquiry, at no time experienced or had a material unauthorized use or disclosure of Protected Health Information (as such term is defined in the regulations implementing HIPAA) or privacy or security breach or other privacy or security incident within the meaning of HIPAA.

f.   Proceedings. There is no pending (or, to the knowledge of any Loan Party, threatened) Health Care Proceeding commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator against or affecting any of the Loan Parties or their Subsidiaries. To Loan Parties' knowledge after due inquiry, there are no facts, circumstances or conditions that would reasonably be expected to form the basis for any such Health Care Proceeding against or affecting any of the Loan Parties or their Subsidiaries.

g.   Corporate Integrity Agreement. None of the Loan Parties or their Subsidiaries, nor any owner, officer, director, partner, agent or managing employee of any of Loan Parties or any of their Subsidiaries, is a party to or bound by any individual integrity agreement, corporate integrity agreement, corporate compliance agreement, deferred prosecution agreement, or other formal or informal agreement with any Governmental Authority concerning compliance with Health Care Laws, any Government Reimbursement Programs or the requirements of any Health Care Permit.

17. **Loan Party Information.** The exact legal name of each Loan Party, as such name appears in its respective certificate of formation or any other organizational document, is set forth below. Each Loan Party is (i) the type of entity disclosed next to its name as set forth below and (ii) a registered organization except to the extent disclosed below. Also set forth below is the organizational identification number, if any, of each Loan Party that is a registered organization, and the jurisdiction of formation of each Loan Party.

WEIL:\98150122\31\66205.0003

| Legal Name | Entity Type | Organizational ID Number | Jurisdiction of Organization |
|---|---|---|---|
| AL Citronelle, LLC | Limited Liability Company | 4544017 | Delaware |
| AL Willow Tree, LLC | Limited Liability Company | 4544021 | Delaware |
| FL HUD Baybreeze, LLC | Limited Liability Company | 4543875 | Delaware |
| FL HUD Bayside, LLC | Limited Liability Company | 4543878 | Delaware |
| FL HUD Destin, LLC | Limited Liability Company | 4543876 | Delaware |
| FL HUD Margate, LLC | Limited Liability Company | 4543879 | Delaware |
| FL HUD Pensacola, LLC | Limited Liability Company | 4543877 | Delaware |
| FL HUD Rosewood, LLC | Limited Liability Company | 4544027 | Delaware |
| FL HUD Silvercrest, LLC | Limited Liability Company | 4543880 | Delaware |
| Florida Facilities, LLC | Limited Liability Company | 4525132 | Delaware |
| GCH Management Services, LLC | Limited Liability Company | 4554298 | Delaware |
| Gulf Coast Facilities, LLC | Limited Liability Company | 4525133 | Delaware |
| Gulf Coast Health Care, LLC | Limited Liability Company | 4522903 | Delaware |
| Gulf Coast Master Tenant Holdings, LLC | Limited Liability Company | 4554297 | Delaware |
| Gulf Coast Master Tenant I, LLC | Limited Liability Company | 4542028 | Delaware |
| Gulf Coast Master Tenant II, LLC | Limited Liability Company | 4542029 | Delaware |
| Gulf Coast Master Tenant III, LLC | Limited Liability Company | 3902710 | Delaware |
| HUD Facilities, LLC | Limited Liability Company | 4525131 | Delaware |
| MF Debary, LLC | Limited Liability Company | 4544039 | Delaware |
| MF Flagler, LLC | Limited Liability Company | 4544041 | Delaware |
| MF Halifax, LLC | Limited Liability Company | 4625418 | Delaware |
| MF Heritage, LLC | Limited Liability Company | 4544032 | Delaware |
| MF Lake Eustis, LLC | Limited Liability Company | 4544031 | Delaware |
| MF Longwood, LLC | Limited Liability Company | 4544033 | Delaware |
| MF Oakwood, LLC | Limited Liability Company | 4544028 | Delaware |
| MF Winter Park, LLC | Limited Liability Company | 4544036 | Delaware |
| MS Greenbough, LLC | Limited Liability Company | 4544006 | Delaware |
| MS HUD Boyington, LLC | Limited Liability Company | 4543884 | Delaware |
| MS HUD Dixie, LLC | Limited Liability Company | 4543881 | Delaware |
| MS HUD Ocean Springs, LLC | Limited Liability Company | 4543883 | Delaware |
| MS HUD Pine View, LLC | Limited Liability Company | 4543882 | Delaware |
| MS Lakeside, LLC | Limited Liability Company | 4544010 | Delaware |
| MS Shelby, LLC | Limited Liability Company | 4544007 | Delaware |
| MS Singing, LLC | Limited Liability Company | 4544008 | Delaware |
| NF Brynwood, LLC | Limited Liability Company | 4543999 | Delaware |
| NF Chipola, LLC | Limited Liability Company | 4544016 | Delaware |
| NF Escambia, LLC | Limited Liability Company | 5586593 | Delaware |
| NF Glen Cove, LLC | Limited Liability Company | 4544001 | Delaware |
| NF Manor, LLC | Limited Liability Company | 4543684 | Delaware |
| NF Nine Mile, LLC | Limited Liability Company | 6324810 | Delaware |
| NF Panama, LLC | Limited Liability Company | 4544003 | Delaware |
| NF Pensacola Manor, LLC | Limited Liability Company | 5376207 | Delaware |
| NF River Chase, LLC | Limited Liability Company | 4544013 | Delaware |
| NF Suwannee, LLC | Limited Liability Company | 4544004 | Delaware |
| NF Windsor, LLC | Limited Liability Company | 4544012 | Delaware |
| Pensacola Administrative Holdings, LLC | Limited Liability Company | 4587598 | Delaware |
| Pensacola Administrative Services, LLC | Limited Liability Company | 4522905 | Delaware |
| SC-GA2018 Cobblestone Rehabilitation and Healthcare Center, LLC | Limited Liability Company | 7091668 | Delaware |

