**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>GULF COAST HEALTH CARE, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 21-11336 (KBO)<br><br>Jointly Administered<br><br>Obj. Deadline: 11/5/21 at 4:00 p.m. (ET)<br>Hrg. Date: 11/12/21 at 10:00 a.m. (ET) |

**MOTION OF DEBTORS FOR ENTRY OF ORDER APPROVING**
**ASSUMPTION OF RESTRUCTURING SUPPORT AGREEMENT**

Gulf Coast Health Care, LLC ("**Gulf Coast**") and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby move (the "**Motion**") for entry of an order (the "**Proposed Order**"), substantially in the form attached hereto as **Exhibit A**, approving the Debtors' assumption of the Restructuring Support Agreement, dated October 14, 2021 (as may be amended, modified, or supplemented, the "**RSA**"),[2] by and among the Debtors, OHI Asset Funding (DE), LLC (the "**DIP Lender**"), certain affiliates of the DIP Lender (the "**Omega Landlords**" and, together with the DIP Lender, the "**Omega Entities**"), New Ark Capital, LLC ("**New Ark**"), certain direct and indirect equity holders of the Debtors (the "**Equity Sponsors**"), and certain affiliated entities that provide services to the Debtors (the "**Service Providers**" and, collectively with the Debtors, the Omega Entities, New Ark, and the Equity Sponsors, the "**RSA Parties**"). In support thereof, the

---

[1] The last four digits of Gulf Coast Health Care, LLC's federal tax identification number are 9281. There are 62 Debtors in these chapter 11 cases, which cases are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/GulfCoastHealthCare. The location of Gulf Coast Health Care, LLC's corporate headquarters and the Debtors' service address is 40 South Palafox Place, Suite 400, Pensacola, FL 32502.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the RSA. A copy of the RSA is attached as Exhibit 1 to the Proposed Order.

Debtors rely upon the *Declaration of M. Benjamin Jones in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 16] (the "**First Day Declaration**"). In further support of the Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.  In light of the ongoing COVID-19 pandemic, the Debtors have faced substantial financial challenges including decreased census and occupancy, increased operating expenses, labor pressures, and uncertainty regarding the extent and duration of COVID-19 and potential variants. As a result, in the weeks and months prior to the Petition Date, the Debtors and their restructuring advisors explored various in-court and out-of-court strategic options to seek to address these financial challenges in an effort to ensure the health, safety, and well-being of their residents.

2.  Recognizing that the Debtors do not own the underlying real property at the 28 skilled nursing and assisted living centers operated by certain of the Debtors, but rather hold leasehold interests in the Facilities, the Debtors and their advisors analyzed financial and operational data to formulate various proposed courses of action with respect to the Facilities. In light of the substantial operating shortfalls associated with the Facilities even *before* payment of rent, the Debtors determined that their master operating leases with (i) the Omega Landlords and (ii) certain affiliates and subsidiaries of Eagle Arc Partners LLC (f/k/a Blue Mountain Holdings) ("**Blue Mountain**" and, collectively, the "**Blue Mountain Landlords**") were not economically viable. This determination was buttressed by the fact that an assumption or assumption and assignment of the Omega Master Lease would require a cure payment in excess of $13 million (without taking into consideration the prepetition acceleration of rent by the Omega Landlords).

3.  In the face of these challenges, the Debtors and their advisors critically compared scenarios where the Debtors would continue to operate all or some of the Facilities with

scenarios where the Debtors would transfer operations of the Facilities to new operators. Following months of financial and operational analysis with their restructuring advisors, as well as, following the Omega Landlords' acceleration of rent, an accelerated period of intense, confidential restructuring negotiations with certain of the Debtors' key stakeholders, including the Omega Landlords and the Debtors' senior secured lender, New Ark—which is an affiliated entity with some common indirect beneficial ownership with the Debtors—the Debtors determined that the most appropriate course of action would be to transfer the operations of all of the Debtors' Facilities to new operators and subsequently wind down the Debtors' operations.

4. The culmination of these negotiations is memorialized in the RSA, which permits the Debtors to proceed with the transition and liquidation process with the support of their key stakeholders. Importantly, given the Debtors' ongoing and substantial operating losses and the fragile nature of the Debtors' residents, the Debtors believe they have limited time to execute the transactions contemplated by the RSA if they are to be successful. These concerns are even more acute in the face of the evolving nature of the COVID-19 pandemic, the recent Delta variant outbreak, and the extremely tight and competitive labor market, among other factors.

## JURISDICTION AND VENUE

5. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these cases and the Motion is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The legal predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

7. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court would lack Article III jurisdiction to enter such final judgment or order absent consent of the parties.