36

| Legal Name | Entity Type | Organizational ID Number | Jurisdiction of Organization |
|---|---|---|---|
| SF Berkshire, LLC | Limited Liability Company | 4544060 | Delaware |
| SF Boynton, LLC | Limited Liability Company | 4544051 | Delaware |
| SF Brevard, LLC | Limited Liability Company | 5586592 | Delaware |
| SF Carnegie, LLC | Limited Liability Company | 4544057 | Delaware |
| SF Fountainhead, LLC | Limited Liability Company | 4544025 | Delaware |
| SF Glen Oaks, LLC | Limited Liability Company | 4544055 | Delaware |
| SF Kissimmee, LLC | Limited Liability Company | 4544048 | Delaware |
| SF Lake Placid ALF, LLC | Limited Liability Company | 5374667 | Delaware |
| SF Lake Placid, LLC | Limited Liability Company | 4544022 | Delaware |
| SF Oakbrook, LLC | Limited Liability Company | 4544046 | Delaware |
| SF Royal Manor, LLC | Limited Liability Company | 4544054 | Delaware |
| SF Salerno, LLC | Limited Liability Company | 4544045 | Delaware |
| SF Tampa, LLC | Limited Liability Company | 4544043 | Delaware |
| Brevard Oaks Center, LLC | Limited Liability Company | L14000169683 | Florida |

37

**ANNEX E**
**TO TERM SHEET**

## CERTAIN AFFIRMATIVE COVENANTS

The Loan Parties agree that until the DIP Facility is Paid in Full:

1. **Inspection**.  Upon reasonable request of the DIP Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the DIP Agent to audit, review, make extracts from or copy, at the Loan Parties' expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss the Loan Parties' affairs with any of their directors, officers, employees, attorneys, or accountants.  The Loan Parties will permit the DIP Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any DIP Collateral or any other property of the Loan Parties at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the DIP Agent (or any agent or representative thereof) that is prohibited by applicable law, subject to confidentiality restrictions or is subject to attorney-client or similar privilege or constitutes attorney work product.