## RELIEF REQUESTED

8. By the Motion, the Debtors request that the Court enter the Proposed Order approving the Debtors' assumption of the RSA and authorizing the Debtors to perform all obligations thereunder. As set forth more fully below, the Debtors believe that assuming the RSA is in the best interests of their estates because, in the Debtors' view, the Restructuring Transactions memorialized in the RSA represent the only option available to transition the Omega facilities in a manner that safeguards the health and safety of the Debtors' residents. The RSA also provides a means for a controlled winddown of the Debtors' operations, and a mechanism to provide recoveries to unsecured creditors—stakeholders that would not be entitled to any recovery absent the agreements among the RSA Parties set forth in the RSA. The Debtors also seek this relief pursuant to Section 6(a)(iii) of the RSA, as failure to pursue the assumption of the RSA would permit the Omega Entities and New Ark to terminate the RSA, withdraw their support for the Plan and the Restructuring Transactions, and cease to provide the DIP Financing and the New Ark Financing, any of which would put the success of the Debtors' restructuring efforts—and the safety of the Debtors' residents—in serious jeopardy.

**BACKGROUND**

**I.     The Chapter 11 Cases**

9.     On October 14, 2021 (the "**Petition Date**"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Chapter 11 Cases are being jointly administered.

10.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the Chapter 11 Cases.

11.    To date, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") has not appointed an official committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed.

12.    Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of the Chapter 11 Cases, is set forth in the First Day Declaration.

13.    On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 14] (the "**DIP Motion**"). On October 18, 2021, the Court approved the DIP Motion on an interim basis [Docket No. 72] (the "**Interim DIP Order**").[3]

---

[3]    As reflected in the DIP Term Sheet attached as Exhibit B to the *Certification of Counsel Regarding Revised Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 70], certain revisions were made to the DIP Term Sheet by the RSA Parties following execution of the RSA. The revised version of the DIP Term Sheet is attached as Exhibit B to the executed version of the RSA attached to the Proposed Order as Exhibit 1.

**II.     The Restructuring Support Agreement**

14.     The Debtors are licensed operators of 28 skilled nursing facilities (collectively, the "**Facilities**" and each, a "**Facility**") comprising nearly 3,350 licensed beds across Florida, Georgia, and Mississippi.  The Debtors are leaders among skilled nursing facility operators in the Southeastern United States and provide short-term rehabilitation, comprehensive post-acute skilled care, long-term care, assisted living, and therapy services in each of the Facilities, earning a reputation for excellence in resident care.  The Debtors lease 24 Facilities (the "**Omega Facilities**") from the Omega Landlords and four Facilities (the "**Blue Mountain Facilities**") from the Blue Mountain Landlords.

15.     As discussed in the First Day Declaration, over the last year and a half, the Debtors have faced significant fiscal challenges emanating from the unprecedented and still ongoing COVID-19 pandemic, as they grappled with caring for their residents and maintaining sufficient operational liquidity amidst constantly changing conditions.  Among other things, the Debtors, as a result of COVID-19, have experienced decreased resident occupancy levels, crippling staffing and employee retention issues, and increased operating expenses associated with personal protective equipment, increased labor costs, and other associated costs, all of which have impacted the healthcare sector generally and operators of skilled nursing facilities in particular.

16.     As discussed above and in the First Day Declaration, in the weeks leading up to the Petition Date, the Debtors, the Omega Landlords, and New Ark engaged in arm's-length and good faith negotiations regarding certain restructuring transactions relating to the Debtors' capital structure and debt obligations, including the Debtors' obligations to the Omega Landlords and New Ark.  After considering the limited likelihood of success of any other alternatives, the

Debtors determined that the transactions contemplated by the RSA are in the best interests of the Debtors and their creditors. Thus, the assumption of the RSA will secure the foundation for the Debtors' consensual restructuring, ensure that the terms of such restructuring memorialized in the RSA are enforceable against all signatories thereto, and provide the Debtors with the benefits they bargained for in the weeks leading up to the Petition Date, including the ability to maximize recoveries for the Debtors' creditors through an efficient chapter 11 process.

17. The RSA contemplates the consummation of certain transactions that, subject to Court approval, will facilitate, among other things, (i) the continued operation of the Facilities through the Debtors' use of cash collateral, the proposed DIP Financing, and the proposed New Ark Financing; (ii) the transition of the management and operations of the Omega Facilities set forth on Exhibit A of the RSA to one or more new operators (the "**New Operator(s)**") designated by the Omega Landlords on the terms set forth in one or more management and operations transfer agreements (the "**MOTA(s)**") to be entered into between the Debtors and the New Operator(s); (iii) the transfer of the applicable Medicare provider agreements to New Operator(s); and (iv) the confirmation of a chapter 11 plan and associated wind-down of the Debtors' business (collectively, the "**Restructuring Transactions**").[4]

18. The Debtors believe that the Restructuring Transactions represent the best and most value-maximizing path for the Debtors, their estates, and all stakeholders. Under the RSA, the RSA Parties agreed to support and take all reasonable actions necessary to facilitate the implementation and consummation of the Restructuring Transactions in accordance with the terms of the RSA in a timely manner. Thus, the RSA ensures key stakeholder support for the

---

[4] Through the Motion, the Debtors seek approval of their assumption of the RSA, but not approval of the underlying transactions contemplated by the Restructuring Transactions. Further, notwithstanding assumption of the RSA, confirmation and consummation of the Plan will remain subject to all requirements of law, including satisfaction of all of the requirements set forth in Bankruptcy Code section 1129.