2. **Compliance with Laws**.  (i) The Loan Parties will comply, in all materials respects, with all requirements of applicable law, except as executed by, or otherwise prohibited by, the provisions of the Bankruptcy Code or as a result of the Chapter 11 Cases and (ii) the Loan Parties will obtain, maintain in effect and comply, in all materials respects, with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the DIP Budget or the Interim DIP Order.

3. **Taxes**.  The Loan Parties will pay or discharge, when due, (i) all material taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Loan Parties (including, without limitation, the DIP Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (a) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Loan Parties, (b) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this DIP Term Sheet, or (c) taxes allocable to the facilities operated by the Debtors for which the Debtors have agreed to pay under any master lease pertaining to such facilities or any sub-leases related thereto, including, without limitation, under the Lease or the Blue Mountain Master Leases and (ii) all federal, state and local taxes required to be withheld by it.

4. **Maintenance of Properties**.  Each the Loan Parties will keep and maintain the DIP Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the DIP Budget or the Interim DIP Order,.

5. **Insurance**.  The Loan Parties will maintain insurance with respect to the DIP Collateral, covering liabilities, losses or damages as are customarily are insured against by other Persons engaged in same or similar businesses and similarly situated and located.  All such policies of insurance shall be with financially sound and reputable insurance companies (including self-funded insurance programs and captive insurers) acceptable to Agent and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to DIP Agent.  All property insurance policies covering the Collateral are to be made payable to Agent for the benefit of DIP Agent and the DIP Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully

protect the Lenders' interest in the Collateral and to any payments to be made under such policies. If any Loan Party or any Subsidiary of any Loan Party fails to maintain such insurance, DIP Agent may arrange for such insurance, but at Borrowers' expense and without any responsibility on DIP Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, DIP Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the DIP Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

6. **Existence**. Each of the Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to, at all times preserve and keep in full force and effect such Person's valid existence and good standing in its jurisdiction of organization and, except as could not reasonably be expected to result in a Material Adverse Effect, good standing with respect to all other jurisdictions in which it is qualified to do business and any rights, franchises, permits, licenses, accreditations, authorizations, or other approvals material to their businesses.

7. **Cooperation with DIP Agent Financial Advisors**. The Loan Parties shall at all times provide reasonable access for, and reasonable cooperation with, any financial advisors to the DIP Agent.

8. **Milestones**. The Loan Parties shall take all actions necessary to cause each of the following to occur (the "Milestones"):

   a. no later than three (3) business days after the Petition Date, the Interim DIP Order approving the Term Sheet shall be entered by the Bankruptcy Court;

   b. on or before the entry of the Final DIP Order by the Bankruptcy Court, the Loan Parties, the DIP Agent and the DIP Lenders shall have executed (i) the DIP Note, consistent with the Documentation Principles, and (ii) any other Documentation reasonably requested by the DIP Agent at least two (2) business days prior to the Final Hearing;

   c. no later than thirty-five (35) days after the Petition Date, the Final Order approving the DIP Facility shall be entered by the Bankruptcy Court;

   d. no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered an order authorizing the Debtors' assumption of the RSA;

   e. no later than 90 days after the Petition Date (*provided that* the deadline may be extended by the Loan Parties by up to an additional thirty (30) days solely to comply with licensing requirements), (i) the Bankruptcy Court shall have entered an order rejecting the Blue Mountain Master Leases, and (ii) the Loan Parties shall have transitioned the properties subject to the Blue Mountain Master Leases;

   f. the Bankruptcy Court shall have entered the MOTA Order within thirty-five (35) days after the Petition Date; *provided that* the deadline to obtain entry of the MOTA Order may be extended by the Borrowers until the earlier of (i) an additional fifteen (15) days or (ii) December 1, 2021 if the Loan Parties are diligently pursuing the MOTA Order and the Loan Parties' failure to obtain the MOTA Order within the first thirty-five (35) Days after the Petition Date is primarily attributable to the Omega Entities (as defined in the RSA) or the New Operator(s); and

   g. No later than the first day of the first month following entry of the MOTA Order, the MOTA(s) shall have been consummated and gone into effect;

h.  No later than fifty (50) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement, solicitation procedures for the Plan (as defined in the RSA, and a deadline or bar date for filing of all prepetition claims;

i.  No later than 100 days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order (as defined in the RSA); and

j.  No later than 30 calendar days after the date that the Court entered the Confirmation Order, the Plan shall have been consummated.