7

Restructuring Transactions, which will permit the Debtors to efficiently transition the Facilities to new operators, wind down their operations, and maximize recoveries for their creditors.  The Debtors further believe that the assumption of the RSA will provide important structure and stability to the Chapter 11 Cases and a framework for the confirmation and consummation of the Plan.  Pursuing the Restructuring Transactions contemplated in the RSA allows the Debtors to avoid a "free fall" into bankruptcy, ensures that the Debtors will be able to obtain the postpetition financing necessary to finance their operational and administrative needs during the Chapter 11 Cases, and enables the Debtors prioritize the health and safety of their residents throughout the Facility transition process.

19. Importantly, the RSA contains a "fiduciary out" provision, preserving the Debtors' flexibility to pursue an alternative value-maximizing transaction (an "**Alternative Transaction**"), should one arise.  *See* RSA, at § 8 ("[U]ntil the entry of the Confirmation Order, nothing in this Agreement shall require the Company or any director, manager, or officer of the Company (in such person's capacity as a director, manager, or officer) to take any action or to refrain from taking any action, to the extent that doing so would be inconsistent with its fiduciary obligations under applicable law . . .").  This provision ensures that, while the Debtors are contractually bound to comply with the RSA, the Debtors nonetheless retain the right to pursue an alternative restructuring path in compliance with their fiduciary duties.

## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**I.     Assumption of the RSA Constitutes a Sound Exercise of the Debtors' Business Judgment and Should be Approved.**

20. By the Motion, the Debtors seek entry of the Proposed Order pursuant to Bankruptcy Code section 365(a) and Bankruptcy Rule 6006, (a) authorizing the Debtors to assume the RSA; and (b) authorizing the Debtors to perform the transactions contemplated

thereunder. As set forth more fully below, the Debtors believe that assuming the RSA is in the best interests of the estates.

21. Bankruptcy Code section 365(a) provides that a debtor-in-possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365 allows a debtor-in-possession to maximize the value of its estate by assuming executory contracts or unexpired leases that benefit the estate and by rejecting those that do not. *See, e.g.*, *Cinicola v. Scharffenberger*, 248 F.3d 110 (3d Cir. 2001); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 117 (Bankr. D. Del. 2001). Courts reviewing a debtor's decision to assume or reject an executory contract or unexpired lease apply a business judgment standard. *See In re Caribbean Petroleum Corp.*, 444 B.R. 263, 268 (Bankr. D. Del. 2010) ("Courts normally leave the decision to reject a contract to the debtor's sound business judgment."); *In re Armstrong World Indus.*, 348 B.R. 136, 162 (D. Del. 2006) (explaining that courts defer to a debtor's business judgment to reject a contract under section 365(a)); *NLRB v. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984) (recognizing courts' use of the business judgment standard in evaluating whether rejection of executory contracts or leases is appropriate).

22. Indeed, debtors are allowed considerable discretion in determining whether to assume or reject an executory contract. *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim or caprice"). Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville*

*Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also Computer Sales Int'l, Inc. v. Fed. Mogul (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (Bankr. D. Del. 2003) (explaining that under the business judgment standard, a court should defer to debtor's contract rejection, "unless that decision is the product of bad faith or a gross abuse of discretion"). Rather, there is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Gantler v. Stephens*, 965 A.2d 695, 705–06 (Del. 2009); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) (holding that "the debtor can reasonably take . . . a business risk if in its sound business judgment, it is worth the risk"). Further, the "business judgment" standard merely requires the debtor to establish that the requested assumption will benefit the estate. *See In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) ("Section 365 enables the [debtor] to maximize the value of the debtor's estate by assuming executory contracts and unexpired leases that benefit the estate and rejecting those that do not").

23.  As courts have clarified, the business judgment standard "embodies the deference that is accorded to managerial decisions of a board of directors." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 928 (Del. 2003). Accordingly, so long as a debtor exercises "reasonable" business judgment, a court should approve the proposed assumption or rejection. *See, e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Grp. of Inst. Inv'rs v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 550 (1943); *In re Mkt. Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (the "resolution of [the] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court"); *Sharon Steel Corp. v. Nat'l Fuel Gas*

10

*Distrib. Corp.* 872 F.2d 36, 39–40 (3d Cir. 1989); *Glenstone Lodge, Inc. v. Buckhead Am. Corp. (In re Buckhead Am. Corp.)*, 180 B.R. 83, 88 (D. Del. 1995).