9.  **Financial Reporting**.  The Loan Parties shall deliver (which delivery may be made by electronic communication (including email)) to the DIP Agent each of the reports and other items set forth on Exhibit A attached hereto no later than the times specified therein (or such later time as the Required Lenders may agree).  Upon reasonable request by the DIP Agent, the Loan Parties shall make their senior management and advisors available at reasonable times and upon reasonable notice to the DIP Agent and DIP Lenders to discuss the financial position, cash flows, variances, operations, sale process and general case status of the Loan Parties.

10.  **Transfer Assistance Obligations**.  The Loan Parties shall promptly satisfy the Transfer Assistance Obligations.

11.  **Operations**.  The Loan Parties shall:

a.  prior to effectiveness of the MOTA, maintain (i) operation of the business at the Leased Property, and (ii) billing and collections procedures and practices, in each case, in the ordinary course of business and consistent with historical practices; and

b.  at all times following effectiveness of the MOTA, comply with and perform their respective obligations under and in accordance with the MOTA.

12.  **Bankruptcy Pleadings**.  The Loan Parties shall cooperate in good faith with the DIP Lenders to address the DIP Lenders' comments with respect to any material pleadings, motions, applications, financial information or other material documents filed on behalf of any Debtor in the Chapter 11 Cases.  Any such material pleadings, motions, applications, financial information or other material documents shall (i) be consistent with the DIP Facility, including, without limitation, the DIP Budget, and (ii) in the case of the Debtors' "first-day" and "second-day" motions, be reasonably acceptable to the DIP Lenders.

13.  **Use of Proceeds**.  The proceeds of the DIP Facility will be used to fund the operational, employee, wind-down and other costs of the Loan Parties, including, without limitation, payments authorized to be made under "first day" or "second day" orders, post-MOTA transition and employee costs, and costs associated with providing shared services to New Operator or plan administrator post-transition, and, in each case, consistent with, subject to, and within the limitations contained in the DIP Budget (including Permitted Variances and Permitted Carrybacks/Carryforwards). Except as expressly set forth in the DIP Budget, proceeds of the DIP Facility will not be used to pay the costs and expenses (including professional fees) of administering the Chapter 11 Cases.

14.  **Compliance with Health Care Laws**. Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to:

a.  comply in all material respects with all applicable Health Care Laws.

b.  (i) obtain, maintain and preserve, and take all necessary action to timely renew, all material Health Care Permits (including, as applicable, Health Care Permits necessary for it to be eligible to receive

payment and compensation from and to participate in any Third-Party Payor Arrangements) which are necessary or useful in the proper conduct of its business; (ii) be and remain in material compliance with all requirements for participation in, and for licensure required to provide the goods or services that are reimbursable under, all Third-Party Payor Arrangements; (iii) cause all Persons providing professional health care services for or on behalf of any of Loan Parties or their Subsidiaries (either as an employee or independent contractor) to comply with all applicable Health Care Laws in the performance of their duties, and to maintain in full force and effect all professional licenses and other Health Care Permits required to perform such duties; and (iv) keep and maintain all records required to be maintained by any Governmental Authority or otherwise under any Health Care Law.

    c.    Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to, maintain a corporate and health care regulatory compliance program ("RCP") which addresses the requirements of Health Care Laws, including HIPAA and Other Privacy Laws, and includes at least the following components: (i) standards of conduct and procedures that describe compliance policies regarding laws with an emphasis on prevention of fraud and abuse; (ii) a specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including fraud and abuse laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including publicizing a reporting system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies including discipline of individuals responsible for the failure to detect violations of the RCP; and (vi) mechanisms to immediately respond to detected violations of the RCP. Loan Parties will, and will cause each of their Subsidiaries and the other Loan Parties to, modify such RCPs from time to time, as may be necessary to ensure continuing compliance with all applicable Health Care Laws. Upon request, the DIP Agent (and/or its consultants) shall be permitted to review such RCPs.

    d.    Provide to DIP Agent upon request, an accurate, complete and current list of all Third-Party Payor Arrangements with respect to the business of any of the Loan Parties.