24. The Debtors' assumption of the RSA is clearly within the Debtors' reasonable business judgment. The RSA is integral to the Debtors' restructuring efforts, as absent the RSA, the Debtors would not have sufficient funding to support their operations, the RSA Parties could withdraw their support for the Plan, and the Debtors could be without any viable restructuring strategies other than a costly and disorderly liquidation process, which would put the health and safety of the Debtors' residents at risk. The Restructuring Transactions contemplated by the RSA position the Debtors to seamlessly transition the operations of the Facilities to one or more new operators and subsequently wind down the Debtors' operations with the cooperation and support of their key stakeholders. In doing so, the RSA Parties are not only agreeing, under the terms set forth in the RSA, to support the transactions by providing substantial economic and other support in the process, but they also are agreeing to significant and valuable claim waivers and redistribution of proceeds in a manner that ultimately benefits general unsecured creditors.

25. Moreover, the RSA is the product of extensive, good-faith, arms'-length negotiations between and among the RSA Parties, which were each represented by sophisticated legal counsel. Without the RSA and the Restructuring Transactions contemplated therein, the Debtors' restructuring efforts would be at risk, jeopardizing the future operations of the Facilities and potentially compromising the health and safety of thousands of at-risk residents. Based on the foregoing, the Debtors submit that they have exercised their sound business judgment in deciding to assume the RSA. Accordingly, the Debtors respectfully request that the Court approve the Debtors' assumption of the RSA.

26.     Courts in this District have regularly granted the same or similar relief to other chapter 11 debtors.  *See, e.g.*, *NinePoint Medical, Inc.*, Case No. 20-12618 (KBO) (Bankr. D. Del. Nov. 19, 2020) (approving debtors' assumption of restructuring support agreement); *In re Emergent Capital, Inc.*, Case No. 20-12602 (BLS) (Bankr. D. Del. Nov. 12, 2020) (same); *In re YogaWorks, Inc.*, Case No. 20-12599 (KBO) (Bankr. D. Del Nov. 9, 2020) (same); *In re Prysm, Inc.*, Case No. 20-11924 (JTD) (Bankr. D. Del. Sept. 14, 2020) (same); *In re Melinta Therapeutics, Inc.*, Case No. 19-12748 (LSS) (Bankr. D. Del. Mar. 18, 2020) (same).

**II.     The Motion Does Not Request Approval of the Terms of the Plan Itself.**

27.     The sole question before the Court is whether assumption of the RSA pursuant to Bankruptcy Code section 365 is a valid exercise of the Debtors' business judgment.  Assumption of the RSA is not equivalent to confirmation of a plan.  *See In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014); *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 467–68 (Bankr. S.D.N.Y. 2014).  Confirmation issues can and will be reserved for the confirmation hearing.  Parties-in-interest may object to the Plan on any number of grounds, irrespective of the Debtors' assumption of the RSA.  *See In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014).

**NOTICE**

28.     The Debtors will provide notice of the Motion to: (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the Securities and Exchange Commission; (d) the United States Attorney for the District of Delaware; (e) the Centers for Medicare & Medicaid Services; (f) the parties included on the Debtors' consolidated list of their 40 largest unsecured creditors; (g) counsel for the Omega Entities; (h) counsel for New Ark Capital, LLC; (i) counsel for Barrow Street Capital LLC and its affiliates; (j) counsel for Eagle Arc Partners LLC (f/k/a BM

Eagle Holdings); and (k) all parties entitled to notice pursuant to Local Rule 2002-1(b). The Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

29. No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: Wilmington, Delaware<br>October 22, 2021 | **MCDERMOTT WILL & EMERY LLP**<br><br>*/s/ David R. Hurst*<br>David R. Hurst (I.D. No. 3743)<br>1007 North Orange Street, 10th Floor<br>Wilmington, Delaware 19801<br>Telephone:  (302) 485-3900<br>Facsimile:  (302) 351-8711<br>Email:  dhurst@mwe.com<br><br>- and -<br><br>Daniel M. Simon (admitted *pro hac vice*)<br>Emily C. Keil (admitted *pro hac vice*)<br>444 West Lake Street, Suite 4000<br>Chicago, IL 60606<br>Telephone:  (312) 372-2000<br>Facsimile:  (312) 984-7700<br>Email:  dmsimon@mwe.com<br>            ekeil@mwe.com<br><br>*Proposed Counsel for Debtors and Debtors-in-Possession* |