15.  **Blue Mountain Master Leases**. The Loan Parties shall use commercially reasonable efforts to cause the rejection of the Blue Mountain Master Leases to be effective *nunc pro tunc* to the Petition Date.

41

<u>Exhibit A to Annex E</u>

Deliver (which delivery may be made by electronic communication (including email)) to the DIP Agent (for distribution by the DIP Agent to the DIP Lenders), each of the financial statements, reports, or other items set forth below at the following times in form reasonably satisfactory to the Required Lenders:

| | |
|---|---|
| on the Budget Testing Start Date and every Thursday of every other week ending thereafter: | (a)    a certificate which shall include such detail as is reasonably satisfactory to the Required Lenders (i) certifying that the Loan Parties are in compliance with the DIP Budget (including Permitted Variances and Permitted Carrybacks/Carryforwards) and (ii) certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and attaching thereto a report identifying any variances and/or any use of any Permitted Carrybacks/Carryforwards.<br><br>(b)    a revised proposed budget (it being understood that upon written approval of such proposed budget by the Required Lenders (and not before such written approval), in their sole discretion, such proposed budget shall become the DIP Budget) and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the Agent and DIP Lenders. |
| three (3) business days prior to any such filing or, where it is not practically possible to do so within such time, as soon as possible and in any event not less than one (1) business day prior to such filing: | (c)    copies of all material pleadings, motions, applications, financial information or other material documents filed on behalf of any Debtor in the Chapter 11 Cases. |
| promptly, but in any event within five (5) business days after Loan Parties have knowledge of any event or condition that constitutes a default or an Event of Default: | (d)    notice of such event or condition and a statement of the curative action that Loan Parties propose to take with respect thereto. |
| as soon as available, but in any event within 30 days after the end of each month during each of Parent's fiscal years | (e)    an unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of shareholder's equity of Parent and its Subsidiaries during such period and compared to the prior period and plan, together with a corresponding discussion and analysis of results from management, and<br><br>(f)    an unaudited combined and combining income statement of Borrowers containing facility level detail during such period and compared to the prior period and plan, and<br><br>(g)    a Compliance Certificate (as defined in the Prepetition Credit Agreement) along with,<br><br>        (i) the underlying calculations, including the calculations to arrive at Consolidated EBITDA (as defined in the Prepetition Credit |

42

| | |
|---|---|
| | Agreement), EBITDA (as defined in the Prepetition Credit Agreement), the Consolidated Fixed Charge Coverage Ratio EBITDA (as defined in the Prepetition Credit Agreement), the Fixed Charge Coverage Ratio EBITDA (as defined in the Prepetition Credit Agreement), and the Cash Velocity Ratio EBITDA (as defined in the Prepetition Credit Agreement);<br><br>(ii) to the extent applicable, a schedule regarding the outstanding balance (and remaining monthly payments) owing under any PL/GL settlement, any longterm payment agreement or tax settlement with any Governmental Authority or other long-term payment agreement, together with evidence of payment by Borrowers of all amounts owing thereunder for the most recently concluded month, and<br><br>(iii) a statistical report, including census, statistics, and such other information (including information relating to payor mix, skilled mix, quality mix, and average length of stay) as may be reasonably requested by Agent, and<br><br>(h) unaudited consolidated and consolidating balance sheet, income statement, statement of cash flow, and statement of shareholder's equity the Master Tenant Affiliates (as defined in the Prepetition Credit Agreement) during such period and compared to the prior period and plan, together with a corresponding discussion and analysis of results from management. |
| Promptly after the commencement thereof, but in any event within 5 Business Days after the service of process with respect thereto on Parent or any Borrower, | (i) notice of all actions, suits, or proceedings brought by or against any of Borrowers, their Subsidiaries or the other Loan Parties before any Governmental Authority which reasonably could be expected to result in a Material Adverse Effect including, without limitation, an condemnation proceeding involving any Health Care Facility. |
| | |
| Promptly after the commencement or occurrence thereof, but in event within 10 Business Days thereafter, any of the following: | (j) [reserved].<br><br>(k) notice that any of Borrowers, their Subsidiaries or the other Loan Parties, or any owner, officer, manager, managing employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in Borrowers, their Subsidiaries or the other Loan Parties: (A) is subject to any Health Care Proceeding or other investigations or audits (including cost reports or similar audits regarding the valuation of receivables payments) conducted by any federal, state or county Governmental Authority or its agents or designees, except in accordance with applicable settlement or appeals procedures that are timely and diligently pursued with respect to which the amount at issue (for any single investigation or audit) does not |

43

exceed $250,000, (B) has had a civil monetary penalty assessed pursuant to 42 U.S.C. § 1320a-7a or is the subject of a proceeding seeking to assess such penalty; (C) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b) or is the subject of a proceeding seeking to assess such penalty; (D) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; or (E) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or in any qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.;

(l)      notice of (A) any material reduction to any rate for reimbursement under any Third Party Payor Arrangement, or (B) any changes in any Health Care Law (including the adoption of a new Health Care Law) that could, in the aggregate, have a Material Adverse Effect;

(m)      notice of (A) any claim to recover any alleged overpayments with respect to any Accounts (as defined in the Prepetition Credit Agreement) in excess of $250,000, (B) any material modification to the billing systems or practices of Borrowers, their Subsidiaries or the other Loan Parties as in effect as of the Petition Date, (C) any validation review, program integrity review or any material reimbursement audits related to Borrowers, their Subsidiaries or the other Loan Parties in connection with any Third Party Payor Arrangement, or (D) the disclosure by any Borrower to the Office of the Inspector General of the United States Department of Health and Human Services, or any Third Party Payor program (including to any intermediary, carrier or contractor of such program), of an actual or potential overpayment involving the submission of claims in an amount greater than $250,000;

(n)      the pending imposition of any material fine or penalty by any Governmental Authority under any Health Care Law against Borrowers, their Subsidiaries or the other Loan Parties;

(o)      any pending revocation, suspension, termination, probation, restriction, limitation, denial, or non-renewal with respect to any Health Care Permit or Third Party Payor Arrangement, except for any such non-renewal at the election of Borrowers, their Subsidiaries or the other Loan Parties as would not, in the aggregate, have a Material Adverse Effect; provided that, for the avoidance of doubt, the inclusion by a Governmental Authority or Third Party Payor of language in a notice letter advising Borrowers, their Subsidiaries or the other Loan Parties that failure to comply with the terms of such letter could result in such Governmental Authority or Third Party Payor taking steps to revoke, suspend, terminate, impose probation, restrict, limit, deny or not renew such Person's Health Care Permit or Third Party Payor Arrangement shall not automatically be deemed a "pending" action for purposes of this clause (5);

44

| | (p)    any non-routine and material inspection of any facility of Borrowers, their Subsidiaries or the other Loan Parties by any Governmental Authority; |
|---|---|
| | (q)    notice of the occurrence of any reportable event as defined in any corporate integrity agreement, corporate compliance agreement or deferred prosecution agreement pursuant to which any of the Borrowers, their Subsidiaries or the other Loan Parties has to make a submission to any Governmental Authority or other Person under the terms of such agreement; |
| | (r)    any threatened or actual ban on admissions by from any Governmental Authority to all or any substantial portion of any Health Care Facility; |
| | (s)    upon request, copies of material Health Care Permits required in connection with the operation of Borrower's business; |
| | (t)    copies of (a) any surveys (i) that are conducted following an "immediate jeopardy" complaint or (ii) with respect to which one or more condition-level deficiencies are found, (b) all plans of correction submitted with respect to such surveys described in clause (a), and (c) upon request, copies of any other surveys and plans of correction related thereto; |
| | (u)    notice of the occurrence of any New Ark Event of Default; |
| | (v)    notices and copies of any subpoenas from the Office of the Inspector General or other Governmental Authority; |
| | (w)    notice of any material default under any Lease of a Health Care Facility, notice from the landlord of any Health Care Facility that such landlord is exercising its termination rights under the Lease applicable thereto or has elected not to renew the Lease applicable thereto, or notice given by any of the Borrowers, their Subsidiaries or the other Loan Parties to such landlord that such Borrower, Subsidiary or other Loan Party is not electing to renew (or is otherwise terminating) the Lease applicable thereto; |
| | (x)    notice of any changes in any director of reimbursement or similar senior executive with respect to the billing and collections personnel of any of the Borrowers, their Subsidiaries or the other Loan Parties; and |
| | (y)    notice of any comprehensive system changes updating the charge master with new billing rates that would affect the Expected Net Value (as defined in the Prepetition Credit Agreement) of Eligible Accounts (as defined in the Prepetition Credit Agreement) of any Borrower. |
| Monthly (no later than the fifteenth day of each month) | (z)    an executed Borrowing Base Certificate (as defined in the Prepetition Credit Agreement) |

| | |
|---|---|
| | (aa)    a detailed aging, by total, of Borrowers' Accounts, together with a reconciliation (if applicable) and supporting documentation for any reconciling items noted (delivered electronically in an acceptable format, if Borrowers have implemented electronic reporting), in a format consistent with past practices,<br><br>(bb)    a monthly Account roll-forward, in a format consistent with past practices, tied to the beginning and ending account receivable balances of Borrowers' general ledger,<br><br>(cc)    any action, suit, proceeding, dispute, set-off, deduction, defense or counterclaim that is asserted by any obligor in an amount in excess of $250,000, and<br><br>(dd)    a reconciliation of Accounts and trade accounts payable Borrowers' general ledger accounts to its monthly financial statements including any book reserves related to each category. |
| Promptly upon the reasonable request of the Required Lenders: | (ee)    any other information relating to the business, financial, legal or corporate affairs of the Loan Parties. |

46

**ANNEX F**
**TO TERM SHEET**

**CERTAIN NEGATIVE COVENANTS**

Until the DIP Facility is Paid in Full, the Loan Parties shall not, without the consent of the Required Lenders:

1. **Restrictions on Fundamental Changes**.  Directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or equity interests of, or otherwise combine with or acquire, any Person, other than, in each case, any such action approved by an order of the Bankruptcy Court in form and substance satisfactory to the Required Lenders.

2. **Permitted Indebtedness**.  Create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Interim DIP Order, Permitted Indebtedness.

3. **Permitted Liens**.  Create, incur, assume or permit to exist any lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Liens.

4. **Permitted Restricted Payments**.  Make any Restricted Payment, except (x) dividends and distributions by Subsidiaries of the Loan Parties paid to the Loan Parties or other wholly-owned Subsidiaries of the Loan Parties and (y) the Prepetition Loan Paydown.

5. **Guarantees of Obligations**.  Assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Loan Parties or any of their Subsidiaries), except the endorsement of negotiable instruments by Loan Parties and their Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

6. **Permitted Asset Sales**.  Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (i) the sales or dispositions of assets in the ordinary course of business, (ii) the sale or disposition of obsolete equipment, (iii) the sale of other property on terms acceptable to the Required Lenders, and (iv) the transfer, sale or disposition of assets approved by an order of the Bankruptcy Court in form and substance satisfactory to the Required Lenders.

7. **Modifications to Material Documents; Payments of Obligations**.  Consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to (i) the Interim DIP Order or (ii) the New Ark Funding or the Prepetition Obligations except, in the case of this clause (ii), where such amendment, supplement or other modification is not materially adverse to the interests of the DIP Lenders.  Except for (A) payments authorized to be made under "first day" or "second day" orders entered by the Bankruptcy Court and identified in the DIP Budget, subject to Permitted Variances and Permitted Carrybacks/Carryforwards, and (B) payments permitted by the Interim DIP Order and the DIP Budget, subject to Permitted Variances and Permitted Carrybacks/Carryforwards, no Loan Party shall make any payment in respect of, or repurchase, redeem, retire or defease any, Indebtedness arising prior to the Petition Date.

8. **Permitted Investments**.  Make any investment in, or make loans or advances of money to, any Person (other than another Loan Party), through the direct or indirect lending of money, holding of securities or otherwise.

9. **Change in Fiscal Year**.  Change their fiscal year.

47

10. **Affiliate Transactions**.  Make any other payments of prepetition claims to Affiliates (other than payments to New Ark and the Prepetition Lenders made in accordance with the New Ark Funding Documentation) nor shall the Loan Parties make any other payments of postpetition claims to Affiliates other than as set forth in the Budgets.

11. **Financial Covenant**.  As of the last day of each Reporting Period commencing with the Budget Testing Start Date, permit the aggregate amount of operating cash disbursements payable to Persons other than the DIP Lenders made by the Debtors to exceed 110% of the aggregate amount of operating cash disbursements for such Reporting Period as set forth in the Approved DIP Budget (such variance that does not breach this covenant, a "Permitted Variance").  Notwithstanding the foregoing, the Borrower may (a) carry-forward any disbursement amounts that are available and unused during a prior Reporting Period to any of the following subsequent Reporting Periods (a "Permitted Carryforward") and (b) may carry-backwards up to 50% of any amounts available to be used in up to two subsequent Reporting Periods to be used in the Reporting Period then in effect (a "Permitted Carryback" and, together with Permitted Carryforwards, "Permitted Carrybacks/Carryforwards") (which Permitted Carrybacks will not be available in any subsequent Reporting Periods).

WEIL:\98150122\31\66205.0003

The events of default under the New Ark Funding (each, a "**New Ark Event of Default**," and collectively, the "**New Ark Events of Default**") shall be limited to:

1. failure to make any payment to the New Ark or the Prepetition Lenders when due;

2. failure to repay the New Ark Operating Advance to the Prepetition Loan Account by no later than December 3, 2021.

3. any breach or failure to comply with the terms of the Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, as applicable, to the extent such breach or failure to comply is not cured within five business days of the earlier to occur of the Borrowers' knowledge of such breach or failure or written notice from New Ark;

4. failure to comply with the Milestones;

5. prior to entry of the MOTA Order, the occurrence of an Event of Default under the DIP Facility that results in any limitation, suspension or termination of funding thereunder;

6. any Loan Party filing of a motion to convert any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the commencement by any of the Debtors of any winding up or liquidation proceeding (other than the Chapter 11 Cases) under any other applicable law;

7. the appointment of a receiver, receiver and manager, interim receiver, or similar official over any substantial portion of the Prepetition Lenders' collateral;

8. the dismissal of the Chapter 11 Cases;

9. the appointment in the Chapter 11 Cases of a chapter 11 trustee or an examiner with expanded powers;

10. any Loan Party shall (A) contest or dispute the validity or enforceability of any New Ark Funding Documentation or any obligation owed under any New Ark Funding Documentation in writing or deny in writing that it has any liability thereunder, (B) contest or dispute the validity or perfection of the Prepetition Credit Agreement, or the liens and security interests securing the claims under the Prepetition Credit Agreement in writing or (C) pursue, negotiate, solicit interest in, or agree to any sale or liquidation of the Debtors' assets or any restructuring, reorganization, refinancing, or other transaction other than on the terms provided for in the RSA;

11. the grant of any super priority administrative expense claim or any lien or charge which is pari passu with or senior to those of New Ark and the Prepetition Lenders (other than as permitted by this Term Sheet and/or the New Ark Funding Documentation);

12. cessation of liens or adequate protection claims granted with respect to the New Ark Funding to be valid, perfected and enforceable in all respects with the priority described herein;

13. the entry of the Final DIP Order shall not have occurred within thirty-five (35) days after entry of the Interim DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any substantive modification or amendment, without the prior written consent of New Ark; and

14. the incurrence by any Loan Party of postpetition administrative or priority expenses individually or in the aggregate in excess of $500,000, the payment for which is not permitted under the Budgets (subject to Permitted Variances and Permitted Carrybacks/Carryforwards).